1   Jason Flanders (CA Bar No. 238007)
    Aqua Terra Aeris Law Group
2   4030 Martin Luther King Jr. Way
    Oakland, CA 94609
3   Ph: (916) 202-3018
    jrf@atalawgroup.com
4
    John R. Mellgren, *applicant for admission pro hac vice*
5   Oregon Bar No. 114620
    Western Environmental Law Center
6   120 Shelton McMurphey Blvd., Ste. 340
    Eugene, OR 97401
7   Ph: 541-359-0090
    mellgren@westernlaw.org
8
    Kelly E. Nokes, *applicant for admission pro hac vice*
9   Colorado Bar No. 51877
    Western Environmental Law Center
10  P.O. Box 218
    Buena Vista, Colorado 81211
11  Ph: 575-613-8051
    nokes@westernlaw.org
12
    *Counsel for Plaintiffs*
13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, a non-profit organization; WESTERN WATERSHEDS PROJECT, a non-profit organization; CASCADIA WILDLANDS, a non-profit organization; ENVIRONMENTAL PROTECTION INFORMATION CENTER, a non-profit organization; KLAMATH FOREST ALLIANCE, a non-profit organization; KLAMATH-SISKIYOU WILDLANDS CENTER, a non-profit organization; THE LANDS COUNCIL, a non-profit organization; and WILDLANDS NETWORK, a non-profit organization, <br><br> Plaintiffs, | No. 3:21-cv-00349 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1   | COMPLAINT

vs.

DAVID BERNHARDT, as Secretary of the
United States Department of the Interior; the
UNITED STATES DEPARTMENT OF THE
INTERIOR, a federal department; the
UNITED STATES FISH AND WILDLIFE
SERVICE, a federal agency; and AURELIA
SKIPWORTH, as Director of the United States
Fish and Wildlife Service,

Federal Defendants.

## INTRODUCTION

1.      WildEarth Guardians, Western Watersheds Project, Cascadia Wildlands, the

Environmental Protection Information Center, Klamath Forest Alliance, Klamath-Siskiyou

Wildlands Center, The Lands Council, and Wildlands Network (collectively, "Plaintiffs"),

bring this civil action against the above-named Federal Defendants (collectively, the

"Service") under the citizen suit provision of the Endangered Species Act ("ESA"), 16

U.S.C. § 1540(g), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, for

violations of the ESA and APA.

2.      This case challenges the Service's decision to remove federal ESA protections from

gray wolves in the contiguous United States. The Service's decision was published in the

Federal Register on November 3, 2020 (85 Fed. Reg. 69,778) and took effect on January 3,

2021.

3.      The Service's 2020 final rule removing gray wolves throughout the contiguous United

States from the list of endangered and threatened wildlife — excepting the Mexican wolf (*C.

l. baileyi*) and red wolf (*C. rufus*) subspecies listings, as well as the already Congressionally-

delisted gray wolf population in the Northern Rocky Mountains distinct population segment ("DPS") — is premature, conflicts with the Service's responsibility to take a precautionary approach to wildlife management in accordance with the mandates and intent of the ESA, and blatantly contravenes prior court orders and rulings on the matter.

4.     The Service's rule relies on the premise that alleged recovery in one region (the Great Lakes) is sufficient to delist a species formerly distributed across the entire continent. The rule explains that despite the fact that gray wolves have yet to be restored to approximately 85 percent of the species' historic range — including in ecologically viable populations in the Pacific Northwest (or "West Coast states") and the Southern (or "Central") Rocky Mountains — wolves in the valuable, suitable habitats afforded by these regions simply do not matter to the yet-to-be-achieved recovery of the species overall.

5.     Plaintiffs – a coalition of conservation organizations dedicated to gray wolf conservation in the American West – are thus compelled to bring this civil action. The Service's 2020 rule removing gray wolves from the list of endangered and threatened wildlife is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA and APA.

**JURISDICTION**

6.     This Court has jurisdiction over this action under 28 U.S.C. § 1331, 16 U.S.C. § 1540(g), and 5 U.S.C. § 704.

7.     This Court has the authority to review the Service's actions or inactions complained of herein, and grant the relief requested, under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and the APA, 5 U.S.C. § 706.

8.      All requirements for judicial review required by the ESA are satisfied. Plaintiffs delivered a notice of intent to sue letter, as required by the ESA, via email on November 6, 2020. That same notice of intent to sue letter was also sent via FedEx, and received by Defendants on November 10 and 12, 2020. These letters notified each defendant of Plaintiffs' intent to file a civil action to rectify the legal violations described in the letter. A copy of Plaintiffs' notice letter is attached to this complaint as Exhibit 1. More than sixty-days have elapsed since all defendants received Plaintiffs' notice of intent to sue for violations of the ESA and APA when removing the gray wolf in the contiguous United States from the list of endangered and threatened wildlife.

9.      All requirements for judicial review required by the APA are satisfied. Plaintiffs exhausted their administrative remedies related to the final rule challenged by this lawsuit. Plaintiffs submitted timely comments to the Service relating to its proposal to remove gray wolves in the contiguous United States from the list of endangered and threatened wildlife.

10.     The relief sought is authorized by 28 U.S.C. §§ 2201 (Declaratory Judgment), 28 U.S.C. § 2202 (Injunctive Relief), 16 U.S.C. § 1540 (ESA), and 5 U.S.C. § 706 (APA).

## VENUE

11.     Venue is proper in this Court under 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e). Federal Defendant U.S. Fish and Wildlife Service maintains an office within this District. Federal Defendant U.S. Department of the Interior maintains an office within this District. At least one Plaintiff maintains an office within this District. A significant portion of the events or omissions giving rise to these claims occurred within this District.

**INTRADISTRICT ASSIGNMENT**

12.     Assignment to the San Francisco, Oakland, or Eureka Divisions under Civil L.R. 3-2(c) is appropriate because: (1) multiple plaintiffs and their members are located in counties within those districts; (2) federal defendants U.S. Fish and Wildlife Service and U.S. Department of the Interior maintain offices in San Francisco, Oakland, and Arcata; and (3) the consequences of the final gray wolf delisting rule challenged in this litigation will occur, in part, within the lands covered by the San Francisco, Oakland, and Eureka Divisions.

**STANDING**

13.     Plaintiffs satisfy the minimum requirements for Article III standing to pursue this civil action. Plaintiffs – including their members, supporters, and staff – have suffered and continue to suffer injuries to their interests in gray wolves, gray wolf habitat, and pursuing their interests in areas occupied by gray wolves caused by the Service's decision to remove gray wolves in the contiguous United States from the list of endangered and threatened wildlife. This Court can redress these injuries by granting the relief requested. There is a present and actual controversy between the parties.

**PARTIES**

14.     Plaintiff, WILDEARTH GUARDIANS ("GUARDIANS"), is a non-profit organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and the health of the American West. Guardians is specifically committed to ensuring the survival and recovery of the gray wolf throughout its historical range. Guardians has approximately 235,000 active members and supporters across the American West, including many who reside in California, Oregon, Washington, Colorado, Utah, New Mexico, and

Idaho. Guardians brings this action on behalf of itself, its members, and its supporters. The delisting rule at issue in this litigation frustrates Guardians' mission to provide for the recovery and maintenance of the gray wolf throughout its historical range, and harms Guardians', its members', and staffs' interests in gray wolves and gray wolf recovery.

15.  Plaintiff, WESTERN WATERSHEDS PROJECT, is a non-profit organization founded in 1993 with approximately 12,000 members and supporters. It has offices in Idaho, Montana, Wyoming, Oregon, Arizona, Utah, Nevada, and California, and its mission is to protect and restore western watersheds and wildlife through education, public policy initiatives, and legal advocacy. Western Watersheds Project works to influence and improve public lands management throughout the West. It works to prevent harm to ecological, biological, cultural, historic, archeological, scenic resources, wilderness values, roadless areas, Wilderness Study Areas, and designated Wilderness. Western Watersheds Project brings this action on behalf of itself, its members, and its supporters. The delisting rule at issue in this litigation frustrates Western Watersheds Project's mission to provide for the recovery and maintenance of the gray wolf throughout its historical range, and harms Western Watersheds Project's, its members', and staffs' interests in gray wolves and gray wolf recovery.

16.  Plaintiff, CASCADIA WILDLANDS, is a non-profit organization headquartered in Eugene, Oregon. Cascadia Wildlands has approximately 12,000 members and supporters throughout the United States. Cascadia Wildlands works to educate, protect, and restore the Cascadia Bioregion's (extending from northern California to southeastern Alaska) wild ecosystems and native species, including the gray wolf. Cascadia Wildlands brings this action on behalf of itself, its members, and its supporters. The delisting rule at issue in this litigation

frustrates Cascadia Wildlands' mission to provide for the recovery and maintenance of the gray wolf throughout its historical range, and harms Cascadia Wildlands', its members', and staffs' interests in gray wolves and gray wolf recovery.

17.     Plaintiff, ENVIRONMENTAL PROTECTION INFORMATION CENTER ("EPIC"), is a non-profit organization located in Eureka, California. Since 1977, EPIC has defended the wildlife and wild places of the Klamath Mountains and North Coast Range. EPIC's mission is the science-based protection and restoration of northwest California's forests and seeks to ensure that a connected landscape exists for species survival, species recovery, and climate adaptation. Most of EPIC's 15,000 members and supporters live in northern California. EPIC's members and staff use, enjoy, and recreate on public lands within the range of the gray wolf. EPIC's members and staff use, enjoy, and recreate on public lands that could serve as habitat for gray wolves. EPIC, its members, and staff are dedicated to the recovery of the gray wolf throughout its historical range, including in northern California. The delisting rule at issue in this litigation frustrates EPIC's mission to provide for the recovery and maintenance of complete and functional ecosystems, and harms EPIC's, its members', and staffs' interests in gray wolves and gray wolf recovery.

18.     Plaintiff, KLAMATH FOREST ALLIANCE ("KFA"), is a non-profit organization founded in 1989, based in Orleans, California. Its mission is to promote sustainable ecosystems and sustainable communities of the Klamath-Siskiyou Mountain region. KFA participates in forest planning through agency engagement, substantive comments and collaboration, and uses law, science, place-based knowledge and conservation advocacy to defend the biodiversity, wildlife, waters and mature forests of the Klamath-Siskiyou

bioregion. KFA's members and staff use, enjoy, and recreate on public lands within the current and future range of the gray wolf. KFA brings this action on behalf of itself, its members, and its supporters. The delisting rule at issue in this litigation frustrates KFA's mission to provide for the recovery and maintenance of the gray wolf throughout its historical range, and harms KFA's, its members', and staffs' interests in gray wolves and gray wolf recovery.

19.     Plaintiff, KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild"), is a non-profit organization headquartered in Ashland, Oregon. KS Wild has over 3,500 members and supporters in more than 10 states, with most members concentrated in southern Oregon and northern California. On behalf of its members, KS Wild advocates for the forests, wildlife, and waters of the Rogue and Klamath Basins and works to protect and restore the extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and northwest California. KS Wild uses environmental law, science, education, and collaboration to help build healthy ecosystems and sustainable communities. Through its campaign work, KS Wild strives to protect the last wild areas and vital biological diversity of the Klamath region. KS Wild is a leader in protecting public lands and routinely participates in commenting, monitoring, and litigation affecting public lands and the natural resources located there. KS Wild's members and staff use, enjoy, and recreate on public lands within the range of the gray wolf. KS Wild brings this action on behalf of itself, its members, and its supporters. The delisting rule at issue in this litigation frustrates KS Wild's mission to provide for the recovery and maintenance of the gray wolf throughout its historical range,

1   and harms KS Wild's, its members', and staffs' interests in gray wolves and gray wolf

2   recovery.

3   20.     Plaintiff, THE LANDS COUNCIL, is a non-profit organization based in Spokane,

4   Washington. The Lands Council's mission is to preserve and revitalize Inland Northwest

5   forests, water, and wildlife through advocacy, education, effective action, and community

6   engagement. The Lands Council collaborates with a broad range of interested parties to seek

7   smart and mutually respectful solutions to environment and health issues. The Lands

8   Council is enriched by the beauty of nature. The Lands Council is energized by the

9   recreational opportunities afforded by nature, and is inspired to preserve its legacy for future

10  generations. The Lands Council's members and staff use, enjoy, and recreate on public lands

11  within the range of the gray wolf. The Lands Council brings this action on behalf of itself, its

12  members, and its supporters. The delisting rule at issue in this litigation frustrates The Lands

13  Council's mission to provide for the recovery and maintenance of the gray wolf throughout

14  its historical range, and harms The Lands Council's, its members', and staffs' interests in gray

15  wolves and gray wolf recovery.

16  21.     Plaintiff, WILDLANDS NETWORK, is a non-profit organization headquartered in

17  Salt Lake City, Utah. It was established in 1991, and its mission is to reconnect nature in

18  North America. Wildlands Network is focused on conserving the wholeness of nature,

19  which requires protecting the biodiversity of species. Wildlands Network works to provide

20  for large core reserves of habitat and the presence of apex predators and species, including

21  the gray wolf. Wildlands Network brings this action on behalf of itself, its members, and its

22  supporters. The delisting rule at issue in this litigation frustrates The Wildlands Network's

mission to provide for the recovery and maintenance of the gray wolf throughout its historical range, and harms Wildlands Network's, its members', and staffs' interests in gray wolves and gray wolf recovery.

22.     Plaintiffs' members, supporters, and staff are dedicated to ensuring the long-term survival and recovery of gray wolves throughout the contiguous United States, and ensuring the Service complies with the ESA and bases all of its listing (and de-listing) decisions on the best scientific and commercial data available.

23.     Plaintiffs' members, supporters, and staff live in or near, and/or routinely recreate in or near, gray wolf habitat across the western United States; including, but not limited to: the Pacific Northwest region (including the West Coast states of Oregon, Washington, and California); the Southern and/or Central Rocky Mountains region (including Colorado, Utah, Nevada, and northern New Mexico); and the Northern Rocky Mountains region (including Idaho, Wyoming, and Montana). Plaintiffs' members, supporters, and staff enjoy observing – or attempting to observe – and studying gray wolves in the Pacific Northwest, Southern and/or Central Rocky Mountains, and Northern Rocky Mountains. Plaintiffs' members, supporters, and staff enjoy observing – or attempting to observe – and studying signs of gray wolves' presence, and observing, studying, and/or photographing gray wolves in areas where gray wolves are known to travel, disperse, roam, and sometimes congregate (e.g., rendezvous sites). The opportunity to view gray wolves or signs of gray wolves in the wild in the Pacific Northwest, Southern and/or Central Rocky Mountains, and/or Northern Rocky Mountains, and elsewhere across the American west – by itself – is of significant

1   interest and value to Plaintiffs' members, supporters, and staff, and increases their use and

2   enjoyment of these areas.

3   24.    Upon delisting, gray wolves may be killed under state management regimes in the

4   West Coast states of Oregon, Washington, and California, and/or in the Southern and/or

5   Central Rocky Mountains states, including Colorado, Utah, Nevada, and northern New

6   Mexico. Any wolf killing by State actors would harm Plaintiffs' members', supporters', and

7   staff's interests in gray wolves in the American West and elsewhere and decrease their ability

8   to observe, or attempt to observe, and enjoy gray wolves and their sign in the wild.

9   25.    The final rule challenged in this lawsuit harms these interests in gray wolves and

10  diminishes Plaintiffs' members', supporters', and staff's enjoyment of recreating within gray

11  wolf habitat and surrounding areas.

12  26.    Plaintiffs' members, supporters, and staff derive aesthetic, recreational, scientific,

13  inspirational, educational, spiritual, and other benefits from gray wolves in the American

14  West, in recreating in areas occupied by and used by gray wolves, in working to protect gray

15  wolves from human-caused mortality and disturbance, and in working to restore gray wolves

16  in the contiguous United States. In furtherance of these interests, Plaintiffs' members,

17  supporters, and staff have worked and continue to work to conserve gray wolves in the

18  Pacific Northwest, Southern and/or Central Rocky Mountains, and Northern Rocky

19  Mountains, including work to restore gray wolf populations throughout the contiguous

20  United States.

21  27.    Plaintiffs' interests have been, are being, and unless the requested relief is granted,

22  will continue to be harmed by the Service's decision to remove gray wolves in the

contiguous United States from the list of endangered and threatened wildlife. If this Court issues the relief requested, the harm to Plaintiffs' interests will be alleviated and/or lessened.

28.     Defendant DAVID BERNHARDT is sued in his official capacity as Secretary of the United States Department of the Interior. As Secretary, Mr. Bernhardt is the federal official with responsibility for all Service officials' inactions and/or actions challenged in this complaint.

29.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is the federal department responsible for applying and implementing the federal laws and regulations challenged in this complaint.

30.     Defendant, the UNITED STATES FISH AND WILDLIFE SERVICE is an agency within the United States Department of the Interior that is responsible for applying and implementing the federal laws and regulations challenged in this complaint.

31.     Defendant AURELIA SKIPWORTH is sued in her official capacity as Director of the United States Fish and Wildlife Service. As Director, Ms. Skipworth is the federal official with responsibility for the Service officials' inactions and/or actions challenged in this complaint.

**FACTS**

**The Gray Wolf (***Canis lupus***)**

32.     Gray wolves are the largest wild members of the canid (dog) family and have a broad circumpolar range.

33.     Adult gray wolves range in weight from 40 to 175 pounds, depending on sex and geographic locale.

34.     Gray wolves are highly territorial, social animals that live and hunt in packs.

35.     Gray wolves are well adapted to travelling fast and far in search of food, and to catching and consuming large mammals.

36.     Gray wolves in North America primarily eat medium to large mammals, including deer, elk, and other species.

37.     Gray wolves successfully occupy a wide range of habitats if sufficient prey availability exists and human-caused mortality is adequately regulated. High-quality, suitable habitat generally exists in areas with sufficient prey where human-caused mortality is relatively low due to limited human access, there are high amounts of escape cover, or there is a relatively low risk of wolf-livestock conflicts.

38.     Where human-caused mortality is low or nonexistent, gray wolf populations are regulated by the distribution and abundance of prey on the landscape. Density-dependent, intrinsic mechanisms (*e.g.*, social strife, territoriality, and disease) may limit gray wolf populations when ungulate densities are high.

39.     Gray wolf pack social structure is relatively adaptable, and breeding members may be replaced from within or outside the pack, and pups may be reared by other pack members if their parents die.

40.     Gray wolf dispersal capabilities allow wolf populations to expand and recolonize vacant habitats as long as rates of human-caused mortality are not excessive. The rate of gray wolf recolonization may be impacted by the extent of intervening unoccupied habitat between the source population and newly recolonized areas.

*//*

**The Gray Wolf's Decline in the Contiguous United States**

41.     Hundreds of thousands of gray wolves likely ranged across the western United States and Mexico. However, the gray wolf's range and numbers declined significantly throughout the 19th and 20th centuries as the result of human-caused mortality from poisoning, trapping, and shooting, and from government-funded programs of gray wolf eradication.

42.     Historically (which the Service views as being at the time of European settlement), the gray wolf's range included most of North America, and consequently, most of the lower 48 United States, except in the far southeastern region of the country. By 1974, the species had been eliminated from most of its historical range, and occurred only in small populations in Minnesota and on Isle Royale, Michigan.

43.     Today, gray wolves exist primarily in two metapopulations: one covering the Western Great Lakes (or "Great Lakes") states of Minnesota, Wisconsin and Michigan; and the other in the Congressionally-created and Congressionally-delisted Northern Rocky Mountains region of Idaho, Montana, and Wyoming (also referred to as the "NRM DPS"). A small number of recolonizing gray wolves can be found in the Pacific Northwest (or "West Coast") states of Oregon, Washington, and California as well.

44.     The Great Lakes metapopulation currently consists of approximately 4,200 individuals.

45.     While the current population in the Northern Rocky Mountains metapopulation is difficult to discern due to the states of Idaho and Montana stopping annual minimum gray wolf population counts back in 2016, in 2015, the population was thought to be approximately 1,900 individuals. Additionally, approximately 311 wolves occurred in

1   Wyoming in 2020, and approximately 311 wolves occurred in the States of Oregon,

2   Washington, and California in 2020.

3   46.     A number of lone dispersing wolves have been documented outside of the Great

4   Lakes and Northern Rocky Mountain metapopulations in all States within the historical

5   range of the gray wolf west of the Mississippi River, except in Oklahoma and Texas. Since

6   the early 2000s, individual gray wolves have been confirmed and reported in the following

7   states: Vermont, Massachusetts, New York, Indiana, Illinois, Iowa, Missouri, North Dakota,

8   South Dakota, Nebraska, Kansas, Colorado, Utah, Arizona, and Nevada.

9   47.     Although gray wolves are starting to make a comeback in select areas of the United

10  States, the species has yet to achieve self-sustaining populations in much of their historic

11  habitat across vast portions of the American West, including in the Pacific Northwest region

12  (including the West Coast states of Oregon, Washington, and California) and the Southern

13  and/or Central Rocky Mountains region (including the states of Colorado, Utah, Nevada,

14  and northern New Mexico).

15  **The Service's Listing of Gray Wolves as an Endangered Species in the Contiguous United States**

16

17  48.     Gray wolves were among the first species granted federal protections, first under the

    legislative predecessors to the ESA, the Endangered Species Preservation Act of 1966 and

18  the Endangered Species Conservation Act of 1969, and subsequently under the ESA of

19  1973, as amended.

20  49.     The entities listed in the 1978 gray wolf listing rule included: (1) an endangered

21  population at the taxonomic species level (*C. lupus*) throughout the contiguous United States

22  and Mexico; and (2) a threatened population in Minnesota.

15   | COMPLAINT

50.     At the time of the 1978 listing, human-caused mortality was identified as a primary threat to the species.

51.     At the time of the 1978 listing, there were only approximately 1,235 wolves in Minnesota remaining.

**The Service's Prior Attempts to Remove Gray Wolves in the Contiguous United States from the List of Endangered and Threatened Wildlife**

52.     The Service's November 3, 2020 final rule stripping gray wolves throughout the contiguous United States of ESA protections is but another attempt in a long history of failed rules seeking the species' removal from the list of endangered and threatened wildlife.

53.     In 2003, the Service attempted to designate three separate DPSs of gray wolves and reclassify their status. 68 Fed. Reg. 15,804 (April 1, 2003). The 2003 rule designated an Eastern DPS and reclassified it as threatened under the ESA. The 2003 rule designated a Western DPS and reclassified it as threatened under the ESA. The 2003 rule designated a Southwestern United States and Mexico DPS and classified it as endangered under the ESA. The 2003 rule delisted the gray wolf in unoccupied non-historical range.

54.     The 2003 rule was vacated in both *Defenders of Wildlife v. Secretary, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005) ("*Oregon Wolves*"), and in *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005) ("*Vermont Wolves*").

55.     In *Oregon Wolves*, the court held that the Service: (1) arbitrarily and capriciously failed to properly analyze whether the gray wolf was endangered or threatened in a "significant portion of its range" by failing to consider that "a species can be extinct throughout a significant portion of its range if there are major geographical areas in which it is no longer viable but once was," 354 F. Supp. 2d at 1167–68; (2) arbitrarily and capriciously applied its

1   DPS policy to "expand the boundaries" of its proposed DPSs, which effectively decreased

2   protections for the species outside of core recovery areas despite there being no changes to

3   existing threats to justify less protection, 354 F. Supp. 2d at 1171; and (3) arbitrarily and

4   capriciously failed to consider the attempt to down-list the species in vast portions of its

5   geographic range without applying the ESA's section 4 listing factors, 354 F. Supp. 2d at

6   1172. As summarized by a federal appellate court later addressing the case, the *Oregon Wolves*

7   court held that "by downlisting the species based solely on the viability of a small population

8   within that segment, the Service was effectively ignoring the species' status in its full range,

9   as the [ESA] requires." *Humane Soc'y of the United States v. Zinke*, 865 F. 3d 585, 592 (D.C. Cir.

10  2017).

11  56.    In *Vermont Wolves*, the court held that the Service "cannot downlist an area that it

12  previously determined warrants an endangered listing because it 'lumps together' a core

13  population with a low to non-existent population outside of the core area." 386 F. Supp. 2d

14  at 565. The *Vermont Wolves* court held that the Service "bypass[es] the application of the ESA

15  in the non-core area" when it arbitrarily "expands the boundaries" of the wolf population to

16  achieve its desired outcome to lessen federal protections for the species. 386 F. Supp. 2d at

17  565. The *Vermont Wolves* court held that a final rule "that makes all other portions of the

18  wolf's historical or current range outside of the core gray wolf populations insignificant and

19  unworthy of protection" is "contrary to the plain meaning of the ESA phrase 'significant

20  portion of its range,' and therefore is an arbitrary and capricious application of the ESA."

21  386 F. Supp. 2d at 566.

22

57.     In 2007, the Service attempted to designate a Western Great Lakes DPS and remove it from the list of endangered and threatened wildlife. 72 Fed. Reg. 6,052 (Feb. 8, 2007).

58.     The 2007 rule was vacated in *Humane Soc'y of the United States v. Kempthorne*, 579 F. 2d 7 (D.D.C. 2008).

59.     In 2008, the Service attempted to designate a Northern Rocky Mountains DPS and remove it from the list of endangered and threatened wildlife. 73 Fed. Reg. 75,356 (Feb. 27, 2008).

60.     The 2008 rule was enjoined in *Defenders of Wildlife v. Hall*, 565 F. Supp. 2d 1160 (D. Mont. 2008), and subsequently vacated and remanded.

61.     In 2009, the Service attempted to designate a Western Great Lakes DPS and remove it from the list of endangered and threatened wildlife. 74 Fed. Reg. 15,070 (Apr. 2, 2009). In 2009, the Service attempted to designate a Northern Rocky Mountains (except Wyoming) DPS and remove it from the list of endangered and threatened wildlife. 74 Fed. Reg. 15,123 (Apr. 2, 2009).

62.     The 2009 Western Great Lakes DPS rule was vacated by *Humane Soc'y of the United States v. Salazar*, 1:09-CV-1092-PLF (D.D.C. 2009) (case settled). The 2009 Northern Rocky Mountains (except Wyoming) DPS rule was vacated by *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2010).

63.     In 2011, Congress reissued the 2009 Northern Rocky Mountain (except Wyoming) rule designating a DPS and removing it from the list of endangered and threatened wildlife in Public Law 112-10, The Department of Defense and Full-Year Continuing Appropriations Act.

64.     In 2011, the Service again attempted to designate a Western Great Lakes DPS and remove it from the list of endangered and threatened species. 76 Fed. Reg. 81,666 (Dec. 28, 2011).

65.     The 2011 Western Great Lakes rule was vacated by *Humane Soc'y of the United States v. Jewell*, 76 F. Supp. 69, 110 (D.D.C. 2014). The vacatur of the 2011 Western Great Lakes rule was upheld on appeal by *Humane Soc'y of the United States v. Zinke*, 865 F. 3d 858 (D.C. Cir. 2017).

66.     In *Humane Soc'y of the United States v. Zinke,* the court held that the Service failed to consider two significant aspects in its 2011 Western Great Lakes rule: (1) the impacts of partial delisting on the remnant population, and (2) the impacts of historical range loss on the already-listed species. 865 F. 3d at 585.

67.     In 2012, the Service attempted to remove gray wolves in Wyoming from the list of endangered and threatened species. 77 Fed. Reg. 55,530 (Sept. 10, 2012).

68.     The 2012 Wyoming rule was vacated in *Defenders of Wildlife v. Jewell*, 68 F. Supp. 3d 193 (D.D.C. 2014). The vacatur of the 2012 Wyoming rule was reversed on appeal in *Defenders of Wildlife v. Zinke*, 849 F. 3d 1077 (D.C. Cir. 2017). The 2012 Wyoming rule was reinstated in 2017. 82 Fed. Reg. 20,284 (May 1, 2017).

**The Service's 2019 Proposal to Remove Gray Wolves from the List of Endangered and Threatened Wildlife**

69.     On March 15, 2019, the Service published a proposed rule to remove the gray wolf in the contiguous United States from the list of endangered and threatened wildlife. 84 Fed. Reg. 9,648 (Mar. 15, 2019) (hereinafter "2019 proposed rule").

70.     In the 2019 proposed rule, the Service lumped the Minnesota and contiguous United States and Mexico populations (excepting the Mexican wolf and red wolf subspecies populations, as well as the already Congressionally-created and Congressionally-delisted Northern Rocky Mountains population) into a singular "gray wolf entity."

71.     In the 2019 proposed rule, the Service removed the entire, newly created, "gray wolf entity" from the list of endangered and threatened wildlife.

72.     In the 2019 proposed rule, the Service relied on the fact that solely one metapopulation – gray wolves in the three Great Lakes states of Minnesota, Wisconsin, and Michigan – may be faring well, in large part, thanks to the ESA's federal management regime, to justify the removal of federal protections from the entire entity as a whole.

73.     The 2019 proposed rule acknowledged that the "gray wolf entity" is not a "species," as that term is defined under the Act.

74.     The 2019 proposed rule acknowledged that the "gray wolf entity" is not a "sub-species," as that term is defined under the Act.

75.     The 2019 proposed rule acknowledged that the "gray wolf entity" is not a DPS, as defined by the agency's 1996 DPS Policy, 61 Fed. Reg. 4,722 (Feb. 7, 1996).

**The Service's 2020 Final Decision to Remove Gray Wolves from the List of Endangered and Threatened Wildlife**

76.     On November 3, 2020, the Service published a final rule to remove the gray wolf in the contiguous United States from the list of endangered and threatened wildlife. 85 Fed. Reg. 69,778 (Nov. 3, 2020) (hereinafter "final rule").

77.     The final rule explains that neither of the listed entities (the threatened "Minnesota" entity, nor the endangered "Lower 48 States and Mexico outside of the Northern Rocky

Mountain DPS and Minnesota" entity) qualifies as a "species," a "sub-species," or a "DPS," as those terms are statutorily defined by the Act and under the Service's 1996 DPS Policy. 85 Fed. Reg. 69,783–84.

78.     The final rule explains that the threatened population in Minnesota is not a DPS because it is not discrete from gray wolves in the endangered entity in the Western Great Lakes region (*i.e.*, Wisconsin and Michigan). 85 Fed. Reg. 69,783. The final rule explains that, likewise, the endangered entity is not a DPS because wolves in the Western Great Lakes region are not discrete from gray wolves in Minnesota. *Id.*

79.     The final rule explains that the endangered entity is not a DPS because wolves in the Pacific Northwest (or, "West Coast States") are not discrete from wolves in the congressionally-delisted Northern Rocky Mountains ("NRM") DPS. 85 Fed. Reg. 69,783–84.

80.     The final rule explains that since "[n]either of the listed entities is a DPS, … thus, neither of the entities is a 'species,' as that term is defined under the Act." 85 Fed. Reg. 69,784.

81.     The final rule explains that "the currently listed gray wolf entities could be removed from the List because they do not meet the statutory definition of a 'species . . . .' [which is an] independent basis for delisting." 85 Fed. Reg. 69,784 (citing 50 C.F.R. 424.11(e)(3)).

82.     In the final rule, the Service assessed the conservation status of gray wolves in three different configurations: (1) "Each of the two currently listed gray wolf entities separately" (referred to as "Minnesota" and the "44-State entity" in the final rule); (2) "the two currently listed entities combined into a single entity (the approach in [the Service's] proposed rule)" (referred to as the "combined listed entity" in the final rule); and (3) "a single gray wolf entity

that includes all gray wolves in the lower 48 state [sic] and Mexico except for the Mexican wolf" (referred to as the "lower 48 United States entity" in the final rule). 85 Fed. Reg. 69,784 –85.

83.     In the final rule, the Service interprets the term "range" as referring to "the area occupied by the species at the time [the Service] make[s] a status determination under section 4 of the Act." 85 Fed. Reg. 69,786 (citing 79 Fed. Reg. 37,583 (July 1, 2014)).

84.     In the final rule, the Service declines to include areas in which only "lone dispersers" are found in its definition of "current range," explaining: "Wolves occur periodically in the lower 48 United States as lone dispersers in places that otherwise lack evidence of persistent wolf presence or suitable habitat for supporting a resident wolf population …. While dispersal plays an important role in recolonization of suitable habitat, individual dispersers that do not settle in an area, survive, and reproduce do not substantively contribute to the wolf's viability (*i.e.*, the ability of a species to sustain populations in the wild over time). Therefore, we did not include the areas in which only these lone dispersers are occasionally found in our definition of current range." 85 Fed. Reg. 69,786.

85.     In the final rule, the Service explains: "[t]he wolves in Wisconsin and Michigan contain sufficient resiliency, redundancy, and representation to sustain populations within the 44-State entity over time. Therefore, we conclude that the relatively few wolves that occur within the 44-State entity outside of Wisconsin and Michigan, including those in the West Coast States and central Rocky Mountains as well as lone dispersers in other States, are not necessary for the recovered status of the 44-State entity." 85 Fed. Reg. 69,883.

1   86.     In the final rule, the Service explains: "Although substantial contraction of gray wolf

2   historical range occurred within the 44-State entity since European settlement, the range of

3   the gray wolf has expanded significantly since its original listing in 1978, and the impacts of

4   lost historical range are no longer manifesting in a way that threatens the viability of the

5   species. The causes of the previous contraction . . .  and the effects of that contraction . . . in

6   addition to the effects of all other threats, have been ameliorated or reduced such that *the 44-*

7   *State entity* no longer meets the Act's definitions of "threatened species" or "endangered

8   species." 85 Fed. Reg. 69,885–86 (emphasis added).

9   87.     In the final rule, the Service explains: "Although substantial contraction of gray wolf

10   historical range occurred within the 44-State entity since European settlement, the range of

11   the gray wolf has expanded significantly since its original listing in 1978, and the impacts of

12   lost historical range are no longer manifesting in a way that threatens the viability of the

13   species. The causes of the previous contraction . . .  and the effects of that contraction . . . in

14   addition to the effects of all other threats, have been ameliorated or reduced such that *the*

15   *combined listed entity* does not meet the Act's definitions of "threatened species" or

16   "endangered species." 85 Fed. Reg. 69,889 (emphasis added).

17   88.     In the final rule, the Service explains: "Although substantial contraction of gray wolf

18   historical range occurred within the 44-State entity since European settlement, the range of

19   the gray wolf has expanded significantly since its original listing in 1978, and the impacts of

20   lost historical range are no longer manifesting in a way that threatens the viability of the

21   species. The causes of the previous contraction . . .  and the effects of that contraction . . . in

22   addition to the effects of all other threats, have been ameliorated or reduced such that *the*

*lower 48 United States entity* does not meet the Act's definitions of "threatened species" or "endangered species." 85 Fed. Reg. 69,893 (emphasis added).

89.     In the final rule, the Service explains that its post-delisting monitoring efforts "will focus on wolves within Minnesota, Wisconsin, and Michigan" only. 85 Fed. Reg. 69,894.

90.     In the final rule, the Service concludes that "gray wolves in the lower 48 states (excepting the Mexican wolf) are recovered." 85 Fed. Reg. 69,893.

91.     Gray wolves in Oregon have not recovered as defined by the ESA. Gray wolves in Washington have not recovered as defined by the ESA. Gray wolves in California have not recovered as defined by the ESA. Gray wolves in Colorado have not recovered as defined by the ESA. Gray wolves in Nevada have not recovered as defined by the ESA. Gray wolves in Utah have not recovered as defined by the ESA. Gray wolves in Arizona have not recovered as defined by the ESA.

**FIRST CLAIM FOR RELIEF**

**(Violation of ESA – Illegal "Species" Determination/DPS Analysis)**

92.     Plaintiffs incorporate all preceding paragraphs.

93.     The final rule concludes "[t]he gray wolf entities that are currently on the List do not meet the Act's definition of a 'species.'" 85 Fed. Reg. 69,783.

94.     The final rule explains that neither currently listed entity "encompasses an entire species, or a subspecies, of gray wolf" and that they also do not qualify as a distinct population segment ("DPS"). 85 Fed. Reg. 69,783–84.

95.     The final rule cites to 50 C.F.R. § 424.11(e)(3) to support the need to delist gray wolves because they purportedly do not meet the definition of a "species" under the Act. 85 Fed. Reg. 69, 784.

96.     These conclusions are erroneous, arbitrary and capricious, are not based on the best available science, conflict with the ESA, and conflict with the Service's 1996 DPS Policy.

97.     The ESA does not define the term "distinct population segment" ("DPS"), and therefore, in 1996, the Service issued a "Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act," 61 Fed. Reg. 4,722 (Feb. 7, 1996) (hereinafter "DPS Policy").

98.     The DPS Policy interprets the term "distinct population segment" as requiring consideration of three factors: (1) the discreteness of the population segment in relation to the remainder (also referred to as the "remnant") of the species to which it belongs; (2) the significance of the population segment to the species to which it belongs; and (3) the population segment's conservation status in relation to the Act's standards for listing. 61 Fed. Reg. 4,725.

99.     A population may be considered discrete if it meets one of two conditions: (1) it is "markedly separated" from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors; and/or (2) it is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act. 61 Fed. Reg. 4,725.

100.    The DPS Policy provides "[t]he standard established for discreteness is simply an attempt to allow an entity given DPS status under the Act to be adequately defined and described." 61 Fed. Reg. 4,724.

101.    The DPS Policy makes clear that complete discreteness is not required, as "the standard adopted does not require absolute separation of a DPS from other members of its species, because this can rarely be demonstrated in nature for any population of organisms." 61 Fed. Reg. 4,724. This standard is intended to create a low bar, as it "allow[s] entities recognized under the Act to be identified without requiring an unreasonably rigid test for distinctness." 61 Fed. Reg. 4,724. In particular, the DPS Policy specifically contemplated that a DPS would have "some limited interchange among population segments considered to be discrete . . . ." 61 Fed. Reg. 4,724.

102.    In the final rule, the Service concludes that the two listed entities (the threatened Minnesota entity and the endangered lower-48 entity) "are not markedly separated from other populations of the same taxon." 85 Fed. Reg. 69,783.

103.    In the final rule, the Service concludes that the threatened Minnesota entity is "not discrete from the endangered listed entity [(the endangered lower-48 entity)] where they abut in the Great Lakes area because gray wolves in Minnesota are not discrete from gray wolves in Wisconsin and Michigan." 85 Fed. Reg. 69,783.

104.    In the final rule, the Service concludes that "gray wolves in the West Coast States that are part of the endangered listed entity [(the endangered lower-48 entity)] are not discrete from the recovered NRM population." 85 Fed. Reg. 69,783–84.

105.    In the final rule, because the Service determined there was a lack of discreteness, it did not continue to evaluate the significance of these populations. 85 Fed. Reg. 69,783–84.

106.    The final rule's conclusions are legally flawed, not supported by the best available science, are in conflict with the ESA and the DPS Policy, and are therefore, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

107.    In the final rule, the Service determines a lack of discreteness to a Congressionally-created DPS — one that never had a legally sufficient scientific basis — without adequately considering the discreteness of wolves in places such as the West Coast States and the Southern (or "Central," as described in the final rule) Rocky Mountains, including Colorado, Utah, Nevada, and northern New Mexico.

108.    In the final rule, the Service ignores its obligation to conduct a "comprehensive review" that addresses the entire listed entities, as opposed to smaller portions of those entities.

109.    In the final rule, the Service fails to include a DPS analysis for Pacific Northwest gray wolves. 85 Fed. Reg. 69,854. Instead, the Service relies on a 2013 analysis in the final rule. 85 Fed. Reg. 69,854–55 (referencing 78 Fed. Reg. 35,664, 35,711–13 (June 13, 2013)). In the final rule, the Service ignores data from 2013 to the present by referring back to the 2013 analysis. In the final rule, the Service ignores its prior conclusion that wolves in the NRM DPS would be isolated from other suitable habitat to the west and south of the DPS. 73 Fed. Reg. 10,514, 10,518 (Feb. 27, 2008). In the final rule, the Service ignores its prior conclusion that wolves occurring in the Cascade Mountains in the Pacific Northwest would not be a

part of the NRM DPS. 73 Fed. Reg. 10,514, 10,518 (Feb. 27, 2008) ("if wolves dispersed into the [North Cascades] they would remain protected by the Act as endangered because it is outside of the NRM DPS."); *see also* 74 Fed. Reg. 15,123, 15,127 (April 2, 2009) (same).

110.     In the final rule, the Service ignores the best available science, including the concerns of peer reviewers, regarding its conclusion that Pacific Northwest (or "West Coast states") gray wolves are not discrete from wolves in the NRM DPS.

111.     In the final rule, the Service erroneously concludes that wolves occurring outside of the geographic boundaries of the NRM DPS in Oregon, Washington, California, Colorado, and elsewhere do not meet the discreteness test in that they are not markedly separated from other populations of the same taxon as a consequence of physical physiological, ecological, or behavioral factors, including genetic differences. In the final rule, the Service erroneously concludes that these wolves are not significant to the rest of the taxon by failing to consider that these wolves represent a significant part of the species' recovery in areas where these wolves are recolonizing historic habitats. In the final rule, the Service erroneously attempts to expand the geographic boundaries of a Congressionally-created, and Congressionally-delisted, NRM DPS in an effort to avoid its ESA obligations to recover gray wolves throughout their historic and current ranges.

112.     The Service's determinations that neither of the listed entities constitute a "species," or a DPS in the final rule violate the ESA and the DPS Policy and are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

113.     In the final rule, the Service relies on a recently enacted regulation requiring the Secretary to delist a species if the Secretary determines "[t]he listed entity does not meet the

statutory definition of a species." 85 Fed. Reg. 69,784 (citing 50 C.F.R. § 424.11(e)(3)(2020)).

But this regulation violates the ESA's purposes and policies, 16 U.S.C. § 1531, and is

therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706 (2)(A).

## SECOND CLAIM FOR RELIEF

### (Violation of ESA – Illegal Analysis of Various "Gray Wolf Entities")

114.     Plaintiffs incorporate all preceding paragraphs.

115.     In the final rule, the Service assesses three separate gray wolf entities: (1) the two

listed entities (the threatened Minnesota entity and the endangered lower-48 entity)

separately; (2) the two listed entities (the threatened Minnesota entity and the endangered

lower-48 entity) combined; and (3) the two listed entities (the threatened Minnesota entity

and the endangered lower-48 entity) and the NRM DPS combined. 85 Fed. Reg. 69,784–85.

116.     The Service's assessments of the listed entities combined violates existing case law.

*Defenders of Wildlife v. Secretary, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005);

*National Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005); *Humane Soc'y of the United

States v. Zinke*, 865 F. 3d 858 (D.C. Cir. 2017); *Defenders of Wildlife v. Norton*, 23 F. Supp. 2d 9,

19 (D.D.C. 2002).

117.     The Service's creation of entirely fictional "gray wolf entities," and simultaneous

delisting of such entities, violates the ESA.

118.     The Service's analysis of various "gray wolf entities" in the final rule violates the ESA

and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706 (2)(A).

1

2

**THIRD CLAIM FOR RELIEF**

**(Violation of ESA – Illegal SPR Analysis)**

3

119.  Plaintiffs incorporate all preceding paragraphs.

4

120.  The ESA requires the Service to consider a species' status across a "significant

5

portion of its range" in making listing determinations. 16 U.S.C. § 1532(6); *Defenders of*

6

*Wildlife v. Norton*, 258 F. 3d 1136 (9th Cir. 2001).

7

121.  There are two situations under which a species, sub-species, or DPS may qualify for

8

listing under the ESA. First, the ESA requires the Service to consider a species' status

9

throughout all of its range. 16 US.C. §§ 1532(6), (20). Second, the ESA requires the Service

10

to consider a species' status across a "significant portion of its range." 16 U.S.C. §§ 1532(6),

11

(20).

12

122.  The ESA does not define "significant portion of its range," but the Ninth Circuit has

13

explained one way a species may qualify for listing throughout a "significant portion of its

14

range" is if there are "major geographical areas in which it is no longer viable but once was."

15

*Defenders of Wildlife v. Norton*, 258 F. 3d 1136, 1145–46 (9th Cir. 2001).

16

123.  The Service must (1) quantify the species' historic range in order to establish a

17

temporal baseline; and (2) then determine whether the lost or no longer viable area, as

18

measured against the baseline, amounts to a significant portion. If a species is "expected to

19

survive" in an area that is much smaller than its historic range, the Service must explain its

20

conclusion that the lost area is not a "significant portion of its range." *Defenders of Wildlife*,

21

258 F. 3d at 1145. An "adequate explanation" why territory, which was a part of a species'

22

historic range but is no longer occupied or considered viable, is not a "significant portion"

of the species' range is required. If the lost area qualifies as a "significant portion," then the Service must complete a threats assessment to determine if the species qualifies for listing throughout a "significant portion of its range." 16 U.S.C. §§ 1532 (6), (20).

124.    The phrase "significant portion of its range" does not mean that threats in the "significant portion" must render the entire species at risk of extinction. *Defenders of Wildlife*, 258 F. 3d at 1141. The phrase "significant portion of its range" was intended to allow for protection in one area, even if a species is abundant or overabundant in another area. *Id.* at 1144. There is no bright-line percentage of habitat that must be affected in order for an area to be "significant." *Id.* at 1143. For a species with a small historical range, even a very small percentage of habitat may be "significant." *Id.*

125.    In 2014, the Service issued a policy interpreting the phrase "significant portion of its range." 79 Fed. Reg. 37,578 (July 1, 2014) (hereinafter "2014 SPR Policy"). The 2014 SPR Policy was vacated in-part by the federal courts. *Center for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946 (D. Ariz. 2017) (finding the Service's interpretation of significant portion of its range" in the 2014 SPR Policy "impermissibly clashes with the rule against surplusage and frustrates the purposes of the ESA" and is therefore arbitrary and capricious under the ESA) *amended in part by* 2017 WL 8788052 (limiting the court's vacatur of the 2014 SPR Policy to the District of Arizona); *Desert Survivors v. U.S. Dep't of the Interior*, 336 F. Supp. 3d 1131 (N.D. Cal. 2018) (clarifying the court's ruling on the merits in 321 F. Supp. 3d 1011 that the 2014 SPR Policy interpreting the phrase "significant portion of its range" is vacated and set aside in regard to the policy's definition of "significant").

126.    In the Service's 2019 proposed rule, the Service acknowledged that part of its 2014 SPR Policy had been vacated across the country in *Desert Survivors*, 336 F. Supp. 3d 1131.

127.    In the Service's final rule, the Service fails to acknowledge that part of its 2014 SPR Policy has been vacated across the country in *Desert Survivors*, 336 F. Supp. 3d 1131. *See* 85 Fed. Reg. 69,853 (ignoring this fact in its response to comments on the issue).

128.    The Service cannot interpret the phrase "significant portion of its range" in a way that wholly excludes analysis of the species' historical range. *Tucson Herpetological Soc. v. Salazar*, 566 F. 3d 870, 876 (9th Cir. 2009). The Service must define the phrase "significant portion of its range" in a manner that includes quantification of the species' historic range and an evaluation of whether the lost habitat amounts to a "significant portion" of that range. *Id.*

129.    The Service may not look only to the health of the species' population in certain areas while ignoring threats in areas where the population is either extirpated or home to only a few individuals. *Tucson Herpetological Soc.*, 566 F. 3d at 877 ("It is insufficient . . . to point to one area or class of areas where [a species'] population persists to support a finding that threats to the species elsewhere are not significant . . . .").

130.    In the final rule, the Service's "significant portion of its range" analyses are legally deficient and violate the ESA and APA. 16 U.S.C. §§ 1532(6), (20); 5 U.S.C. § 706(2)(A).

131.    In the final rule, the Service's interpretation of the term "significant" in its "significant portion of its range" analysis violates the ESA.

132.    In the final rule, the Service defines "significant" by asking whether "any portions are biologically meaningful in terms of resiliency, redundancy, or representation of gray wolves

in the 44-State entity." 85 Fed. Reg. 69,885. In the final rule, the service relies on the assumption that there is allegedly sufficient resiliency, redundancy, and representation to sustain gray wolf populations over time provided by the Great Lakes area metapopulation, and that other wolves are merely part of the Congressionally-created (and Congressionally-delisted) Northern Rocky Mountains DPS, and therefore are expendable. *Id.* In the final rule, the Service asserts that "the relatively few wolves that occur outside the Great Lakes area within the gray wolf entity, including those in the West Coast States and Central/Southern Rocky Mountains as well as lone dispersers in other States, are not necessary for the recovered status of the combined listed entity." 85 Fed. Reg. 69,886.

133.     In the final rule, the Service ignores the possibility of ever restoring gray wolves to the thousands of square miles of suitable habitat with sufficient prey base outside of the Great Lakes region. In the final rule, the service ignores the value of recovering gray wolves in the West Coast States and Central/Southern Rocky Mountains. In the final rule, the Service ignores the "significance" of suitable habitats within the West Coast States and the Central/Southern Rocky Mountains to the species recovery in these regions.

134.     In the final rule, the Service's interpretation of "range" in its "significant portion of its range" analysis violates the ESA.

135.     In the final rule, the Service defines the term "range" unlawfully narrowly and excludes the importance of individual dispersers to the species' recovery. In the final rule, the service ignores the best available science, including the concerns of peer reviewers, regarding its definition of "range."

136.    The Service's determinations that gray wolves are not in danger of extinction throughout all or a significant part of its range, 16 U.S.C. § 1532 (6), nor are they likely to become an endangered species within the foreseeable future throughout all or a significant part of its range, 16 U.S.C. § 1532 (20), violate the ESA and are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

### FOURTH CLAIM FOR RELIEF

**(Violation of ESA – Inadequate Threats Assessment)**

137.    Plaintiffs incorporate all preceding paragraphs.

138.    The ESA requires the Service to determine whether a species qualifies as an endangered species or threatened species due to one or more (or a combination of) factors as described in section 4(a)(1) of the Act. These factors include: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533 (a)(1). These same factors must be considered before delisting a species, subspecies, or a DPS. 50 C.F.R. § 424.11(d).

139.    The ESA requires the Service's evaluation of threats for purposes of delisting must consider both the threats currently facing the species, subspecies, or DPS, and the threats that are reasonably likely to affect the species, subspecies, or DPS in the foreseeable future following the removal of the ESA's protections.

140.    In the final rule, the Service determined that the threats to the gray wolf throughout the Lower 48 have been reduced such that the listed entities no longer meet the definition of threatened or endangered under the ESA. 85 Fed. Reg. 69,889. In making this determination, the Service failed to utilize the best available science and failed to carefully consider and adequately apply section 4(a)(1)'s threat factors in accordance with the ESA and the Service's implementing regulations and policy.

141.    The final rule fails to include an adequate section 4(a)(1) threats factors analysis for gray wolves in the Central/Southern Rocky Mountains. The final rule fails to adequately consider whether gray wolves occurring in the Central/Southern Rocky Mountains are threatened or endangered because of any of the following (or a combination of) the following factors: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreation, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting tis continued existence. 16 U.S.C. § 1533 (a)(1). The final rule fails to consider the vast amount of suitable habitat for gray wolves in the Central/Southern Rocky Mountains states that remains unoccupied. The final rule fails to consider the importance of connectivity corridors and habitats necessary to foster movement into and recolonization of habitats in the Central/Southern Rocky Mountains states by gray wolves in the Northern Rocky Mountains DPS.

142.    In the final rule, the Service concludes that while a group of six wolves travelling together in a group was documented in far northwestern Colorado (within close proximity to Utah) in January 2020, as dispersers, these wolves are not necessary to the recovery of the

44-State entity, and therefore, do not matter to the recovery of the species. 85 Fed. Reg. 69,883.

143.    By failing to conduct an adequate section 4(a)(1) threats analysis for gray wolves in the Central/Southern Rocky Mountains, the final rule fails to consider an important aspect of the species recovery – the recovery of gray wolves in the Central/Southern Rocky Mountains – and therefore, violates the ESA and APA. 16 U.S.C. § 1533(a)(1); 5 U.S.C. § 706(2)(A).

144.    The final rule fails to include an adequate section 4(a)(1) threats factors analysis for gray wolves in the Pacific Northwest or West Coast states of Oregon, Washington, and California.

145.    The final rule fails to adequately consider whether gray wolves occurring in the West Coast states of Oregon, Washington, and California qualify as an endangered or threatened species because of the present or threatened destruction, modification, or curtailment of the species range. 16 U.S.C. § 1533(a)(1)(A). The final rule fails to consider the best available science in its analysis of "suitable habitat" in the West Coast states by primarily considering road density and human population density only. The final rule fails to consider the vast amount of suitable habitat for gray wolves in the West Coast states that remains unoccupied. The final rule fails to consider the importance of connectivity corridors and habitats necessary to foster movement into and recolonization of habitats in the West Coast states by gray wolves in the Northern Rocky Mountains DPS. The final rule arbitrarily relies on the Service's belief that wolves outside of Wisconsin and Michigan are not necessary for the recovery of the 44-State entity. 85 Fed. Reg. 69,885. The final rule arbitrarily relies on the

1    Service's belief that individual dispersing wolves are not necessary for the recovery of the 44-

2    State entity. The final rule fails to consider that the Service's erroneous determination that

3    gray wolves in the West Coast states are the same as gray wolves in the Northern Rocky

4    Mountains DPS curtails the current range of the listed endangered entity (gray wolves in the

5    Lower 48).

6    146.    The final rule fails to adequately consider whether gray wolves occurring in the West

7    Coast states of Oregon, Washington, and California qualify as an endangered or threatened

8    species because of overutilization for commercial, recreational, scientific, or educational

9    purposes. 16 U.S.C. § 1533(a)(1)(B). The final rule fails to consider the impacts of human-

10   caused mortality on gray wolves in the West Coast states. The final rule fails to consider the

11   impacts of lethal management of gray wolves in Oregon, Washington, and California. The

12   final rule fails to consider the impacts of excessive levels of recreational hunting in the

13   Northern Rocky Mountains DPS on the recovery of gray wolves in the West Coast states.

14   The final rule fails to consider the impacts of hunting and trapping of gray wolves on tribal

15   lands in the West Coast states on the recovery of gray wolves in the West Coast states. The

16   final rule fails to consider the impacts of the immense loss of gray wolves in the West Coast

17   states at the behest of livestock producers on the recovery of gray wolves in the West Coast

18   states. The final rule fails to consider the threats to gray wolf recovery in the West Coast

19   states due to the lack of non-lethal coexistence practices in key gray wolf habitats in Oregon,

20   Washington, and California. The final rule fails to consider that current levels of lethal take

21   of gray wolves in the West Coast states is regulated by the Act's protections and that levels

22

1   of lethal take of gray wolves in the West Coast states is likely to increase without the Act's

2   protections in effect.

3   147.   The final rule fails to adequately consider whether gray wolves occurring in the West

4   Coast states of Oregon, Washington, and California qualify as an endangered or threatened

5   species because of disease or predation. 16 U.S.C. § 1533(a)(1)(C). The final rule fails to

6   adequately consider the potential for disease to threaten gray wolf populations in the West

7   Coast states. The final rule fails to consider the potential impacts of disease on gray wolves

8   in the West Coast states due to the Pacific Northwest's uniquely different climate from that

9   of the Great Lakes region. The final rule assesses the threat factor of disease and predation

10   on gray wolves in the Great Lakes region alone, and fails to consider the impacts of disease

11   on small and isolated populations, such as those found in the West Coast states.

12   148.   The final rule fails to adequately consider whether gray wolves occurring in the West

13   Coast states of Oregon, Washington, and California qualify as an endangered or threatened

14   species because of the inadequacy of regulatory mechanisms. 16 U.S.C. § 1533(a)(1)(D). The

15   final rule fails to consider the adequacy of state management plans in the West Coast states

16   of Oregon, Washington, and California. The final rule fails to consider the non-binding

17   nature, and recent changes to, the gray wolf management plan in Washington State. The final

18   rule fails to consider the lack of state-level protections for gray wolves in Oregon. The final

19   rule fails to consider the impact of potential state-regulated hunting of gray wolves in the

20   West Coast states absent the Act's federal protections. The final rule fails to adequately

21   consider gray wolf management on federal public lands in the West Coast states, including

22

1   on lands managed by the United States Forest Service and United States Bureau of Land

2   Management.

3   149.    The final rule fails to adequately consider whether gray wolves occurring in the West

4   Coast states of Oregon, Washington, and California qualify as an endangered or threatened

5   species because of other manmade factors affecting the species' continued existence. 16

6   U.S.C. § 1533(a)(1)(E). The final rule fails to adequately consider the impacts of climate

7   change on the recovery of gray wolves in the West Coast states. The final rule fails to

8   consider the changes in habitat suitability and current and future ranges for gray wolves in

9   the West Coast states that are resulting from and will continue to result from the changing

10  climate. The final rule fails to consider the impacts of climate change on gray wolves' prey

11  availability (including deer and elk populations) in the West Coast states. The final rule fails

12  to consider the best available science, including the concerns of peer reviewers, regarding

13  climate change and its impacts upon the recovery of gray wolves in the West Coast states.

14  150.    The final rule fails to adequately consider whether gray wolves occurring in the West

15  Coast states of Oregon, Washington, and California qualify as an endangered or threatened

16  species because of the cumulative impacts of threats in combination. 16 U.S.C. § 1533(a)(1).

17  151.    By failing to conduct an adequate section 4(a)(1) threats analysis for gray wolves in

18  the West Coast States, the final rule fails to consider an important aspect of the species'

19  recovery – the recovery of gray wolves in the West Coast States – and therefore, violates the

20  ESA and APA. 16 U.S.C. § 1533(a)(1); 5 U.S.C. § 706(2)(A).

21  152.    In the final rule, the Service relies on the alleged recovery of wolves in the Northern

22  Rocky Mountains DPS to rationalize that gray wolves in the West Coast states of Oregon,

1   Washington, and California are not necessary to support the recovery of the species overall.

2   But the final rule does not consider the best available science in concluding that recovery in

3   the Northern Rocky Mountains DPS has been and continues to be successful in supporting

4   an ecologically viable population of gray wolves in the Northern Rocky Mountains DPS.

5   153.    In the final rule, the Service discusses state management regimes in the Northern

6   Rocky Mountains DPS states of Idaho, Montana, and Wyoming. But the final rule does not

7   consider the best available science in concluding that the state management regimes in

8   Idaho, Montana, and Wyoming have been and continue to be successful in supporting an

9   ecologically viable population of gray wolves in the Northern Rocky Mountains DPS.

10   154.    The final rule's treatment of the status of Idaho's wolf population and regulatory

11   mechanisms in place there is arbitrary and capricious, and therefore the final rule does not

12   contain an adequate section 4(a)(1) threats analysis for gray wolves occurring in the

13   Congressionally-created (and Congressionally-delisted) Northern Rocky Mountains DPS.

14   The final rule ignores that the State of Idaho stopped reporting minimum wolf population

15   numbers in 2015. The final rule ignores wolf population data for Idaho more recent than

16   2016. The final rule ignores that Idaho allowed 60 percent of its wolf population to be

17   hunted or trapped in 2019-2020. The final rule ignores Idaho's wolf bounty program. The

18   final rule failed to rely on the best scientific and commercial data related to Idaho's wolf

19   population. The final rule failed to rely on the best scientific and commercial data related to

20   Idaho's wolf management regime.

21   155.    The Service's determination that the threats to the gray wolf throughout the Lower

22   48 have been reduced such that the listed entities no longer meet the definition of threatened

or endangered under the ESA violates the ESA and is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

## FIFTH CLAIM FOR RELIEF

### (Violation of ESA – Failure to Use and Apply the Best Available Science)

156.    Plaintiffs incorporate all preceding paragraphs.

157.    The ESA requires listing determinations to be based "solely on the basis of the best

scientific and commercial data available," (hereinafter "best available science"). 16 U.S.C. §

1533(b)(1)(A).

158.    The final rule fails to consider, apply, and comport with the best available science.

159.    The final rule's application of the scientific concept of "resiliency, redundancy, and

representation," or the "3 Rs," as authored by Shaffer and Stein (2000), fails to comport with

the best available science. The final rule rests on the premise that gray wolves in the Great

Lakes region alone purportedly provide adequate "resiliency, redundancy, and

representation" to sustain populations within the 44-State entity over time. 85 Fed. Reg.

69,885. The Service uses these "3 R's" (resiliency, redundancy, and representation) to define

"significance" under its "significant portion of its range" analysis. 85 Fed. Reg. 69,885. The

Service explains that the relatively few wolves outside of the Great Lakes area within the 44-

State entity, including those in the West Coast states and lone dispersers in other states, such

as Colorado, are not necessary to the recovery of the 44-State entity overall. 85 Fed. Reg.

69,885. But the Service misinterprets and misapplies the science underlying the "3 Rs"

concept. In the final rule, the Service applies the "3 Rs" concept at the species-level, 85 Fed.

Reg. 69,854, but the best available science mandates the "3 Rs" concept is to be applied in

1    the broader ecosystem-based context, *see* Shaffer and Stein (2000). The Service's failure to

2    base the final rule on the best available science violates the ESA and APA. 16 U.S.C. §

3    1533(b)(1)(A); 5 U.S.C. § 706(2)(A).

4    160.    The final rule's analysis of habitat suitability fails to comport with the best available

5    science. The final rule fails to apply the best available science to its analysis of habitat

6    suitability in the Central/Southern Rocky Mountains, including in Colorado, Utah, Nevada,

7    and northern New Mexico. Instead, the final rule rests on the Service's belief that the gray

8    wolves occurring in the Central/Southern Rocky Mountains, including in Colorado and

9    Utah, are not necessary to the recovery of the 44-State entity overall. 85 Fed. Reg. 69,885.

10   The final rule fails to explain why the Central/Southern Rocky Mountains no longer contain

11   necessary suitable habitat for gray wolf recovery, as the Service has concluded it does in prior

12   rules. The Service's failure to base the final rule on the best available science violates the

13   ESA and APA. 16 U.S.C. § 1533(b)(1)(A); 5 U.S.C. § 706(2)(A).

14   161.    The Service's determination that the final rule is based on the best available science

15   violates the ESA and is "arbitrary, capricious, an abuse of discretion, or otherwise not in

16   accordance with law." 5 U.S.C. § 706 (2)(A).

17                               **SIXTH CLAIM FOR RELIEF**

18               **(Violation of ESA – Illegal Post-Delisting Monitoring Program)**

19   162.    Plaintiffs incorporate all preceding paragraphs.

20   163.    Section 4(g)(1) of the ESA requires the Service to implement a system, in cooperation

21   with the States, to monitor effectively — for not less than five years — the status of all

22   species that have been determined to be recovered to the point at which the Act's

1    protections are no longer required, and which have been removed from the federal list of

2    endangered and threatened wildlife. 16 U.S.C. § 1533(g)(1).

3    164.    The Service's Post-Delisting Monitoring Plan Guidance provides that the Service

4    should tailor a post-delisting monitoring program to collect and evaluate data "most likely to

5    detect increased vulnerability of the species following removal of ESA protections." U.S.

6    Fish and Wildlife Service and National Marine Fisheries Service, Post-Delisting Monitoring

7    Plan Guidance Under the Endangered Species Act at 4-1 (August 2008) (hereinafter

8    "Monitoring Guidance"). The Service's Post-Delisting Monitoring Plan Guidance provides

9    that different monitoring protocols in different locations due to differences in threats and

10    population dynamics should be contemplated. Monitoring Guidance at 4-2.

11    165.    In the final rule, the Service explains: "Our monitoring activities will focus on wolves

12    within Minnesota, Wisconsin, and Michigan. Although the entities evaluated in this rule

13    include wolves outside of those states, we have determined that it is appropriate to focus on

14    the Great Lakes area because it includes the currently-listed Minnesota entity and that

15    portion of the 44-state entity that is most significant in terms of vulnerability of the species

16    following removal of the Act's protections. Therefore, by evaluating the monitoring data

17    from the Great Lakes states, we can effectively monitor the status of the species." 85 Fed.

18    Reg. 69,894.

19    166.    In the final rule, the Service explains that it will not conduct any post-delisting

20    monitoring of the species outside of Minnesota, Wisconsin, and Michigan. 85 Fed. Reg.

21    69,894.

22

167.    In the final rule, the Service explains that it will not conduct any post-delisting monitoring of the species in Oregon, Washington, California, Colorado, or other states where a small number of gray wolves currently exist. 85 Fed. Reg. 69,894.

168.    In the final rule, the Service explains that it will not conduct any further post-delisting monitoring of the species in the NRM DPS, including in Idaho and Montana, where post-delisting monitoring is already complete, nor in Wyoming, where post-delisting monitoring is currently in place. 85 Fed. Reg. 69,894.

169.    In the final rule, the Service relies on a 2008 monitoring plan prepared for a DPS that does not exist, entitled "Post-delisting Monitoring Plan for the Western Great Lakes Distinct Population Segment of the Gray Wolf" (February 2008). 85 Fed. Reg. 69,894.

170.    The Service's failure to monitor gray wolves outside of the Great Lakes States and reliance on an outdated monitoring plan for a DPS that does not exist violates the ESA and the Service's Post-delisting Monitoring Plan Guidance, and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

**SEVENTH CLAIM FOR RELIEF**

**(Violation of APA – Inadequate Public Notice and Comment)**

171.    Plaintiffs incorporate all preceding paragraphs.

172.    The APA requires federal agencies to provide notice of rulemaking to the public. 5 U.S.C. § 553(b). The APA requires federal agencies "shall provide interested persons an opportunity to participate in the rule making though submission of written data, views or arguments." 5 U.S.C. § 553(c). Any changes between a proposed rule and final rule must be a logical outgrowth of the notice and comments received.

173.    Agency action without observance of the procedure required by law is arbitrary or abuse of discretion and shall be set aside. 5 U.S.C. § 706(2)(D).

174.    The changes between the Service's 2019 proposed rule and the Service's 2020 final rule are significant and required additional notice and opportunity for the public to comment.

175.    The Service changed its approach from analyzing a single "gray wolf entity" in the 2019 proposed rule, to analyzing three different configurations of "gray wolf entities" in the final rule.

176.    The Service added significant new biological and policy information to the final rule that was omitted from the 2019 proposed rule.

177.    The Service did not provide the public, nor peer reviewers of the Service's 2019 proposed rule, adequate notice and an opportunity to comment on the revised approach of the final rule and significant new biological and policy information included within.

178.    The Service's failure to provide adequate notice and opportunity to comment on the significant changes from the proposed rule to the final rule renders the final rule "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

A.    Declare the Service has violated and continues to violate the law as alleged above;

B.    Set aside and vacate the Service's November 3, 2020 final rule challenged herein pending compliance with the ESA and APA, as alleged herein;

1   C.      Remand this matter back to the Service with instructions to comply with the ESA

2   and APA, as alleged herein;

3   D.      Issue any interim or permanent injunctive relief or other relief this Court deems

4   necessary, just, or proper or that Plaintiffs may subsequently request;

5   E.      Award Plaintiffs their reasonable attorneys' fees, costs, and expenses of litigation;

6

7           Respectfully submitted this 14th day of January, 2021.

                                    /s/ Jason Flanders

8                                   /s/ John R. Mellgren
                                    John R. Mellgren
9                                   *applicant for admission pro hac vice*

                                    /s/ Kelly E. Nokes
10                                  Kelly E. Nokes
                                    *applicant for admission pro hac vice*
11

12

13

14

15

16

17

18

19

20

21

22