Jason Flanders (CA Bar No. 238007)
Aqua Terra Aeris Law Group
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Ph: (916) 202-3018
jrf@atalawgroup.com

John R. Mellgren, *appearance pro hac vice*
Oregon Bar No. 114620
Western Environmental Law Center
120 Shelton McMurphey Blvd., Ste. 340
Eugene, OR 97401
Ph: 541-359-0090
mellgren@westernlaw.org

Kelly E. Nokes, *appearance pro hac vice*
Colorado Bar No. 51877
Western Environmental Law Center
P.O. Box 218
Buena Vista, Colorado 81211
Ph: 575-613-8051
nokes@westernlaw.org

*Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, a non-profit organization; et al., | Case No. 4:21-cv-00349-JSW |
| Plaintiffs, | Related Case Nos.<br>4:21-cv-00344-JSW<br>4:21-cv-00349-JSW |
| vs. | |
| DEBRA HAALAND, as Secretary of the United States Department of the Interior; et al., | **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Federal Defendants, and | |
| NATIONAL RIFLE ASSOCIATION OF AMERICA, et al.; | |

Defendant-Intervenors.

## INTRODUCTION

1.    This second amended complaint is filed as a matter of course pursuant to Fed. R. Civ. P. 15(a)(1)(B). Defendant-Intervenors, National Rifle Association of America, et al. ("NRA, et al.") filed a Motion to Dismiss under Fed. R. Civ. P. 12(b)(1) on May 6, 2021. ECF No. 44. Plaintiffs file this Second Amended Complaint within 21 days of service of NRA's Fed. R. Civ. P. 12(b) motion. Fed. R. Civ. P. 15(a)(1)(B).

2.    WildEarth Guardians, Western Watersheds Project, Cascadia Wildlands, the Environmental Protection Information Center, Klamath Forest Alliance, Klamath-Siskiyou Wildlands Center, The Lands Council, Wildlands Network, and Kettle Range Conservation Group (collectively, "Plaintiffs"), bring this civil action against the above-named Federal Defendants (collectively, the "Service") under the citizen suit provision of the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, for violations of the ESA and APA.

3.    This case challenges the Service's decision to remove federal ESA protections from gray wolves in the contiguous United States. The Service's decision was published in the Federal Register on November 3, 2020 (85 Fed. Reg. 69,778) and took effect on January 3, 2021.

4.    The Service's 2020 final rule removing gray wolves throughout the contiguous United States from the list of endangered and threatened wildlife — excepting the Mexican wolf (*C. l. baileyi*) and red wolf (*C. rufus*) subspecies listings, as well as the already Congressionally-

1  delisted gray wolf population in the Northern Rocky Mountains distinct population segment

2  ("DPS") — is premature, conflicts with the Service's responsibility to take a precautionary

3  approach to wildlife management in accordance with the mandates and intent of the ESA,

4  and blatantly contravenes prior court orders and rulings on the matter.

5  5.    The Service's rule relies on the premise that alleged recovery in one region (the Great

6  Lakes)[1] is sufficient to delist a species formerly distributed across the entire continent. The

7  rule explains that despite the fact that gray wolves have yet to be restored to approximately

8  85 percent of the species' historic range — including in ecologically viable populations in the

9  Pacific Northwest (or "West Coast states") and the Southern (or "Central") Rocky

10  Mountains — wolves in the valuable, suitable habitats afforded by these regions simply do

11  not matter to the yet-to-be-achieved recovery of the species overall.

12  6.    Plaintiffs – a coalition of conservation organizations dedicated to gray wolf

13  conservation in the American West – are thus compelled to bring this civil action. The

14  Service's 2020 rule removing gray wolves from the list of endangered and threatened wildlife

15  is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA and APA.

**JURISDICTION**

17  7.    This Court has jurisdiction over this action under 28 U.S.C. § 1331, 16 U.S.C. §

18  1540(g), and 5 U.S.C. § 704.

---

[1] Plaintiffs make no admission that recovery of gray wolves in the Great Lakes region has actually, biologically, nor lawfully been achieved in accordance with the mandates of the ESA.

1    8.    This Court has the authority to review the Service's actions or inactions complained

2    of herein, and grant the relief requested, under the ESA's citizen suit provision, 16 U.S.C. §

3    1540(g), and the APA, 5 U.S.C. § 706.

4    9.    All requirements for judicial review required by the ESA are satisfied. Plaintiffs

5    delivered a notice of intent to sue letter, as required by the ESA, via email on November 6,

6    2020. That same notice of intent to sue letter was also sent via FedEx, and received by

7    Defendants on November 10 and 12, 2020. These letters notified each defendant of

8    Plaintiffs' intent to file a civil action to rectify the legal violations described in the letter. A

9    copy of Plaintiffs' notice letter is attached to this complaint as Exhibit 1. More than sixty-

10   days have elapsed since all defendants received Plaintiffs' notice of intent to sue for

11   violations of the ESA and APA when removing the gray wolf in the contiguous United

12   States from the list of endangered and threatened wildlife.

13   10.   All requirements for judicial review required by the APA are satisfied. Plaintiffs

14   exhausted their administrative remedies related to the final rule challenged by this lawsuit.

15   Plaintiffs submitted timely comments to the Service relating to its proposal to remove gray

16   wolves in the contiguous United States from the list of endangered and threatened wildlife.

17   11.   The relief sought is authorized by 28 U.S.C. §§ 2201 (Declaratory Judgment), 28

18   U.S.C. § 2202 (Injunctive Relief), 16 U.S.C. § 1540 (ESA), and 5 U.S.C. § 706 (APA).

19                                      **VENUE**

20   12.   Venue is proper in this Court under 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. §

21   1391(e). Federal Defendant U.S. Fish and Wildlife Service maintains an office within this

22   District. Federal Defendant U.S. Department of the Interior maintains an office within this

1  District. At least one Plaintiff maintains an office within this District. A significant portion

2  of the events or omissions giving rise to these claims occurred within this District.

3  ### INTRADISTRICT ASSIGNMENT

4  13.    Assignment to the San Francisco, Oakland, or Eureka Divisions under Civil L.R. 3-

5  2(c) is appropriate because: (1) multiple plaintiffs and their members are located in counties

6  within those districts; (2) federal defendants U.S. Fish and Wildlife Service and U.S.

7  Department of the Interior maintain offices in San Francisco, Oakland, and Arcata; and (3)

8  the consequences of the final gray wolf delisting rule challenged in this litigation will occur,

9  in part, within the lands covered by the San Francisco, Oakland, and Eureka Divisions.

10  ### STANDING

11  14.    As demonstrated in the allegations of Plaintiffs' and their members' interests in this

12  controversy included below, and in the attached declarations (Exhibits 2–11), Plaintiffs

13  satisfy the minimum requirements for Article III standing to pursue this civil action.

14  Plaintiffs – including their members, supporters, and staff – have suffered and continue to

15  suffer injuries to their interests in gray wolves, gray wolf habitat, and pursuing their interests

16  in areas occupied by gray wolves caused by the Service's decision to remove gray wolves in

17  the contiguous United States from the list of endangered and threatened wildlife. *See e.g.,*

18  Exhibit 2, Declaration of Kimberly Baker; Exhibit 3, Declaration of Timothy Coleman;

19  Exhibit 4, Declaration of Greg Costello; Exhibit 5, Declaration of Bethany Cotton; Exhibit

20  6, Declaration of Michael Dotson; Exhibit 7, Declaration of Marla Fox; Exhibit 8,

21  Declaration of Chris Krupp; Exhibit 9, Declaration of Lindsay Larris; Exhibit 10,

22  Declaration of Ralph Maughan; and Exhibit 11, Declaration of Erik Molvar. This Court can

1   redress these injuries by granting the relief requested. *See e.g.,* Exhibit 2, Declaration of

2   Kimberly Baker; Exhibit 3, Declaration of Timothy Coleman; Exhibit 4, Declaration of Greg

3   Costello; Exhibit 5, Declaration of Bethany Cotton; Exhibit 6, Declaration of Michael

4   Dotson; Exhibit 7, Declaration of Marla Fox; Exhibit 8, Declaration of Chris Krupp; Exhibit

5   9, Declaration of Lindsay Larris; Exhibit 10, Declaration of Ralph Maughan; and Exhibit 11,

6   Declaration of Erik Molvar. There is a present and actual controversy between the parties.

7                                    **PARTIES**

8   15.     Plaintiff, WILDEARTH GUARDIANS ("GUARDIANS"), is a non-profit

9   organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and

10  the health of the American West. Guardians is specifically committed to ensuring the

11  survival and recovery of the gray wolf throughout its historical range. Guardians has

12  approximately 235,000 active members and supporters across the American West, including

13  many who reside in California, Oregon, Washington, Colorado, Utah, New Mexico, and

14  Idaho. Guardians brings this action on behalf of itself, its members, and its supporters. The

15  delisting rule at issue in this litigation frustrates Guardians' mission to provide for the

16  recovery and maintenance of the gray wolf throughout its historical range, and harms

17  Guardians', its members', and staffs' interests in gray wolves and gray wolf recovery. *See e.g.,*

18  Exhibit 9, Declaration of Lindsay Larris; Exhibit 7, Declaration of Marla Fox; Exhibit 8,

19  Declaration of Chris Krupp.

20  16.     Guardians staff and member, Ms. Fox, is a resident of Carson, Washington along the

21  Wind River in the southern Washington Cascades. Exhibit 7, Declaration of Marla Fox at ¶

22  2. Ms. Fox is originally from Mendota Heights, Minnesota and her family owns two cabins

on Johnson Lake in Burnett County in Northern Wisconsin. *Id.* at ¶¶ 3, 7. Ms. Fox holds

sincere recreational, aesthetic, spiritual, and personal interests in wolves coexisting with

humans and thriving on the landscape in Northern Wisconsin and Northern Minnesota,

including the region surrounding Johnson Lake. *Id.* at ¶ 12. Ms. Fox holds sincere

recreational, spiritual, and personal interests in wolves coexisting with humans and thriving

on the landscape in the southern Washington Cascades. *Id.* Ms. Fox appreciates knowing

that wolves exist in Northern Wisconsin, and are beginning to return to southern

Washington. *Id.* Ms. Fox is concerned that state-authorized hunting of gray wolves in

Northern Wisconsin, as the direct result of the species' loss of federal protections under the

ESA, will harm her chances of ever viewing wolves in the region when visiting her family's

cabins on Johnson Lake. *Id.* at ¶ 15. Ms. Fox's recreational, aesthetic, spiritual, and personal

enjoyment of the area surrounding Johnson Lake is harmed by the delisting of wolves and

the hunting that is likely to occur in Wisconsin as the result of delisting. *Id.* Ms. Fox is

concerned that she may never get the chance to see a wolf in Northern Wisconsin or

southern Washington as a result of reduced population numbers, which are likely to be

driven down as a result of federal delisting. *Id.* If Guardians is successful in overturning the

federal delisting of wolves, as challenged herein, the harms to Ms. Fox's recreational,

aesthetic, spiritual, and personal interests in Johnson Lake and the surrounding area, and in

southern Washington, and in the wolves on those landscapes will be remedied because

federal protections would be restored and there would be no Wisconsin wolf hunts, or

increased authority for lethal control of wolves in Washington, to drastically reduce wolf

population numbers. *Id.* at 16.

17.     Guardians member and Wildlife Program Director, Ms. Larris, holds aesthetic, educational, and recreational interests in gray wolves and gray wolf recovery. Exhibit 9, Declaration of Lindsay Larris at ¶¶ 4–5. Ms. Larris resides in Denver, Colorado, and hopes to someday see wolves fully restored to her state, and elsewhere throughout their historic range. *Id.* at ¶¶ 2, 9–12. Ms. Larris believes that the U.S. Fish and Wildlife Service's premature delisting of gray wolves, which fails to take into consideration populations across the historic range for wolves, has hampered her own and Guardians' ability to ensure wolves are rightfully recovered to suitable, historic habitats, inlcuding in Oregon, Washington, California, Colorado, and elsewhere. *Id.* at ¶ 16. If Guardians is successful in reinstating ESA protections for gray wolves as the result of this litigation, the harms Ms. Larris and Guardians face will be lessened because gray wolves will once again be protected by he ESA's take prohibition in areas like Colorado and California and the authorization of lethal control of wolves by the states of Washington and Oregon will be lessened. *Id.* at 17.

18.     Guardians member and employee, Mr. Krupp, holds personal and professional interests in seeing gray wolves in the wild in both his home state of Washington and where he was born, in Wisconsin. Exhibit 8, Declaration of Chris Krupp at ¶¶ 2–3, 7, 10, 15. Mr. Krupp regularly recreates with his family on national forest lands where suitable wolf habitat exists, including on the Mt. Baker-Snoqualmie and Olympic National Forests in Washington, and on the Chequamegon-Nicolet National Forest in northern Wisconsin. *Id.* at ¶¶ 8–9. Mr. Krupp regularly looks for wolves when he visit theses forests and has plans to do so again this summer. *Id.* at ¶ 11 (describing an upcoming visit to his sister's cabin in Oneida County, Wisconsin on August 23–29, 2021). Mr. Krupp is concerned that his, and his son's, chance

1    of seeing wolves in the wild will be lessened as a result of the federal delisting of the species,

2    and the resultant hunting that Wisconsin law mandates to occur absent federal protections.

3    *Id.* at ¶¶ 12–15. If Guardians' is successful in this litigation, the harms to Mr. Krupp's

4    interests in seeing gray wolves in the wild will be lessened because wolves will regain federal

5    protections and will no longer be subjected to a hunt in Wisconsin. *Id.* at ¶ 16.

6    19.    Plaintiff, WESTERN WATERSHEDS PROJECT ("WWP"), is a non-profit

7    organization founded in 1993 with approximately 12,000 members and supporters. It has

8    offices in Idaho, Montana, Wyoming, Oregon, Arizona, Utah, Nevada, and California, and

9    its mission is to protect and restore western watersheds and wildlife through education,

10   public policy initiatives, and legal advocacy. Western Watersheds Project works to influence

11   and improve public lands management throughout the West. It works to prevent harm to

12   ecological, biological, cultural, historic, archeological, scenic resources, wilderness values,

13   roadless areas, Wilderness Study Areas, and designated Wilderness. Western Watersheds

14   Project brings this action on behalf of itself, its members, and its supporters. The delisting

15   rule at issue in this litigation frustrates Western Watersheds Project's mission to provide for

16   the recovery and maintenance of the gray wolf throughout its historical range, and harms

17   Western Watersheds Project's, its members', and staffs' interests in gray wolves and gray

18   wolf recovery. *See e.g.,* Exhibit 11, Declaration of Erik Molvar; Exhibit 10, Declaration of

19   Ralph Maughan.

20   20.    WWP Executive Director and member, Mr. Molvar, resides in Laramie, Wyoming

21   and holds a Master of Science degree in Wildlife Management from the University of Alaska,

22   Fairbanks. Exhibit 11, Declaration of Erik Molvar at ¶¶ 16, 4. Mr. Molvar holds both

professional and personal, educational, recreational, and aesthetic interests in seeing gray

wolves recovered throughout the species' historic and native range. *Id.* at ¶¶ 7–9, 12–13, 15,

17, 19, 26, 31. As a professional and published ecologist, Mr. Molvar has a deep appreciation

for the existence value of wolves, and the key role the species plays in maintaining the

natural ecological balance of healthy ecosystems. *Id.* at ¶ 34. Mr. Molvar's interests in and

enjoyment of public lands and wildlife are amplified by sighting wolves or detecting signs or

sounds of gray wolves, and conversely, are substantially harmed by being unable to see or

hear wolves or their sign. *Id.* at ¶ 35. Mr. Molvar enjoys wildlife photography and fears that

the removal of federal ESA protections from gray wolves will lessen his chances of getting

to photograph a wolf in the wild. *Id.* at ¶ 35. Mr. Molvar is concerned that the removal of

ESA protections from gray wolves in the states of Oregon and Washington will likely lead to

increased wolf killing to protect livestock interests. *Id.* at ¶ 38. Mr. Molvar believes that if

WWP achieves a favorable resolution in this lawsuit, the ongoing injuries he, and other

members of WWP, face to their interests in ensuring gray wolves are biologically and legally

recovered under the ESA, will be alleviated because the agency will be forced to ensure its

listing decisions relating to gray wolves comply with the best available science and the

mandates of the ESA. *Id.* at ¶ 39.

21.     WWP member, Mr. Maughan, has educational, recreational, and aesthetic interests in

gray wolves and seeing gray wolves recovered in the American West. Exhibit 10, Declaration

of Ralph Maughan at ¶¶ 11, 12, 16, 19. Mr. Maughan resides in Pocatello, Idaho, and is

dismayed by the state management of wolves in his state since gray wolves in Idaho were

federally delisted. *Id.* at ¶¶ 19–20. Mr. Maughan enjoys looking for wolves when he is hiking

1   and backpacking in areas throughout the west, including in Utah, where key habitat for

2   wolves exist, but none yet do. *Id.* at ¶¶ 15–18. Mr. Maughan fears that the delisting of wolves

3   throughout the contiguous United States will negatively impact the ability of dispersing

4   wolves to recover in states where they have yet to return, like Utah, because state

5   management regimes in the Northern Rocky Mountains states is resulting in more killing of

6   wolves and intense population reductions. *Id.* at ¶¶ 19–21. The harms to Mr. Maughan's

7   interests in gray wolves and their recovery in states like Utah, will be alleviated if WWP is

8   successful in this litigation because dispersing wolves will once again be protected from

9   being killed under the ESA if the relief requested by Plaintiffs is granted. *Id.* at ¶ 23.

10  22.     Plaintiff, CASCADIA WILDLANDS, is a non-profit organization headquartered in

11  Eugene, Oregon. Cascadia Wildlands has approximately 12,000 members and supporters

12  throughout the United States. Cascadia Wildlands works to educate, protect, and restore the

13  Cascadia Bioregion's (extending from northern California to southeastern Alaska) wild

14  ecosystems and native species, including the gray wolf. Cascadia Wildlands brings this action

15  on behalf of itself, its members, and its supporters. The delisting rule at issue in this litigation

16  frustrates Cascadia Wildlands' mission to provide for the recovery and maintenance of the

17  gray wolf throughout its historical range, and harms Cascadia Wildlands', its members', and

18  staffs' interests in gray wolves and gray wolf recovery. *See* Exhibit 5, Declaration of Bethany

19  Cotton.

20  23.     Cascadia Wildlands' member and Conservation Director, Ms. Cotton,  holds sincere

21  aesthetic, recreational, educational, spiritual and other interests in wolves and in seeking out

22  wolf encounters for photographing, hoping to hear and/or witness the species in the wild,

1   and in knowing wolves are starting to return to historic habitats. Exhibit 5, Declaration of

2   Bethany Cotton at ¶ 4. Ms. Cotton resides on a private inholding in the Cascade Siskiyou

3   National Monument, which is historic and recently re-occupied wolf habitat just outside of

4   Ashland, Oregon. *Id.* at ¶ 1. Ms. Cotton, and Cascadia Wildlands as an organization, have a

5   specific interest in the plight of wolves and in ensuring the integrity of the ESA. *Id.* at ¶ 5.

6   Ms. Cotton regularly recreates in remote areas of wolf habitat in Eastern and Western

7   Oregon, Southern Washington, Idaho, and Wyoming, but has yet to see a wolf in the wild in

8   these geographies. *Id.* at ¶ 10. Ms. Cotton is deeply concerned that without federal

9   safeguards wolves will become so rare, and also so conditioned to fear humans, that she may

10   never again get to see a wolf outside of National Park boundaries, which has only happened

11   once. *Id.* at ¶ 11. Ms. Cotton is also an amateur photographer, and she derives aesthetic and

12   recreational enjoyment from seeking out wolves and other wildlife, from seeing tracks and

13   other sign, and from simply knowing that wolves still roam wildlands. *Id.* at ¶ 13. Ms. Cotton

14   finds it deeply troubling that the many decades of efforts to restore wolves to the landscape

15   is being rapidly undone by states and others who seek to reject sound science and rush to

16   remove ESA protections from the species when they have yet to be restored to much of

17   their historic habitat. *Id.* Ms. Cotton's concerns about the losses of wolves that will be

18   suffered without ESA protections are not merely speculative or conjecture — they are

19   founded in the very real outcomes for wolves that she has witnessed in Idaho, Montana, and

20   Wyoming upon delisting of wolves there. *Id.* Ms. Cotton believes that the gains in wolf

21   recovery in Washington, Oregon, and California are tenuous, and were largely provided by

22   ESA protections, and without those protections, wolves are likely far more vulnerable to

state management regimes that allow for more liberalized killing of wolves. *Id.* at 15. Ms.

Cotton feels that each wolf killed harms her own and Cascadia Wildlands' interests in gray

wolves, gray wolf recovery, and fully functioning ecosystems across the Cascadia bioregion,

and further, that such loss diminishes the primeval experience of recreating in the woods

knowing that carnivores are present. *Id.* Ms. Cotton's and Cascadia Wildlands' interests in

wolves have been and continue to be harmed by the delisting rule and the resultant

likelihood that more wolves will be killed under state management programs in Oregon and

Washington. *Id.* at 21. If Cascadia Wildlands is successful in this litigation, these harms will

be alleviated because federal protections for wolves will be reinstated and the states of

Oregon and Washington will no longer be able to kill wolves in the western portions of each

state. *Id.*

24.     Plaintiff, ENVIRONMENTAL PROTECTION INFORMATION CENTER

("EPIC"), is a non-profit organization located in Eureka, California. Since 1977, EPIC has

defended the wildlife and wild places of the Klamath Mountains and North Coast Range.

EPIC's mission is the science-based protection and restoration of northwest California's

forests and seeks to ensure that a connected landscape exists for species survival, species

recovery, and climate adaptation. Most of EPIC's 15,000 members and supporters live in

northern California. EPIC's members and staff use, enjoy, and recreate on public lands

within the range of the gray wolf. EPIC's members and staff use, enjoy, and recreate on

public lands that could serve as habitat for gray wolves. EPIC, its members, and staff are

dedicated to the recovery of the gray wolf throughout its historical range, including in

northern California. The delisting rule at issue in this litigation frustrates EPIC's mission to

provide for the recovery and maintenance of complete and functional ecosystems, and

harms EPIC's, its members', and staffs' interests in gray wolves and gray wolf recovery. *See*

Exhibit 2, Declaration of Kimberly Baker.

25.     EPIC Public Land Advocate, Ms. Baker, has both personal and professional,

recreational, educational, spiritual, and aesthetic interests in gray wolves, and in seeing gray

wolves recovered along the West Coast, especially near her home in Northern California.

Exhibit 2, Declaration of Kimberly Baker at ¶¶ 4, 5, 7, 9–14, 18. Ms. Baker resides in

Trinidad, California and has a second home in Gasquet, California. *Id.* at ¶ 2. Ms. Baker

represented EPIC in the gray wolf stakeholder group during the development and drafting

of the California Department of Fish and Wildlife Conservation Plan for Gray Wolves in

California. *Id.* at ¶ 5. Ms. Baker often visits and recreates in areas of suitable gray wolf habitat

in the Six Rivers, Klamath, Shasta-Trinity, Mendocino, and Modoc National Forests, and is

spiritually fulfilled by witnessing nature and intact ecosystems. *Id.* at ¶ 7. Ms. Baker always

looks for signs or evidence of wolves when out in these forests. *Id.* Ms. Baker holds a deep

appreciation for the traditions of the Karuk people and their cultural practices, and works to

promote the incorporation of their traditional ecological knowledge into public land

management. *Id.* at 9. Ms. Baker has been greatly saddened, depressed, and haunted by the

effects of removing the gray wolf from the endangered species list. *Id.* at ¶ 17. Ms. Baker's

personal and professional interests in gray wolves and their recovery are harmed by the

delisting because, absent federal protections, less wolves are likely to be permitted to

disperse into California and wolf recovery in the state may never be realized. *Id.* at ¶ 18. Ms.

Baker's spiritual interests in the species are harmed because federal delisting (and the

1    increased killing of wolves that results) hampers the reinvigoration of indigenous culture and

2    tradition relating to the gray wolf. *Id.* Ms. Baker has experienced a procedural injury as a

3    result of the delisting because the U.S. Fish and Wildlife Service failed to comply with the

4    ESA's best available science mandate in promulgating the final rule. *Id.* at ¶ 19. Ms. Baker's

5    harm would be alleviated if EPIC is successful in this lawsuit because the reinstatement of

6    ESA protections would better allow for the recovery and continued occupancy of gray

7    wolves in California, where this keystone species can again play its part in balancing

8    ecosystems and contributing to Native American culture. *Id.* at ¶¶ 20–21. Ms. Baker is also

9    the Executive Director of Plaintiff, Klamath Forest Alliance. *Id.* at ¶ 3.

10   26.     Plaintiff, KLAMATH FOREST ALLIANCE ("KFA"), is a non-profit organization

11   founded in 1989, based in Orleans, California. Its mission is to promote sustainable

12   ecosystems and sustainable communities of the Klamath-Siskiyou Mountain region. KFA

13   participates in forest planning through agency engagement, substantive comments and

14   collaboration, and uses law, science, place-based knowledge and conservation advocacy to

15   defend the biodiversity, wildlife, waters and mature forests of the Klamath-Siskiyou

16   bioregion. KFA's members and staff use, enjoy, and recreate on public lands within the

17   current and future range of the gray wolf. KFA brings this action on behalf of itself, its

18   members, and its supporters. The delisting rule at issue in this litigation frustrates KFA's

19   mission to provide for the recovery and maintenance of the gray wolf throughout its

20   historical range, and harms KFA's, its members', and staffs' interests in gray wolves and gray

21   wolf recovery. *See* Exhibit 2, Declaration of Kimberly Baker; *see also infra* ¶ 25 (describing Ms.

22

1   Baker's personal and professional interests in gray wolf recovery and the harms she faces as

2   the result of the delisting rule challenged herein).

3   27.     Plaintiff, KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild"), is a non-

4   profit organization headquartered in Ashland, Oregon. KS Wild has over 3,500 members

5   and supporters in more than 10 states, with most members concentrated in southern Oregon

6   and northern California. On behalf of its members, KS Wild advocates for the forests,

7   wildlife, and waters of the Rogue and Klamath Basins and works to protect and restore the

8   extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and

9   northwest California. KS Wild uses environmental law, science, education, and collaboration

10  to help build healthy ecosystems and sustainable communities. Through its campaign work,

11  KS Wild strives to protect the last wild areas and vital biological diversity of the Klamath

12  region. KS Wild is a leader in protecting public lands and routinely participates in

13  commenting, monitoring, and litigation affecting public lands and the natural resources

14  located there. KS Wild's members and staff use, enjoy, and recreate on public lands within

15  the range of the gray wolf. KS Wild brings this action on behalf of itself, its members, and its

16  supporters. The delisting rule at issue in this litigation frustrates KS Wild's mission to

17  provide for the recovery and maintenance of the gray wolf throughout its historical range,

18  and harms KS Wild's, its members', and staffs' interests in gray wolves and gray wolf

19  recovery. *See* Exhibit 6, Declaration of Michael Dotson.

20  28.     KS Wild Executive Director and member, Mr. Dotson, holds professional and

21  personal, educational, recreational, and aesthetic interests in gray wolf recovery, and in

22  particular, in seeing gray wolves rightfully restored to the Pacific Northwest. Exhibit 6,

Declaration of Michael Dotson at ¶¶ 3, 7, 8. Mr. Dotson resides in Jackson County, Oregon and regularly recreates, whether it be hiking, backpacking, camping or rafting, in the wild places near his home where wolves have been known to be present or are areas of known wolf activity, including the Rogue River Siskiyou National Forest, Fremont-Winema National Forest, and the Medford Bureau of Land Managament District. *Id.* at ¶ 4. Mr. Dotson has yet to see a gray wolf in the wild, but hopes to see a wolf in the wild in the southern Cascades someday. *Id.* at ¶ 6. Through his work with KS Wild, Mr. Dotson has assisted local ranching families in the Rogue River area to develop non-lethal means to help deter livestock depredation incidents involving wolves. *Id.* The U.S. Fish and Wildlife Service was a key partner in this work, and Mr. Dotson is now concerned that with the federal delisting of wolves — and the U.S. Fish and Wildlife Service no longer being engaged in wolf management — the local ranchers and other landowners he has assisted will not have the tools to effectively use non-lethal means to prevent wolf-livestock conflict. *Id.* Mr. Dotson fears that the loss of the U.S. Fish and Wildlife Service as a partner in this work (as the direct result of delisting) may lead to increased wolf-livestock conflict in southern Oregon, and may lead to increased wolf killing under the Oregon Department of Fish and Wildlife's wolf management rules, which allow both the Department and landowners to kill or harass wolves caught in the act of chasing or attacking livestock. *Id.* The decision to remove federal ESA protections from gray wolves in the Klamath-Siskiyou region and the U.S. Fish and Wildlife Service's failure to comply with the ESA in making that decision, as challenged herein, has harmed, and continues to harm, Mr. Dotson and other KS Wild members' interests in the species. *Id.* at ¶ 8. If KS Wild is successful in this lawsuit, ESA

1    protections for wolves in the Klamath-Siskiyou region will be reinstated and wolf recovery in

2    this region will be able to continue. *Id.*

3    29.    Plaintiff, THE LANDS COUNCIL, is a non-profit organization based in Spokane,

4    Washington. The Lands Council's mission is to preserve and revitalize Inland Northwest

5    forests, water, and wildlife through advocacy, education, effective action, and community

6    engagement. The Lands Council collaborates with a broad range of interested parties to seek

7    smart and mutually respectful solutions to environment and health issues. The Lands

8    Council is enriched by the beauty of nature. The Lands Council is energized by the

9    recreational opportunities afforded by nature, and is inspired to preserve its legacy for future

10   generations. The Lands Council's members and staff use, enjoy, and recreate on public lands

11   within the range of the gray wolf. The Lands Council brings this action on behalf of itself, its

12   members, and its supporters. The delisting rule at issue in this litigation frustrates The Lands

13   Council's mission to provide for the recovery and maintenance of the gray wolf throughout

14   its historical range, and harms The Lands Council's, its members', and staffs' interests in gray

15   wolves and gray wolf recovery.

16   30.    Plaintiff, WILDLANDS NETWORK, is a non-profit organization headquartered in

17   Salt Lake City, Utah. It was established in 1991, and its mission is to reconnect nature in

18   North America. Wildlands Network is focused on conserving the wholeness of nature,

19   which requires protecting the biodiversity of species. Wildlands Network works to provide

20   for large core reserves of habitat and the presence of apex predators and species, including

21   the gray wolf. Wildlands Network brings this action on behalf of itself, its members, and its

22   supporters. The delisting rule at issue in this litigation frustrates The Wildlands Network's

1   mission to provide for the recovery and maintenance of the gray wolf throughout its

2   historical range, and harms Wildlands Network's, its members', and staffs' interests in gray

3   wolves and gray wolf recovery. *See* Exhibit 4, Declaration of Greg Costello.

4   31.      Wildlands Network Executive Director and member, Mr. Costello, holds sincere

5   personal and professional, aesthetic, recreational, and educational interests in gray wolves

6   and gray wolf recovery. Exhibit 4, Declaration of Greg Costello at ¶ 4, 6, 11, 13. Mr.

7   Costello has long been involved with wolf recovery efforts and is working to realize suitable

8   habitat and landscape connectivity for the species. *Id.* at ¶¶ 6–10, 16. Wildlands Network,

9   and Mr. Costello, are working toward a goal of establishing a contiguous populations of

10  wolves from the Yukon to Mexico, a goal which they believe is impeded by the loss of ESA

11  protections for the species throughout the contiguous United States. *Id.* at ¶ 10. Mr. Costello

12  fears that the improper state management of wolves, which can allow excessive killing and

13  trapping of wolves, hampers the species' ability to disperse and reestablish populations with

14  sufficient densities and over adequate habitats to ensure the species' recovery in places it has

15  yet to be restored, and its ability to fulfill its ecological function throughout its native habitat.

16  *Id.* at ¶ 10. Mr. Costello fears that his chances of seeing wolves in the wild in his home state

17  of Washington are lessened as a result of delisting, and the depleted chances of wolves

18  successfully dispersing into his state as a result. *Id.* at ¶ 11. Mr. Costello is dismayed by the

19  state management of wolves in Oregon and Washington and fears that these state agencies'

20  management of the species has allowed recovery there to slow due to increased levels of

21  lethal removal of wolves due to alleged wolf/livestock conflict. *Id.* at ¶ 19. Mr. Costello, and

22  Wildlands Network's staff, board, and supporters, have strong interests in ensuring gray

1   wolves continue to receive the safeguards they need to be resilient in the face of increasing

2   threats to their survival and eventual return to still unoccupied habitats. *Id.* at 20. Mr.

3   Costello, and Wildlands Nework's, interests in the persistence and recovery of gray wolves

4   across their historic range, and in federal agency compliance with federal law, have been

5   harmed, and will continue to be harmed, by the U.S. Fish and Wildlife Service's premature,

6   legally deficient, and scientifically unsupported decision to strip gray wolves of ESA

7   protections. *Id.* If Wildlands Network is granted the relief requested in this litigation, the

8   injuries Mr. Costello and Wildlands Network face would be alleviated because ESA

9   protections for dispersing wolves from the Northern Rocky Mountain states would again be

10  reinstated and state management authority over the species would be significantly reduced.

11  *Id.*

12  32.    Plaintiff, KETTLE RANGE CONSERVATION GROUP, is a non-profit

13  organization headquartered in Republic, Washington. It was founded in 1976, and its

14  mission is to defend wilderness, protect biodiversity, and restore ecosystems of the

15  Columbia River Basin. Kettle Range Conservation Group works to preserve federal and

16  state roadless areas to protect critical habitat for native terrestrial and aquatic species, and to

17  safeguard resources of clean water, outdoor recreation, and natural scenic beauty. In

18  particular, Kettle Range Conservation Group has long advocated to protect gray wolves

19  under federal and state laws, and its staff served on the Washington Department of Fish and

20  Wildlife's Wolf Advisory Group for several years. Kettle Range Conservation Group brings

21  this action on behalf of itself, its members, and its supporters. The delisting rule at issue in

22  this litigation frustrates Kettle Range Conservation Group's mission to provide for the

1    recovery and maintenance of the gray wolf throughout its historical range, and harms its

2    members' and staffs' interests in gray wolves and gray wolf recovery. *See* Exhibit 3,

3    Declaration of Timothy Coleman.

4    33.    Kettle Range Conservation Group member and Executive Director, Mr. Coleman,

5    holds strong personal and professional, recreational, educational, and aesthetc interests in

6    gray wolves and the species recovery, especially in Northeastern Washington State. Exhibit

7    3, Declaration of Timothy Coleman at ¶¶ 2–3, 5–6, 8, 12–15. Mr. Coleman resides in

8    Republic, Washington and has advocated for the recovery of wolves since at least 1985. *Id.* at

9    ¶ 1, 5. Mr. Colemen sincerely hopes that someday Washington will have a thriving

10   population of gray wolves. *Id.* at ¶ 6. Mr. Coleman is concerned that the Washington

11   Department of Fish and Wildlife's Wolf Conservation and Management Plan is not a legally

12   binding or legally enforceable document. *Id.* at 9. Mr. Coleman formerly served on the state's

13   Wolf Advisory Group, until he was removed in August 2020, at the behest of livestock

14   stakeholder groups because he disagreed that with the Washington Department of Fish and

15   Wildlife's killing of the OPT Pack of wolves without following the agency's non-lethal

16   deterrence protocol. *Id.* at ¶ 11. Mr. Coleman regularly recreates in wolf habitat, including in

17   the Kettle River Mountains, the Selkirk Mountains, and the Cascade Mountains, and

18   regularly looks for wolves and their sign while hiking. *Id.* at ¶ 12. In August 2014, Mr.

19   Coleman and his friend came across a dead black wolf pup while hiking in the home territory

20   of the Profanity Pack along the Midnight Mountain Trail to the Kettle Crest National Scenic

21   Trail. *Id.* at ¶ 17. This was only the second time that Mr. Coleman had ever seen a wolf in the

22   wild, and it was a gut-wrenching experience for him to see such a beautiful animal shot to

1  death by the trailside. *Id.* Mr. Coleman gets emotionally distressed every time a wolf is killed

2  in Washington. *Id.* Mr. Coleman was extremely dismayed when the Washington Department

3  of Fish and Wildlife killed the Wedge Pack in 2012, and again when the agency killed the

4  breeding female of the Huckleberry Pack in 2014. *Id.* at ¶¶ 18-19. Mr. Coleman was

5  especially dismayed by these killings because the state agency did not follow its own

6  protocols regaring non-lethal deterrence before eliminating the packs. *Id.* at 19. Mr.

7  Coleman, and the Kettle Range Conservation Group, have strong interests in ensuring gray

8  wolves receive the protections they need to biologically recover in Washington, and those

9  interests are harmed by the Washington Department of Fish and Wildlife's wolf

10  management (including lethal wolf management) in Washington and by the U.S. Fish and

11  Wildlife Service's failure to comply with the mandates of the ESA and APA, as alleged

12  herein. *Id.* at ¶ 22. If Kettle Range Conservation Group is successful in this lawsuit, the relief

13  requested would alleviate the harms to Mr. Coleman and Kettle Range Conservation

14  Group's interests because ESA protections for the species would be reinstated and state

15  management authority over the species would be greatly reduced. *Id.*

16  34.     Plaintiffs' members, supporters, and staff are dedicated to ensuring the long-term

17  survival and recovery of gray wolves throughout the contiguous United States, and ensuring

18  the Service complies with the ESA and bases all of its listing (and de-listing) decisions on the

19  best scientific and commercial data available. *See e.g.,* Exhibit 2, Declaration of Kimberly

20  Baker; Exhibit 3, Declaration of Timothy Coleman; Exhibit 4, Declaration of Greg Costello;

21  Exhibit 5, Declaration of Bethany Cotton; Exhibit 6, Declaration of Michael Dotson;

22  Exhibit 7, Declaration of Marla Fox; Exhibit 8, Declaration of Chris Krupp; Exhibit 9,

1  Declaration of Lindsay Larris; Exhibit 10, Declaration of Ralph Maughan; and Exhibit 11,
2  Declaration of Erik Molvar.

3  35.   Plaintiffs' members, supporters, and staff live in or near, and/or routinely recreate in
4  or near, gray wolf habitat across the United States; including, but not limited to: the Pacific
5  Northwest region (including the West Coast states of Oregon, Washington, and California);
6  the Southern and/or Central Rocky Mountains region (including Colorado, Utah, Nevada,
7  and northern New Mexico); the Northern Rocky Mountains region (including Idaho,
8  Wyoming, and Montana); and areas of northern Wisconsin. *See e.g.,* Exhibit 2, Declaration of
9  Kimberly Baker; Exhibit 3, Declaration of Timothy Coleman; Exhibit 4, Declaration of Greg
10  Costello; Exhibit 5, Declaration of Bethany Cotton; Exhibit 6, Declaration of Michael
11  Dotson; Exhibit 7, Declaration of Marla Fox; Exhibit 8, Declaration of Chris Krupp; Exhibit
12  9, Declaration of Lindsay Larris; Exhibit 10, Declaration of Ralph Maughan; and Exhibit 11,
13  Declaration of Erik Molvar.

14  36.   Plaintiffs' members, supporters, and staff enjoy observing – or attempting to observe
15  – and studying gray wolves in the Pacific Northwest, Southern and/or Central Rocky
16  Mountains, Northern Rocky Mountains, and Wisconsin. *See e.g.,* Exhibit 2, Declaration of
17  Kimberly Baker; Exhibit 3, Declaration of Timothy Coleman; Exhibit 4, Declaration of Greg
18  Costello; Exhibit 5, Declaration of Bethany Cotton; Exhibit 6, Declaration of Michael
19  Dotson; Exhibit 7, Declaration of Marla Fox; Exhibit 8, Declaration of Chris Krupp; Exhibit
20  9, Declaration of Lindsay Larris; Exhibit 10, Declaration of Ralph Maughan; and Exhibit 11,
21  Declaration of Erik Molvar. Plaintiffs' members, supporters, and staff enjoy observing – or
22  attempting to observe – and studying signs of gray wolves' presence, and observing,

1   studying, and/or photographing gray wolves in areas where gray wolves are known to travel,

2   disperse, roam, and sometimes congregate (e.g., rendezvous sites). *See e.g.,* Exhibit 2,

3   Declaration of Kimberly Baker; Exhibit 3, Declaration of Timothy Coleman; Exhibit 4,

4   Declaration of Greg Costello; Exhibit 5, Declaration of Bethany Cotton; Exhibit 6,

5   Declaration of Michael Dotson; Exhibit 7, Declaration of Marla Fox; Exhibit 8, Declaration

6   of Chris Krupp; Exhibit 9, Declaration of Lindsay Larris; Exhibit 10, Declaration of Ralph

7   Maughan; and Exhibit 11, Declaration of Erik Molvar.

8   37.     The opportunity to view gray wolves or signs of gray wolves in the wild in the Pacific

9   Northwest, Southern and/or Central Rocky Mountains, and/or Northern Rocky Mountains,

10  and elsewhere across the American west – by itself – is of significant interest and value to

11  Plaintiffs' members, supporters, and staff, and increases their use and enjoyment of these

12  areas. *See e.g.,* Exhibit 2, Declaration of Kimberly Baker; Exhibit 3, Declaration of Timothy

13  Coleman; Exhibit 4, Declaration of Greg Costello; Exhibit 5, Declaration of Bethany

14  Cotton; Exhibit 6, Declaration of Michael Dotson; Exhibit 7, Declaration of Marla Fox;

15  Exhibit 8, Declaration of Chris Krupp; Exhibit 9, Declaration of Lindsay Larris; Exhibit 10,

16  Declaration of Ralph Maughan; and Exhibit 11, Declaration of Erik Molvar.

17  38.     Upon delisting, gray wolves may be killed under state management regimes in

18  Wisconsin, in the West Coast states of Oregon, Washington, and California, and/or in the

19  Southern and/or Central Rocky Mountains states, including Colorado, Utah, Nevada, and

20  northern New Mexico. *See e.g.,* Exhibit 2, Declaration of Kimberly Baker; Exhibit 3,

21  Declaration of Timothy Coleman; Exhibit 4, Declaration of Greg Costello; Exhibit 5,

22  Declaration of Bethany Cotton; Exhibit 6, Declaration of Michael Dotson; Exhibit 7,

1    Declaration of Marla Fox; Exhibit 8, Declaration of Chris Krupp; Exhibit 9, Declaration of

2    Lindsay Larris; Exhibit 10, Declaration of Ralph Maughan; and Exhibit 11, Declaration of

3    Erik Molvar. Any wolf killing by State actors would harm Plaintiffs' members', supporters',

4    and staff's interests in gray wolves in the American West and elsewhere and decrease their

5    ability to observe, or attempt to observe, and enjoy gray wolves and their sign in the wild. *See*

6    *e.g.,* Exhibit 2, Declaration of Kimberly Baker; Exhibit 3, Declaration of Timothy Coleman;

7    Exhibit 4, Declaration of Greg Costello; Exhibit 5, Declaration of Bethany Cotton; Exhibit

8    6, Declaration of Michael Dotson; Exhibit 7, Declaration of Marla Fox; Exhibit 8,

9    Declaration of Chris Krupp; Exhibit 9, Declaration of Lindsay Larris; Exhibit 10,

10   Declaration of Ralph Maughan; and Exhibit 11, Declaration of Erik Molvar.

11   39.     The final rule challenged in this lawsuit harms these interests in gray wolves and

12   diminishes Plaintiffs' members', supporters', and staff's enjoyment of recreating within gray

13   wolf habitat and surrounding areas. *See e.g.,* Exhibit 2, Declaration of Kimberly Baker;

14   Exhibit 3, Declaration of Timothy Coleman; Exhibit 4, Declaration of Greg Costello;

15   Exhibit 5, Declaration of Bethany Cotton; Exhibit 6, Declaration of Michael Dotson;

16   Exhibit 7, Declaration of Marla Fox; Exhibit 8, Declaration of Chris Krupp; Exhibit 9,

17   Declaration of Lindsay Larris; Exhibit 10, Declaration of Ralph Maughan; and Exhibit 11,

18   Declaration of Erik Molvar.

19   40.     Plaintiffs' members, supporters, and staff derive aesthetic, recreational, scientific,

20   inspirational, educational, spiritual, and other benefits from gray wolves in the American

21   West, in recreating in areas occupied by and used by gray wolves, in working to protect gray

22   wolves from human-caused mortality and disturbance, and in working to restore gray wolves

in the contiguous United States. *See e.g.,* Exhibit 2, Declaration of Kimberly Baker; Exhibit 3, Declaration of Timothy Coleman; Exhibit 4, Declaration of Greg Costello; Exhibit 5, Declaration of Bethany Cotton; Exhibit 6, Declaration of Michael Dotson; Exhibit 7, Declaration of Marla Fox; Exhibit 8, Declaration of Chris Krupp; Exhibit 9, Declaration of Lindsay Larris; Exhibit 10, Declaration of Ralph Maughan; and Exhibit 11, Declaration of Erik Molvar. In furtherance of these interests, Plaintiffs' members, supporters, and staff have worked and continue to work to conserve gray wolves in the Pacific Northwest, Southern and/or Central Rocky Mountains, and Northern Rocky Mountains, including work to restore gray wolf populations throughout the contiguous United States. *See e.g.,* Exhibit 2, Declaration of Kimberly Baker; Exhibit 3, Declaration of Timothy Coleman; Exhibit 4, Declaration of Greg Costello; Exhibit 5, Declaration of Bethany Cotton; Exhibit 6, Declaration of Michael Dotson; Exhibit 7, Declaration of Marla Fox; Exhibit 8, Declaration of Chris Krupp; Exhibit 9, Declaration of Lindsay Larris; Exhibit 10, Declaration of Ralph Maughan; and Exhibit 11, Declaration of Erik Molvar.

41.     Plaintiffs' interests have been, are being, and unless the requested relief is granted, will continue to be harmed by the Service's decision to remove gray wolves in the contiguous United States from the list of endangered and threatened wildlife. *See e.g.,* Exhibit 2, Declaration of Kimberly Baker; Exhibit 3, Declaration of Timothy Coleman; Exhibit 4, Declaration of Greg Costello; Exhibit 5, Declaration of Bethany Cotton; Exhibit 6, Declaration of Michael Dotson; Exhibit 7, Declaration of Marla Fox; Exhibit 8, Declaration of Chris Krupp; Exhibit 9, Declaration of Lindsay Larris; Exhibit 10, Declaration of Ralph Maughan; and Exhibit 11, Declaration of Erik Molvar. If this Court issues the relief

1   requested, the harm to Plaintiffs' interests will be alleviated and/or lessened. *See e.g.,* Exhibit

2   2, Declaration of Kimberly Baker; Exhibit 3, Declaration of Timothy Coleman; Exhibit 4,

3   Declaration of Greg Costello; Exhibit 5, Declaration of Bethany Cotton; Exhibit 6,

4   Declaration of Michael Dotson; Exhibit 7, Declaration of Marla Fox; Exhibit 8, Declaration

5   of Chris Krupp; Exhibit 9, Declaration of Lindsay Larris; Exhibit 10, Declaration of Ralph

6   Maughan; and Exhibit 11, Declaration of Erik Molvar.

7   42.    Defendant DEBRA HAALAND is sued in her official capacity as Secretary of the

8   United States Department of the Interior. As Secretary, Ms. Haaland is the federal official

9   with responsibility for all Service officials' inactions and/or actions challenged in this

10  complaint.

11  43.    Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is the federal

12  department responsible for applying and implementing the federal laws and regulations

13  challenged in this complaint.

14  44.    Defendant, the UNITED STATES FISH AND WILDLIFE SERVICE is an agency

15  within the United States Department of the Interior that is responsible for applying and

16  implementing the federal laws and regulations challenged in this complaint.

17  45.    Defendant MARTHA WILLIAMS is sued in her official capacity as Principal Deputy

18  Director of the United States Fish and Wildlife Service. In this capacity, Ms. Williams is

19  designated to exercise the authority of Director of the agency, and is the federal official with

20  responsibility for the Service officials' inactions and/or actions challenged in this complaint.

21

22

# FACTS

**The Gray Wolf (*Canis lupus*)**

46.     Gray wolves are the largest wild members of the canid (dog) family and have a broad circumpolar range.

47.     Adult gray wolves range in weight from 40 to 175 pounds, depending on sex and geographic locale.

48.     Gray wolves are highly territorial, social animals that live and hunt in packs.

49.     Gray wolves are well adapted to travelling fast and far in search of food, and to catching and consuming large mammals.

50.     Gray wolves in North America primarily eat medium to large mammals, including deer, elk, and other species.

51.     Gray wolves successfully occupy a wide range of habitats if sufficient prey availability exists and human-caused mortality is adequately regulated. High-quality, suitable habitat generally exists in areas with sufficient prey where human-caused mortality is relatively low due to limited human access, there are high amounts of escape cover, or there is a relatively low risk of wolf-livestock conflicts.

52.     Where human-caused mortality is low or nonexistent, gray wolf populations are regulated by the distribution and abundance of prey on the landscape. Density-dependent, intrinsic mechanisms (*e.g.*, social strife, territoriality, and disease) may limit gray wolf populations when ungulate densities are high.

53.     Gray wolf pack social structure is relatively adaptable, and breeding members may be replaced from within or outside the pack, and pups may be reared by other pack members if their parents die.

54.     Gray wolf dispersal capabilities allow wolf populations to expand and recolonize vacant habitats as long as rates of human-caused mortality are not excessive. The rate of gray wolf recolonization may be impacted by the extent of intervening unoccupied habitat between the source population and newly recolonized areas.

**The Gray Wolf's Decline in the Contiguous United States**

55.     Hundreds of thousands of gray wolves likely ranged across the western United States and Mexico. However, the gray wolf's range and numbers declined significantly throughout the 19th and 20th centuries as the result of human-caused mortality from poisoning, trapping, and shooting, and from government-funded programs of gray wolf eradication.

56.     Historically (which the Service views as being at the time of European settlement), the gray wolf's range included most of North America, and consequently, most of the lower 48 United States, except in the far southeastern region of the country. By 1974, the species had been eliminated from most of its historical range, and occurred only in small populations in Minnesota and on Isle Royale, Michigan.

57.     Today, gray wolves exist primarily in two metapopulations: one covering the Western Great Lakes (or "Great Lakes") states of Minnesota, Wisconsin and Michigan; and the other in the Congressionally-created and Congressionally-delisted Northern Rocky Mountains region of Idaho, Montana, and Wyoming (also referred to as the "NRM DPS"). A small

1   number of recolonizing gray wolves can be found in the Pacific Northwest (or "West

2   Coast") states of Oregon, Washington, and California as well.

3   58.   The Great Lakes metapopulation currently consists of approximately 4,200

4   individuals.

5   59.   While the current population in the Northern Rocky Mountains metapopulation is

6   difficult to discern due to the states of Idaho and Montana stopping annual minimum gray

7   wolf population counts back in 2016, in 2015, the population was thought to be

8   approximately 1,900 individuals. Additionally, approximately 311 wolves occurred in

9   Wyoming in 2020, and approximately 311 wolves occurred in the States of Oregon,

10   Washington, and California in 2020.

11   60.   A number of lone dispersing wolves have been documented outside of the Great

12   Lakes and Northern Rocky Mountain metapopulations in all States within the historical

13   range of the gray wolf west of the Mississippi River, except in Oklahoma and Texas. Since

14   the early 2000s, individual gray wolves have been confirmed and reported in the following

15   states: Vermont, Massachusetts, New York, Indiana, Illinois, Iowa, Missouri, North Dakota,

16   South Dakota, Nebraska, Kansas, Colorado, Utah, Arizona, and Nevada.

17   61.   Although gray wolves are starting to make a comeback in select areas of the United

18   States, the species has yet to achieve self-sustaining populations in much of their historic

19   habitat across vast portions of the American West, including in the Pacific Northwest region

20   (including the West Coast states of Oregon, Washington, and California) and the Southern

21   and/or Central Rocky Mountains region (including the states of Colorado, Utah, Nevada,

22   and northern New Mexico).

**The Service's Listing of Gray Wolves as an Endangered Species in the Contiguous United States**

62.     Gray wolves were among the first species granted federal protections, first under the legislative predecessors to the ESA, the Endangered Species Preservation Act of 1966 and the Endangered Species Conservation Act of 1969, and subsequently under the ESA of 1973, as amended.

63.     The entities listed in the 1978 gray wolf listing rule included: (1) an endangered population at the taxonomic species level (*C. lupus*) throughout the contiguous United States and Mexico; and (2) a threatened population in Minnesota.

64.     At the time of the 1978 listing, human-caused mortality was identified as a primary threat to the species.

65.     At the time of the 1978 listing, there were only approximately 1,235 wolves in Minnesota remaining.

**The Service's Prior Attempts to Remove Gray Wolves in the Contiguous United States from the List of Endangered and Threatened Wildlife**

66.     The Service's November 3, 2020 final rule stripping gray wolves throughout the contiguous United States of ESA protections is but another attempt in a long history of failed rules seeking the species' removal from the list of endangered and threatened wildlife.

67.     In 2003, the Service attempted to designate three separate DPSs of gray wolves and reclassify their status. 68 Fed. Reg. 15,804 (April 1, 2003). The 2003 rule designated an Eastern DPS and reclassified it as threatened under the ESA. The 2003 rule designated a Western DPS and reclassified it as threatened under the ESA. The 2003 rule designated a

1    Southwestern United States and Mexico DPS and classified it as endangered under the ESA.

2    The 2003 rule delisted the gray wolf in unoccupied non-historical range.

3    68.     The 2003 rule was vacated in both *Defenders of Wildlife v. Secretary, U.S. Dep't of the*

4    *Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005) ("*Oregon Wolves*"), and in *Nat'l Wildlife Fed'n v.*

5    *Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005) ("*Vermont Wolves*").

6    69.     In *Oregon Wolves*, the court held that the Service: (1) arbitrarily and capriciously failed

7    to properly analyze whether the gray wolf was endangered or threatened in a "significant

8    portion of its range" by failing to consider that "a species can be extinct throughout a

9    significant portion of its range if there are major geographical areas in which it is no longer

10   viable but once was," 354 F. Supp. 2d at 1167–68; (2) arbitrarily and capriciously applied its

11   DPS policy to "expand the boundaries" of its proposed DPSs, which effectively decreased

12   protections for the species outside of core recovery areas despite there being no changes to

13   existing threats to justify less protection, 354 F. Supp. 2d at 1171; and (3) arbitrarily and

14   capriciously failed to consider the attempt to down-list the species in vast portions of its

15   geographic range without applying the ESA's section 4 listing factors, 354 F. Supp. 2d at

16   1172. As summarized by a federal appellate court later addressing the case, the *Oregon Wolves*

17   court held that "by downlisting the species based solely on the viability of a small population

18   within that segment, the Service was effectively ignoring the species' status in its full range,

19   as the [ESA] requires." *Humane Soc'y of the United States v. Zinke*, 865 F. 3d 585, 592 (D.C. Cir.

20   2017).

21   70.     In *Vermont Wolves*, the court held that the Service "cannot downlist an area that it

22   previously determined warrants an endangered listing because it 'lumps together' a core

1  population with a low to non-existent population outside of the core area." 386 F. Supp. 2d

2  at 565. The *Vermont Wolves* court held that the Service "bypass[es] the application of the ESA

3  in the non-core area" when it arbitrarily "expands the boundaries" of the wolf population to

4  achieve its desired outcome to lessen federal protections for the species. 386 F. Supp. 2d at

5  565. The *Vermont Wolves* court held that a final rule "that makes all other portions of the

6  wolf's historical or current range outside of the core gray wolf populations insignificant and

7  unworthy of protection" is "contrary to the plain meaning of the ESA phrase 'significant

8  portion of its range,' and therefore is an arbitrary and capricious application of the ESA."

9  386 F. Supp. 2d at 566.

10  71.     In 2007, the Service attempted to designate a Western Great Lakes DPS and remove

11  it from the list of endangered and threatened wildlife. 72 Fed. Reg. 6,052 (Feb. 8, 2007).

12  72.     The 2007 rule was vacated in *Humane Soc'y of the United States v. Kempthorne*, 579 F. 2d 7

13  (D.D.C. 2008).

14  73.     In 2008, the Service attempted to designate a Northern Rocky Mountains DPS and

15  remove it from the list of endangered and threatened wildlife. 73 Fed. Reg. 75,356 (Feb. 27,

16  2008).

17  74.     The 2008 rule was enjoined in *Defenders of Wildlife v. Hall*, 565 F. Supp. 2d 1160 (D.

18  Mont. 2008), and subsequently vacated and remanded.

19  75.     In 2009, the Service attempted to designate a Western Great Lakes DPS and remove

20  it from the list of endangered and threatened wildlife. 74 Fed. Reg. 15,070 (Apr. 2, 2009). In

21  2009, the Service attempted to designate a Northern Rocky Mountains (except Wyoming)

22

DPS and remove it from the list of endangered and threatened wildlife. 74 Fed. Reg. 15,123 (Apr. 2, 2009).

76.     The 2009 Western Great Lakes DPS rule was vacated by *Humane Soc'y of the United States v. Salazar*, 1:09-CV-1092-PLF (D.D.C. 2009) (case settled). The 2009 Northern Rocky Mountains (except Wyoming) DPS rule was vacated by *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2010).

77.     In 2011, Congress reissued the 2009 Northern Rocky Mountain (except Wyoming) rule designating a DPS and removing it from the list of endangered and threatened wildlife in Public Law 112-10, The Department of Defense and Full-Year Continuing Appropriations Act.

78.     In 2011, the Service again attempted to designate a Western Great Lakes DPS and remove it from the list of endangered and threatened species. 76 Fed. Reg. 81,666 (Dec. 28, 2011).

79.     The 2011 Western Great Lakes rule was vacated by *Humane Soc'y of the United States v. Jewell*, 76 F. Supp. 69, 110 (D.D.C. 2014). The vacatur of the 2011 Western Great Lakes rule was upheld on appeal by *Humane Soc'y of the United States v. Zinke*, 865 F. 3d 858 (D.C. Cir. 2017).

80.     In *Humane Soc'y of the United States v. Zinke,* the court held that the Service failed to consider two significant aspects in its 2011 Western Great Lakes rule: (1) the impacts of partial delisting on the remnant population, and (2) the impacts of historical range loss on the already-listed species. 865 F. 3d at 585.

81.     In 2012, the Service attempted to remove gray wolves in Wyoming from the list of endangered and threatened species. 77 Fed. Reg. 55,530 (Sept. 10, 2012).

82.     The 2012 Wyoming rule was vacated in *Defenders of Wildlife v. Jewell*, 68 F. Supp. 3d 193 (D.D.C. 2014). The vacatur of the 2012 Wyoming rule was reversed on appeal in *Defenders of Wildlife v. Zinke*, 849 F. 3d 1077 (D.C. Cir. 2017). The 2012 Wyoming rule was reinstated in 2017. 82 Fed. Reg. 20,284 (May 1, 2017).

**The Service's 2019 Proposal to Remove Gray Wolves from the List of Endangered and Threatened Wildlife**

83.     On March 15, 2019, the Service published a proposed rule to remove the gray wolf in the contiguous United States from the list of endangered and threatened wildlife. 84 Fed. Reg. 9,648 (Mar. 15, 2019) (hereinafter "2019 proposed rule").

84.     In the 2019 proposed rule, the Service lumped the Minnesota and contiguous United States and Mexico populations (excepting the Mexican wolf and red wolf subspecies populations, as well as the already Congressionally-created and Congressionally-delisted Northern Rocky Mountains population) into a singular "gray wolf entity."

85.     In the 2019 proposed rule, the Service removed the entire, newly created, "gray wolf entity" from the list of endangered and threatened wildlife.

86.     In the 2019 proposed rule, the Service relied on the fact that solely one metapopulation – gray wolves in the three Great Lakes states of Minnesota, Wisconsin, and

1   Michigan – may be faring well,[2] in large part, thanks to the ESA's federal management

2   regime, to justify the removal of federal protections from the entire entity as a whole.

3   87.   The 2019 proposed rule acknowledged that the "gray wolf entity" is not a "species,"

4   as that term is defined under the Act.

5   88.   The 2019 proposed rule acknowledged that the "gray wolf entity" is not a "sub-

6   species," as that term is defined under the Act.

7   89.   The 2019 proposed rule acknowledged that the "gray wolf entity" is not a DPS, as

8   defined by the agency's 1996 DPS Policy, 61 Fed. Reg. 4,722 (Feb. 7, 1996).

9   **The Service's 2020 Final Decision to Remove Gray Wolves from the List of
    Endangered and Threatened Wildlife**

10  90.   On November 3, 2020, the Service published a final rule to remove the gray wolf in

11  the contiguous United States from the list of endangered and threatened wildlife. 85 Fed.

12  Reg. 69,778 (Nov. 3, 2020) (hereinafter "final rule").

13  91.   The final rule explains that neither of the listed entities (the threatened "Minnesota"

14  entity, nor the endangered "Lower 48 States and Mexico outside of the Northern Rocky

15  Mountain DPS and Minnesota" entity) qualifies as a "species," a "sub-species," or a "DPS,"

16  as those terms are statutorily defined by the Act and under the Service's 1996 DPS Policy. 85

17  Fed. Reg. 69,783–84.

18  92.   The final rule explains that the threatened population in Minnesota is not a DPS

19  because it is not discrete from gray wolves in the endangered entity in the Western Great

20

21

22  _____

[2] Plaintiffs make no admission that recovery of gray wolves in the Great Lakes region has actually, biologically, nor lawfully been achieved in accordance with the mandates of the ESA.

Lakes region (*i.e.*, Wisconsin and Michigan). 85 Fed. Reg. 69,783. The final rule explains that, likewise, the endangered entity is not a DPS because wolves in the Western Great Lakes region are not discrete from gray wolves in Minnesota. *Id.*

93.  The final rule explains that the endangered entity is not a DPS because wolves in the Pacific Northwest (or, "West Coast States") are not discrete from wolves in the congressionally-delisted Northern Rocky Mountains ("NRM") DPS. 85 Fed. Reg. 69,783–84.

94.  The final rule explains that since "[n]either of the listed entities is a DPS, … thus, neither of the entities is a 'species,' as that term is defined under the Act." 85 Fed. Reg. 69,784.

95.  The final rule explains that "the currently listed gray wolf entities could be removed from the List because they do not meet the statutory definition of a 'species . . . .' [which is an] independent basis for delisting." 85 Fed. Reg. 69,784 (citing 50 C.F.R. 424.11(e)(3)).

96.  In the final rule, the Service assessed the conservation status of gray wolves in three different configurations: (1) "Each of the two currently listed gray wolf entities separately" (referred to as "Minnesota" and the "44-State entity" in the final rule); (2) "the two currently listed entities combined into a single entity (the approach in [the Service's] proposed rule)" (referred to as the "combined listed entity" in the final rule); and (3) "a single gray wolf entity that includes all gray wolves in the lower 48 state [sic] and Mexico except for the Mexican wolf" (referred to as the "lower 48 United States entity" in the final rule). 85 Fed. Reg. 69,784 –85.

97.     In the final rule, the Service interprets the term "range" as referring to "the area occupied by the species at the time [the Service] make[s] a status determination under section 4 of the Act." 85 Fed. Reg. 69,786 (citing 79 Fed. Reg. 37,583 (July 1, 2014)).

98.     In the final rule, the Service declines to include areas in which only "lone dispersers" are found in its definition of "current range," explaining: "Wolves occur periodically in the lower 48 United States as lone dispersers in places that otherwise lack evidence of persistent wolf presence or suitable habitat for supporting a resident wolf population …. While dispersal plays an important role in recolonization of suitable habitat, individual dispersers that do not settle in an area, survive, and reproduce do not substantively contribute to the wolf's viability (*i.e.*, the ability of a species to sustain populations in the wild over time). Therefore, we did not include the areas in which only these lone dispersers are occasionally found in our definition of current range." 85 Fed. Reg. 69,786.

99.     In the final rule, the Service explains: "[t]he wolves in Wisconsin and Michigan contain sufficient resiliency, redundancy, and representation to sustain populations within the 44-State entity over time. Therefore, we conclude that the relatively few wolves that occur within the 44-State entity outside of Wisconsin and Michigan, including those in the West Coast States and central Rocky Mountains as well as lone dispersers in other States, are not necessary for the recovered status of the 44-State entity." 85 Fed. Reg. 69,883.

100.    In the final rule, the Service explains: "Although substantial contraction of gray wolf historical range occurred within the 44-State entity since European settlement, the range of the gray wolf has expanded significantly since its original listing in 1978, and the impacts of lost historical range are no longer manifesting in a way that threatens the viability of the

1  species. The causes of the previous contraction . . . and the effects of that contraction . . . in

2  addition to the effects of all other threats, have been ameliorated or reduced such that *the 44-*

3  *State entity* no longer meets the Act's definitions of "threatened species" or "endangered

4  species." 85 Fed. Reg. 69,885–86 (emphasis added).

5  101.    In the final rule, the Service explains: "Although substantial contraction of gray wolf

6  historical range occurred within the 44-State entity since European settlement, the range of

7  the gray wolf has expanded significantly since its original listing in 1978, and the impacts of

8  lost historical range are no longer manifesting in a way that threatens the viability of the

9  species. The causes of the previous contraction . . . and the effects of that contraction . . . in

10  addition to the effects of all other threats, have been ameliorated or reduced such that *the*

11  *combined listed entity* does not meet the Act's definitions of "threatened species" or

12  "endangered species." 85 Fed. Reg. 69,889 (emphasis added).

13  102.    In the final rule, the Service explains: "Although substantial contraction of gray wolf

14  historical range occurred within the 44-State entity since European settlement, the range of

15  the gray wolf has expanded significantly since its original listing in 1978, and the impacts of

16  lost historical range are no longer manifesting in a way that threatens the viability of the

17  species. The causes of the previous contraction . . . and the effects of that contraction . . . in

18  addition to the effects of all other threats, have been ameliorated or reduced such that *the*

19  *lower 48 United States entity* does not meet the Act's definitions of "threatened species" or

20  "endangered species." 85 Fed. Reg. 69,893 (emphasis added).

21  103.    In the final rule, the Service explains that its post-delisting monitoring efforts "will

22  focus on wolves within Minnesota, Wisconsin, and Michigan" only. 85 Fed. Reg. 69,894.

104.    In the final rule, the Service concludes that "gray wolves in the lower 48 states (excepting the Mexican wolf) are recovered." 85 Fed. Reg. 69,893.

105.    Gray wolves in Oregon have not recovered as defined by the ESA. Gray wolves in Washington have not recovered as defined by the ESA. Gray wolves in California have not recovered as defined by the ESA. Gray wolves in Colorado have not recovered as defined by the ESA. Gray wolves in Nevada have not recovered as defined by the ESA. Gray wolves in Utah have not recovered as defined by the ESA. Gray wolves in Arizona have not recovered as defined by the ESA. Gray wolves in Wisconsin have not been recovered as defined by the ESA. Gray wolves in Minnesota have not been recovered as defined by the ESA. Gray wolves in Michigan have not been recovered as defined by the ESA. Gray wolves throughout the contiguous United States have not been recovered as defined by the ESA.

**Gray Wolves Face Increased Levels of Human-Caused Mortality as the Result of the Final Rule**

106.    The final rule transferred management authority for gray wolves to state wildlife management departments.

107.    In Oregon, the state's management plan for gray wolves allows for lethal control of wolves. Oregon's wolf management plan is codified in the Oregon Administrative Rules ("OAR"). The Oregon Department of Fish and Wildlife will not be authorized to lethally control wolves in the western two-thirds of the state if the court grants the relief requested by Plaintiffs herein.

108.    The Oregon wolf management plan allows livestock producers — on land they own or lawfully occupy — and grazing permittees to harass wolves in any place in Oregon where wolves are not listed as threatened or endangered under the federal ESA.

1    109.    The Oregon wolf management plan allows livestock producers — on land they own

2    or lawfully occupy — and grazing permittees to use non-lethal injurious harassment on

3    wolves if they have a valid permit from the Oregon Department of Fish and Wildlife.

4    110.    The Oregon wolf management plan allows an individual — or an agent of that

5    individual — to kill a wolf or wolves caught in the act of biting, wounding, or killing

6    livestock or working dogs on land that the individual lawfully occupies.

7    111.    The Oregon wolf management plan allows an individual — or an agent of that

8    individual — to kill a wolf or wolves caught in the act of chasing livestock or working dogs

9    on land that the individual lawfully occupies, provided the individual has used non-lethal

10   conflict deterrent tools as required by the Oregon Department of Fish and Wildlife and if

11   the Oregon Department of Fish and Wildlife has determined a situation of chronic

12   depredation exists.

13   112.    The Oregon Department of Fish and Wildlife has killed 16 wolves in Oregon

14   between September 2009 and December 2020.

15   113.    On January 13, 2021, the Oregon Department of Fish and Wildlife issued a public

16   statement explaining the wolf-killing rules in effect once the gray wolf was officially delisted

17   from federal ESA protections.

18   114.    The January 13, 2021, Oregon Department of Fish and Wildlife Statement says:

19   "Since the federal delisting of wolves on Jan. 4, 20201, livestock producers across Oregon

20   can now shoot wolves caught in the act of attacking (biting, wounding or killing) their

21   livestock without a permit in certain situations."

22

115.    The January 13, 2021, Oregon Department of Fish and Wildlife Statement says: "Livestock producers in the Rogue Pack area of Jackson and Klamath Counties may shoot a wolf chasing livestock if they have been doing specific appropriate non-lethal measures to reduce wolf-livestock conflict and as long as the area remains in a chronic depredation situation."

116.    In Washington, the state's management plan for gray wolves allows for lethal control of wolves. In Washington, the state's wolf management plan is not codified in any administrative rules. Rather, the Washington Department of Fish and Wildlife has the discretion to determine if and when to kill wolves when there is conflict between wolves and livestock. Washington has general regulations governing wildlife killing by individuals, landowners, and grazing permittees. Washington has a regulation allowing the owner of domestic animals to kill one wolf without a permit if the wolf is attacking the owner's domestic animals.

117.    The Washington wolf management plan is not binding on the Washington Fish and Wildlife Department. The Director of the Washington Department of Fish and Wildlife once stated in a public meeting of the Washington Fish and Wildlife Commission that Washington's wolf plan was not binding. The Director of the Washington Department of Fish and Wildlife once stated in a public meeting of the Washington Fish and Wildlife Commission that Washington's wolf plan could be changed at any time with a letter to the file from the Director.

118.    The Washington Department of Fish and Wildlife has killed 31 wolves in Washington between 2012 and 2019.

119.     In 2012, the Washington Department of Fish and Wildlife killed 7 wolves. At the time, the official wolf count in Washington was 27 wolves across the entire state. The seven wolves killed in 2012 were part of the Wedge pack.

120.     In 2014, the Washington Department of Fish and Wildlife killed 1 wolf. The one wolf killed in 2014 was part of the Huckleberry Pack.

121.     In 2016, the Washington Department of Fish and Wildlife killed 7 wolves. The seven wolves killed in 2016 were part of the Profanity Peak pack.

122.     In 2017, the Washington Department of Fish and Wildlife killed 3 wolves. Two of the wolves killed in 2017 were part of the Smackout pack. One of the wolves killed in 2017 was part of the Sherman pack.

123.     In 2018, the Washington Department of Fish and Wildlife killed 4 wolves. One of the wolves killed in 2018 was part of the Togo pack. One of the wolves killed in 2018 was part of the Smackout Pack. Two of the wolves killed in 2018 were part of the OPT pack.

124.     In 2019, the Washington Department of Fish and Wildlife killed 9 wolves. Eight of the wolves killed in 2019 were part of the OPT pack. One of the wolves killed in 2019 was part of the Grouse Flats pack.

125.     On May 11, 2020, a number of conservation organizations — including Plaintiffs Cascadia Wildlands and WildEarth Guardians — filed a petition for rulemaking with the Washington Fish and Wildlife Commission. The May 11, 2020, petition sought to amend the Washington Administrative Code to regulate wolf killing by the Washington Department of Fish and Wildlife. The May 11, 2020, petition sought to add consistency, transparency, and science to Washington's wolf management regime. The Washington Fish and Wildlife

1   Commission denied the petition. On September 4, 2020, Washington Governor Jay Inslee

2   granted an appeal of the petition denial. On September 4, 2020, Governor Inslee ordered the

3   Washington Fish and Wildlife Commission to "initiate a new rulemaking related to wolf

4   management" and encouraged the Commission to address certain items, including

5   standardized requirements for the use of non-lethal deterrents.

6   126.   The Washington Department of Fish and Wildlife will not be authorized to lethally

7   control wolves in the western two-thirds of the state if the court grants the relief requested

8   by Plaintiffs herein.

9   127.   In Wisconsin, state law requires the Wisconsin Department of Natural Resources to

10  hold a public hunt for gray wolves beginning on the first Saturday of November and ending

11  on the last day of February when wolves are no longer federally listed under the ESA. *See*

12  Wi. Stat. § 29.185(1m), (5). Pursuant to Wisconsin state law, the Wisconsin Department of

13  Natural Resources is planning to hold a gray wolf hunt commencing on November 6, 2021

14  and extending through February 28, 2022, or until all harvest zones are closed. When wolves

15  were previously delisted in Wisconsin in 2012, 2013, and 2014, wolf hunting resulted in a

16  total of at least 528 wolves being killed over the three-year period. Wisconsin will not be

17  authorized to hold a wolf hunt this fall if the court grants the relief as requested by Plaintiffs

18  herein.

19

20                          **FIRST CLAIM FOR RELIEF**

21          **(Violation of ESA – Illegal "Species" Determination/DPS Analysis)**

22  128.   Plaintiffs incorporate all preceding paragraphs.

129.    The final rule concludes "[t]he gray wolf entities that are currently on the List do not meet the Act's definition of a 'species.'" 85 Fed. Reg. 69,783.

130.    The final rule explains that neither currently listed entity "encompasses an entire species, or a subspecies, of gray wolf" and that they also do not qualify as a distinct population segment ("DPS"). 85 Fed. Reg. 69,783–84.

131.    The final rule cites to 50 C.F.R. § 424.11(e)(3) to support the need to delist gray wolves because they purportedly do not meet the definition of a "species" under the Act. 85 Fed. Reg. 69, 784.

132.    These conclusions are erroneous, arbitrary and capricious, are not based on the best available science, conflict with the ESA, and conflict with the Service's 1996 DPS Policy.

133.     The ESA does not define the term "distinct population segment" ("DPS"), and therefore, in 1996, the Service issued a "Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act," 61 Fed. Reg. 4,722 (Feb. 7, 1996) (hereinafter "DPS Policy").

134.    The DPS Policy interprets the term "distinct population segment" as requiring consideration of three factors: (1) the discreteness of the population segment in relation to the remainder (also referred to as the "remnant") of the species to which it belongs; (2) the significance of the population segment to the species to which it belongs; and (3) the population segment's conservation status in relation to the Act's standards for listing. 61 Fed. Reg. 4,725.

135.    A population may be considered discrete if it meets one of two conditions: (1) it is "markedly separated" from other populations of the same taxon as a consequence of

1    physical, physiological, ecological, or behavioral factors; and/or (2) it is delimited by

2    international governmental boundaries within which differences in control of exploitation,

3    management of habitat, conservation status, or regulatory mechanisms exist that are

4    significant in light of section 4(a)(1)(D) of the Act. 61 Fed. Reg. 4,725.

5    136.    The DPS Policy provides "[t]he standard established for discreteness is simply an

6    attempt to allow an entity given DPS status under the Act to be adequately defined and

7    described." 61 Fed. Reg. 4,724.

8    137.    The DPS Policy makes clear that complete discreteness is not required, as "the

9    standard adopted does not require absolute separation of a DPS from other members of its

10   species, because this can rarely be demonstrated in nature for any population of organisms."

11   61 Fed. Reg. 4,724. This standard is intended to create a low bar, as it "allow[s] entities

12   recognized under the Act to be identified without requiring an unreasonably rigid test for

13   distinctness." 61 Fed. Reg. 4,724. In particular, the DPS Policy specifically contemplated that

14   a DPS would have "some limited interchange among population segments considered to be

15   discrete . . . ." 61 Fed. Reg. 4,724.

16   138.    In the final rule, the Service concludes that the two listed entities (the threatened

17   Minnesota entity and the endangered lower-48 entity) "are not markedly separated from

18   other populations of the same taxon." 85 Fed. Reg. 69,783.

19   139.    In the final rule, the Service concludes that the threatened Minnesota entity is "not

20   discrete from the endangered listed entity [(the endangered lower-48 entity)] where they abut

21   in the Great Lakes area because gray wolves in Minnesota are not discrete from gray wolves

22   in Wisconsin and Michigan." 85 Fed. Reg. 69,783.

140.    In the final rule, the Service concludes that "gray wolves in the West Coast States that are part of the endangered listed entity [(the endangered lower-48 entity)] are not discrete from the recovered NRM population." 85 Fed. Reg. 69,783–84.

141.    In the final rule, because the Service determined there was a lack of discreteness, it did not continue to evaluate the significance of these populations. 85 Fed. Reg. 69,783–84.

142.    The final rule's conclusions are legally flawed, not supported by the best available science, are in conflict with the ESA and the DPS Policy, and are therefore, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

143.    In the final rule, the Service determines a lack of discreteness to a Congressionally-created DPS — one that never had a legally sufficient scientific basis — without adequately considering the discreteness of wolves in places such as the West Coast States and the Southern (or "Central," as described in the final rule) Rocky Mountains, including Colorado, Utah, Nevada, and northern New Mexico.

144.    In the final rule, the Service ignores its obligation to conduct a "comprehensive review" that addresses the entire listed entities, as opposed to smaller portions of those entities.

145.    In the final rule, the Service fails to include a DPS analysis for Pacific Northwest gray wolves. 85 Fed. Reg. 69,854. Instead, the Service relies on a 2013 analysis in the final rule. 85 Fed. Reg. 69,854–55 (referencing 78 Fed. Reg. 35,664, 35,711–13 (June 13, 2013)). In the final rule, the Service ignores data from 2013 to the present by referring back to the 2013 analysis. In the final rule, the Service ignores its prior conclusion that wolves in the NRM

1    DPS would be isolated from other suitable habitat to the west and south of the DPS. 73 Fed.

2    Reg. 10,514, 10,518 (Feb. 27, 2008). In the final rule, the Service ignores its prior conclusion

3    that wolves occurring in the Cascade Mountains in the Pacific Northwest would not be a

4    part of the NRM DPS. 73 Fed. Reg. 10,514, 10,518 (Feb. 27, 2008) ("if wolves dispersed into

5    the [North Cascades] they would remain protected by the Act as endangered because it is

6    outside of the NRM DPS."); *see also* 74 Fed. Reg. 15,123, 15,127 (April 2, 2009) (same).

7    146.    In the final rule, the Service ignores the best available science, including the concerns

8    of peer reviewers, regarding its conclusion that Pacific Northwest (or "West Coast states")

9    gray wolves are not discrete from wolves in the NRM DPS.

10   147.    In the final rule, the Service erroneously concludes that wolves occurring outside of

11   the geographic boundaries of the NRM DPS in Oregon, Washington, California, Colorado,

12   and elsewhere do not meet the discreteness test in that they are not markedly separated from

13   other populations of the same taxon as a consequence of physical physiological, ecological,

14   or behavioral factors, including genetic differences. In the final rule, the Service erroneously

15   concludes that these wolves are not significant to the rest of the taxon by failing to consider

16   that these wolves represent a significant part of the species' recovery in areas where these

17   wolves are recolonizing historic habitats. In the final rule, the Service erroneously attempts

18   to expand the geographic boundaries of a Congressionally-created, and Congressionally-

19   delisted, NRM DPS in an effort to avoid its ESA obligations to recover gray wolves

20   throughout their historic and current ranges.

21

22

148.     The Service's determinations that neither of the listed entities constitute a "species," or a DPS in the final rule violate the ESA and the DPS Policy and are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

149.     In the final rule, the Service relies on a recently enacted regulation requiring the Secretary to delist a species if the Secretary determines "[t]he listed entity does not meet the statutory definition of a species." 85 Fed. Reg. 69,784 (citing 50 C.F.R. § 424.11(e)(3)(2020)). But this regulation violates the ESA's purposes and policies, 16 U.S.C. § 1531, and is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

## SECOND CLAIM FOR RELIEF

### (Violation of ESA – Illegal Analysis of Various "Gray Wolf Entities")

150.     Plaintiffs incorporate all preceding paragraphs.

151.     In the final rule, the Service assesses three separate gray wolf entities: (1) the two listed entities (the threatened Minnesota entity and the endangered lower-48 entity) separately; (2) the two listed entities (the threatened Minnesota entity and the endangered lower-48 entity) combined; and (3) the two listed entities (the threatened Minnesota entity and the endangered lower-48 entity) and the NRM DPS combined. 85 Fed. Reg. 69,784–85.

152.     The Service's assessments of the listed entities combined violates existing case law. *Defenders of Wildlife v. Secretary, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156 (D. Or. 2005); *National Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553 (D. Vt. 2005); *Humane Soc'y of the United States v. Zinke*, 865 F. 3d 858 (D.C. Cir. 2017); *Defenders of Wildlife v. Norton*, 23 F. Supp. 2d 9, 19 (D.D.C. 2002).

153.    The Service's creation of entirely fictional "gray wolf entities," and simultaneous delisting of such entities, violates the ESA.

154.    The Service's analysis of various "gray wolf entities" in the final rule violates the ESA and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

## THIRD CLAIM FOR RELIEF

### (Violation of ESA – Illegal SPR Analysis)

155.    Plaintiffs incorporate all preceding paragraphs.

156.    The ESA requires the Service to consider a species' status across a "significant portion of its range" in making listing determinations. 16 U.S.C. § 1532(6); *Defenders of Wildlife v. Norton*, 258 F. 3d 1136 (9th Cir. 2001).

157.    There are two situations under which a species, sub-species, or DPS may qualify for listing under the ESA. First, the ESA requires the Service to consider a species' status throughout all of its range. 16 US.C. §§ 1532(6), (20). Second, the ESA requires the Service to consider a species' status across a "significant portion of its range." 16 U.S.C. §§ 1532(6), (20).

158.    The ESA does not define "significant portion of its range," but the Ninth Circuit has explained one way a species may qualify for listing throughout a "significant portion of its range" is if there are "major geographical areas in which it is no longer viable but once was." *Defenders of Wildlife v. Norton*, 258 F. 3d 1136, 1145–46 (9th Cir. 2001).

159.    The Service must (1) quantify the species' historic range in order to establish a temporal baseline; and (2) then determine whether the lost or no longer viable area, as

measured against the baseline, amounts to a significant portion. If a species is "expected to survive" in an area that is much smaller than its historic range, the Service must explain its conclusion that the lost area is not a "significant portion of its range." *Defenders of Wildlife*, 258 F. 3d at 1145. An "adequate explanation" why territory, which was a part of a species' historic range but is no longer occupied or considered viable, is not a "significant portion" of the species' range is required. If the lost area qualifies as a "significant portion," then the Service must complete a threats assessment to determine if the species qualifies for listing throughout a "significant portion of its range." 16 U.S.C. §§ 1532 (6), (20).

160.    The phrase "significant portion of its range" does not mean that threats in the "significant portion" must render the entire species at risk of extinction. *Defenders of Wildlife*, 258 F. 3d at 1141. The phrase "significant portion of its range" was intended to allow for protection in one area, even if a species is abundant or overabundant in another area. *Id.* at 1144. There is no bright-line percentage of habitat that must be affected in order for an area to be "significant." *Id.* at 1143. For a species with a small historical range, even a very small percentage of habitat may be "significant." *Id.*

161.    In 2014, the Service issued a policy interpreting the phrase "significant portion of its range." 79 Fed. Reg. 37,578 (July 1, 2014) (hereinafter "2014 SPR Policy"). The 2014 SPR Policy was vacated in-part by the federal courts. *Center for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946 (D. Ariz. 2017) (finding the Service's interpretation of significant portion of its range" in the 2014 SPR Policy "impermissibly clashes with the rule against surplusage and frustrates the purposes of the ESA" and is therefore arbitrary and capricious under the ESA) *amended in part by* 2017 WL 8788052 (limiting the court's vacatur of the 2014 SPR Policy to

1   the District of Arizona); *Desert Survivors v. U.S. Dep't of the Interior*, 336 F. Supp. 3d 1131 (N.D.

2   Cal. 2018) (clarifying the court's ruling on the merits in 321 F. Supp. 3d 1011 that the 2014

3   SPR Policy interpreting the phrase "significant portion of its range" is vacated and set aside

4   in regard to the policy's definition of "significant").

5   162.   In the Service's 2019 proposed rule, the Service acknowledged that part of its 2014

6   SPR Policy had been vacated across the country in *Desert Survivors*, 336 F. Supp. 3d 1131.

7   163.   In the Service's final rule, the Service fails to acknowledge that part of its 2014 SPR

8   Policy has been vacated across the country in *Desert Survivors*, 336 F. Supp. 3d 1131. *See* 85

9   Fed. Reg. 69,853 (ignoring this fact in its response to comments on the issue).

10   164.   The Service cannot interpret the phrase "significant portion of its range" in a way

11   that wholly excludes analysis of the species' historical range. *Tucson Herpetological Soc. v.*

12   *Salazar*, 566 F. 3d 870, 876 (9th Cir. 2009). The Service must define the phrase "significant

13   portion of its range" in a manner that includes quantification of the species' historic range

14   and an evaluation of whether the lost habitat amounts to a "significant portion" of that

15   range. *Id.*

16   165.   The Service may not look only to the health of the species' population in certain areas

17   while ignoring threats in areas where the population is either extirpated or home to only a

18   few individuals. *Tucson Herpetological Soc.*, 566 F. 3d at 877 ("It is insufficient . . . to point to

19   one area or class of areas where [a species'] population persists to support a finding that

20   threats to the species elsewhere are not significant . . . .").

21   166.   In the final rule, the Service's "significant portion of its range" analyses are legally

22   deficient and violate the ESA and APA. 16 U.S.C. §§ 1532(6), (20); 5 U.S.C. § 706(2)(A).

167.    In the final rule, the Service's interpretation of the term "significant" in its "significant portion of its range" analysis violates the ESA.

168.    In the final rule, the Service defines "significant" by asking whether "any portions are biologically meaningful in terms of resiliency, redundancy, or representation of gray wolves in the 44-State entity." 85 Fed. Reg. 69,885. In the final rule, the Service relies on the assumption that there is allegedly sufficient resiliency, redundancy, and representation to sustain gray wolf populations over time provided by the Great Lakes area metapopulation, and that other wolves are merely part of the Congressionally-created (and Congressionally-delisted) Northern Rocky Mountains DPS, and therefore are expendable. *Id.* In the final rule, the Service asserts that "the relatively few wolves that occur outside the Great Lakes area within the gray wolf entity, including those in the West Coast States and Central/Southern Rocky Mountains as well as lone dispersers in other States, are not necessary for the recovered status of the combined listed entity." 85 Fed. Reg. 69,886.

169.    In the final rule, the Service ignores the possibility of ever restoring gray wolves to the thousands of square miles of suitable habitat with sufficient prey base outside of the Great Lakes region. In the final rule, the service ignores the value of recovering gray wolves in the West Coast States and Central/Southern Rocky Mountains. In the final rule, the Service ignores the "significance" of suitable habitats within the West Coast States and the Central/Southern Rocky Mountains to the species recovery in these regions.

170.    In the final rule, the Service's interpretation of "range" in its "significant portion of its range" analysis violates the ESA.

171.     In the final rule, the Service defines the term "range" unlawfully narrowly and excludes the importance of individual dispersers to the species' recovery. In the final rule, the Service ignores the best available science, including the concerns of peer reviewers, regarding its definition of "range."

172.     The Service's determinations that gray wolves are not in danger of extinction throughout all or a significant part of its range, 16 U.S.C. § 1532 (6), nor are they likely to become an endangered species within the foreseeable future throughout all or a significant part of its range, 16 U.S.C. § 1532 (20), violate the ESA and are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

**FOURTH CLAIM FOR RELIEF**

**(Violation of ESA – Inadequate Threats Assessment)**

173.     Plaintiffs incorporate all preceding paragraphs.

174.     The ESA requires the Service to determine whether a species qualifies as an endangered species or threatened species due to one or more (or a combination of) factors as described in section 4(a)(1) of the Act. These factors include: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533 (a)(1). These same factors must be considered before delisting a species, subspecies, or a DPS. 50 C.F.R. § 424.11(d).

175.    The ESA requires the Service's evaluation of threats for purposes of delisting must consider both the threats currently facing the species, subspecies, or DPS, and the threats that are reasonably likely to affect the species, subspecies, or DPS in the foreseeable future following the removal of the ESA's protections.

176.    In the final rule, the Service determined that the threats to the gray wolf throughout the Lower 48 have been reduced such that the listed entities no longer meet the definition of threatened or endangered under the ESA. 85 Fed. Reg. 69,889. In making this determination, the Service failed to utilize the best available science and failed to carefully consider and adequately apply section 4(a)(1)'s threat factors in accordance with the ESA and the Service's implementing regulations and policy.

177.    The final rule fails to include an adequate section 4(a)(1) threats factors analysis for gray wolves in the Central/Southern Rocky Mountains. The final rule fails to adequately consider whether gray wolves occurring in the Central/Southern Rocky Mountains are threatened or endangered because of any of the following (or a combination of) the following factors: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreation, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting tis continued existence. 16 U.S.C. § 1533 (a)(1). The final rule fails to consider the vast amount of suitable habitat for gray wolves in the Central/Southern Rocky Mountains states that remains unoccupied. The final rule fails to consider the importance of connectivity corridors and habitats necessary to foster

movement into and recolonization of habitats in the Central/Southern Rocky Mountains states by gray wolves in the Northern Rocky Mountains DPS.

178.    In the final rule, the Service concludes that while a group of six wolves travelling together in a group was documented in far northwestern Colorado (within close proximity to Utah) in January 2020, as dispersers, these wolves are not necessary to the recovery of the 44-State entity, and therefore, do not matter to the recovery of the species. 85 Fed. Reg. 69,883.

179.    By failing to conduct an adequate section 4(a)(1) threats analysis for gray wolves in the Central/Southern Rocky Mountains, the final rule fails to consider an important aspect of the species recovery – the recovery of gray wolves in the Central/Southern Rocky Mountains – and therefore, violates the ESA and APA. 16 U.S.C. § 1533(a)(1); 5 U.S.C. § 706(2)(A).

180.    The final rule fails to include an adequate section 4(a)(1) threats factors analysis for gray wolves in the Pacific Northwest or West Coast states of Oregon, Washington, and California.

181.    The final rule fails to adequately consider whether gray wolves occurring in the West Coast states of Oregon, Washington, and California qualify as an endangered or threatened species because of the present or threatened destruction, modification, or curtailment of the species range. 16 U.S.C. § 1533(a)(1)(A). The final rule fails to consider the best available science in its analysis of "suitable habitat" in the West Coast states by primarily considering road density and human population density only. The final rule fails to consider the vast amount of suitable habitat for gray wolves in the West Coast states that remains unoccupied.

1   The final rule fails to consider the importance of connectivity corridors and habitats

2   necessary to foster movement into and recolonization of habitats in the West Coast states by

3   gray wolves in the Northern Rocky Mountains DPS. The final rule arbitrarily relies on the

4   Service's belief that wolves outside of Wisconsin and Michigan are not necessary for the

5   recovery of the 44-State entity. 85 Fed. Reg. 69,885. The final rule arbitrarily relies on the

6   Service's belief that individual dispersing wolves are not necessary for the recovery of the 44-

7   State entity. The final rule fails to consider that the Service's erroneous determination that

8   gray wolves in the West Coast states are the same as gray wolves in the Northern Rocky

9   Mountains DPS curtails the current range of the listed endangered entity (gray wolves in the

10  Lower 48).

11  182.    The final rule fails to adequately consider whether gray wolves occurring in the West

12  Coast states of Oregon, Washington, and California qualify as an endangered or threatened

13  species because of overutilization for commercial, recreational, scientific, or educational

14  purposes. 16 U.S.C. § 1533(a)(1)(B). The final rule fails to consider the impacts of human-

15  caused mortality on gray wolves in the West Coast states. The final rule fails to consider the

16  impacts of lethal management of gray wolves in Oregon, Washington, and California. The

17  final rule fails to consider the impacts of excessive levels of recreational hunting in the

18  Northern Rocky Mountains DPS on the recovery of gray wolves in the West Coast states.

19  The final rule fails to consider the impacts of hunting and trapping of gray wolves on tribal

20  lands in the West Coast states on the recovery of gray wolves in the West Coast states. The

21  final rule fails to consider the impacts of the immense loss of gray wolves in the West Coast

22  states at the behest of livestock producers on the recovery of gray wolves in the West Coast

1   states. The final rule fails to consider the threats to gray wolf recovery in the West Coast

2   states due to the lack of non-lethal coexistence practices in key gray wolf habitats in Oregon,

3   Washington, and California. The final rule fails to consider that current levels of lethal take

4   of gray wolves in the West Coast states is regulated by the Act's protections and that levels

5   of lethal take of gray wolves in the West Coast states is likely to increase without the Act's

6   protections in effect.

7   183.    The final rule fails to adequately consider whether gray wolves occurring in the West

8   Coast states of Oregon, Washington, and California qualify as an endangered or threatened

9   species because of disease or predation. 16 U.S.C. § 1533(a)(1)(C). The final rule fails to

10   adequately consider the potential for disease to threaten gray wolf populations in the West

11   Coast states. The final rule fails to consider the potential impacts of disease on gray wolves

12   in the West Coast states due to the Pacific Northwest's uniquely different climate from that

13   of the Great Lakes region. The final rule assesses the threat factor of disease and predation

14   on gray wolves in the Great Lakes region alone, and fails to consider the impacts of disease

15   on small and isolated populations, such as those found in the West Coast states.

16   184.    The final rule fails to adequately consider whether gray wolves occurring in the West

17   Coast states of Oregon, Washington, and California qualify as an endangered or threatened

18   species because of the inadequacy of regulatory mechanisms. 16 U.S.C. § 1533(a)(1)(D). The

19   final rule fails to consider the adequacy of state management plans in the West Coast states

20   of Oregon, Washington, and California. The final rule fails to consider the non-binding

21   nature, and recent changes to, the gray wolf management plan in Washington State. The final

22   rule fails to consider the lack of state-level protections for gray wolves in Oregon. The final

1    rule fails to consider the impact of potential state-regulated hunting of gray wolves in the

2    West Coast states absent the Act's federal protections. The final rule fails to adequately

3    consider gray wolf management on federal public lands in the West Coast states, including

4    on lands managed by the United States Forest Service and United States Bureau of Land

5    Management.

6    185.    The final rule fails to adequately consider whether gray wolves occurring in the West

7    Coast states of Oregon, Washington, and California qualify as an endangered or threatened

8    species because of other manmade factors affecting the species' continued existence. 16

9    U.S.C. § 1533(a)(1)(E). The final rule fails to adequately consider the impacts of climate

10   change on the recovery of gray wolves in the West Coast states. The final rule fails to

11   consider the changes in habitat suitability and current and future ranges for gray wolves in

12   the West Coast states that are resulting from and will continue to result from the changing

13   climate. The final rule fails to consider the impacts of climate change on gray wolves' prey

14   availability (including deer and elk populations) in the West Coast states. The final rule fails

15   to consider the best available science, including the concerns of peer reviewers, regarding

16   climate change and its impacts upon the recovery of gray wolves in the West Coast states.

17   186.    The final rule fails to adequately consider whether gray wolves occurring in the West

18   Coast states of Oregon, Washington, and California qualify as an endangered or threatened

19   species because of the cumulative impacts of threats in combination. 16 U.S.C. § 1533(a)(1).

20   187.    By failing to conduct an adequate section 4(a)(1) threats analysis for gray wolves in

21   the West Coast States, the final rule fails to consider an important aspect of the species'

22

recovery – the recovery of gray wolves in the West Coast States – and therefore, violates the
ESA and APA. 16 U.S.C. § 1533(a)(1); 5 U.S.C. § 706(2)(A).

188.    In the final rule, the Service relies on the alleged recovery of wolves in the Northern
Rocky Mountains DPS to rationalize that gray wolves in the West Coast states of Oregon,
Washington, and California are not necessary to support the recovery of the species overall.
But the final rule does not consider the best available science in concluding that recovery in
the Northern Rocky Mountains DPS has been and continues to be successful in supporting
an ecologically viable population of gray wolves in the Northern Rocky Mountains DPS.

189.    In the final rule, the Service discusses state management regimes in the Northern
Rocky Mountains DPS states of Idaho, Montana, and Wyoming. But the final rule does not
consider the best available science in concluding that the state management regimes in
Idaho, Montana, and Wyoming have been and continue to be successful in supporting an
ecologically viable population of gray wolves in the Northern Rocky Mountains DPS.

190.    The final rule's treatment of the status of Idaho's wolf population and regulatory
mechanisms in place there is arbitrary and capricious, and therefore the final rule does not
contain an adequate section 4(a)(1) threats analysis for gray wolves occurring in the
Congressionally-created (and Congressionally-delisted) Northern Rocky Mountains DPS.
The final rule ignores that the State of Idaho stopped reporting minimum wolf population
numbers in 2015. The final rule ignores wolf population data for Idaho more recent than
2016. The final rule ignores that Idaho allowed 60 percent of its wolf population to be
hunted or trapped in 2019-2020. The final rule ignores Idaho's wolf bounty program. The
final rule failed to rely on the best scientific and commercial data related to Idaho's wolf

population. The final rule failed to rely on the best scientific and commercial data related to

Idaho's wolf management regime.

191.    The Service's determination that the threats to the gray wolf throughout the Lower

48 have been reduced such that the listed entities no longer meet the definition of threatened

or endangered under the ESA violates the ESA and is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

## FIFTH CLAIM FOR RELIEF

## (Violation of ESA – Failure to Use and Apply the Best Available Science)

192.    Plaintiffs incorporate all preceding paragraphs.

193.    The ESA requires listing determinations to be based "solely on the basis of the best

scientific and commercial data available," (hereinafter "best available science"). 16 U.S.C. §

1533(b)(1)(A).

194.    The final rule fails to consider, apply, and comport with the best available science.

195.    The final rule's application of the scientific concept of "resiliency, redundancy, and

representation," or the "3 Rs," as authored by Shaffer and Stein (2000), fails to comport with

the best available science. The final rule rests on the premise that gray wolves in the Great

Lakes region alone purportedly provide adequate "resiliency, redundancy, and

representation" to sustain populations within the 44-State entity over time. 85 Fed. Reg.

69,885. The Service uses these "3 R's" (resiliency, redundancy, and representation) to define

"significance" under its "significant portion of its range" analysis. 85 Fed. Reg. 69,885. The

Service explains that the relatively few wolves outside of the Great Lakes area within the 44-

State entity, including those in the West Coast states and lone dispersers in other states, such

as Colorado, are not necessary to the recovery of the 44-State entity overall. 85 Fed. Reg. 69,885. But the Service misinterprets and misapplies the science underlying the "3 Rs" concept. In the final rule, the Service applies the "3 Rs" concept at the species-level, 85 Fed. Reg. 69,854, but the best available science mandates the "3 Rs" concept is to be applied in the broader ecosystem-based context, *see* Shaffer and Stein (2000). The Service's failure to base the final rule on the best available science violates the ESA and APA. 16 U.S.C. § 1533(b)(1)(A); 5 U.S.C. § 706(2)(A).

196.    The final rule's analysis of habitat suitability fails to comport with the best available science. The final rule fails to apply the best available science to its analysis of habitat suitability in the Central/Southern Rocky Mountains, including in Colorado, Utah, Nevada, and northern New Mexico. Instead, the final rule rests on the Service's belief that the gray wolves occurring in the Central/Southern Rocky Mountains, including in Colorado and Utah, are not necessary to the recovery of the 44-State entity overall. 85 Fed. Reg. 69,885. The final rule fails to explain why the Central/Southern Rocky Mountains no longer contain necessary suitable habitat for gray wolf recovery, as the Service has concluded it does in prior rules. The Service's failure to base the final rule on the best available science violates the ESA and APA. 16 U.S.C. § 1533(b)(1)(A); 5 U.S.C. § 706(2)(A).

197.    The Service's determination that the final rule is based on the best available science violates the ESA and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

### SIXTH CLAIM FOR RELIEF

### (Violation of ESA – Illegal Post-Delisting Monitoring Program)

198.   Plaintiffs incorporate all preceding paragraphs.

199.   Section 4(g)(1) of the ESA requires the Service to implement a system, in cooperation with the States, to monitor effectively — for not less than five years — the status of all species that have been determined to be recovered to the point at which the Act's protections are no longer required, and which have been removed from the federal list of endangered and threatened wildlife. 16 U.S.C. § 1533(g)(1).

200.   The Service's Post-Delisting Monitoring Plan Guidance provides that the Service should tailor a post-delisting monitoring program to collect and evaluate data "most likely to detect increased vulnerability of the species following removal of ESA protections." U.S. Fish and Wildlife Service and National Marine Fisheries Service, Post-Delisting Monitoring Plan Guidance Under the Endangered Species Act at 4-1 (August 2008) (hereinafter "Monitoring Guidance"). The Service's Post-Delisting Monitoring Plan Guidance provides that different monitoring protocols in different locations due to differences in threats and population dynamics should be contemplated. Monitoring Guidance at 4-2.

201.   In the final rule, the Service explains: "Our monitoring activities will focus on wolves within Minnesota, Wisconsin, and Michigan. Although the entities evaluated in this rule include wolves outside of those states, we have determined that it is appropriate to focus on the Great Lakes area because it includes the currently-listed Minnesota entity and that portion of the 44-state entity that is most significant in terms of vulnerability of the species following removal of the Act's protections. Therefore, by evaluating the monitoring data from the Great Lakes states, we can effectively monitor the status of the species." 85 Fed. Reg. 69,894.

202.    In the final rule, the Service explains that it will not conduct any post-delisting monitoring of the species outside of Minnesota, Wisconsin, and Michigan. 85 Fed. Reg. 69,894.

203.    In the final rule, the Service explains that it will not conduct any post-delisting monitoring of the species in Oregon, Washington, California, Colorado, or other states where a small number of gray wolves currently exist. 85 Fed. Reg. 69,894.

204.    In the final rule, the Service explains that it will not conduct any further post-delisting monitoring of the species in the NRM DPS, including in Idaho and Montana, where post-delisting monitoring is already complete, nor in Wyoming, where post-delisting monitoring is currently in place. 85 Fed. Reg. 69,894.

205.    In the final rule, the Service relies on a 2008 monitoring plan prepared for a DPS that does not exist, entitled "Post-delisting Monitoring Plan for the Western Great Lakes Distinct Population Segment of the Gray Wolf" (February 2008). 85 Fed. Reg. 69,894.

206.    The Service's failure to monitor gray wolves outside of the Great Lakes States and reliance on an outdated monitoring plan for a DPS that does not exist violates the ESA and the Service's Post-delisting Monitoring Plan Guidance, and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

## SEVENTH CLAIM FOR RELIEF

### (Violation of APA – Inadequate Public Notice and Comment)

207.    Plaintiffs incorporate all preceding paragraphs.

208.    The APA requires federal agencies to provide notice of rulemaking to the public. 5 U.S.C. § 553(b). The APA requires federal agencies "shall provide interested persons an

opportunity to participate in the rule making though submission of written data, views or arguments." 5 U.S.C. § 553(c). Any changes between a proposed rule and final rule must be a logical outgrowth of the notice and comments received.

209.    Agency action without observance of the procedure required by law is arbitrary or abuse of discretion and shall be set aside. 5 U.S.C. § 706(2)(D).

210.    The changes between the Service's 2019 proposed rule and the Service's 2020 final rule are significant and required additional notice and opportunity for the public to comment.

211.    The Service changed its approach from analyzing a single "gray wolf entity" in the 2019 proposed rule, to analyzing three different configurations of "gray wolf entities" in the final rule.

212.    The Service added significant new biological and policy information to the final rule that was omitted from the 2019 proposed rule.

213.    The Service did not provide the public, nor peer reviewers of the Service's 2019 proposed rule, adequate notice and an opportunity to comment on the revised approach of the final rule and significant new biological and policy information included within.

214.    The Service's failure to provide adequate notice and opportunity to comment on the significant changes from the proposed rule to the final rule renders the final rule "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

A.      Declare the Service has violated and continues to violate the law as alleged above;

B.      Set aside and vacate the Service's November 3, 2020 final rule challenged herein pending compliance with the ESA and APA, as alleged herein;

C.      Remand this matter back to the Service with instructions to comply with the ESA and APA, as alleged herein;

D.      Issue any interim or permanent injunctive relief or other relief this Court deems necessary, just, or proper or that Plaintiffs may subsequently request;

E.      Award Plaintiffs their reasonable attorneys' fees, costs, and expenses of litigation;

Respectfully submitted this 20th day of May, 2021.

/s/ John R. Mellgren
John R. Mellgren
*appearance pro hac vice*

/s/ Kelly E. Nokes
Kelly E. Nokes
*appearance pro hac vice*