1   KRISTEN L. BOYLES (CSBA #158450)
    MICHAEL MAYER (WSBA #32135)
2   *[Admitted Pro Hac Vice]*
3   EARTHJUSTICE
    810 Third Avenue, Suite 610
4   Seattle, WA 98104
    (206) 343-7340
5   kboyles@earthjustice.org
    mmayer@earthjustice.org
6

7   *[Additional counsel listed at end]*

8                  UNITED STATES DISTRICT COURT
9          FOR THE NORTHERN DISTRICT OF CALIFORNIA
                        OAKLAND DIVISION
10

11  DEFENDERS OF WILDLIFE *et al.*,

12              Plaintiffs,

13          v.                              Case No. 4:21-cv-00344-JSW

14  U.S. FISH AND WILDLIFE SERVICE *et al.*,   Related Cases:    4:21-cv-00349-JSW
                                                                 4:21-cv-00561-JSW
15              Defendants.

16  WILDEARTH GUARDIANS *et al.*,

17              Plaintiffs,

18          v.                              **PLAINTIFFS' JOINT NOTICE OF
                                            MOTION, MOTION FOR SUMMARY
    DEBRA HAALAND, U.S. SECRETARY OF        JUDGMENT, AND MEMORANDUM
19  THE INTERIOR *et al.*,                  IN SUPPORT OF SUMMARY
                                            JUDGMENT**
20              Defendants.

21  NATURAL RESOURCES DEFENSE
    COUNCIL, INC.,
22
                Plaintiff,                   Hearing Date: November 12, 2021
23                                           Time: 9 a.m.
            v.                               Courtroom 5
24                                           Before Judge Jeffrey S. White
    U.S. DEPARTMENT OF THE INTERIOR *et
25  al.*,

26              Defendants.

27

28

**TABLE OF CONTENTS**

Table of Authorities ........................................................................................................ iii

Glossary .......................................................................................................................... ix

Table of Significant Record Documents ........................................................................ x

Notice of Motion ............................................................................................................ xi

Statement of Issues to be Decided ................................................................................. 1

Introduction .................................................................................................................... 1

Statement of Relevant Facts .......................................................................................... 3

I.     The Endangered Species Act ................................................................................. 3

II.    Gray Wolves in the United States .......................................................................... 4

III.   FWS's Prior, Unlawful Delisting Efforts .............................................................. 6

IV.    2018 Gray Wolf Distinct Population Segment Petition ......................................... 7

V.     2020 Delisting Rule ................................................................................................ 7

Standard of Review ......................................................................................................... 8

Argument ........................................................................................................................ 9

I.     FWS's Failure to Evaluate the Full Listed Gray Wolf Species Violated the ESA ................. 10

II.    FWS Unlawfully Ignored the Conservation Status of Pacific Coast Wolves .......................... 13

III.   FWS's Application of "Significant Portion of its Range" to the Gray Wolf Listed
       Population Violated the ESA ................................................................................. 18

       A.  Courts have repeatedly rejected FWS's attempts to minimize the ESA's
           "significant portion" listing criterion ........................................................... 19

       B.  FWS's standardless "significant portion" analysis in the Delisting Rule
           was arbitrary and capricious ......................................................................... 21

       C.  FWS irrationally applied its arbitrary "significant portion" standard to the gray wolf ...... 23

IV.    FWS's Threats Assessment was Arbitrary and Not in Accordance with the ESA ................. 27

       A.  FWS failed to analyze threat factors across the entire listed species ................................ 28

       B.  FWS failed to consider effects of lost historical range ..................................................... 28

C. FWS violated the ESA in its determination that wolves in the Great Lakes
states could be delisted despite inadequate existing state regulatory protections.............. 30

1. Wisconsin and Minnesota plan deliberate, intentional killing of wolves
through hunting, trapping, and other lethal methods .................................... 31

2. Outdated population goals and unsustainable mortality levels do not reflect
the best available science ........................................................ 35

D. FWS violated the ESA in its determination that wolves outside the Great Lakes
states could be delisted despite inadequate existing state regulatory protections.............. 37

V.    FWS's Analysis and Reliance on a "Lower 48 United States Entity" was
Not a Logical Outgrowth of the Proposed Rule........................................ 41

VI.   FWS Denied the Wolf DPS Petition by Using an Incorrect, Elevated Standard .................... 43

VII.  Plaintiffs Have Standing to Challenge the Delisting Rule............................. 46

VIII. To Remedy FWS's Violations of Law, the Court Should Vacate the Delisting Rule ............. 47

Conclusion ......................................................................... 49

1

# TABLE OF AUTHORITIES

2

**Cases**

3
*Ariz. Cattle Growers' Ass'n v. Salazar,*
4
 606 F.3d 1160 (9th Cir. 2010) ........................................................................ 13, 48

5
*Cal. Cmtys. Against Toxics v. EPA,*
 688 F.3d 989 (9th Cir. 2012) ................................................................................. 48
6

7
*Cascadia Wildlands v. Dep't of Fish & Wildlife,*
 300 Or. App. 648 (2019) ......................................................................................... 38
8

9
*Cascadia Wildlands v. Woodruff,*
 151 F. Supp. 3d 1153 (W.D. Wash. 2015) ......................................................... 37–38

10
*Citizens to Preserve Overton Park, Inc. v. Volpe,*
11
 401 U.S. 402 (1971) .................................................................................................. 9

12
*Conner v. Burford,*
13
 848 F.2d 1441 (9th Cir. 1988) ............................................................................... 17

14
*Crow Indian Tribe v. United States,*
15
 965 F.3d 662 (9th Cir. 2020) ........................................... 10, 11, 18, 28, 30, 37, 38

16
*Ctr. for Biological Diversity v. Haaland,*
17
 998 F.3d 1061 (9th Cir. 2021) ............................................................................... 15

18
*Ctr. for Biological Diversity v. Jewell,*
 248 F. Supp. 3d 946 (D. Ariz. 2017) ......................................................... 19, 20, 21
19

20
*Ctr. for Biological Diversity v. Kelly,*
 93 F. Supp. 3d 1193 (D. Idaho 2015) .................................................................... 43
21

22
*Ctr. for Biological Diversity v. Kempthorne,*
 2008 WL 659822 (D. Ariz. 2008) ..................................................................... 44, 45

23
*Ctr. for Biological Diversity v. Kempthorne,*
24
 2007 WL 163244 (N.D. Cal. 2007) ................................................................... 44, 46

25
*Ctr. for Biological Diversity v. Morgenweck,*
26
 351 F. Supp. 2d 1137 (D. Colo. 2004) ............................................................... 44–45

27
*Ctr. for Biological Diversity v. Zinke,*
28
 900 F.3d 1053 (9th Cir. 2018) ...................................... 17, 27, 28, 29–30, 48

*Defs. of Wildlife v. EPA*,
    420 F.3d 946, 959 (9th Cir. 2005) ...................................................... 9

*Defs. of Wildlife v. Hall*,
    565 F. Supp. 2d 1160 (D. Mont. 2008) ............................................... 6

*Defs. of Wildlife v. Norton*,
    258 F.3d 1136, 1142 (9th Cir. 2001) ...................................... 19–20, 22

*Defs. of Wildlife v. Norton* (*Oregon Wolves*),
    354 F. Supp. 2d 1156 (D. Or. 2005) ........................... 6, 12, 28, 47, 49

*Defs. of Wildlife v. Salazar*,
    729 F. Supp. 2d 1207 (D. Mont. 2010) ..................................... 6, 10, 49

*Defs. of Wildlife v. Zinke*,
    849 F.3d 1077 (D.C. Cir. 2017) .............................................. 6, 37, 38

*Desert Survivors v. U.S. Dep't of the Interior*,
    336 F. Supp. 3d 1131 (N.D. Cal. 2018) ............................................ 20

*Desert Survivors v. U.S. Dep't of the Interior*,
    321 F. Supp. 3d 1011 (N.D. Cal. 2018) ...................................... 20, 29

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ............................................................ 47

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ......................................................................... 15

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*,
    381 F. Supp. 3d 1127 (D. Alaska 2019) ........................................... 15

*Friends of Animals v. Haaland*,
    997 F.3d 1010 (9th Cir. 2021) .......................................................... 22

*Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*,
    528 U.S. 167 (2000) ......................................................................... 46

*Getty v. Federal Sav. & Loan Ins. Corp.*,
    805 F.2d 1050 (D.C. Cir. 1986) ....................................................... 30

*Gifford Pinchot Task Force v. FWS*,
    378 F.3d 1059 (9th Cir.), *amended by* 387 F.3d 968 (9th Cir. 2004) ................... 22

*Greater Yellowstone Coalition, Inc. v. Servheen*,
    665 F.3d 1015 (9th Cir. 2011) ................................................................. 8, 9, 13, 40

*Hospital of Barstow, Inc. v. NLRB*,
    820 F.3d 440 (D.C. Cir. 2016) ................................................................. 22

*Humane Soc'y of the U.S. v. Jewell*,
    76 F. Supp. 3d 69 (D.D.C. 2014) ............................................................. 6

*Humane Soc'y of the U.S. v. Kempthorne*,
    579 F. Supp. 2d (D.D.C. 2008) ................................................................. 6, 48, 49

*Humane Soc'y of U.S. v. Zinke*,
    865 F.3d 585 (D.C. Cir. 2017) ................................................. 3, 6, 11, 15, 29, 30, 47, 48

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ................................................................. 43, 48

*INS v. Orlanda Ventura*,
    537 U.S. 12 (2002) ................................................................................. 22

*McCrary v. Gutierrez*,
    2010 WL 520762 (N.D. Cal. 2010) ......................................................... 45

*Moden v. U.S. Fish & Wildlife Serv.*,
    281 F. Supp. 2d 1193 (D. Or. 2003) ........................................................ 45

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* (*State Farm*),
    463 U.S. 29 (1983) ................................................................................. 9, 26, 28

*Nat'l Ass'n of Home Builders v. Norton*,
    340 F.3d 835 (9th Cir. 2003) ................................................................. 16, 24

*Nat'l Parks Conservation Ass'n v. EPA*,
    788 F.3d 1134 (9th Cir. 2015) ................................................................. 8, 25

*Nat'l Wildlife Fed'n v. Norton* (*Vermont Wolves*),
    386 F. Supp. 2d 553 (D. Vt. 2005) .......................................................... 6, 12, 43, 49

*NRDC v. EPA*,
    863 F.2d 1420 (9th Cir. 1988) ................................................................. 41

*NRDC v. EPA*,
    279 F.3d 1180 (9th Cir. 2002) ................................................................. 41, 42, 43

Plaintiffs' Joint Motion for Summary Judgment; Lead Case No. 4:21-cv-00344-JSW

*NRDC v. Pritzker*,
    828 F.3d 1125 (9th Cir. 2016) ........................................................ 8

*Or. Nat. Res. Council v. Daley*,
    6 F. Supp. 2d 1139 (D. Or. 1998) .................................................. 30

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) ................................................... 14–15

*Pollinator Stewardship Council v. EPA*,
    806 F.3d 520 (9th Cir. 2015) .................................................. 47, 48

*Sugar Cane Growers Co-Op v. Veneman*,
    289 F.3d 89 (D.C. Cir. 2002) ......................................................... 30

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978).................................................................. 8, 48

*Transp. Div. of Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Fed. R.R. Admin.*,
    988 F.3d 1170 (9th Cir. 2021) ....................................................... 42

*Trout Unlimited v. Lohn*,
    559 F.3d 946 (9th Cir. 2009) ......................................................... 10

*W. Watersheds Project v. FWS*,
    535 F. Supp. 2d 1173 (D. Idaho 2007) .......................................... 40

*W. Watersheds Project v. Krayeenbrink*,
    632 F.3d 472 (9th Cir. 2011) .................................................. 17, 47

*W. Watersheds Project v. Norton*,
    2007 WL 2827375 (D. Idaho 2007).............................................. 45

*WildEarth Guardians v. Jeffries*,
    370 F. Supp. 3d 1208 (D. Or 2019) .............................................. 40

**Statutes**

5 U.S.C. § 553 ........................................................................................................ 41

5 U.S.C. § 706(2) .......................................................................................... 9, 41, 47

16 U.S.C. § 1531(b) ................................................................................................. 3

16 U.S.C. § 1531(c) ................................................................................................. 4

16 U.S.C. § 1532(6) ..................................................................................... 3, 19, 22

16 U.S.C. § 1532(16) ...................................................................................... 3, 24

16 U.S.C. § 1532(19) ............................................................................................. 4

16 U.S.C. § 1532(20) ................................................................................... 3, 19, 22

16 U.S.C. § 1533 ............................................................................................. 3, 43

16 U.S.C. § 1533(a) ......................................................... 3–4, 10, 27, 38, 30, 37

16 U.S.C. § 1533(b) ................................................................ 4, 25, 35, 37, 41

16 U.S.C. § 1533(c) .......................................................................................... 10

16 U.S.C. § 1533(f) .......................................................................................... 13

16 U.S.C. § 1536(a) .......................................................................................... 40

16 U.S.C. § 1538(a) ............................................................................................ 4

Mich. Comp. Laws § 324.40103(1) .................................................................. 33

Wisc. Stat. Ann. § 29.185(1m) ......................................................................... 32

**Regulations & Rulemakings**

36 C.F.R. § 219.9(c) ....................................................................................... 41

50 C.F.R. § 17.40(d) ....................................................................................... 33

50 C.F.R. § 424.14(c) ...................................................................................... 44

50 C.F.R. § 424.14(h) .................................................................................. 43–44

32 Fed. Reg. 4001 (Mar. 11, 1967) ................................................................... 5

38 Fed. Reg. 14,678 (June 4, 1973) .................................................................. 5

39 Fed. Reg. 1171 (Jan. 4, 1974) ...................................................................... 5

41 Fed. Reg. 17,736 (Apr. 28, 1976) ................................................................ 5

41 Fed. Reg. 24,064 (June 14, 1976) ................................................................ 5

Plaintiffs' Joint Motion for Summary Judgment; Lead Case No. 4:21-cv-00344-JSW

43 Fed. Reg. 9607 (Mar. 9, 1978) ..................................................................... 5

61 Fed. Reg. 4722 (Feb. 7, 1996) .............................................. 16, 18, 24, 25

68 Fed. Reg. 15,804 (Apr. 1, 2003) ............................................................... 5

73 Fed. Reg. 10,514 (Feb. 27, 2008) ..................................................... 14, 16

74 Fed. Reg. 15,123 (Apr. 2, 2009) ....................................................... 14, 15

76 Fed. Reg. 81,666 (Dec. 28, 2011) ......................................................... 11

78 Fed. Reg. 35,664 (June 13, 2013) ................................................... 11, 14

79 Fed. Reg. 37,578 (July 1, 2014) ....................................... 20, 24, 27, 28, 29

82 Fed. Reg. 30,502 (June 30, 2017) ......................................................... 23

84 Fed. Reg. 9648 (Mar. 15, 2019) (Proposed Delisting Rule) ................................. *passim*

84 Fed. Reg. 52,598 (Oct. 2, 2019) ........................................................... 23

85 Fed. Reg. 69,778 (Nov. 3, 2020) (Delisting Rule) ............................................ *passim*

## Other Sources

Aldo Leopold, A Sand County Almanac (1949) ................................................. 1

S. Rep. No. 97-418 (1982) ..................................................................... 3

**GLOSSARY**

| Short Form | Title or Phrase |
| --- | --- |
| APA | Administrative Procedure Act |
| DPS | Distinct Population Segment |
| ESA | Endangered Species Act |
| FWS | U.S. Fish & Wildlife Service |
| GLIFWC | Great Lakes Indian Fish & Wildlife Commission |
| SPR | Significant Portion of its Range |

| Short Form | Document |
| --- | --- |
| Proposed Delisting Rule | Removing the Gray Wolf (Canis lupus) From the List of Endangered and Threatened Wildlife, 84 Fed. Reg. 9648 (Mar. 15, 2019) |
| Independent Peer Reviews | Summary Report of Independent Peer Reviews for the U.S. Fish and Wildlife Service Gray Wolf Delisting Review (May 2019) |
| Delisting Rule | Removing the Gray Wolf (Canis lupus) From the List of Endangered and Threatened Wildlife, 85 Fed. Reg. 69,778 (Nov. 3, 2020) |
| Wolf DPS Petition | Petition to Maintain Protections for Gray Wolves (Canis lupus) in the Lower 48 States as Endangered or Threatened "Distinct Population Segments" Under the Endangered Species Act (Dec. 17, 2018) |
| 90-Day Finding | 90-Day Finding on Petition to Maintain Protections for Gray Wolves (*Canis Lupus*) in the Lower 48 States as Endangered or Threatened "Distinct Population Segments" under the Endangered Species Act (Nov. 27, 2020) |

## TABLE OF SIGNIFICANT RECORD DOCUMENTS

| Document | AR Range |
| --- | --- |
| Delisting Rule, 85 Fed. Reg. 69,778 (Nov. 3, 2020) | AR_0000038–0000155 |
| 90-Day Finding | AR_0000322–0000354 |
| Gray Wolf Biological Report (Oct. 13, 2020) | AR_0000397–0000448 |
| Independent Peer Reviews | AR_0010956–0001200 |
| Proposed Delisting Rule, 84 Fed. Reg. 9648 (Mar. 15, 2019) | AR_0020097–0020136 |
| Wolf DPS Petition | AR_0021766–0000814 |

**NOTICE OF MOTION**

Please take notice that, pursuant to Fed. R. Civ. P. 56(a) and Civil Local Rule 7, plaintiffs in these three related cases—No. 4:21-cv-344-JSW: Defenders of Wildlife, Center for Biological Diversity, Sierra Club, National Parks Conservation Association, Oregon Wild, and Humane Society of the United States (collectively, *Defenders* plaintiffs); No. 4:21-cv-349-JSW: WildEarth Guardians, Western Watersheds Project, Cascadia Wildlands, Environmental Protection Information Center, Kettle Range Conservation Group, Klamath Forest Alliance, Klamath-Siskiyou Wildlands Center, The Lands Council, and Wildlands Network (collectively, *Guardians* plaintiffs); and No. 4:21-cv-561-JSW: Natural Resources Defense Council (NRDC)—respectfully move this Court for summary judgment. The Court has scheduled a hearing for November 12, 2021 at 9 a.m. before the Honorable Jeffrey S. White, United States District Judge, Oakland Courthouse, Courtroom 5–2nd Floor, 1301 Clay Street, Oakland, CA 94612.

Federal defendants U.S. Fish and Wildlife Service *et al.* (FWS) violated the Endangered Species Act (ESA) and Administrative Procedure Act (APA) when they removed federal Endangered Species Act protections from the gray wolf in the lower-48 United States. *See* Endangered and Threatened Wildlife and Plants; Removing the Gray Wolf (Canis lupus) From the List of Endangered and Threatened Wildlife, 85 Fed. Reg. 69,778 (Nov. 3, 2020) (Delisting Rule). Plaintiffs ask the Court to issue an order declaring the Delisting Rule invalid, vacating the Delisting Rule, and reinstating ESA protections for the gray wolf. Because there are no genuine issues of material fact and plaintiffs are entitled to judgment as a matter of law, this Court should enter summary judgment for plaintiffs, *see* Fed. R. Civ. P. 56(a), and vacate the unlawful Delisting Rule, *see* 5 U.S.C. § 706(2)(A).

This motion is supported by the accompanying memorandum, the pleadings previously filed with the Court in the three related cases, the declarations and other papers submitted herewith, and such other evidence as the Court deems appropriate. In particular, plaintiffs' standing to bring this case is demonstrated by the member declarations of Collette Adkins, Diane Cain, Jeff Davison, Christine Goepfert, Noah Greenwald, James Hines, Bart Melton, Danielle Mosier, Susan Kane Ronning, Ryan Schwarz, Jodi Habush Sinykin, Gary Skiba, Robert Waligora, Penny Warner, and

Nancy Warren (*Defenders* case, ECF 54-2 to 54-16); Kimberly Baker, Timothy Coleman, Greg Costello, Bethany Cotton, Michael Dotson, Marla Fox, Chris Krupp, Lindsay Larris, Ralph Maughan, and Erik Molvar (*Guardians* case, ECF 58-2 to 58-11); and Margaret Gompper, Diarmuid McGuire, Martha Osterberg, Gonzalo Rodriguez, Gina Trujillo, Ellyn Wiens, and Matt Wilkin (*NRDC* case, ECF No. 70-1 to 70-7, submitted concurrently).

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether FWS violated the ESA when, in the Delisting Rule, it failed to evaluate the full listed gray wolf species.

2.      Whether FWS violated the ESA when, in the Delisting Rule, it ignored the conservation status of Pacific Coast wolves.

3.      Whether FWS violated the ESA when, in the Delisting Rule, it failed to interpret and rationally apply a discernable definition of the statutory term "significant portion of its range."

4.      Whether FWS violated the ESA when, in the Delisting Rule, it failed to adequately consider the threats facing the species.

5.      Whether FWS violated the ESA and APA when, in the Delisting Rule, it analyzed and relied on the so-called "Lower 48 United States Entity," which was not included in the proposed rule.

6.      Whether FWS violated the ESA and APA when, in its 90-Day Finding (published with the Delisting Rule), it denied the petition to list and protect gray wolves in alternative distinct population segments using an incorrect standard and repeating errors from the Delisting Rule itself.

## INTRODUCTION

Ma'iingan [Gray Wolf] walked with Wenaboozhoo, or Original Man, after they received instructions to travel throughout the earth, naming all aspects of creation. At the end of that journey, Wenaboozhoo and Ma'iingan parted ways. However, before parting, the Creator explained that the Ojibwe and Ma'iingan would always be related as brothers, whatever befalls one would befall the other, and that they would both be forever feared and misunderstood.

-Ojibwe Creation Story[1]

I was young then, and full of trigger-itch; I thought that because fewer wolves meant more deer, that no wolves would mean hunters' paradise. But after seeing the green fire die, I sensed that neither the wolf nor the mountain agreed with such a view.

-Aldo Leopold, A Sand County Almanac (1949)

Gray wolves in the United States should be an American success story. Hunted, trapped, and poisoned with the approval of federal and state agencies, by 1967 wolves were reduced to fewer than 1,000 individuals in one small part of northeastern Minnesota with an isolated population on

---

[1] AR_0010570 (Great Lakes Indian Fish and Wildlife Commission (GLIFWC) comment letter).

Isle Royale National Park in Lake Superior. The U.S. Fish and Wildlife Service (FWS) protected gray wolves, *Canis lupus*, throughout the lower-48 states under the fledgling Endangered Species Act (ESA) in 1978 as two groups: a threatened population in Minnesota and an endangered population in the rest of the lower-48 states. Today, there are recovering wolf populations in the Northern Rocky Mountains and the Great Lakes states of Minnesota, Wisconsin, and Michigan; wolves have begun to reinhabit the Pacific Northwest, California, and Colorado; and wolf habitat remains explored but largely unclaimed in states including Utah and Maine. Slowly, under the ESA's federal protections, nationwide wolf recovery is moving forward.

Yet FWS has shown unrelenting hostility toward gray wolf protection and recovery. For almost twenty years, FWS has proposed increasingly more tenuous rules to remove protections from gray wolves, despite federal courts consistently rejecting those attempts as unlawful. Undaunted by this history, in 2020 FWS again finalized a delisting rule, this time eliminating all federal protections from gray wolves save for a separate population in the Southwest. *See* AR_0000038 (85 Fed. Reg. 69,778 (Nov. 3, 2020)) (Delisting Rule).

Plaintiffs challenge the Delisting Rule for the specific legal reasons set out below. At its core, however, this case is about FWS's unlawful reliance on the numbers of wolves in the Great Lakes states to write off relatively new wolf populations in other states as unnecessary outliers, dooming the goal of true nationwide species recovery. But even for the Great Lakes wolves, FWS failed to adequately review or account for the admitted lack of state-level protections, a failure that immediately led to an ill-timed and badly managed wolf hunt in Wisconsin during breeding season that killed far more wolves than the target goal. The Delisting Rule violates the ESA, fails to use the best available science, and is arbitrary and capricious under the Administrative Procedure Act (APA). Plaintiffs respectfully ask the Court to vacate the Delisting Rule—a decision that would reinstate federal ESA protections for gray wolves and recommit FWS to working toward legitimate recovery for a nationwide wolf population and safeguarding wolves in the Great Lakes region and beyond.

**STATEMENT OF RELEVANT FACTS**

## I.   The Endangered Species Act

The ESA was enacted to "provide a program for the conservation of . . . endangered species and threatened species" and "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). To receive full protection under the Act, a species must be listed by the Secretary of the Interior as "endangered" or "threatened." *See id.* § 1533(a). ESA section 4—the "cornerstone of effective implementation" of the Act, S. Rep. No. 97-418, at 10 (1982)—establishes the binding framework for listing or delisting a species. *See* 16 U.S.C. § 1533.

The ESA defines "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). The ESA further defines the term "species" to include "any subspecies of fish or wildlife . . . and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16). Under these definitions, the FWS can list or delist a distinct population segment (DPS) of a vertebrate species, even when the entire species would not warrant such a listing or delisting action. This reflects "Congress's intent to target the Act's provisions where needed, rather than to require the woodenly undifferentiated treatment of all members of a taxonomic species regardless of how their actual status and condition might change over time." *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 598 (D.C. Cir. 2017).

In making decisions to list or delist a species, including a DPS, as "endangered" or "threatened," the ESA requires the Secretary to "determine whether [the] species is an endangered species or a threatened species because of any of the following factors:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;
(B) overutilization for commercial, recreational, scientific, or educational purposes;
(C) disease or predation;
(D) the inadequacy of existing regulatory mechanisms; or
(E) other natural or manmade factors affecting its continued existence."

16 U.S.C. § 1533(a)(1). The Secretary must make these determinations "on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species." *Id.* § 1533(b)(1)(A). Once a species is listed as "endangered" or "threatened" under the ESA, "all Federal departments and agencies shall seek to conserve" the species "and shall utilize their authorities in furtherance of the purposes of [the ESA]." *Id.* § 1531(c). And, with limited exceptions, no individual, business, or government entity can "take"—that is, "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect," *id.* § 1532(19)—an endangered species. *See id.* § 1538(a)(1)(B).

## II.   Gray Wolves in the United States



The gray wolf (*Canis lupus*) is the largest wild member of the dog family (*Canidae*). AR_0030013 (Ma'iingan (Wolf) Management Plan 2013). Despite its name, a gray wolf's fur can range from white to shades of gray to coal black. AR_0030014. Gray wolves are territorial and social animals that exhibit group hunting behavior, normally living in packs of two to eight individuals. AR_0038894–95 (Maine Gray Wolf Fact Sheet). Wolves primarily prey on medium and large mammals. *Id.* Within the United States, studies of gray wolves in Yellowstone National Park and elsewhere show that wolves' predations significantly shape their ecosystems, promoting biodiversity and overall ecosystem health. AR_0018200 (Ripple & Beschta).

Historically, gray wolves were the nation's most common large carnivore, with habitat generally thought to extend across nearly all of North America. AR_000406–07 & fig. 1 (Biological

Report). Many Native American cultures revere gray wolves, considering them "to possess equal, or superior, capacity to human beings with respect to intelligence and agility, but also in terms of Ma'iingan's [i.e., wolves'] parenting skills and ability to coordinate and communicate collective action." AR_0010570 (GLIFWC comment letter objecting to "any action taken by the United States, and the separate states that fails to incorporate the sacred obligation we have as human beings to protect Ma'iingan, promote understanding of its critical role in natural systems and ensure the long-term health of Ma'iingan populations, at their natural carrying capacity and within historic ranges"). With European settlement, however, "superstition and fears . . . led to widespread persecution of wolves." 68 Fed. Reg. 15,804, 15,805 (Apr. 1, 2003). In the United States, wolves were routinely hunted and killed, and this hunting, together with an active eradication program sponsored and carried out by the federal government (including FWS) in the early 20th century, resulted in the extirpation of wolves from more than 95 percent of their range in the lower-48 states. *See* AR_0000407–08 fig. 1 (Biological Report).

Two subspecies of gray wolves were originally granted legal protection under the Endangered Species Preservation Act of 1966. 32 Fed. Reg. 4001 (Mar. 11, 1967) (*C. l. lycaon*); 38 Fed. Reg. 14,678 (June 4, 1973) (*C. l. irremotus*). In January 1974, FWS granted those wolves protection under the then-current version of the ESA. 39 Fed. Reg. 1171 (Jan. 4, 1974). Other subspecies of gray wolves were later granted protections under the ESA. 41 Fed. Reg. 17,736 (Apr. 28, 1976) (*C. l. baileyi*); 41 Fed. Reg. 24,064 (June 14, 1976) (*C. l. monstrabilis*). In 1978, after recognizing the uncertain scientific taxonomy of the subpopulations and "that the entire species *Canis lupus* is Endangered or Threatened to the south of Canada," FWS reclassified gray wolves as endangered at the species level throughout the contiguous United States, except for a population in Minnesota, which was listed as a threatened species. 43 Fed. Reg. 9607 (Mar. 9, 1978).

Flash forward to today: There are larger wolf populations in Wisconsin, Minnesota, Michigan, and the Northern Rocky Mountains. Wolf packs have begun to reestablish themselves in the Pacific Coast states. The Central Rockies has inviting wolf habitat, as does Maine and other Northeastern states. AR_0000048–49, 51.

### III.   FWS's Prior, Unlawful Delisting Efforts

The gray wolf still exists only on a fraction of its range and at population numbers well below historical levels. And, at the same time, a desire for increased wolf hunting and even wolf eradication is growing in parts of the nation.

Although FWS has taken important steps to recover wolves, the agency has also consistently demonstrated a desire to prematurely declare victory and halt further recovery efforts. For close to twenty years, FWS has stripped away protections and exposed wolves to severe new mortality threats, often relying on versions of a single, flawed legal theory: that limited recovery in discrete areas can justify widespread delisting. Federal courts have consistently rejected this approach as invalid and vacated the unlawful delisting efforts.

In 2003, FWS issued a final rule that created three new wolf DPSs and downlisted two of them. Two courts invalidated this rule because FWS assessed only the status of core population portions of the new DPSs and did not apply the statutory listing factors outside of those areas. *See Defs. of Wildlife v. Norton* (*Oregon Wolves*), 354 F. Supp. 2d 1156, 1170–72 (D. Or. 2005); *Nat'l Wildlife Fed'n v. Norton* (*Vermont Wolves*), 386 F. Supp. 2d 553, 564–65 (D. Vt. 2005).

FWS repeated variations on this approach—drawing a narrow DPS while ignoring the broader population and the wider habitat availability—with almost clockwork regularity in 2007, 2008, 2009, and 2011. Wolf advocates—including plaintiffs here—challenged these efforts and the courts rejected them. *See Humane Soc'y of the U.S. v. Kempthorne*, 579 F. Supp. 2d 7 (D.D.C. 2008) (vacating rule); *Defs. of Wildlife v. Hall*, 565 F. Supp. 2d 1160 (D. Mont. 2008) (enjoining rule); Stip. Settlement Agreement & Order, *Humane Soc'y of the U.S. v. Salazar*, No. 09-1092-PLF (D.D.C. July 2, 2009), ECF No. 27 (settlement vacating rule); *Defs. of Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2010) (vacating rule); *Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69 (D.D.C. 2014) (vacating rule), *aff'd* 865 F.3d 585 (D.C. Cir. 2017).[2]

---

[2] FWS recognized and delisted the Northern Rocky Mountain population of gray wolves in 2009, and although that delisting was invalidated through litigation, *see Defs. of Wildlife*, 729 F. Supp. 2d at 1228, Congress reinstated the delisting in 2011. AR_0000040. The D.C. Circuit upheld FWS's delisting of wolves in Wyoming. *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1093 (D.C. Cir. 2017).

## IV. 2018 Gray Wolf Distinct Population Segment Petition

In 2018, in an attempt to align protected wolf populations with the best available science, plaintiffs Center for Biological Diversity and Humane Society of the United States submitted a petition to FWS that presented scientific studies and evidence to support ways to define and protect gray wolves in the United States. AR_0021766–814 (Wolf DPS Petition). The Wolf DPS Petition presented FWS with three, scientifically based alternatives: 1) a single DPS for the entire lower 48-states, including the Northern Rocky Mountains; 2) two DPSs, Eastern and Western; and 3) five regional DPSs. AR_0021775–76.

## V. 2020 Delisting Rule

In March 2019, FWS once again proposed eliminating ESA protections for the gray wolf throughout the contiguous United States. AR_0020097 (84 Fed. Reg. 9648 (Mar. 15, 2019)). FWS received more than 750,000 comments on the proposal, the vast majority of which opposed wolf delisting. Numerous members of Congress signed letters opposing delisting, while top government officials in California, Oregon, and Washington all spoke out against the proposed rule. A scientific peer review commissioned by FWS sharply criticized the proposal, with several of the scientists opposing the proposed rule for failing to use the best available science. AR_0010956–1200 (Report of Independent Peer Reviews for Gray Wolf Delisting Review (May 2019)).

The peer review report included the comments of one eminent scientist who found that FWS failed to "provide coherent factual support or logical explanation for the agency's conclusions;" bemoaned the "lack of detail and rigor in the treatment of genetic issues;" and faulted the "extreme oversimplification" of wolf genetics. AR_0011079–81 (Dr. Carroll peer review). Other peer reviewers questioned whether the FWS's proposed rule was based on the best available science,[3]

---

[3] *See e.g.*, AR_0011079 (Dr. Carroll peer review) (concluding "the proposed rule did not build on the assembled scientific information to provide coherent factual support or logical information for the agency's conclusions"); AR_0011134 (Dr. Treves peer review) ("In sum, I do not find the proposed rule and draft biological report present the best available science. . . ."); AR_0011195 (Dr. MacNulty peer review) ("[T]here are demonstrable errors of fact, interpretation, and logic. Some interpretations of scientific information are not sound.").

noting there were clear omissions of key scientific data,[4] and that the publications and analysis relied upon appeared "haphazard," AR_0011158 (Dr. Treves peer review), and "ad hoc," AR_0011192 (Dr. MacNulty peer review). And multiple peer reviewers commented that the rule failed to properly account for the ESA's foundational policy of "institutionalized caution," AR_0011094 (Dr. Carroll peer review), and inherently avoided due consideration and application of the "precautionary principle" to wildlife management, AR_0011156 (Dr. Treves peer review).[5] The Service also received a public comment from nearly 100 scientists corroborating these key flaws and concluding that, in "the most general terms, the FWS proposal does not represent the best-available science pertaining to wolf conservation." AR_0005163.

Nevertheless, on November 3, 2020, FWS moved forward with its plans and issued its final rule delisting the gray wolf. AR_0000038 (85 Fed. Reg. 69,778 (Nov. 3, 2020)). The Delisting Rule considered wolves in three different "configurations" for the purposes of delisting, including one not found in the proposed rule that combined listed wolves with the already congressionally delisted Northern Rockies DPS. AR_0000044–45. In the Delisting Rule, FWS also denied the Wolf DPS Petition, finding that it did not present substantial scientific or commercial information indicating that the petitioned actions were warranted. AR_0000138–39. The Delisting Rule took effect on January 4, 2021, removing federal protections from wolves across the nation.

## STANDARD OF REVIEW

Review of an agency's compliance with the ESA—including the ESA's listing provisions—is governed by the Administrative Procedure Act (APA). *See Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011). The APA, in turn, requires courts to set aside

---

[4] *See e.g.,* AR_0011192 (Dr. MacNulty peer review) ("The review overlooked many rigorous, peer-reviewed studies that are directly relevant to understanding and predicting rates of human-caused mortality among wolves inhabiting the current range of the gray wolf entity."); AR_0011076 (Dr. Carroll peer review) (suggesting key publications wrongly omitted from the proposed rule's underlying biological report "that need to be addressed in order for the report to provide a comprehensive information base for the rule").

[5] *See also Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978) ("Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'").

agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

While the APA does "not empower[] [courts] to substitute [their] judgment for that of the agency," it does require "a thorough, probing, in-depth review" of challenged decisions. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971). "Agency decisions may not, of course, be inconsistent with the governing statute." *Defs. of Wildlife v. EPA*, 420 F.3d 946, 959 (9th Cir. 2005) (citing 5 U.S.C. § 706(2)(A) (instructing courts to "set aside" agency action "not in accordance with law")). Administrative action also violates the APA where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* (*State Farm*), 463 U.S. 29, 43 (1983). Internally contradictory agency reasoning also renders resulting action arbitrary and capricious. *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015). Even where issues touch on scientific judgments within the scope of agency expertise, the agency still must rationally explain its findings, *see Greater Yellowstone Coalition*, 665 F.3d at 1028, and courts will "not rubber-stamp . . . administrative decisions that [they] deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute," *NRDC v. Pritzker*, 828 F.3d 1125, 1139 (9th Cir. 2016) (internal quotation marks omitted).

## ARGUMENT[6]

In the challenged Delisting Rule, FWS once again attempted to justify widespread delisting of wolves based on limited recovery in a few discrete areas. And once again, FWS's effort to ram through a broad delisting based on narrow progress toward recovery was unlawful. Among other errors, FWS again focused on wolves in the Great Lakes region, even though the listing itself applies to wolves in 44 states; irrationally dismissed the importance of nascent wolf recovery in key regions of historical habitat; incoherently purported to apply a critical statutory standard that the agency steadfastly refused to define; and disregarded numerous ongoing threats to wolf viability.

---

[6] Unless otherwise indicated, all plaintiffs from the related cases join the arguments presented.

For these reasons and others detailed below, FWS's Delisting Rule violated the ESA and APA and should be vacated.

## I.   FWS's Failure to Evaluate the Full Listed Gray Wolf Species Violated the ESA

FWS failed to analyze gray wolves across the full geography where they were—until the Delisting Rule took effect—listed as endangered or threatened. In the Delisting Rule, FWS purported to evaluate gray wolves as four different "entities" in three different "configurations." AR_0000044–45. These three configurations, at first blush, would appear to cover the full scope of the listed gray wolf species: (1) the threatened Minnesota entity and the endangered "44-State entity," separately; (2) a "combined listed entity" that joins the threatened and endangered areas together; and (3) a "lower 48 United States entity" that merges the "combined listed entity" with the congressionally delisted Northern Rockies population. *Id.* But, in application, FWS did not actually analyze these configurations. Instead, with each configuration, it drew an arbitrary line around a purportedly recovered subpopulation in the Great Lakes (and, for one configuration, the Northern Rockies as well), and decided that all wolves outside that area were unnecessary. This approach mirrors FWS's past, unlawful attempts to delist the gray wolf, and violates the ESA's requirement that FWS must analyze the conservation status of the full listed species.[7]

"The ESA requires the agency to 'determine whether any *species* is an endangered species or threatened species.'" *Defs. of Wildlife*, 729 F. Supp. 2d at 1221 (quoting *Trout Unlimited v. Lohn*, 559 F.3d 946, 957 (9th Cir. 2009) (quoting 16 U.S.C. § 1533(a)(1))). The ESA's focus on "species" applies equally to delisting decisions. Indeed, in making a delisting decision, FWS must undertake a "full, five-factor threats analysis" of the listed entity under 16 U.S.C. § 1533(a). *Crow Indian Tribe v. United States*, 965 F.3d 662, 678 (9th Cir. 2020) (citing 16 U.S.C. § 1533(c)(2)(A), (B)). The requirement to analyze wildlife as a species prevents FWS from restricting its analysis of extinction risk based on artificially confined considerations that systemically under-protect listed or listable species.

---

[7] This fundamental flaw ripples throughout the Delisting Rule, contributing to many of its other shortcomings, including its unlawful range and threats analyses. *See infra* Parts III–IV.

At every step in the Delisting Rule analysis, FWS avoided evaluating the entirety of the gray wolf listings. No matter the "configuration," FWS's analysis focused only on one or both so-called "metapopulations" of wolves in the Great Lakes states or the Northern Rockies. *E.g.*, AR_0000140; 146–47; 150–51. For instance, FWS acknowledged that wolf populations "peripheral to the Great Lake metapopulation within the lower 48 United States . . . may be at greater risk from human-caused mortality or from factors related to small numbers of individuals," but concluded these wolves were "not meaningful." AR_0000152. At no point did FWS actually go beyond the "metapopulations" to evaluate the entire listed species. This approach violated the ESA. *See Crow Indian Tribe*, 965 F.3d at 678.

FWS's unlawful focus on the purported recovery of wolves in "core" areas of the Great Lakes and Northern Rockies is not new. The Delisting Rule's approach follows the worn path of an earlier attempt by FWS to delist gray wolves that was struck down in the D.C. Circuit. In 2011, FWS first designated and delisted a Western Great Lakes DPS of gray wolves, *see* 76 Fed. Reg. 81,666 (Dec. 28, 2011), and then separately proposed to delist all other gray wolves in the lower-48 United States, *see* 78 Fed. Reg. 35,664 (June 13, 2013).[8] FWS reasoned that wolves outside the core, now-delisted Great Lakes and the Northern Rockies areas were no longer protectable under the ESA. *See id.* at 35,718. But the D.C. Circuit rejected FWS's approach as "a backdoor route to the *de facto* delisting of already-listed species," *Humane Soc'y*, 865 F.3d at 602, and explained that the agency could not "delist an already-protected species by balkanization," *id.* at 603; *see also id.* at 601 ("[W]hen a species is already listed, the Service cannot review a single segment with blinders on, ignoring the continuing status of the species' remnant.").

FWS has tried the same strategy again here. But this time, FWS did not even bother to first carve out a DPS of gray wolves before reaching the same result—that wolves outside of purportedly recovered subpopulations in the Great Lakes or Northern Rockies are "not necessary" for the species and not worthy of further analysis. AR_0000143, 146. FWS cannot now do in one rule what it previously could not do in two. While FWS attempts to obscure its unlawfully narrow analysis of

---

[8] By then, the Northern Rockies wolves had been delisted by Congress in an appropriations rider that precluded initial judicial review. *See supra* note 2.

the gray wolf populations by referring to seemingly all-encompassing "configurations," the result is the same: an unlawful "backdoor route" to nationwide delisting based only on the asserted recovery of wolves in two "core" geographic areas.

FWS's failure to consider the entire species in the Delisting Rule also echoes the errors of another earlier, unsuccessful attempt by the agency to downlist the gray wolf. In that failed effort— as here—the agency "did not consider the threats to the wolf outside of the core areas" of the Great Lakes and the Northern Rockies. *Oregon Wolves*, 354 F. Supp. 2d at 1173 (evaluating and vacating 2003 downlisting rule). Specifically, when FWS focused only on the "core areas" of the Great Lakes and Northern Rockies to downlist wolves through newly created DPSs in 2003, it unlawfully ignored that "the conservation status of [gray wolf] populations . . . varies dramatically, ranging from recovered populations in parts of Montana, to precarious populations in Washington, to extirpated populations in Nevada, for example." *Id.* at 1171. Courts rejected this "wolves in some areas are enough for all areas" approach to delisting. As one court held, "FWS simply cannot downlist or delist an area that it previously determined warrants an endangered listing because it 'lumps together' a core population with a low to non-existent population outside of the core area," thereby "bypassing the application of the ESA in the non-core population areas." *Vermont Wolves*, 386 F. Supp. 2d at 565.

FWS's analysis in the Delisting Rule repeats these flaws. The Delisting Rule analyzes the core populations of Great Lakes and Northern Rockies wolves while failing to adequately evaluate wolves in low-population areas, such as the Pacific Coast, the Central Rockies, and the Northeast. AR_0000153. But each of these different populations of wolves, whether in precariously established packs or as lone dispersers, were protected as members of the entire listed species. And each population across the entire listed geography merited analysis—not just the one or two "core" areas. *See Oregon Wolves*, 354 F. Supp. 2d at 1171; *Vermont Wolves*, 386 F. Supp. 2d at 565. As with the 2003 rule, FWS's attempt to delist smaller, more precarious populations of wolves based

only on the status of distant, larger populations without a reasoned and scientific foundation renders the Delisting Rule unlawful.[9]

Whatever the legal theory, FWS seems intent on relying on one or two "core" populations to delist gray wolves nationally. FWS's discussion of broad "entities" and "configurations" merely papers over the ways the agency unlawfully narrowed its analysis to find a "backdoor route" to delisting, despite the absence of recovered wolf populations in areas like the Pacific Coast and Central Rockies. FWS "cannot take a full-speed ahead, damn-the-torpedoes approach to delisting—especially given the ESA's 'policy of institutionalized caution.'" *Greater Yellowstone Coalition*, 665 F.3d at 1030 (quoting *Ariz. Cattle Growers' Ass'n v. Salazar,* 606 F.3d 1160, 1167 (9th Cir. 2010)). But it has done just that in the Delisting Rule.

## II.   FWS Unlawfully Ignored the Conservation Status of Pacific Coast Wolves

FWS's framing of its Delisting Rule also violated the ESA because FWS arbitrarily and unlawfully grafted Pacific Coast wolves onto an already delisted segment of wolves for the purposes of its analysis. Until the Delisting Rule went into effect, gray wolves in western sections of Washington, western sections of Oregon, and California were still protected as endangered. *See* AR_0000042 fig. 1. At the end of 2019, there were 54 wolves in that area. AR_0000430 (Biological Report). The best available scientific information indicates that some of these wolves are representative of an admixture of a "coastal ecotype" that is "genetically and morphologically distinct, and display[s] distinct habitat and prey preferences, despite relatively close proximity" to other wolves. AR_0000401 (Biological Report). Some wolves in that area also occupy coastal rainforest ecosystems, a "unique ecological setting" for the species. AR_0011092 (Dr. Carroll peer

---

[9] FWS continues to repeat the same unlawful mistakes in part because it continues to rely on outdated, regional recovery plans for gray wolves. Recovery plans must include "management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species" and "objective, measurable criteria" for delisting a species. 16 U.S.C. § 1533(f)(1)(B). Despite repeated requests for FWS to develop a national recovery plan that reflects the current state of the science, *see, e.g.*, AR_0002800 (Wolf DPS petition); AR_0032491 (2010 petition for national recovery plan), the agency has stuck with a 1992 "Revised Recovery Plan for the Eastern Timber Wolf" and a 1987 revision of the Northern Rockies "Wolf Recovery Plan." AR_0000050–52. Neither of these documents provides criteria for wolf delisting as a species nationally. And after roughly three decades, neither document reflects the best available science.

review). But FWS decided not to analyze whether acknowledged threats to these Pacific Coast wolves warranted their continued listing under the ESA, instead lumping them together with the already delisted Northern Rockies population. In doing so, the agency contradicted its earlier findings, ignored the best available science before it, and failed to meet its statutory obligations.

In the Delisting Rule, FWS recognized that Pacific Coast wolves were subject to greater threats than other, more stable wolf populations. For instance, the agency explained that "[e]xpanding populations, including the wolves in California, may be exposed to different pressures than core populations, including the potential for reduced genetic diversity" and other genetic impairments. AR_0000118. And it "acknowledge[d] that [Pacific Coast wolves] may be at greater risk from human-caused mortality or from factors related to small numbers of individuals." AR_0000145, 149. Yet instead of analyzing those greater threats to Pacific Coast wolves, FWS ignored them by treating Pacific Coast wolves as nothing more than an extension of the congressionally delisted Northern Rockies population. *See* AR_0000145, 149.

FWS's treatment of the Pacific Coast wolves departs, without acknowledgment or reasoned explanation, from its prior finding that these wolves were discrete from the Northern Rockies wolves. In 2008, FWS determined that the Pacific Coast wolves were sufficiently discrete from the Northern Rockies wolves to justify creating—and then delisting—the Northern Rockies DPS. *See* 73 Fed. Reg. 10,514, 10,518–19 (Feb. 27, 2008); 74 Fed. Reg. 15,123, 15,128–29 (Apr. 2, 2009).[10] Now, the agency claims that Pacific Coast wolves "are *not* discrete from wolves in the delisted [Northern Rockies] portion of the gray wolf taxon," AR_0000043–44 (emphasis added) (citing 78 Fed. Reg. at 35,707–13), and therefore *cannot* constitute a DPS that would warrant protection.

FWS's reversal without further explanation is arbitrary and capricious. When changing a policy position, an agency must, among other things, "display[] 'awareness that it is changing position'" and provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay . . . the prior policy." *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966

[10] For instance, FWS previously concluded based on genetic testing that wolves in the North Cascades came from Canada, and stated that those wolves would "remain protected by the Act as endangered because it is outside of the [Northern Rockies] DPS." 73 Fed. Reg. at 10,518; 74 Fed. Reg. at 15,127.

1   (9th Cir. 2015) (en banc) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16

2   (2009)). "This framework applies to a change in position on whether a species warrants protection

3   under the ESA." *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021). In

4   the Delisting Rule, FWS never acknowledges it is changing its position on the discreteness of the

5   Pacific Coast wolves. *See* AR_0000043 (claiming the agency's "strategy has been consistent").[11]

6   "This omission suggests that [FWS] did not . . . display 'awareness that [it was] changing

7   position.'" *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F. Supp. 3d 1127, 1140

8   (D. Alaska 2019) (quoting *Kake*, 795 F.3d at 966).

9        FWS also failed to provide a reasoned explanation for its unacknowledged change in

10  position. The agency did reference a so-called "detailed analysis of the discreteness of 'Pacific

11  Northwest' wolves" as part of a "2013 status review for gray wolves in the Pacific Northwest."

12  AR_0000137 (citing 78 Fed. Reg. 35,709–13). But the referenced "status review" was merely part of

13  a *proposed rule*—one that scientific experts strongly criticized,[12] that was never finalized, and

14  which the D.C. Circuit explained would have unlawfully delisted remnant populations of wolves

15  without analyzing threats to them. *Humane Soc'y*, 865 F.3d at 602–03. Further, mere incorporation

16  of a prior assessment is not sufficient to explain a change in position, especially when the

17  assessment does not "purport to be a decision document." *Ctr. for Biological Diversity*, 998 F.3d at

18  1068. The Delisting Rule's references to the "status review" otherwise offer little more than "a

19  cursory explanation of why the findings underlying [FWS's 2008] Decision no longer apply," *id.*,

20

21

22  [11] FWS likewise did not claim to be modifying the established "geographic boundaries" of the
    Northern Rockies segment, *see* 74 Fed. Reg. at 15,125–28, and explicitly refused to consider

23  whether the Northern Rockies wolves themselves should be relisted, *see* AR_0000104.

24  [12] One peer reviewer of that proposal stated that "Pacific Northwest wolves are likely to be
    genetically and ecologically distinct" and that FWS's conclusions in the draft did "not seem to

25  logically follow" the scientific information. AR_0007482 (Dr. Fallon peer review); *see also*
    AR_0007399 (2013 scientists letter) ("It defies logic for [FWS] to now argue that . . . occasional

26  dispersal prevents recognition of a DPS that would protect wolves that are beginning to establish in
    the Pacific Northwest. Additionally, genetic testing of gray wolves that have migrated naturally into

27  the Pacific Northwest has found that some derive from British Columbia coastal wolf populations
    which are genetically distinct from the inland stock of wolves used as a source for reintroduction to

28  the northern Rocky Mountains.").

and therefore cannot satisfy the agency's obligation to acknowledge and explain its changed policy position as to the discreteness of Pacific Coast wolves.

Even setting aside FWS's failure to address its earlier conclusion, the agency's singular reliance on the distance between the Pacific Coast and Northern Rockies populations to determine the discreteness issue violated the agency's own policies and contradicted the best available science. In the Delisting Rule, FWS concluded that Pacific Coast wolves are not discrete from Northern Rockies wolves because "there is little separation between occupied wolf habitat in the" Northern Rockies "and suitable habitat in western Washington, western Oregon, and northern California." AR_0000044.[13] But under FWS's longstanding DPS Policy, physical separation is not dispositive; a population segment may be considered "discrete" if it "is markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors." 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996) (DPS Policy). The discreteness "standard . . . does not require absolute separation of a DPS from other members of its species, because this can rarely be demonstrated in nature for any population of organisms." *Id.* at 4724; *see also Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 842 (9th Cir. 2003).

In an earlier application of that standard to the Northern Rockies wolves, FWS recognized that because the "policy does not require complete separation" between populations, even "if occasional individual wolves or packs disperse among populations . . . [Northern Rockies] gray wolves are markedly separated from all other gray wolf populations in the U.S." 73 Fed. Reg. at 10,519; *see also* AR_0006249 (letter of 128 scientists) (explaining "barriers or discontinuities can be genetic, geographic or ecological and do not have to be 100% effective to meet the FWS's 1996 discreteness requirement under ESA"). In the Delisting Rule, FWS arbitrarily departed, without

---

[13] FWS also made an unfounded claim that "most" Pacific Coast wolves "are dispersers from the [Northern Rockies]." AR_0000103, 137 (citing Hendricks 2018). However, the only study the agency cited in support of this claim never indicates that "most" wolves in that area were descended of Northern Rockies wolves, and FWS ignored the study's discussion of the "distinct and declining coastal wolf ecotype." AR_0006214 (Hendricks 2018). That study concluded "the natural expansion and protection of the coastal wolves in the contiguous U.S. should be an emphasis of wolf management in the [Pacific Northwest] in order to restore ecological processes, and enable the evolutionary process for adaptation to coastal environments." AR_0006223.

explanation, from this prior finding and required something more—absolute separation—than its longstanding policy demands.

FWS also failed to consider the best available science on the genetic and physiological distinctions between Pacific Coast and Northern Rockies wolves. FWS "cannot ignore available biological information." *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1060 (9th Cir. 2018) (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)). The best available science here showed Pacific Coast wolves have "markedly different genetic or phenotypic traits" than Northern Rockies wolves. AR_0011091 (Dr. Carroll peer review) (quoting Hendricks 2018). Recent genomic studies identified wolves in Washington with "a dominant coastal ancestry," AR_0006223 (Hendricks 2018), and found that Washington and Oregon have distinct suitable habitats for coastal wolves and for inland wolves, AR_0005499 (Hendricks 2019). The Delisting Rule acknowledges there are wolves in Washington "descended" from "wolves in Canada," but then concludes that these wolves "are not genetically distinct from" Northern Rockies wolves. AR_0000044. This conclusion "misinterprets the state of knowledge and/or does not address the implications of these studies" before FWS. AR_0011081 (Dr. Carroll peer review); *see also* AR_0006249 (letter of 128 scientists) (noting "blanket delisting that is proposed would foreclose that important evolutionary process, resulting in reduced genetic variability and evolutionary potential for the species as a whole"). FWS also provided no support for its claim that the Pacific Coast wolves "are not an isolated population with unique or markedly different genotypic or phenotypic traits that is evolving separate from other wolf populations." AR_0000145, 149. The agency's "fail[ure] to consider relevant expert analysis or articulate a rational connection between the facts found and the choice made" renders its decision arbitrary and capricious. *W. Watersheds Project v. Krayeenbrink*, 632 F.3d 472, 498 (9th Cir. 2011).

By considering only physical separation to determine discreteness, FWS's conclusion also ran counter to its own scientific findings and the other science before it. In its underlying Biological Report, the agency recognized that "[f]actors such as habitat type and prey specialization have been shown to influence genetic structuring, leading to measurable differentiation *even between areas with no physical barriers to dispersal*." AR_0000401 (emphasis added). FWS also acknowledged

that genetic differences for wolves are "driven more strongly by climate and ecological factors" than by "isolation by distance." *Id.* And the record made clear that the Pacific Coast has a distinct climate and ecology from interior areas of the West—like the Northern Rockies—and that habitat makes it more suitable for wolves with different genetic, morphological, and behavioral traits. *See* AR_0005499 (Hendricks 2019) (analyzing habitat suitability for discrete genetic variations of wolves); *see also* AR_0011081, 91 (Dr. Carroll peer review) (discussing Hendricks 2019).[14] FWS's Biological Report further explained how "[h]aving robust populations of these different ecotypes improves the species' ability to adapt to changing environmental conditions over time and to recolonize a variety of suitable habitats." AR_0000426. But the agency failed to consider the scientific information in its Biological Report and raised by peer reviewers demonstrating discreteness of Pacific Coast wolves based on "physiological, ecological, or behavioral factors," as required under its own policies. 61 Fed. Reg. at 4725. Instead, FWS unlawfully relied exclusively on physical separation to evaluate discreteness.

In sum, by grafting the Pacific Coast wolves onto the purportedly recovered Northern Rockies segment, FWS dodged the statutorily required delisting analysis for Pacific Coast wolves and avoided evaluating "as important any threats to the gray wolf ecotype inhabiting Pacific coastal rainforest ecosystems . . . that has colonized the US Pacific Northwest." AR_11080 (Dr. Carroll peer review); *see also Crow Indian Tribe*, 965 F.3d at 678 (delisting determination requires "full, five-factor threats analysis" of listed entity). Instead of protecting Pacific Coast wolves, FWS made these genetically important wolves invisible for the purposes of its ESA delisting analysis and therefore unlawfully failed to consider threats to them.

## III.   FWS's Application of "Significant Portion of its Range" to the Gray Wolf Listed Population Violated the ESA

FWS further violated the ESA by dismissing important components of the gray wolf population as not constituting a "significant portion" of the gray wolf's range. *See* AR_0000141–53. In so doing, FWS wrote off as insignificant wolf populations in Pacific Coast states and the Central

---

[14] FWS acknowledged the existence of at least one wolf with coastal genetic ancestry in the distinct "area considered highly suitable for coastal wolves." AR_0000115.

Rocky Mountains region whose loss would dramatically shrink the wolf's return throughout the United States and eliminate wolves from ecosystems where they contribute to the species' genetic vitality and fill an otherwise empty ecological niche. FWS relied on the application of a vague and standardless significance analysis that declined any attempt to interpret the governing statutory language after courts repeatedly rejected the agency's prior attempts. FWS's analysis also reached inconsistent and arbitrary results and offered conclusions that, in application, mirrored those prior, unlawful statutory interpretations. For these reasons, FWS's "significant portion of range" determination violated the ESA.

### A. Courts have repeatedly rejected FWS's attempts to minimize the ESA's "significant portion" listing criterion

A species must be listed under the ESA if it is threatened or endangered throughout "all *or* a significant portion of its range." 16 U.S.C. § 1532(6), (20) (emphasis added). The disjunctive phrasing of this statutory language is key; multiple courts have recognized that any valid interpretation of "significant portion of its range" (often referred to as "SPR") must provide a basis for listing that is "independent" from the separate "all"-of-its-range standard. *Ctr. for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946, 956 (D. Ariz. 2017); *see also Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1142 (9th Cir. 2001) (rejecting FWS interpretation of "significant portion" language that "views the statute as saying the same thing twice"). And yet for close to two decades, FWS has repeatedly collapsed the key distinctions between a species imperiled through all of its range or a significant portion of it, and has repeatedly had those efforts struck down by the courts.

In 2001, FWS argued that a species was eligible for listing based on the "significant portion" language only if it faced threats "in enough key portions of its range that the *entire species* is in danger of extinction, or will be in the foreseeable future." *Defs. of Wildlife*, 258 F.3d at 1141. The Ninth Circuit rejected this "redundant reading" of such a "significant statutory phrase":

> If . . . the effect of extinction throughout "a significant portion of its range" is the threat of extinction everywhere, then the threat of extinction throughout "a significant portion of its range" is equivalent to the threat of extinction throughout all its range. Because the statute already defines "endangered species" as those that are "in danger of extinction throughout all . . . of [their] range," the Secretary's

---

19

interpretation of "a significant portion of its range" has the effect of rendering the phrase superfluous.

*Id.* at 1141–42. The Court remanded the challenged listing decision to FWS, with directions that the agency reconsider its position on the "significant portion" language using the legal standards in the Court's opinion. *Id.* at 1146–47.

Despite the Ninth Circuit's decision, FWS in 2014 promulgated a formal policy that again rendered the ESA's "significant portion" standard redundant. The policy asserted that a "significant" portion means any portion of a species' range for which the

> contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range.

79 Fed. Reg. 37,578, 37,609 (July 1, 2014). While FWS insisted that this 2014 policy represented a break from its previous interpretation, two district courts—including one from this district—found that any claimed difference was "illusory" and held the policy unlawful. *Desert Survivors v. U.S. Dep't of the Interior*, 321 F. Supp. 3d 1011, 1072–73 (N.D. Cal. 2018); *Ctr. for Biological Diversity*, 248 F. Supp. 3d at 956; *see also Desert Survivors v. U.S. Dep't of the Interior*, 336 F. Supp. 3d 1131 (N.D. Cal. 2018) (vacating FWS definition of "significant" in SPR policy without geographic limitation). As one court aptly summarized:

> If a portion of a species' range is so vital that its loss would render the entire species endangered or threatened, and the species is endangered or threatened in that portion, then the entire species is necessarily endangered or threatened. . . . The Final SPR Policy's requirement that a portion of a species' range can be considered significant only "if the species is not currently endangered or threatened throughout all of its range," 79 Fed. Reg. at 37,582—far from ensuring that the "significant" and "all" language of the ESA will retain independent meaning—actually ensures that a portion of a species' range will never be considered significant based on accurate application of the Final SPR Policy.

*Ctr. for Biological Diversity*, 248 F. Supp. 3d at 956–57; *accord Desert Survivors*, 321 F. Supp. 3d at 1072-73. The same court concluded that "it appears that the Service's goal in creating the Final SPR Policy was to give as little substantive effect as possible to the SPR language of the ESA in order to avoid providing range-wide protection to a species based on threats in a portion of the species' range." *Ctr. for Biological Diversity*, 248 F. Supp. 3d at 958.

20

**B.**     **FWS's standardless "significant portion" analysis in the Delisting Rule was arbitrary and capricious**

In the Delisting Rule, it appears that FWS again set out "to give as little substantive effect as possible to the SPR language of the ESA." *Ctr. for Biological Diversity*, 248 F. Supp. 3d at 958. This time, however, FWS tried a different approach. Having twice failed to convince courts to accept its interpretations of the ESA's "significant portion" language, FWS declined to interpret the term at all—even while applying the "significant portion" language to repeatedly conclude that various permutations of the lower-48 gray wolf population did not constitute "significant portions" of the species' range. Indeed, FWS admitted in the proposed rule that it had "not yet determined the best way to interpret 'significant' in light of the [court's] decision in *Desert Survivors*," the Northern District of California ruling rejecting FWS's 2014 "significant portion" policy. AR_0020133. Yet instead of offering an interpretation of "significant" that could provide a measurable guidepost for its "significant portion" analysis, FWS applied a vague and endlessly malleable standard that enabled it to repeatedly dismiss wolf populations as unimportant without ever disclosing what level of importance would suffice to render such populations a "significant portion" of the wolf's range. *See also infra* Part III.C (discussing specific FWS "significant portion" determinations).

FWS stated in the final rule that it "assessed 'significance' based on whether portions of the range contribute meaningfully to the resiliency, redundancy, or representation of the gray wolf entity being evaluated without prescribing a specific 'threshold.'" AR_0000114. Ultimately, FWS asserted that, to determine whether an area "may be significant," it would evaluate whether it "could be considered significant under any reasonable definition of 'significant.'" AR_0000138.

This approach was arbitrary, unlawful, and more than a little confusing. While FWS claimed to evaluate whether portions of the wolf's range "contribute meaningfully to the resiliency, redundancy, or representation of the gray wolf entity," AR_0000114, this alleged standard is meaningless without an interpretation of the "significant portion" language. FWS could not rationally examine whether portions of the wolf's range "contribute meaningfully to the redundancy, resiliency, or representation" of gray wolves, *id.*, in the abstract. Under the ESA's

definitions of endangered or threatened species, 16 U.S.C. § 1532(6), (20), FWS cannot divorce the determination of "meaningful contribution" from the standard for a significant portion of range. A range's contribution can be meaningful only if it suffices to render the wolf range at issue significant, yet FWS explicitly declined to "prescribe a specific 'threshold'" for significance. AR_0000114. On that critical statutory question—what characteristics would enable a portion of the wolf's range to qualify as significant in the "significant portion" analysis—FWS withheld any explanation. *Id.*

The agency's assertion that it "evaluated whether any portions [of the wolf's range] could be considered significant under any reasonable definition of 'significant'" does not save its flawed approach. AR_0000138. FWS never explained what those "reasonable definition[s]" were and provided no means for the public or the Court to evaluate its approach. Yet it is hornbook administrative law that an "agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Friends of Animals v. Haaland*, 997 F.3d 1010, 1016 (9th Cir. 2021).

Where, as here, "an agency fails to wrestle with the relevant statutory provisions," the Court "cannot do its work for it." *Hospital of Barstow, Inc. v. NLRB*, 820 F.3d 440, 445 (D.C. Cir. 2016). Rather, such agency failure to offer a statutory interpretation is, by itself, grounds for a remand. *See id.* (where agency fails to interpret pivotal statutory provision, court should "remand the proceeding to enable the agency to interpret the statute in the first instance"). The Ninth Circuit has noted that the court "cannot substitute [its] analysis as the work of the agency[.]" *Gifford Pinchot Task Force v. FWS,* 378 F.3d 1059, 1074 (9th Cir.), *amended by* 387 F.3d 968 (9th Cir. 2004); *see also INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) ("Generally speaking, a [court] should remand a case to an agency for decision of a matter that statutes place primarily in agency hands."); *Defs. of Wildlife*, 258 F.3d at 1146 (finding that FWS's "omission with respect to a significant legal issue raised by the factual circumstances would itself be a sufficient basis for remanding the case to the Secretary to consider the question").

In sum, FWS failed to interpret the governing "significant portion" language, and none of its purported surrogates for such an interpretation offered a rational standard for the agency's ESA listing analysis. For this reason alone, the Court should invalidate the Delisting Rule.

1

2

**C.      FWS irrationally applied its arbitrary "significant portion" standard to the gray wolf**

3

4

5

6

7

FWS's application of its vague and malleable "significant portion" standard to the gray wolf exemplifies the standard's arbitrariness and potential for mischief. Without a meaningful standard against which to measure "significance," FWS repeatedly overlooked important factors and arrived at inconsistent and irrational determinations that provide further grounds for invalidating the Delisting Rule.

8

9

10

11

12

13

At the outset, FWS's "significant portion" determinations for wolves in the Pacific Coast states and a region of the Central Rockies on the Colorado-Utah border overlooked factors that FWS itself has often deemed important. FWS recognized that these populations face a "greater risk from human-caused mortality" and other threats, but dismissed the significance of these populations without considering basic facts concerning their importance to wolves' return to their former range in the lower-48 United States and the larger U.S. wolf population. AR_0000145, 148–49.

14

15

16

17

18

19

20

21

22

23

24

25

26

First, FWS ignored the potential significance of range contraction to gray wolf viability. Deeming Pacific Coast and Central Rockies wolves "insignificant" and therefore expendable would lop off approximately 3 degrees of longitude and 2 degrees of latitude from the farthest extensions of current gray wolf range westward and southward in the contiguous states. *See* AR_0000407 (Biological Report). FWS has frequently seized upon comparable potentials for range contraction to deem peripheral populations of a species significant in similar contexts. *See* 84 Fed. Reg. 52,598, 52,604 (Oct. 2, 2019) (FWS determination that loss of woodland caribou population in United States would be significant because it "would result in the loss of the southern-most extent of the range of woodland caribou by about 2.5 degrees of latitude," impacting representation and resilience of the species); 82 Fed. Reg. 30,502, 30,519 (June 30, 2017) (FWS determination that loss of Yellowstone-area grizzly bear population "would significantly impact representation of the species because it would substantially curtail the range of the grizzly bear in North America by moving the range approximately 3 degrees of latitude or 200 mi (350 km) to the north").[15] But,

27

28

---

[15] FWS reached the cited significance determinations in the context of assessing whether the referenced populations are listable under the ESA as a DPS rather than a significant portion of the

despite purporting to apply a similar analysis here, FWS failed even to consider the potential

significance of threatened range contraction to wolf viability. The absence of such an analysis

artificially masked the threat of unchecked mortality to wolves' nascent return to the remaining

suitable habitat of their former nationwide range.

In addition, FWS overlooked the importance that loss of such peripheral populations may

have for the vitality of the larger U.S. wolf population. As FWS has observed in a similar context,

such "peripheral populations can possess slight genetic or phenotypic divergences from core

populations" that "may be central to the species' survival in the face of environmental change." 84

Fed. Reg. at 52,632 (Woodland caribou listing determination). Yet here, despite FWS's own

recognition that the coastal wolf "ecotype" was "genetically and morphologically distinct, and

display[ed] distinct habitat and prey preferences" from inland cousins, AR_0000401—and despite

acknowledging that some Pacific Coast wolves show evidence of "an admixture of inland and

coastal ecotypes," AR_0000402—FWS ignored the potential importance of peripheral populations

in its "significant portion" analysis. Indeed, FWS dismissed any potential that the Pacific Coast

wolves might represent a population with "markedly different genotypic or phenotypic traits that is

evolving separate from other wolf populations." AR_0000145. *See supra* at 17. Again, this

approach represented a sharp departure from FWS's own treatment of the significance

determination in conducting similar analyses under the ESA, where the agency deems populations

significant if they persist "in an ecological setting unusual or unique for the taxon" or "differ[]

---

range of the relevant species. *See* 16 U.S.C. § 1532(16) (ESA "species" definition providing for
listing of "any distinct population segment of any species of vertebrate fish or wildlife which
interbreeds when mature"); 61 Fed. Reg. at 4725 (DPS Policy prescribing analysis of "[t]he
significance of the population segment to the species to which it belongs"). While FWS asserted in
the wolf-delisting rule that "the threshold for significance must be higher for evaluating SPR than
for purposes of the DPS policy," AR_0000114, this interpretation traces its origin to FWS's
illegitimate interpretation of the "significant portion" language in its discredited 2014 policy
promulgation, *see* 79 Fed. Reg. at 37,581, and is not persuasive. In any event, even if the SPR
inquiry applies a higher threshold than the DPS policy for a threatened range contraction to be
deemed significant, FWS must at least consider the potential significance of a threatened range
contraction, which the agency entirely ignored here. *See Nat'l Ass'n of Home Builders*, 340 F.3d at
848–49 (recognizing that significance inquiries under "significant portion" and DPS analyses "are
similar" and precedent addressing "significant portion" provides "useful guidance" for DPS
analysis).

markedly from other populations of the species in [their] genetic characteristics." 61 Fed. Reg. at 4,725 (DPS Policy); *see also supra* note 15.

The limited analysis FWS conducted of the genetic contributions of peripheral populations was inconsistent and irrational. FWS's approach put gray wolves in an impossible position: they were insignificant if too connected and similar to the core population in Wisconsin and Michigan and equally insignificant if too disconnected and different. Specifically, in conducting its ESA listing analysis for the so-called 44-State entity, FWS concluded that wolves in Michigan and Wisconsin contain sufficient "resiliency, redundancy, and representation" to sustain the entire entity over time. AR_0000143.[16] In so concluding, FWS determined that wolves found in areas that are in the "periphery" of the core Wisconsin and Michigan populations (portions of Michigan and North and South Dakota) are not a "significant portion" of the range because they are dispersers from the core populations and "do not contribute to the overall demographic or genetic diversity of the Wisconsin-Michigan population," and further lack "genetic or ecological uniqueness relative to other wolves in the States." AR_0000144–45. Yet while FWS dismissed the peripheral Wisconsin-Michigan populations as insignificant because they were not genetically distinct from other populations in those states, it equally dismissed the Pacific Coast and Central Rockies wolves as "not necessary," because they *were* genetically distinct. AR_0000146, 151. According to FWS, these wolves were unimportant because they "are not connected biologically to the core populations in the 44-State entity, and are not biologically 'significant' to this entity" because they originated from the Northern Rocky Mountains. AR_0000145. This type of inconsistent reasoning is a hallmark of arbitrary and capricious decision making. *See Nat'l Parks Conservation Ass'n*, 788 F.3d at 1141.

FWS's treatment of wolf abundance in its "significance" analysis was similarly irrational. The Delisting Rule repeatedly referenced the relatively lower number of wolves in certain areas to

---

[16] FWS's application of the conservation principle of "resiliency, redundancy, and representation" in this manner is contrary to the best available science. AR_0011085–86 (Dr. Carroll peer review) (noting the FWS's misapplication of the concept in the proposed rule and explaining that "to be considered recovered, a species should be present in many large populations arrayed across a range of ecological settings" and that representation "applies primarily to a population itself . . . rather than to a population's contribution to the entire species."); 16 U.S.C. § 1533(b)(1)(A).

discount their significance. *See, e.g.*, AR_0000142 ("wolves in this higher intensity management zone are not meaningful to the resiliency of the Minnesota entity because they constitute a small proportion of wolves" in the state); AR_0000144–45 (wolves subject to depredation not significant because they are "on the periphery of a large population" in Wisconsin and Michigan). But in doing so FWS "failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43— namely, the implication of writing off wolf populations precisely because their numbers indicate that they may be under threat of extinction.

For example, as discussed above, FWS determined that wolves on the Pacific Coast and in Colorado "may be at greater risk from human-caused mortality or from factors related to small numbers of individuals." AR_0000145. Yet the agency found that the wolves in these portions were not "meaningful" to the redundancy or resiliency of the 44-State entity because they currently occur "in small numbers and include relatively few breeding pairs." *Id.*; *see also id.* at AR_0000152–53 (similar conclusion for same wolves as part of the "lower 48 United States entity"). This conflation of the two prongs of the listing inquiry—significance of the range and the extinction risk there— virtually ensured that peripheral gray wolves most at risk of extinction would never satisfy FWS's standards.[17]

Regarding wolves in the Central Rockies in particular, FWS acknowledged in the Delisting Rule that "[a]dditional populations of wolves in Colorado would add to the resiliency and redundancy of gray wolves in the lower 48 United States." AR_0000126. Yet, as discussed, the agency ultimately deemed the current Colorado population insignificant because of the relatively few individuals that have founded this nascent range return. AR_0000152; *see also, e.g., id.* at AR_0000145 ("wolves in these portions are not meaningful to the redundancy or resiliency of the 44-State entity because they occur in small numbers and include relatively few breeding pairs").

---

[17] FWS made a similar mistake in its denial of the 2018 DPS Petition. In that decision, once FWS affirmed that petitioners presented "credible scientific and commercial data regarding the impacts of human-caused mortality, disease, and isolation and small population size on gray wolf individuals in the lower 48 United States DPS (or a Western and Eastern United States DPS)," it "assessed the extent to which each of these claims may have a negative effect on populations of the species *as a whole*," as opposed to geographically smaller proposed populations. AR_0000322–54 (90-Day Finding) (emphasis added).

FWS offered no explanation for how larger populations of wolves could be established in the Central Rockies—and thereby "add to the resiliency and redundancy of gray wolves in the lower 48 United States," AR_0000126—if the pioneers of such a restoration are deemed insignificant and disqualified from the ESA's protections.

Finally, FWS failed to consider all areas where wolves had been sighted throughout the United States. In the Delisting Rule, FWS stated that "the Northeastern United States does not merit evaluation as a significant portion of the species' range because the best available science indicates that this area is *unoccupied*." AR_0000113 (emphasis added). FWS's conclusion misapplies its own definition of "range": "the general geographical area within which the species is currently found, including those areas used throughout all or part of the species' life cycle, *even if not used on a regular basis*." 79 Fed. Reg. at 37,583 (emphasis added); *see Ctr. for Biological Diversity*, 900 F.3d at 1067 (affirming definition). It also flatly contradicts the record. FWS has acknowledged documented wolves in Vermont, Massachusetts, New York, Indiana, Illinois, Iowa, Missouri, Nebraska, Kansas, Utah, Arizona, and Nevada over the last twenty years. AR_0000049. Independent reviews have documented wolves in many more states. *See* AR_0021919–67 (Wolf DPS Petition at 30). Indeed, the Delisting Rule acknowledges that wolves have recently been found in numerous states across the West, Midwest, and Northeast. *See* AR_0000049. These areas, which include the Northeast, are used as "part of the species' life cycle," 79 Fed. Reg. at 37,609, through dispersal, which is a behavior that involves wolves leaving "their natal pack to locate social openings in existing packs or find a mate and form a new pack." AR_0000404. By dismissing the potential significance of Northeastern states based on an unjustified assessment of the gray wolf's current range, FWS acted arbitrarily and unlawfully in violation of the ESA.

## IV.    FWS's Threats Assessment Was Arbitrary and Not in Accordance with the ESA

The ESA requires FWS to consider five specific factors when determining whether to list a species as endangered or threatened. 16 U.S.C. § 1533(a)(1). Here, FWS's analysis of the threat factors was unlawful because it did not utilize the best available science, ignored crucial information, failed to consider the effects of lost historical range, and hinged on FWS's illegal

determination that wolves outside the Great Lakes states were unnecessary for the recovery of the gray wolf across the lower-48 states.

### A.   FWS failed to analyze threat factors across the entire listed species

The Delisting Rule unlawfully omitted a threats assessment for gray wolves across much of the species' current and historical range. The fundamental flaws associated with FWS's analysis of various "gray wolf entities," *see supra* Part I, poison the ESA's required threats assessment as well. By relying on the flawed conclusion that wolves occurring outside of the Great Lakes states simply do not matter to the recovery of the species overall, AR_000143, FWS dodged the mandatory threats assessment for wolves outside of the Great Lakes region. For example, the agency did not assess the ESA's threat factors for wolves in the Central Rocky Mountains region. FWS instead stripped the few wolves that currently do live in the Central Rockies of vital ESA protections without *any* threats analysis. *See* AR_0000048 (documenting recent observation of wolves in Colorado); AR_0002400 (Colorado Parks and Wildlife information sheet documenting all known wolf occurrences (and outcomes) in the state); AR_0023269 (likely and verified wolves in Utah). FWS's assessment of Pacific Coast wolves is similarly inadequate. *See supra* Part II. By limiting its section 4(a)(1) analysis to focus almost exclusively on the threats facing the species in the Great Lakes region alone, FWS "entirely failed to consider an important aspect of the problem"—the recovery of the species across vast geographic areas of the species' current and historical range—in violation of the ESA and APA. *State Farm*, 463 U.S. at 43. This incomplete threats analysis violates the ESA. 16 U.S.C. § 1533(a)(1); *Crow Indian Tribe*, 965 F.3d at 678; *see Oregon Wolves*, 354 F. Supp. 2d at 1172 (vacating rule that "downlisted major geographic areas without assessing the threats to the wolf by applying the statutorily mandated listing factors").

### B.   FWS failed to consider effects of lost historical range

The historical range of gray wolves covered most of North America prior to European settlement. AR_0000406–07 (Biological Report). Today, however, wolves occupy only a small fraction of that range. *See id.* The "loss of historical range can lead to reduced abundance, inhibited gene flow, and increased susceptibility to extinction." *See Ctr. for Biological Diversity*, 900 F.3d at 1067 (citing 79 Fed. Reg. at 37,584). As a result, according to FWS's SPR policy, a species may be

"endangered or threatened throughout all or a significant portion of its current range because [the] loss of historical range is so substantial that it undermines the viability of the species as it exists today." 79 Fed. Reg. at 37,584. Yet despite estimates that "95% of the gray wolf's historical range has disappeared," *Humane Soc'y*, 865 F.3d at 606, the Delisting Rule did not evaluate if the loss of that historical range threatens gray wolves.

The Delisting Rule's fleeting references to historical range do not constitute actual analysis. FWS claimed it "t[ook] into account the effect [of] lost historical range . . . through [the] analysis of the five factors described in section 4(a)(1) of the Act." AR_0000053. But it never did so. Indeed, the referenced analysis does not grapple with the causes or effects of lost historical range. At most, FWS asserted "[a]n active eradication program is the sole reason that wolves were extirpated from much of their historical range in the United States." AR_0000054. As one peer reviewer pointed out, though, this claim relies on an "outdated" source and fails to define the "eradication program" or determine if there are similar current threats to wolves. *See* AR_0011142–43 (Dr. Treves peer review). Other peer reviewers quite simply answered "No" to the question of whether FWS had adequately considered the impacts of lost historical range, AR_0011194 (Dr. MacNulty peer review); responded that FWS's analysis was so jumbled as to make answering the question impossible, *see* AR_0011069–70 (Dr. Allendorf peer review); or provided a detailed description of the "omissions and misinterpretations" in FWS's range analysis, AR_0011082–95 (Dr. Carroll peer review).

FWS failed to meaningfully respond to these critiques. Instead, it repeated, without support, the justification from the proposed rule, *see* AR_0000113, claimed increases in wolves' range since its lowest point in 1978 made the impacts of lost range no longer relevant, *see* AR_0000149, 153, and relied on court decisions upholding FWS's definition of "range" in one policy to mean "current range," *see* AR_0000113 (citing *Humane Soc'y*, 865 F.3d at 585; *Ctr. for Biological Diversity*, 900 F.3d at 1066–67; *Desert Survivors*, 321 F. Supp. 3d at 1131).

None of these explanations suffice. First, although courts have accepted FWS's interpretation of "range" for the purpose of ESA's SPR policy as "current range," FWS must still analyze the impacts of the loss of historical range on a species' current status. *Ctr. for Biological*

*Diversity*, 900 F.3d at 1067; *Humane Soc'y*, 865 F.3d at 606–07. Second, describing an increase of range from the species' nadir reveals nothing about persisting impacts of lost historical range. And, third, repeating flawed arguments from the proposed rule is not an adequate response to the peer reviewers' criticisms.

FWS has an "obligation" when analyzing gray wolves "to contend with the implications of massive range loss for the species' endangered or threatened status within its current environment." *Humane Soc'y*, 865 F.3d at 606. "Stating that a factor was considered . . . is not the same as considering it." *Getty v. Federal Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986); *see also Sugar Cane Growers Co-Op v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) ("Referencing a requirement is not the same as complying with that requirement"). Just as with FWS's last attempt to delist gray wolves in 2011 and 2013, the "wholesale failure to address that factor renders the Service's decision unreasoned, arbitrary, and capricious." *Humane Soc'y*, 865 F.3d at 607.

## C.   FWS violated the ESA in its determination that wolves in the Great Lakes states could be delisted despite inadequate existing state regulatory protections

FWS also violated the ESA by uncritically relying on inadequate and outdated state plans for gray wolf management in determining that wolves in Wisconsin, Minnesota, and Michigan—the area FWS characterizes as the core of the lower-48 gray wolf population—no longer qualified for federal protection. That delisting determination must consider the "inadequacy of existing regulatory mechanisms," 16 U.S.C. § 1533(a)(1)(D), and continued threat from this factor mandates continued ESA protection. *See Crow Indian Tribe*, 965 F.3d at 679–80.

Much of the caselaw interpreting the inadequacy of existing regulatory mechanisms focuses on whether states have binding protections for a species if federal ESA protections are lifted. *See, e.g., Or. Nat. Res. Council v. Daley,* 6 F. Supp. 2d 1139, 1155 (D. Or. 1998) (holding that "regulatory mechanisms" essential to species viability must consist of specific legal mandates with "some method of enforcing compliance"). Here, the question is not whether the Great Lakes states have binding protections, but whether their plans and laws are effectively protective. They are not. In fact, these states' plans and laws actually *increase* the harm to the species through sanctioned killing in ways that FWS either failed to critically analyze or entirely ignored.

Upon federal delisting, management authority over gray wolves devolved to state wildlife management agencies. Yet the state management plans and laws in Wisconsin, Minnesota, and Michigan will aggressively reduce wolf populations and shrink occupied wolf range, which will threaten the survival of wolves post-delisting.[18] Planned wolf killings under the Wisconsin and Minnesota plans will wreak havoc on the core population of gray wolves in the United States, making FWS's failure to analyze these plans particularly confounding, as the agency itself knows that "[t]he regulation of human-caused mortality has long been recognized as the most significant factor affecting the long-term conservation of wolves." AR_0000054.

### 1. Wisconsin and Minnesota plan deliberate, intentional killing of wolves through hunting, trapping, and other lethal methods

The minimal discussion of hunting seasons in the state plans did not give FWS a rational basis to conclude that state wolf hunting would be conducted in a sustainable manner consistent with the long-term viability of the species. FWS admitted that "[r]egulated public harvest is another form of human-caused mortality that has occurred in the Great Lakes area during periods when wolves were delisted, and will likely occur in Minnesota, Wisconsin, and Michigan if wolves are delisted again." AR_0000056. The Great Lakes states' plans purport to outline what on-the-ground management will be once FWS removes federal protections, yet those plans fail to acknowledge the past and predicted future of hunting and trapping seasons in each state, as well as underestimate the impacts of loosened depredation control rules.

Take Wisconsin, for example. The state's 2006 revision to its 1999 wolf management plan defines its post-delisting regulatory regime. AR_0041598 (1999 plan), AR_0036548 (2006 revision). And that regime will drastically expand the number of wolves humans can kill. The Wisconsin plan contemplates a deliberate reduction in the wolf population to a target below half of

---

[18] The risk is not only from trophy hunting or trapping seasons. Each state plan also discusses depredation control: state-performed or -sanctioned wolf killing due to livestock or pet conflicts. In Minnesota, state wildlife services or private depredation control from 2015–2018 accounted for a loss of 7.5% of the population. AR_0000087. In Wisconsin, where wolf deaths primarily arise from conflicts with hunting dogs, when wolves were delisted and depredation control allowed from 2012 to 2014, 164 wolves were killed through state wildlife service trapping or permits to kill to private landowners. AR_0000089–90.

what the state population was at the time of delisting. AR_0041104 (FWS summary of Wisconsin plan). GLIFWC specifically called out this failure, noting that Wisconsin could reduce its wolf population by 60%. AR_0010572 (GLIFWC comment letter); AR_0000492 (April 2020 Wisconsin minimum wolf count was 1034-1057 wolves). A 2018 state statute further guarantees massive population reduction by *mandating* a trophy hunting and trapping season for wolves *immediately* upon delisting. Wisc. Stat. Ann. § 29.185(1m).

FWS failed to consider basic facts about Wisconsin's immediate trophy hunts, such as the potential for excessive kills as a result of allowing hunting with dogs (a highly efficient means of killing wolves) and an absence of details about how the state would ensure that wolf kill limits were not exceeded. And none of this was new information, as Wisconsin had held wolf hunts in 2012. AR_0029998 ("In October 2012, Wisconsin launched its first regulated wolf hunt. Wisconsin Act 169 allows for a statewide, 5-month, 24-hour hunting season that includes period of wolf mating and gestation and permits hunting with dogs, bait, and traps."). Nor did FWS consider the potential for the state to allow hunting during the wolves' mating season, which would impact reproduction and potentially cause a cascade of population impacts. AR_0000071 ("Mortality of breeding gray wolves was more likely to lead to pack dissolution and reduced reproduction when mortality occurred very near to, or during, the breeding season."). These were all issues FWS knew about and failed to analyze before finalizing the Delisting Rule.[19]

Management under the Minnesota plan also drastically reduces legal protections for wolves, even compared to the relatively relaxed special rule for taking wolves that had been in effect in Minnesota under the ESA (where wolves were listed as "threatened" rather than "endangered"). The 2001 Minnesota plan is the core state regulatory mechanism that now guides post-delisting wolf management in that state. AR_0040402. Upon delisting, Minnesota will liberalize private killing of

---

[19] Wisconsin's February 2021 hunt tragically highlighted all these failings. Wisconsin's post-hunt report found a total of 218 wolves killed, almost 100 wolves above the state-licensed quota. Wisconsin Wolf Season Report 6 (Feb. 2021) (NRDC case, ECF No. 71-1). The state closed the hunt after only two days, when it became clear that the quota had been exceeded. *Id.* at 1. Hunters with dog packs killed 188 wolves. *Id.* at 7. A study by one of the peer review scientists for the Delisting Rule estimates that up to one-third of all wolves in Wisconsin were killed between delisting and April 2021. Treves et al. 2021, at 1 (NRDC case, ECF No. 71-2).

depredating wolves and take steps to restart trophy hunting and trapping seasons—neither of which was permissible prior to delisting, *see* AR_0000153-54 (removing special regulations for threatened wolves at 50 C.F.R. § 17.40(d))—to cull the state's wolf population down 40% from the population at the time of delisting.[20]

The Michigan plan, last updated in 2015, describes Michigan's approach to post-delisting wolf management. AR_0028167. Unlike the Minnesota and Wisconsin plans, the Michigan plan does not expressly contemplate the immediate opening of an aggressive trophy hunting season to reduce the state's wolf population. But it does not foreclose the possibility of such a season either, and when wolves were last delisted, Michigan held a wolf hunt in 2013. AR_0000095. In 2016, Michigan also enacted a statute that returned wolves to the state game species list. Mich. Comp. Laws § 324.40103(1)(kk).

Based on what happened after FWS's prior unlawful delisting, FWS knew the inadequacy of these state plans. In the three years that wolves were delisted, people killed hundreds of wolves through hunting, trapping, and livestock predation control, and wolf populations plummeted. For example, in Minnesota, a 2012–13 wolf survey found the wolf population had fallen by approximately 700 wolves from its 2007 levels, much of that attributed to the over 400 wolves killed by hunters and trappers in the 2012–13 hunting season—the first public hunt in the state in over four decades. AR_0025305 (Distribution and Abundance of Wolves in Minnesota, 2012–13). As another example, for the 2013–14 hunting season, Wisconsin set a hunting and trapping quota of one-third of the state's wolves, and hunters and trappers killed 257 of approximately 822 wolves estimated to occupy the state. AR_0029779 (Wisconsin Wolf Season Report 2013–14).

Yet FWS ignored the past failings of the state plans and again accepted them as adequate without grappling with how hunting and trapping after delisting will be managed to protect the wolf populations. The Minnesota plan devotes a single paragraph to hunting and trapping seasons:

> Population management measures, including public taking (i.e., hunting and trapping seasons) or other options, will be considered by DNR in the future but not sooner than 5 years after Federal delisting by USFWS. If, in the future, public taking is proposed by DNR, there will be opportunity for full public comment.

---

[20] As of July 2019, Minnesota's wolf population was estimated at 2,655 wolves. AR_0010333 (Minnesota state regulator's comment letter).

Decisions on public taking will be based on sound biological data, including comprehensive population surveys.

AR_0040423. But the plan's "not sooner than 5 years after Federal delisting" language is meaningless. In 2011, the Minnesota Legislature authorized a wolf hunt season following federal delisting. And after the 2011 delisting, Minnesota held hunting/trapping seasons each year in 2012, 2013, and 2014. AR_0000088.[21]

The Wisconsin plan similarly relegates its entire discussion of hunting and trapping to a single paragraph, this time in the appendix summarizing public comments. That paragraph contains no substance, but instead focuses on the split in public sentiment regarding wolf hunts, remarking that "the time may come when a public harvest is wise," but concluding that "the committee did not feel it could adequately evaluate the attitudes of the people affected to determine 'social carrying capacity' at this time." AR_0041649. This uncertainty about "social carrying capacity," however, did not prevent Wisconsin from drastically culling wolves and opening trophy hunting seasons the last time federal ESA protections were removed. Each year from 2012 to 2014, Wisconsin held wolf trophy hunts, with state-licensed limits between 156 and 275 wolves that were violated each time in total, AR_0000092, and within particular management zones, AR_0010572–73 (GLIFWC comment letter) (29 wolves killed in zone with 15 wolf quota).

And while it is evident that states have no obligation to follow their own state plans, given Minnesota's example of an immediate 2012 hunt despite the language of a five-year moratorium, the plans themselves are inadequate. They say nothing about how quotas will be established, the specific role hunting and trapping will play in each state's campaign to reduce wolf populations, what kind of hunting will be allowed, where and when hunting and trapping will be allowed, and numerous other basic elements routinely included in state species management plans. State plans are often far more comprehensive. For example, Wisconsin's Black Bear Management Plan has almost 30 pages of information on black bear management zones, hunting seasons, hunting

---

[21] The Minnesota 2012 target was 400 wolves, with 413 killed; 2013 target was 220 wolves, with 238 killed; 2014 target was 250 wolves, with 272 killed. AR_0000088.

techniques, and harvest quotas; Minnesota's White-Tailed Deer Management Plan is over 50 pages long and primarily focused on all aspects of deer hunting.[22]

FWS's approval of state management plans that barely acknowledge imminent hunting seasons, much less spell out the basic sideboards for such hunting, is arbitrary and capricious. Even assuming that a default 50% decline in the Great Lake wolf population will not hinder long-term stability, the state plans provide inadequate assurance that these goals will be reliably met and maintained. FWS failed, in the face of these hollow plans and the states' checkered histories, to fulfill its duty to assure there were adequate regulatory mechanisms in Great Lakes states to justify delisting.

### 2.    Outdated population goals and unsustainable mortality levels do not reflect the best available science

Aside from affirmatively allowing and even encouraging gray wolves to be killed, the Great Lakes states' plans are fundamentally outdated. Minnesota's plan has not been revised for 20 years;[23] Wisconsin's similarly lags by well over a decade. These state plans, which now control management over the vast majority of wolves in the Midwest, do not reflect the best available science for wolf management. *See* 16 U.S.C. § 1533(b)(1)(A). Yet FWS relied on them without examining critical scientific information indicating their inadequacy.

First, the population goals chosen by the states are arbitrary. Minnesota's population goal of 1,600 wolves was set not through an analysis of the best available science—either currently or as of its drafting in 2001—or indeed any scientific inquiry. Instead, the population goal of 1,600 wolves was indexed to the almost 30-year-old federal Recovery Plan's criterion of 1,251 to 1,440 wolves in the state of Minnesota. AR_0040417 (Minnesota plan). Similarly, the Wisconsin plan's population target of 350 wolves was selected by reference to the Recovery Plan criterion in that state. *See*

---

[22] *Available at* https://p.widencdn.net/wzas7l/bearplan and https://files.dnr.state.mn.us/wildlife/deer/plan/deerplan.pdf, respectively. *See also* AR_0027503 (Michigan deer management plan).

[23] FWS deferred to the 20-year-old Minnesota plan, which even Minnesota's own DNR later admitted was outdated when it announced that there would be no wolf hunting and trapping season until it developed a new long-term plan. *See* John Myers, *DNR: No Minnesota Wolf Hunt This Year*, Duluth News Tribune (July 10, 2021), 2021 WLNR 22390735.

AR_003553940 (Wisconsin plan). Wolf scholarship has criticized Wisconsin's population goal in particular:

> Wisconsin's management goal of 350 wolves . . . was established before there were empirical data on how the recovering wolf population would respond to the unique ecological and human sociological landscapes of the . . . region. Hence, re-evaluation or re-validation of state goals with respect to population growth and estimates of carrying capacity of wolves, as well as the management effort needed to stabilize a wolf population below carrying capacity, may be needed.

AR_0033208 (Van Deelen 2009).

Second, the states' chosen mortality levels are aggressive and unsustainable. Minnesota's target of 1,600 wolves represents more than a 40% reduction from the state's most recent population estimate. Wisconsin's plan is even more drastic, planning to achieve a population target of 350 wolves by eliminating more than 60% of the state's current population. But recent studies, all of which post-date the Minnesota and Wisconsin plans, demonstrate that even under otherwise optimally stable conditions, wolf mortality rates must be kept below 30% to remain sustainable. AR_0033870 (Adams et al. 2008); *see also* AR_0008189 (Creel & Rotella 2010); AR_0001932–35 (Final Wyoming Gray Wolf Peer Review Panel Summary Report (Dec. 2011)).

Third, the Great Lakes state plans severely underestimate the damage that the sudden imposition of massive trophy hunting quotas will have on the states' wolf populations. The best available science shows that hunting and trapping cause a cascade of harms that quantitatively and qualitatively exceed the removal of the target wolf numbers from the population. Even FWS recognized that "[t]rapping, in particular, may remove the age classes most likely to disperse because younger, less experienced wolves are often more vulnerable to this form of harvest." AR_0000055; *see also* AR_0032285 (Murray et al. 2010); AR_0008189 (Creel & Rotella 2010); AR_0028544 (Ausband et al. 2015); AR_0029250 (Borg et al. 2014); AR_0006619 (Brainerd et al. 2008); AR_0029112 (Hochard & Finnoff 2014); AR_0029097 (Bryan et al. 2014); AR_0025705 (Rick et al. 2017); AR_0025922 (Ausband et al. 2017).

Finally, the Great Lakes state plans fail to address recent peer-reviewed studies that cast doubt on assumptions underlying the states' treatment of poaching mortality. Recent scholarship out of Wisconsin has shown that liberalizing legal killing (through trophy hunts or depredation

removals) is likely to *increase* the incidence of illegal poaching of the same population. AR_0027313 (Chapron & Treves 2016). Researchers also proved serious systemic biases in the methods employed by state managers to estimate the incidence of illegal killing, resulting in consistent underestimates of poaching incidents. *See* AR_0026358 (Treves et al. 2017).

FWS has an obligation to evaluate state regulatory mechanisms solely on the basis of the "best available science." 16 U.S.C. § 1533(b)(1). While Minnesota, Wisconsin, and Michigan state law may not require their respective wildlife agencies to adhere to this demanding standard, this does not absolve FWS of its responsibility to apply the best available science to scrutinize each state's management regime as a precondition to delisting. FWS's delisting decision violates the ESA because these fundamentally flawed regulatory mechanisms do not protect—and in fact affirmatively harm—the most substantial population of wolves in the continental United States.

**D.    FWS violated the ESA in its determination that wolves outside the Great Lakes states could be delisted despite inadequate existing state regulatory protections**

To support delisting, existing regulatory mechanisms must be "sufficiently certain and effective to alleviate a threat of endangerment . . . after delisting." *Crow Indian Tribe*, 965 F.3d at 680 (quoting *Defs. of Wildlife*, 849 F.3d at 1081); *see* 16 U.S.C. § 1533(a)(1)(D). Here, however, FWS's assessment of the adequacy of existing regulatory mechanisms arbitrarily ignored key deficiencies in—and, in some places, complete lack of—management plans for state-level wolf management outside of the Great Lakes states.

For example, as related to state management of wolves in western Washington, FWS failed to explain how Washington's wolf plan, *see* AR_0031112–412, would provide for a sustainable population of gray wolves in that state, given that (1) the plan is not binding or codified in any way as a regulation;[24] (2) state regulators rely on a protocol to decide when to kill wolves that has never

---

[24] Indeed, as described by the Director of the Washington Department of Fish and Wildlife, the Washington plan is an "advisory" document that can be changed "with a letter to the file." AR_0007755. And, a Washington court recognized the inadequacy of the plan, noting it "is not mandatory . . . and is subject to changes and additions, allowing for room for discretionary acts." *Cascadia Wildlands v. Woodruff*, 151 F. Supp. 3d 1153, 1161 (W.D. Wash. 2015). The court also explained that Washington's wolf management scheme "giv[es] the public scant recourse" in terms

---

1    gone through public notice-and-comment rulemaking or peer review; and (3) the same state

2    regulators routinely depart from the plan's non-binding lethal removal protocols to justify killing

3    wolves. AR_0007755–58; *see also* AR_0007578. Indeed, within months of Washington's plan

4    taking effect, state regulators deviated from the plan by killing wolves without requiring appropriate

5    non-lethal tools first. AR_0007596–97. This resulted in the elimination of a wolf pack and a 14%

6    reduction in the state's wolf population. *Id*. This pattern has repeated itself year after year in

7    Washington. AR_0007756–57 (summarizing lethal wolf operations in Washington from 2012–

8    2018); *see also* AR_0007596–601. As such, the Washington plan provides no assurances as to how

9    state regulators will manage wolves now or into the future, and fails to qualify as a regulatory

10   mechanism that is "sufficiently certain and effective to alleviate a threat of endangerment . . . after

11   delisting." *Crow Indian Tribe*, 965 F.3d at 680 (quoting *Defs. of Wildlife*, 849 F.3d at 1081).

12        FWS also failed to adequately consider the threats from removal of ESA protections for gray

13   wolves in western Oregon. Although the agency correctly noted that wolves lost Oregon state-level

14   endangered species protections in 2015,[25] AR_000095, it ignored the fact that the legislature

15   blocked judicial review of that decision, preventing review of whether the delisting complied with

16   the Oregon state-level endangered species act and that law's verifiable science standard. *See*

17   *Cascadia Wildlands v. Dep't of Fish & Wildlife*, 300 Or. App. 648, 661 (2019). Instead, FWS

18   assumed that state delisting meant that wolves are recovered there, but failed to actually verify that

19   wolves in the state have met population or recovery goals and objectives, including whether or not

20   such goals and objectives were scientifically valid in the first place. Had FWS reviewed this

21   information, it would have learned that Oregon's population objectives have never been met in

22   western Oregon and that significant problems remain with Oregon's 2019 wolf management plan.

23        For example, Oregon's population objectives call first for "four breeding pairs of wolves

24   present for three consecutive years" in both eastern and western Oregon. AR_0021205 (Oregon

25   plan). Its management population objective calls for "seven breeding pairs of wolves present for

26

27   of commenting or influencing "changes or additions [to the wolf management plan] by WDFW." *Id*.
     at 1167.

28   [25] In Oregon, wolves are classified as special status game mammals. AR_0021189.

three consecutive years" in both eastern and western Oregon. *Id*. Neither objective has been met in western Oregon. AR_0020517–19 (Oregon 2018 wolf report), AR_0020529–31 (Oregon 2019 wolf report). This dynamic led Oregon Governor Kate Brown to publicly explain that Oregon's wolf management plan failed to meet her expectations for ensuring the future health of Oregon's wolf population. AR_0007724.

Further, FWS admits Washington, Oregon, and California's wolf management plans "do not yet include population management goals." AR_0000143. Especially during the required five-year monitoring period after a delisting, 16 U.S.C § 1533(g)(1), specific population management goals would provide a metric by which to measure and ensure a recovered and sustainable post-delisting wolf population in those states. Despite the lack of population management goals, FWS merely concluded that "recovery objectives" under state-law schemes somehow ensure that wolf populations will not decline after delisting. AR_0000095–97. This conclusion is arbitrary and not supported by FWS's cursory analysis.

FWS also failed to analyze whether state wolf management over the last decade in the congressionally delisted Northern Rocky Mountains DPS portions of eastern Oregon and Washington had—or is currently having—any impact on wolf populations, wolf dispersal into new territories, and ultimately, wolf recovery. FWS had a unique opportunity for a delisting analysis: Oregon and Washington's management of wolf populations in the eastern portions of those states prior to wolf delisting in the western portions of those states could have allowed the agency to actually analyze those states' past management and ascertain the likely direction of future wolf management activities. But FWS did not. Instead, FWS simply doubled down on its argument that wolves in Oregon and Washington do not matter for the recovery of the species, AR_0000143, AR_0000146, and ultimately concluded—without analysis—that while "human-caused mortality will likely increase post-delisting[,]" existing regulatory mechanisms "are adequate to ensure the long-term recovered status of wolves." AR_0000133.

FWS repeated similar failures for the Central Rockies. The agency failed to even examine the existing regulatory mechanisms in Colorado and Utah. *See* AR_0000056 (concluding Colorado and Utah "are also committed to conserving wolves as demonstrated by the development of

management plans and/or codification of laws and regulations that protect wolves," but nowhere mentioning—let alone analyzing—what these plans or laws are or how they serve to conserve wolves in those states); AR_0000072. The omission of any detailed analysis of existing regulatory mechanisms in these states is especially egregious because recovery in the Central Rockies is so nascent—indeed, only a few wolves have been recently documented in Colorado, *see* AR_0000048; AR_0002400, and Utah, AR_0023269. FWS's complete failure to assess the adequacy of regulatory mechanisms in the Central Rockies violates the ESA. *W. Watersheds Project v. FWS,* 535 F. Supp. 2d 1173 (D. Idaho 2007) (failure to consider adequacy of existing regulatory mechanisms renders agency decision arbitrary and capricious).

Finally, because wolves in the western United States reside largely on federal public lands, AR_0000102, FWS also had an obligation to determine whether federal public lands management regimes provided adequate regulatory mechanisms to ensure a sustainable wolf population post-delisting. Courts have recognized that federal land management activities can have an adverse impact on gray wolves. *See, e.g.*, *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1231 (D. Or. 2019) (explaining how motorized trail system would negatively impact gray wolves in central Oregon and holding Forest Service must consult with FWS on wolf impacts). FWS conceded that U.S. Forest Service land management plans in the West Coast States "do not contain standards and guidelines specific to wolf management." AR_0000102. But they could, such as by restricting logging operations and other human disturbance activities near den sites during denning season. If such binding standards and guidelines existed, they would matter to FWS's review of protective regulatory mechanisms. *See Greater Yellowstone Coalition*, 665 F.3d at 1031 (concluding that binding standards in Forest Service land management plans represented adequate regulatory mechanisms for the purposes of an ESA delisting analysis).

FWS, however, curiously suggests that this does not matter because federal land management agencies must comply with the ESA's consultation requirements. But any ESA requirements for federal land management agencies to consult regarding gray wolves ended when FWS delisted the gray wolves. *Cf.* 16 U.S.C. § 1536(a)(1) (requiring consultation for "listed" species). It was arbitrary and capricious for FWS to rely on no-longer-applicable ESA obligations to

1    fulfill the adequate regulatory mechanism requirement.

2          FWS also explains that upon delisting, wolves would be added to the Forest Service's

3    Region 6 Sensitive Species list. AR_0000102. While the Forest Service's guidance does state that

4    delisted species should be added to the Sensitive Species list, FWS ignores that this is not an

5    automatic process, and that the list is only updated periodically. AR_0020898–901 (2019 Forest

6    Service and BLM memo updating Sensitive Species list). And even if the gray wolf were

7    automatically added to the Sensitive Species list, FWS never explains how that designation provides

8    for sustainable wolf populations post-delisting, or how it meets the definition of an adequate

9    regulatory mechanism under the ESA. Further, the agency also ignores that the Sensitive Species

10   designation was eliminated by the Forest Service's 2012 forest planning rule, to be replaced by a

11   new designation, called "Species of Conservation Concern," which has different requirements,

12   qualifications, and impacts on management activities. 36 C.F.R. § 219.9(c). Although existing

13   Forest Plans that rely on the Sensitive Species list remain in effect, the Sensitive Species

14   designation will have no impact on providing for sustainable wolf populations when Pacific Coast

15   National Forests revise their forest plans in coming years. FWS's failure to acknowledge and

16   explain this dynamic renders its analysis arbitrary and capricious, and in violation of the ESA.

17   **V.    FWS's Analysis and Reliance on a "Lower 48 United States Entity" Was Not a Logical**
18   **       Outgrowth of the Proposed Rule**[26]

19          The ESA requires FWS to comply with the provisions of the APA and provide the public

20   with adequate notice and an opportunity to comment before it delists a species. 16 U.S.C.

21   § 1533(b)(4) (requiring compliance with 5 U.S.C. § 553). Such notice must be "sufficient to fairly

22   apprise interested persons of the subjects and issues before" FWS and any difference between a

23   final and proposed rule "must be a logical outgrowth of the proposed rule," *NRDC v. EPA*, 863 F.2d

24   1420, 1429 (9th Cir. 1988) (citing 5 U.S.C. § 553). The "essential inquiry" in the logical outgrowth

25   analysis is "whether interested parties reasonably could have anticipated the final rulemaking from

26   the" proposed rule. *Id.* If not, the decision is "arbitrary or an abuse of discretion" as a matter of law.

27   *NRDC v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002) (citing 5 U.S.C. § 706(2)(A)).

28
_____
[26] This argument is brought by the *Guardians* plaintiffs and NRDC.

FWS did not provide adequate notice of its decision to combine all gray wolves in the contiguous United States for purposes of its delisting analysis in the final rule. As described above, one of the "configurations" of wolves FWS analyzed in the Delisting Rule was the "Lower 48 United States Entity," which included all gray wolves in the contiguous United States, including those in the Northern Rocky Mountain DPS that had been congressionally delisted for a decade. *Supra* at 10. FWS then spent more than a dozen pages discussing the status and management of wolves in the Northern Rockies, *see, e.g.*, AR_0000057–67, 76, 82–85, ultimately relying on that analysis to conclude that wolves across the newly announced "Lower 48 United States Entity" did not deserve ESA protections, *see* AR_0000153. FWS relied on this information despite some uncertainty over the current status of wolves in the Northern Rockies due to changes in state monitoring methods, *see* AR_0000048, and FWS's explicit refusal to "reexamin[e] or revisit[]" their decade-old determination that wolves in the Northern Rockies were in fact recovered, AR_0000045.

FWS's reliance on the so-called "Lower 48 United States Entity," however, could not have been anticipated from the proposed rule. FWS did not analyze this entity in the proposed rule. Indeed, it explicitly refused to do so: The agency explained that it would *not* combine the Northern Rocky Mountain DPS with the listed wolves for purposes of its delisting analysis because the Northern Rockies wolves were "not currently listed under the Act." AR_0020103. And it eschewed any consideration of wolves in the Northern Rockies in the proposed rule, "except to provide context" relating to discussions of the wolves *actually* under consideration. *Id.* FWS was unequivocal that wolves in the Northern Rockies were not under consideration, and the proposed rule did not invite public comment on this issue.

FWS's analysis of the Lower 48 United States entity was therefore not a logical outgrowth of the proposed rule. Given the agency's clear statement that it was not going to consider the Northern Rockies wolves as part of its entity analysis, "interested parties could not have reasonably anticipated that the final" rule would do precisely that. *NRDC*, 279 F.3d at 1187; *see also Transp. Div. of Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Fed. R.R. Admin.*, 988 F.3d 1170, 1181 (9th Cir. 2021) (agency's decision to set maximum crew size of one was not a logical

outgrowth of proposal to set minimum crew size of two). This is underscored by the lack of comments recommending that FWS consider anything resembling the Lower 48 United States entity.[27] FWS should have provided notice and taken public comment on its new alternative approach, and the analysis it undertook to support it. *See Vermont Wolves*, 386 F. Supp. 2d at 561 (FWS's decision to delist "larger Eastern" DPS for gray wolves was not a logical outgrowth of its proposal to delist a smaller "Northeastern" DPS); *Idaho Farm Bureau Fed'n*, 58 F.3d at 1403 ("Opportunity for public comment is particularly crucial when the accuracy of important material in the record is in question."). Its failure to do so violated the APA and ESA.

## VI.    FWS Denied the Wolf DPS Petition by Using an Incorrect, Elevated Standard[28]

FWS further violated the ESA in denying the Wolf DPS Petition submitted by certain Plaintiffs. As discussed above, the ESA's substantive protections for a species and its habitat are triggered only if FWS formally lists a species as either endangered or threatened. 16 U.S.C. § 1533. Any interested party can initiate the listing process by submitting a petition to FWS, and once received, FWS has 90 days to determine whether the "petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* § 1533(b)(3)(A); 50 C.F.R. § 424.14(h)(1). ESA regulations define "substantial scientific or commercial information" as information "such that a reasonable person conducting an impartial

---

[27] While FWS suggested that it adopted its new approach in response to comments it received, AR_0000103, none of those comments suggested the approach the agency took. One peer reviewer noted that the proposed rule's treatment of Northern Rocky Mountain wolves was inconsistent: refusing to evaluate those wolves' management because they were delisted, but nonetheless relying on their existence to claim Pacific Coast wolves were superfluous. AR_0000116; AR_0011091–92. This peer reviewer, however, did not propose that FWS consider a listing entity including wolves in the Midwest, Rockies, and everywhere else in the contiguous United States. Nor could that reviewer's observation excuse FWS's failure to provide notice and solicit public comment on its new analysis. *See NRDC*, 279 F.3d at 1186 (agency violated APA when "it did not afford interested parties the opportunity to comment on whether [interested party's] proposed change" conformed to the law); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995) (FWS violated APA when it relied on new report not available at the time of proposed listing decision and did not provide the public an opportunity to comment on that report); *Ctr. for Biological Diversity v. Kelly*, 93 F. Supp. 3d 1193, 1205–06 (D. Idaho 2015) (FWS violated APA when it made "a fundamental and dramatic change in reasoning" from proposal, prompted "in large part by four peer reviewers," without providing additional notice and comment).

[28] This argument is brought by the *Defenders* plaintiffs.

1  scientific review would conclude that the action proposed in the petition may be warranted." 50

2  C.F.R. § 424.14(h)(1)(i). This is a low threshold. "[T]he 90-day review of a listing petition is a

3  cursory review to determine whether a petition contains information that warrants a more in-depth

4  review." *Ctr. for Biological Diversity v. Kempthorne,* 2008 WL 659822, *8 (D. Ariz. 2008); *Ctr. for

5  Biological Diversity v. Kempthorne,* 2007 WL 163244, *3 (N.D. Cal. 2007) (FWS 90-day denial

6  reversed for using standard higher than that a "reasonable person" would find the proposed action

7  "may be warranted"). If the 90-day determination is positive, FWS will go on to conduct a formal

8  review of the petition and species concerned, including a public comment period, to determine

9  whether listing the species is warranted. 16 U.S.C. § 1533(b)(3)(B).

10  In the Wolf DPS Petition, petitioners provided FWS with three scientifically supported ways

11  to list and protect gray wolves across the lower-48 states. AR_0021766–814. The petition made it

12  clear that these potential DPSs were legally justifiable avenues to remedy the current patchwork of

13  wolf listings across the nation; the petition also addressed some of the legacy problems with the

14  current Lower-48 listing, the congressional delisting of Northern Rocky Mountain wolves, and the

15  recovery that wolves are making in Pacific Coast states and the Central Rockies.

16  In the Delisting Rule, FWS denied the Wolf DPS Petition, using an incorrect and

17  unreasonably elevated standard. AR_0000139 (finding petition did not present substantial scientific

18  or commercial information indicating that the petitioned actions were warranted). On its face, this

19  denial is unsupportable. The Wolf DPS Petition checked all the boxes for substantial information: it

20  clearly indicated the administrative measure recommended and gave scientific and common name

21  of the species involved; contained detailed narrative justification for the recommended measure,

22  describing, based on available information, past and present numbers and distribution of the species

23  involved and any threats faced by the species; provided information on the status of the species

24  overall or a significant portion of its range; and was accompanied by appropriate supporting

25  documentation in the form of bibliographic references, reprints of pertinent publications, copies of

26  reports or letters from authorities, and maps. 50 C.F.R. § 424.14(c); *see Ctr. for Biological Diversity

27  v. Morgenweck,* 351 F. Supp. 2d 1137, 1141 (D. Colo. 2004) ("[I]t is clear that the ESA does not

28  contemplate that a petition contain conclusive evidence of a high probability of species extinction to

1   warrant further consideration of listing that species. Instead, it sets forth a lesser standard by which

2   a petitioner must simply show that the substantial information in the Petition demonstrates that

3   listing of the species may be warranted. FWS's failure to apply this appropriate standard renders its

4   findings and ultimate conclusion flawed."); *Moden v. FWS*, 281 F. Supp. 2d 1193, 1203 (D. Or.

5   2003) ("[T]he standard in reviewing a petition . . . does not require conclusive evidence . . . .").

6          The ultimate conclusion regarding whether to list gray wolves in various DPSs is of "little

7   consequence when the FWS undertakes a 90-day finding, because at the 90-day stage the FWS may

8   only evaluate whether there is sufficient information in a listing petition to indicate that the

9   petitioned action *may be* warranted, such that the FWS should proceed with a status review of the

10  alleged DPS." *Ctr. for Biological Diversity,* 2008 WL 659822 at *11. In fact, FWS found that the

11  petition presented two viable listed species arrangements: a single lower-48 DPS or two DPSs,

12  Eastern and Western. FWS next went through a threats analysis, finding that the petition presented

13  substantial information on the threats of overutilization, disease, and genetic

14  diversity/isolation/small populations for these two alternatives. AR_0000341–46 (90-Day Finding).

15  That should have been the end of the analysis for a positive 90-day finding.

16         Instead, FWS continued its review, addressing whether those threats are having a "negative

17  effect on populations or the species as a whole." AR_0000341 (90-Day Finding). This goes beyond

18  the substantial information inquiry. *See W. Watersheds Project v. Norton,* 2007 WL 2827375, *6

19  (D. Idaho 2007) (FWS erred by demanding a higher standard than required at 90-day stage of listing

20  process when seeking "substantial information that clearly documents that the areas where these

21  habitat losses have occurred are also the areas where pygmy rabbits are found"); *see also McCrary

22  v. Gutierrez,* 2010 WL 520762, *7 (N.D. Cal. 2010) (FWS evaluations over a two-and-a-half-year

23  period indicated it was likely the petition presented sufficient evidence to meet the 90-day threshold

24  requirement).

25         FWS compounded that error by failing to defer to information that supported DPS

26  protections, invalidly resolving any uncertainty against the petitioned action. *See* AR_0000344

27  (rebutting evidence on wolf hunting policies in the Northern Rocky Mountains); AR_0000343

28  (emphasizing wolf pack resilience to counter evidence presented of pack impacts from human-

caused mortality). Such rebuttal in a 90-day finding is incorrect; "in cases of such contradictory evidence, the Service must defer to information that supports petition's position. It would be wrong to discount the information submitted in a petition solely because other data might contradict it." *Ctr. for Biological Diversity,* 2007 WL 163244 at *4; *id.* at *7 ("where there is disagreement among reasonable scientists, then the Service should make the 'may be warranted' finding and then proceed to the more-searching next step in the ESA process").

The 90-day denial also repeated two of the errors discussed above with respect to delisting: (1) FWS failed to analyze threats to a significant portion of the range of gray wolves, specifically in the Pacific Coast states and Central Rockies, *see supra* Parts III.C, IV.A; and (2) FWS invalidly found the wolves in the Pacific Coast states and Central Rockies are insignificant because they are allegedly interconnected with wolves in the Northern Rocky Mountains, *see supra* at 25.

The Wolf DPS Petition presented the agency with three legitimate paths to ground gray wolf listing, protection, and recovery decisions in the best available science. Yet FWS rejected these alternatives at the 90-day stage, precluding the agency from assessing whether gray wolves warrant continued protection under the ESA. Remand to the agency to further consider these options would give FWS the opportunity to accurately evaluate the status of gray wolf recovery across the nation.

## VII.   Plaintiffs Have Standing to Challenge the Delisting Rule

Article III standing requires a plaintiff to show an "injury in fact" that is "fairly traceable to the challenged action" and likely to be "redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citations omitted). A membership organization has standing to sue on behalf of its members when, among other factors, "its members would have standing to sue in their own right." *Id.* at 181.

Plaintiffs satisfy this standard. Plaintiffs have members with scientific, educational, recreational, aesthetic, vocational, and other interests in gray wolves and their current and historical habitat. *See, e.g.*, Warren Decl. ¶¶ 4–18 (Case No. 21-cv-344, ECF No. 54-16); Coleman Decl. ¶¶ 3–22 (Case No. 21-cv-349, ECF No. 58-3); Gompper Decl. ¶¶ 8–20 (Case No. 21-cv-561, ECF No. 70-1). The Delisting Rule threatens these members' interests by lifting federal protections for gray wolves, increasing the likelihood that wolves will be hunted, trapped, or otherwise killed, and

increasing the risk that wolf populations will fall in the areas where their members' seek to enjoy wolves. This threat of lost opportunities to observe or otherwise enjoy wolves is a cognizable injury-in-fact. *See W. Watersheds Project*, 632 F.3d at 484 ("[E]nvironmental groups ha[ve] standing to bring an ESA claim where the groups' members regularly use[] and enjoy[] an area inhabited by the imperiled species."); *Oregon Wolves*, 354 F. Supp. 2d. at 1163 (emphasizing "decreased protection impairs the members' ability to observe wolves, which is an injury in fact."). And this Court can redress these members' injuries by vacating the unlawful Delisting Rule, which would reinstate federal protections for gray wolves. Plaintiffs thus have standing to bring this case.

**VIII.   To Remedy FWS's Violations of Law, the Court Should Vacate the Delisting Rule**

The APA directs that courts "shall set aside" unlawful agency actions. 5 U.S.C. § 706(2). Vacatur is the "typical" remedy for violations for unlawful rules, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021), and courts will remand without vacatur "only in limited circumstances," *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (internal quotation marks omitted). Those circumstances are not present here: both "the seriousness of the agency's errors" and the lack of "disruptive consequences" from vacatur support the normal remedy in this case. *Id.*

FWS's errors are serious and demand vacatur. The agency refused to analyze the entire listed species; failed to comply with applicable law on range analysis and threats analysis; ignored the best available science; and failed to provide adequate notice of changes between the proposed and final rule. These are "major shortcomings that go to the heart of [FWS's] delisting decision," *Humane Soc'y*, 865 F.3d at 614, and raise a serious possibility that on remand a "different result may be reached," *Pollinator Stewardship Council*, 806 F.3d at 532. On remand, FWS may decide to delist only some wolves in the contiguous United States, or abandon its attempts altogether. And even if it chooses to again try to delist wolves across the country, history provides little reason to think the agency's next attempt would be successful. Without a strong showing that the agency can

justify its decision to delist *all* wolves in the contiguous United States on remand, vacatur remains the default remedy.[29]

Vacatur, moreover, will not be disruptive. This is not a case where vacatur would risk environmental harm and undermine statutory purposes. *Cf. Idaho Farm Bureau Fed'n*, 58 F.3d at 1405–06 (remanding listing decision without vacatur where vacatur of decision would risk potential extinction of that species); *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (remanding without vacatur because vacating action could lead to air pollution, undermining the goals of the Clean Air Act). Vacatur will simply return gray wolves to federally protected status, a status that FWS lifted only a few months ago.

Indeed, vacatur will further the ESA's purposes by ensuring that gray wolves receive the federal protections they are entitled to under the Act while FWS reconsiders its position on remand. *See Tenn. Valley Auth.*, 437 U.S. at 194 (explaining Congress made "it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities"); *Humane Soc'y*, 579 F. Supp. 2d at 21 (explaining that the "ESA's preference for protecting endangered species counsels strongly in favor of vacating the Final Rule while FWS revisits" its decision). Restoring protection for gray wolves on remand will also honor "the ESA's policy of 'institutionalized caution.'" *Ctr. for Biological Diversity*, 900 F.3d at 1073 (quoting *Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1167). On the other hand, remand without vacatur would risk further harm to wolf populations from hunting and other wolf-control activities that would again be illegal if the Rule were vacated. Hunters and trappers in Wisconsin have already killed more than 200 of the state's wolves this year and may kill hundreds more this fall. *See supra* note 19. The fact that leaving the Delisting Rule in place "risks more potential environmental harm than vacating it" supports the normal remedy of vacatur. *See Pollinator Stewardship Council*, 806 F.3d at 532.

All four courts that considered FWS's previous, illegal attempts to delist the gray wolf vacated those decisions. *Humane Soc'y*, 865 F.3d at 614–15 (affirming district court's vacatur);

---

[29] Remand with vacatur is also required for FWS's denial of the DPS Petition. The agency's use of the wrong standard, *supra* Part VI, short-circuited its review of possible, scientifically justified gray wolf DPSs. There is a serious possibility that, once it applies the correct, less onerous standard on remand, FWS will reach a different decision.

1 | *Defs. of Wildlife*, 729 F. Supp. 2d at 1228–29; *Humane Soc'y*, 579 F. Supp. 2d at 20–21; *Vermont*
2 | *Wolves*, 386 F. Supp. 2d at 568; *Oregon Wolves*, 354 F. Supp. 2d at 1174. This Court should do the
3 | same here.

**CONCLUSION**

For the foregoing reasons, the Court should vacate the Delisting Rule and the Wolf DPS
Petition Denial.

DATED this 16th day of July, 2021.

Respectfully submitted,

/s/ *Kristen L. Boyles*
KRISTEN L. BOYLES (CSBA #158450)
MICHAEL MAYER (WSBA #32135)
*Appearing Pro Hac Vice*
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-7340
kboyles@earthjustice.org
mmayer@earthjustice.org

TIMOTHY J. PRESO (MSBA #5255)
*Appearing Pro Hac Vice*
Earthjustice
313 East Main Street
Bozeman, MT 59715
(406) 586-9695
tpreso@earthjustice.org

GREGORY C. LOARIE (CSBA #215859)
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
(415) 217-2000
gloarie@earthjustice.org

*Attorneys for Plaintiffs Defenders of Wildlife et al.*

JASON FLANDERS (CA No. 238007)
Aqua Terra Aeris Law Group
4030 Martin Luther King Jr. Way
Oakland, CA 94609

1          (916) 202-3018
         jrf@atalawgroup.com

2

         /s/ *Kelly E. Nokes*
3          KELLY E. NOKES (CO No. 51877)
         *Appearing Pro Hac Vice*
4          Western Environmental Law Center
5          P.O. Box 218
         Buena Vista, Colorado 81211
6          (575) 613-8051
7          nokes@westernlaw.org

8          JOHN R. MELLGREN (OR No. 114620)
9          *Appearing Pro Hac Vice*
         Western Environmental Law Center
10         120 Shelton McMurphey Blvd., Ste. 340
         Eugene, OR 97401
11         (541) 359-0090
12         mellgren@westernlaw.org

13         *Counsel for Plaintiffs WildEarth Guardians et al.*

14         /s/ *Jared E. Knicley*
15         JARED E. KNICLEY (DC No. 1027257)
         *Appearing Pro Hac Vice*
16         Natural Resources Defense Council
         1152 15th Street NW, Suite 300
17         Washington, DC 20005
18         Telephone: (202) 513-6242
         Fax: (415) 795-4799
19         E-mail: jknicley@nrdc.org

20         FRANCIS W. STURGES, JR. (IL No. 6336824)
21         *Appearing Pro Hac Vice*
         Natural Resources Defense Council
22         20 N. Wacker Drive, Suite 1600
         Chicago, IL 60606
23         Telephone: (312) 847-6807
24         Fax: (415) 795-4799
         E-mail: fsturges@nrdc.org

25

26         KATHERINE DESORMEAU (SBN 266463)
         Natural Resources Defense Council
27         111 Sutter Street, 21st Floor
         San Francisco, CA 94104
28         Telephone: (415) 875-6100

Fax: (415) 795-4799
E-mail: kdesormeau@nrdc.org

*Counsel for Plaintiff Natural Resources Defense
Council*

Plaintiffs' Joint Motion for Summary Judgment; Lead Case No. 4:21-cv-00344-JSW