1  Colette Routel, (MN#0313336)
   Mitchell Hamline School of Law
2  875 Summit Avenue
   St. Paul, MN 55105
3  (651) 290-6327
   colette.routel@mitchellhamline.edu
4  *Appearing Pro Hac Vice*

5
   Deborah A. Sivas, (CA#135446)
6  Stanford Law School
   559 Nathan Abbott Way
7  Rm. N120, Neukom Building
   Stanford, CA 94305
8  (650) 723-0325
   dsivas@stanford.edu
9  *Counsel for Amici Tribes*

10

11                    UNITED STATES DISTRICT COURT
12              FOR THE NORTHERN DISTRICT OF CALIFORNIA
                        OAKLAND DIVISION
13
   DEFENDERS OF WILDLIFE *et al.*,
14
               Plaintiffs,
15
        v.                               Case No. 4:21-cv-00344-JSW
16
   U.S. FISH AND WILDLIFE SERVICE *et al.*,   Related Cases:   4:21-cv-00349-JSW
                                                               4:21-cv-00561-JSW
17             Defendants.

18 ───────────────────────────
   WILDEARTH GUARDIANS *et al.*,
19
               Plaintiffs,
20
        v.                               **BRIEF OF *AMICI* TRIBES IN
   DEBRA HAALAND, U.S. SECRETARY OF      SUPPORT OF PLAINTIFFS' MOTION
21 THE INTERIOR *et al.*,                **FOR SUMMARY JUDGMENT**
22             Defendants.

23 ───────────────────────────
   NATURAL RESOURCES DEFENSE
24 COUNCIL, INC.,                        Hearing Date: November 12, 2021
                                         Time: 9 a.m.
               Plaintiff,                Courtroom 5
25                                       Before Judge Jeffrey S. White
        v.
26
   U.S. DEPARTMENT OF THE INTERIOR *et*
27 *al.*,

28             Defendants.

───────────────────────────────────────────────────────

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................. ii

Statement of Interest ........................................................................................................... vi

Factual Background .............................................................................................................. 1

A.   The Ojibwe, Wolves, and Treaty Rights.......................................................... 1

B.   Wisconsin's Target Wolf Population................................................................. 7

C.   Wisconsin's February 2021 Wolf Hunt ........................................................... 9

Summary of the Argument.................................................................................................. 16

Argument ............................................................................................................................ 18

I.   Wisconsin Does Not Possess Adequate Existing Regulatory Protections as Required for
Delisting Under the ESA ................................................................................. 18

II.   The Tribes will Suffer Irreparable Harm if the Delisting Rule is Not Vacated ...................... 22

Conclusion .......................................................................................................................... 25

Brief of *Amici Curiae Tribes*; Lead Case No. 4:21-cv-00344-JSW

# TABLE OF AUTHORITIES

## Cases

*Center for Biological Diversity v. Morgenweck,*
  351 F. Supp. 2d 1137 (D. Colo. 2004).........................................................................19

*Confederated Tribes and Bands of the Yakama Nation v. Klickitat County,*
  1 F.4th 673 (9th Cir. 2021) ........................................................................................2

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.,*
  789 F.3d 1075 (9th Cir. 2015) ...............................................................................22, 23

*Federation of Fly Fishers v. Daley,*
  131 F. Supp. 2d 1158 (N.D. Cal. 2000) ....................................................................19

*Fund for Animals v. Norton,*
  281 F.Supp.2d 209 (D.D.C. 2003) ............................................................................23

*Fund for Animals v. Espy,*
  814 F. Supp. 142 (1993) ...........................................................................................23

*Fund for Animals v. Clark,*
  27 F. Supp. 2d 8 (D. D.C. 1998).............................................................................23

*Greater Yellowstone Coal. v. Servheen,*
  665 F.3d 1015 (9th Cir. 2011) .............................................................................18, 20

*Hunter Nation v. Wisconsin Dep't of Nat. Res.,*
  (No. 2021-CV-000031) & (No. 2021AP000256) ...............................................12, 20

*Klamath Tribes v. United States,*
  1996 WL 924509 (D. Or. Oct. 2, 1996)......................................................................3

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt,*
  700 F.2d 341 (7th Cir. 1983) ......................................................................................2

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin,*
  653 F. Supp. 1420 (W.D. Wis. 1987) .......................................................................2

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*
  740 F. Supp. 1400 (W.D. Wis. 1990) .......................................................................4

*Lane v. Pena,*
  518 U.S. 187 (1996)...................................................................................................22

*Marbled Murrelet v. Babbitt*,
  83 F.3d 1060 (9th Cir. 1996) ......................................................................... 23

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
  526 U.S. 172 (1999) ......................................................................................... 2

*Oregon Natural Resources Council v. Daley*,
  6 F. Supp. 2d 1139 (D. Or. 1998) ................................................................ 19

*Palila v. Hawaii Dep't of Land and Nat. Res.*,
  852 F.2d 1106 (9th Cir. 1998) ..................................................................... 23

*Save Our Springs v. Babbitt*,
  27 F. Supp. 2d 739 (W.D. Tex. 1997) ......................................................... 19

*Seattle Audubon Soc'y v. Evans*,
  852 F.2d 297 (9th Cir. 1991) ....................................................................... 17

*TVA v. Hill*,
  437 U.S. 153 (1978) ................................................................................. 16, 22

*United States v. Washington*,
  853 F.3d 946 (9th Cir. 2017) ....................................................................... 3, 4

*United States v. Winans*,
  198 U.S. 371 (1905) ......................................................................................... 1

*Washington v. Washington State Commercial Passenger Fishing Vessel*,
  443 U.S. 658 (1979) ......................................................................................... 4

*Winter v. National Resources Defense Council, Inc*,
  555 U.S. 7 (2008) ........................................................................................... 22

*Wishtoyo Foundation v. United Water Conservation District*,
  2018 WL 6265099 (C.D. Cal. Sept. 23, 2018) ........................................... 23

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  422 F.3d 782 (9th Cir. 2005) ....................................................................... 23

*Idaho Rivers United v. U.S. Army Corps of Engineers*,
  156 F. Supp. 3d 1252 (W.D. Wash. 2015) .................................................. 23

**Statutes and Treaties**

Treaty with the Chippewa, 7 Stat. 536 (1837) ..................................................... 1

Treaty with the Chippewa, 7 Stat. 591 (1842) ..................................................... 1

Treaty with the Chippewa, 10 Stat. 1109 (1854) ............................................................. 1, 2

16 U.S.C. § 1533(a)(1) ................................................................................................. 17, 18

2011 Wisconsin Act 169 ....................................................................................10-11, 20, 22

Wis. Stat. § 29.185 ................................................................................................. 11, 20, 21

Wis. Stat. § 29.604 ....................................................................................................... 11, 20

**Regulations & Rulemakings**

50 C.F.R. § 424.11 .........................................................................................................16-17

84 Fed. Reg. 9648 (Mar. 15, 2019) (Proposed Delisting Rule) ................................... *passim*

85 Fed. Reg. 69,778 (Nov. 3, 2020) (Delisting Rule) ................................................. *passim*

**Other Sources**

John F. Benson et al., *Ungulate predation and ecological roles of wolves and coyotes in eastern North America*, 27(3) Ecological Applications 718 (April 2017)……………………………... .... 5

Edward Benton-Banai, *The Mishomis Book: The Voice of the Ojibway* (2d ed. 2010).................. 24

Federico Cheever, *The Rhetoric of Delisting Under the ESA:  How to Declare Victory Without Winning the War*, 31 Envtl. L. Rep. 11,302 (2001) ...................................................................19-20

Holly Doremus, *Delisting Under the ESA: An Aspirational Goal, Not a Realistic Expectation,* 30 Envtl. L. Rep. 10,434 (2000) ...................................................................................................... 19

Great Lakes Indian Fish and Wildlife Commission Comment Letter (July 10, 2019)............... *passim*

Adam Perou Hermans et al., *Wolf Reintroduction: Ecological Management and the Substitution Problem*, 32(3) Ecological Restoration 221 (Sept. 2014).................................................................. 5

H.H.T. Jackson, *Mammals of Wisconsin* (1961).............................................................................. 2

Danielle Kaeding, *Study Finds Hunters and Poachers Have Killed A Third of Wisconsin Wolves Since Delisting,* NPR (July 6, 2021) .....................................................................................15-16

Randy Johnson & Anna Schneider, *Wisconsin Wolf Season Report, Feb. 2021* (2021) ....... 13, 14, 15

Letter from Humane Society of the United States to Wisconsin DNR (Nov. 19, 2020).................... 8

Rory Linnane, *Scientists Question State's Course on Wolves* (Oct. 13, 2013) ................................. 7

Curt Meine et al., *Early Wolf Research and Conservation in the Great Lakes Region, Recovery of Gray Wolves in the Great Lakes Region of the United States* (Jan. 2009) ........................................ 24

*Natural Resources Board Meeting,* Wisconsin NRB (Jan. 22, 2021) ................................ 11

Mary Annette Pember, *Wisconsin Tribes Struggle to Save Their Brothers the Wolves from Sanctioned Hunt,* Indian Country Today (Aug. 14, 2012)................................................6-7

Press Release, Wisconsin DNR Announces Wolf Season Begins Nov. 6, 2021 (Dec. 4, 2020)....9-10

William J. Ripple & Robert L. Beschta, *Trophic cascade in Yellowstone: The first 15 years after wolf introduction*, 145 Biological Conservation 205 (2012) ............................................ 5

Colette Routel & Jeffrey Holth, *Toward Genuine Tribal Consultation in the 21*st* Century*, 46 Mich. J. L. Ref. 417 (2013) ..............................................................................................3-4

Rob Stafsholt, Wisconsin Senator, et al., to Dr. Frederick Prehn, Chairman, Wisconsin NRB (Jan. 13, 2021) ............................................................................................................ 10

*Statement Made by the Indians: A Bilingual Petition of the Chippewas of Lake Superior*, 1864 (John D. Nichols, ed., 1988) ........................................................................................... 3

Adrian Treves, et al., *Quantifying the effects of delisting wolves after the first state began lethal management*, PeerJ (July 5, 2021) ..................................................................13-14, 15, 16

Adrian Treves et al., *Transparency About Values and Assertions of Fact in Natural Resource Management*, 2 Frontiers in Conservation Science: Human-Wildlife Dynamics (2021)................... 8

Jane E. Wiedenhoeft et al., Wisconsin Gray Wolf Monitoring Report 15 April 2019 through 14 April 2020)............................................................................................................ 7

Wisconsin Department of Natural Resources, *Wisconsin Wolf Management Plan* (Oct. 27, 1999 & Supp. I 2007)......................................................................................................passim

Wisconsin's Greenfire, *The February 2021 Wisconsin Wolf Hunt:  A Preliminary Assessment*, *May 2021* (Apr. 27, 2021)......................................................................... 13, 14, 15, 21, 22

Sandra B. Zellmer et al., *Species Conservation & Recovery Through Adequate Regulatory Mechanisms*, 44 Harv. Envtl. L. Rev. 36 (2020) ........................................................... 18

**STATEMENT OF INTEREST**

The Ojibwe are a thriving people with more than a dozen federally recognized tribes in Minnesota, Michigan, and Wisconsin including the *Amici* Tribes represented here. Each of these Tribes has one or more treaties with the United States that confirm their right to protect and harvest species (on-reservation, off-reservation, or both) in portions of the states noted above. These treaty rights include the right to protect the gray wolf (*Canis lupus*). Even so, the *Amici* Tribe's interests in the gray wolf predates and transcends these treaties. Ojibwe culture identifies the wolf as a brother, and the wolf carries significant cultural and spiritual importance to Ojibwe people.

The *Amici* Tribes oppose the removal of the gray wolf from the list of endangered and threatened species and support Plaintiffs' motion for summary judgment. The U.S. Fish and Wildlife Service failed to properly assess Wisconsin's regulatory mechanisms, which mandate wolf hunting. The *Amici* have been irreparably harmed by Wisconsin's February 2021 wolf hunt. Another wolf hunt will occur each November under Wisconsin law, unless the gray wolf is listed as a threatened or endangered species. For these reasons, the *Amici* have been and will continue to be harmed if the Delisting Rule is not vacated.

**FACTUAL BACKGROUND**

### A.  The Ojibwe, Wolves, and Treaty Rights

Ojibwe teachings instruct that Ma'iingan (the Ojibwe word for wolf) is a brother to Native people. In the beginning, Wenaboozhoo (Original Man) and Ma'iingan walked the Earth together, naming all aspects of creation. Man and wolf eventually took different paths but were told by the Creator that whatever should happen to one would happen to the other; their fates would always be intertwined, and they would both be forever misunderstood. In other words, the health and survival of Ojibwe people will always be tied to that of Ma'iingan. Great Lakes Indian Fish and Wildlife Commission ("GLIFWC") Comment Letter (July 10, 2019) ("GLIFWC Comment Letter").

In treaties with the United States, the Lake Superior and Mississippi Ojibwe ceded vast sections of timber and mineral-rich land. *E.g.*, Treaty with the Chippewa, 7 Stat. 536 (1837) ("1837 Treaty"); Treaty with the Chippewa, 7 Stat. 591 (1842) ("1842 Treaty"); Treaty with the Chippewa, 10 Stat. 1109 (1854) ("1854 Treaty"). Before agreeing to these land cessions, the Ojibwe insisted that they retain[1] the right to hunt, fish, and gather throughout the territory they were ceding, which today comprises all or part of thirty Wisconsin counties, as well as central and northeastern Minnesota and the Upper Peninsula of Michigan. 1837 Treaty, art. 5 ("The privilege of hunting, fishing, and gathering . . . is guarantied [sic] to the Indians, during the pleasure of the President of the United States"); 1842 Treaty, art. 2 ("The Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United

---

[1] These and other treaty rights are referred to as "reserved rights." The reserved rights doctrine is when interpreting Indian treaties, as treaties do not need to explicitly grant tribal rights; the inherent sovereign rights of tribes are retained unless they have been explicitly relinquished via treaty. *United States v. Winans*, 198 U.S. 371, 381-82 (1905) (noting that a treaty is "not a grant of rights to the Indians, but a grant of rights from them, a reservation of those not granted").

States . . . ."); 1854 Treaty, art. 11 ("[the Indians who] reside in the territory hereby ceded shall have the right to hunt and fish therein, until otherwise ordered by the President"). The existence and ongoing vitality of these treaty rights have been repeatedly acknowledged by federal courts in recent decades. *See, e.g.*, *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 176-77 (1999) (affirming ongoing rights under the 1837 Treaty); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 344-45 (7th Cir. 1983) (affirming rights under the 1837 and 1842 Treaties).

Ma'iingan is one of the species protected by the Tribes' treaty rights. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin*, 653 F. Supp. 1420, 1426-27 (W.D. Wis. 1987). During the early and mid-nineteenth century, when these treaties were negotiated, wolves were abundant in what is now the State of Wisconsin, with estimates of their population size ranging from 3,000 to 25,000 wolves. *Compare* H.H.T. Jackson, *Mammals of Wisconsin* 293 (1961) (noting that in 1835, there may have been 20,000 to 25,000 wolves within what is today Wisconsin), *with* Removing the Gray Wolf (*Canis lupus*) from the List of Endangered and Threatened Wildlife, 85 Fed. Reg. 67,778 (Nov. 3, 2020) (the "Delisting Rule") (claiming that "there may have been 4,000 to 8,000 wolves in Minnesota, 3,000 to 5,000 in Wisconsin, and fewer than 6,000 in Michigan"). But even during this time of abundance, the Ojibwe recognized that their natural resources would need to be protected from persons seeking to exploit the timber and mineral resources found in the territory they were ceding. Thus, they clarified during treaty negotiations[2] that they were retaining the right to

---

[2] Indian treaties are not interpreted based on their plain language, but rather, using special canons of construction. One of those canons requires the court to interpret a treaty the way the tribal negotiators would have understood it, at the time it was negotiated. Courts routinely look to what was said by the treaty signatories before, during, and after the treaty was executed to determine this Indian understanding. *See, e.g.*, *Confederated Tribes and Bands of the Yakama Nation v. Klickitat County*, 1 F.4th 673, 680, 682 (9th Cir. 2021).

*protect* the species of plants and animals they relied on, not simply *harvest* them. *See, e.g.*, *Statement Made by the Indians: A Bilingual Petition of the Chippewas of Lake Superior*, *1864* 15 (John D. Nichols, ed., 1988) (noting, for example, that while negotiating the 1837 Treaty, the Ojibwe explicitly stated "[t]hat you," meaning the United States and its citizens, "may not destroy the [Wild] Rice in working the timber"); *see also United States v. Washington*, 853 F.3d 946, 965-66 (9th Cir. 2017) (holding that treaties with Pacific Northwest tribes required that the state ensure fish would continue to exist at all usual and accustomed fishing places, in sufficient quantities to provide the tribe with a moderate living, and upholding an injunction requiring the removal of barrier culverts that impeded salmon passage), *aff'd by equally divided court*, 138 S. Ct. 1832 (2018).

The Ojibwe's treaty rights include several additional components. Federal and state officials must engage in government-to-government consultation before taking any action that could impact treaty-protected resources and rights, a tribal representative must be included on species-specific state advisory committees, and the goal shall be to reach consensus between the tribes and the state in managing treaty-protected resources. *Lac Courte Oreilles v.* Wisconsin, Case No. 74-C-313-C, *Stipulation for Technical, Management and Other Updates: Second Amendment of the Stipulations Included in the Final Judgment,* at 40, §§ XV(A)(1)(a)(14) & XV(A)(3) (guaranteeing a tribal representative on the Wolf Advisory Committee, and noting that "[t]he parties agree that a consensus approach shall be used and agree to make all reasonable efforts to reach a consensus in all committees or processes outlined in this Stipulation"); *Klamath Tribes v. United States*, 1996 WL 924509, *4, *8, *9 (D. Or. Oct. 2, 1996) (enjoining the U.S. Forest Service from selling timber "without ensuring, in consultation with the Klamath Tribes on a government-to-government basis, that the resources on which the Tribes' treaty rights depend will be protected"); *see also* Colette Routel & Jeffrey Holth, *Toward Genuine Tribal Consultation in the 21st Century*, 46 Mich. J. L. Ref. 417 (2013) (discussing

history of tribal consultation duty). And the tribes have a right to protect or take up to 50% of the resource that is available for harvest. *Lac Courte Oreilles Band of Lake Superior Chippewa v. Wisconsin*, 740 F. Supp. 1400 (W.D. Wis. 1990); *see also Washington v. Washington State Commercial Passenger Fishing Vessel,* 443 U.S. 658, 685-87 (1979) (concluded that treaty "right of taking fish . . . in common with all citizens of the Territory" secured to the Indian tribes the right to up to 50% of the harvestable fish). As noted above, this includes the guarantee that manmade actions (e.g., habitat modification, overharvest) will not destroy the existence of the treaty-protected resource. *Washington*, 853 F.3d at 965-66.

The Ojibwe have protected ma'iingan since time immemorial due to the deep sense of cultural kinship between these tribal nations and the wolf. Ma'iingan continues to be a highly regarded species by tribal members today. Victoria Shelley, *The Influence of Culture on Attitudes to Wolves and Wolf Policy Among Ojibwe Tribal Member and Non-tribal Residents of Wisconsin's Wolf Range* 46-47 (2010) (unpublished thesis, University of Wisconsin-Madison), *available at* http://faculty.nelson.wisc.edu/treves/pubs/Shelley_MSThesis.pdf. In modern life, the wolf is seen as symbolic of ideals to be sought by humans: intelligence, agility, perseverance, fidelity, and guardianship. Ma'iingan are respected for their intimate, attentive, and lengthy parenting, as well as their ability to coordinate and communicate collective action. *Id.* at 46-47; GLIFWC Comment Letter at 6.

The belief that the fate of ma'iingan and the Ojibwe are intertwined persists, and it is just as relevant today as it was in the nineteenth century. The scientific community has only recently realized what the Ojibwe have always known: the presence of wolves in sufficient numbers is necessary for a healthy and productive ecosystem. Today, wolves are viewed as "keystone" species. As their reintroduction into the Yellowstone ecosystem vividly demonstrated, the presence of wolves literally

changes the landscape. In sufficient numbers, they keep large and mid-sized mammals in check, thereby enabling the plant species those mammals would consume to flourish. These plant species, in turn, provide cover and forage for smaller animals. Consequently, the presence of wolves in sufficient numbers on the landscape fosters biodiversity. William J. Ripple & Robert L. Beschta, *Trophic Cascade in Yellowstone: The First 15 years After Wolf Introduction*, 145 Biological Conservation 205-13 (2012); Adam Perou Hermans et al., *Wolf Reintroduction: Ecological Management and the Substitution Problem*, 32(3) Ecological Restoration 221-28 (Sept. 2014); *see also* John F. Benson et al., *Ungulate predation and ecological roles of wolves and coyotes in eastern North America*, 27(3) Ecological Applications 718, 718-33 (April 2017) (noting that coyotes kill far fewer deer than wolves, and therefore, cannot effectively replace wolves as apex predators). This is essential for the Ojibwe, who continue to rely on the wild plant and small game species in the ceded territory for food and medicine. GLIFWC Comment Letter at 6.

In addition, ma'iingan is increasingly important in Wisconsin, as a deadly, incurable disease – chronic wasting disease (CWD) – has infiltrated the white-tailed deer population over the past 20 years. Wolves are a natural weapon against CWD, because they cull the sick and injured deer. GLIFWC Comment Letter at 2. Thus, while CWD has proliferated in deer located in the southern portion of Wisconsin (and the State's attempts to slow or reverse its spread have been ineffectual), there have only been isolated instances of CWD found in wild deer within the ceded territory, due, in large part, to the lower deer and higher wolf densities that exist in the northern portion of the State. *Compare* Statewide CWD positive locations (2021), *available at* https://p.widencdn.net/6ixtwa/cwdAffectedCountiesMap, *and* Wisconsin DNR, Cumulative Distribution of Chronic Wasting Disease Detections in Southern and Central Wisconsin, 2001-2019,

*available at* https://p.widencdn.net/nfe9ku/cwddistribution, *with* GLIFWC, Ceded Territory Boundaries, available at https://data.glifwc.org/ceded/.[3]

For these reasons, the Wisconsin Ojibwe have been consistent and unified in their desire to protect the existing wolf populations both on their reservations and within the ceded territory. They have refused to authorize wolf hunting either on or off their reservations. But because their reservations are small, only a handful of wolf packs can be found there, and even those wolves have a core range that extends both on and off-reservation. Jason D. Sanders, *Comment: Wolves, Lone and Pack: Ojibwe Treaty Rights and the Wisconsin Wolf Hunt*, 2013 Wisc. L. Rev. 1263, 1282-83 (diagramming range of on- and off-reservation wolf packs and concluding that "a buffer area adjacent to Ojibwe reservation land would be essential to protect wolf packs whose territory overlaps with non-reservation land"). Thus, the Ojibwe cannot protect their brother, ma'iingan, without federal or state assistance. GLIFWC Comment Letter at 5. Unfortunately, the State of Wisconsin has made it plain that it has far different management objectives than the Ojibwe tribes. State politicians and hunters have long lobbied for a massive reduction in the wolf population and failed to provide the most basic protections for even on-reservation wolf packs. Mary Annette Pember, *Wisconsin Tribes Struggle to Save Their Brothers the Wolves from Sanctioned Hunt,* Indian Country Today (Aug. 14, 2012) available at https://indiancountrytoday.com/archive/wisconsin-tribes-struggle-to-save-their-

---

[3] The Delisting Rule contains virtually no discussion of the devastating impact that a reduction in the wolf population could have on the spread of CWD in the tribes' ceded territory. A peer reviewer "noted that CWD is not currently found in areas with wolf packs," and the reviewer provided a reference indicating that wolf predation on elk and deer could be curbing the spread of CWD in certain areas. 85 Fed. Reg. at 69,851. Yet the U.S. Fish and Wildlife Service only responded by noting that it was "aware of CWD as an emerging contagious disease threat to deer and elk," while claiming that its "ultimate impact" and "prevalence" was unknown, and that States have developed "robust surveillance and response plans for CWD to minimize and mitigate impacts." *Id.* at 69,818. Wisconsin's CWD response plan, which included controlled shooting and bait bans, has not been effective at decreasing the spread of CWD throughout the deer population in central-south Wisconsin.

brothers-the-wolves-from-sanctioned-hunt (noting that the tribes requested the State protect reservation wolves by creating "buffer zones" prohibiting the killing of wolves within a few miles of reservation boundaries, but the State failed to do so).

**B. Wisconsin's Target Wolf Population and the Delisting Rule**

In 2020, there were approximately 1,034 wolves within the State of Wisconsin. Jane E. Wiedenhoeft et al., Wisconsin Gray Wolf Monitoring Report 15 April 2019 through 14 April 2020, at 3 ("2020 Wolf Monitoring Report"). Wisconsin's stated goal, however, is to reduce that population to just 350 wolves. This number is derived from Wisconsin's 1999 Wolf Management Plan. Wisconsin Department of Natural Resources, *Wisconsin Wolf Management Plan* (Oct. 27, 1999 & Supp. I 2007) ("Wisconsin Wolf Plan"),   https://dnr.wo/gov/files/PDF/pubs/ER/ER099.pdf.[4] Scientists now agree that this population number is based on outdated science, and "runs counter to a widely accepted scientific model for harvest management." Rory Linnane, *Scientists Question State's Course on Wolves,* WisconsinWatch.org (Oct. 13, 2013), http://www.wisconsinwatch.org/2013/10/13/scientists-question-states-course-on-wolves/.

The original target population of 350 wolves to establish a "recovered" population in Wisconsin was based on scientific information that is now more than 20 years old. At the time it was created, scientists assumed that road density would limit viable wolf habitat, and that the available habitat might reach its maximum carrying capacity at "considerably less than 500 [wolves]." Wisconsin Wolf Plan at 14–15 (map of purported primary and secondary wolf habitat and population estimates). But these assumptions have long since proven to be incorrect. Wolves have expanded their range into many areas that the original wolf plan believed were not possible, and prior to delisting,

---

[4] While the Wisconsin Wolf Plan was partially revised in 2006 and 2007, this population goal was not altered.

there were more than 1,000 wolves within the State. 2020 Wolf Monitoring Report at 3, 16 (map of wolf pack distribution within the State).

The inadequacy of the Wisconsin Wolf Plan's population goal has been acknowledged by the scientific community for many years. When Richard Thiel and Tim Van Deelan – both co-authors of the Wisconsin Wolf Plan – testified before the Wisconsin Senate in 2012, they acknowledged that reducing the wolf population to just 350 wolves could have catastrophic effects. Van Deelan explained:

> The 350 number was derived when we thought the carrying capacity for wolves in Wisconsin was dramatically lower than it's turning out to be, and so if you set 350 as the goal and then choose to manage by setting quotas that would get to that number, *pretty elementary harvest management theory would suggest that you run the risk of destabilizing the population*.

Letter from Humane Society of the United States to Wisconsin DNR, 6-9 (Nov. 19, 2020), https://blog.humanesociety.org/wp-content/uploads/2020/11/HSUS-Letter-on-Unlawful-Wolf-Hunt-11-19-2020.pdf (summarizing and quoting Senate testimony) (emphasis added). Indeed, recent peer-reviewed studies conclude that reducing the population from 1,034 to 350 wolves is ill-advised, is not based on the best science available, and could once again bring the wolf to the brink of extinction in Wisconsin. *See, e.g.,* Adrian Treves et al., *Transparency About Values and Assertions of Fact in Natural Resource Management*, 2 Frontiers in Conservation Science: Human-Wildlife Dynamics (2021) (debunking validity of Wisconsin Wolf Plan's population goal). Yet despite this, Wisconsin politicians have remained doggedly dedicated to reducing the wolf population to achieve this outdated goal.

GLIFWC highlighted this issue for the U.S. Fish and Wildlife Service ("USFWS") after publication of the proposed delisting rule on March 15, 2019. Removing the Gray Wolf (*Canis lupus*) From the List of Endangered and Threatened Wildlife, 84 Fed. Reg. 9648 (Mar. 15, 2019),

https://www.govinfo.gov/content/pkg/FR-2019-03-15/html/2019-04420.htm ("Proposed Delisting Rule"). In the Proposed Delisting Rule, the USFWS claimed that Wisconsin would "maintain populations at sustainable levels well above management objectives," without providing any supporting evidence for this assertion. *Id.* at 9662. GLIFWC pointed out that Wisconsin had had more than a decade to revise the population goal contained in its Wolf Management Plan but had not done so, and thus, if the wolf was delisted, its population could very well be reduced by over 60% to meet the stated goal. GLIFWC Comment Letter at 4. GLIFWC also noted that the State had a history of allowing hunters to overshoot the wolf hunt quotas that it developed, and that it had failed in the past to adjust those quotas to account for significant amounts of illegal poaching. *Id*. at 4–5.

Despite these comments, the USFWS concluded that the wolf population in Wisconsin had recovered, Wisconsin's stated goal of reducing its current population of 1,034 wolves to 350 wolves was not problematic, and existing regulatory mechanisms were adequate to ensure that the Wisconsin wolf population was no longer in danger of, or threatened with, extinction. Removing the Gray Wolf (*Canis lupus*) From the List of Endangered and Threatened Wildlife, 84 Fed. Reg. 9648, 9683 (Mar. 15, 2019) (the "Delisting Rule"). The Ojibwe concerns, however, have already been validated.

### C.  Wisconsin's February 2021 Wolf Hunt

In November 2020, the USFWS published its final Delisting Rule, which, by its terms, was set to become effective on January 4, 2021. 85 Fed. Reg. at 69,778. One month after publication of the Delisting Rule, on December 4, 2020, the Wisconsin Department of Natural Resources ("Wisconsin DNR") announced its intention to hold a public wolf hunt in November 2021. Press Release, Wisconsin DNR Announces Wolf Season Begins November 6, 2021 (Dec. 4, 2020), available at https://dnr.wisconsin.gov/newsroom/release/39871. The Press Release noted that "implementing a wolf season requires adequate time not only to develop a science-based harvest quota but also to

engage the public and tribal partners in the development of a season plan," and thus, the hunt could not commence earlier. *Id.* The Wisconsin DNR admitted that the "current" Wisconsin Wolf Plan had not been revised for 15 years and promised that it would "work collaboratively and transparently to create a new wolf management plan to reflect our increased understanding of the biological and social issues relevant to wolf management." No timetable was given for the creation of this new management plan, but presumably, it was to occur prior to the November 2021 hunt. *Id.*

But a November 2021 hunt was not fast enough for many Wisconsin politicians. On January 13, 2021, the Wisconsin Senate's Committee on Sporting Heritage, Small Business, and Rural Issues, and the Wisconsin Assembly's Committee on Sporting Heritage, held a joint informational hearing that was open to the public. In a letter sent to the Wisconsin Natural Resources Board ("Wisconsin NRB") shortly thereafter, Committee leadership noted that "the consensus was that wolves in Wisconsin need to be hunted now." This urgency to hunt was supposedly due to environmental organizations, who had already sent letters to the USFWS providing notice of their intent to challenge the Delisting Rule in court. As a result, the Senators argued that February 2021 might be the only opportunity for the public to engage in a wolf hunt before the wolf was relisted as an endangered species. Rob Stafsholt, Wisconsin Senator, et al., to Dr. Frederick Prehn, Chairman, Wisconsin NRB (Jan. 13, 2021), https://widnr.widen.net/s/kwn7csxrvm/2021-01-2a-wolf-hunt-special-meeting-green-sheet-package. The letter pointed out that State law required the Wisconsin DNR to initiate a wolf hunt so long as the wolf is not listed as an endangered or threatened species under federal or state law, and the statutory wolf season runs from November through the end of February. *Id.* Because it was still January, a wolf season should commence immediately. *Id.*

The USFWS had not acknowledged these problematic provisions in State law in its Delisting Rule, even though they were not of recent vintage. In 2012, the Wisconsin Legislature enacted 2011

Wisconsin Act 169. That statute states "[i]f the wolf is not listed on the federal endangered list and is not listed on the state endangered list, the department *shall allow* the hunting and trapping of wolves." Wis. Stat. § 29.185, subd. 1m (2017) (emphasis added). State law does not provide for the automatic listing of the wolf population if it drops below a particular minimum threshold; rather, it requires affirmative action by the Wisconsin DNR, for which no timetables are provided. *See generally,* Wis. Stat. § 29.604 (2013). Thus, Wisconsin law could still *require* a wolf hunt even if the population drops to precipitously low levels. Additionally, 2011 Wisconsin Act 169 removes much of the Wisconsin DNR's discretion to manage the hunt according to the best available science and past practice. For example, Wisconsin is the only state in the country that authorizes the hunting of wolves using dogs[5] – an extremely efficient method of harvest – and it mandates that the hunting season run through the end of February if the quota is not reached before then. Wis. Stat. § 29.185, subd. 5(a). Hunting and trapping during the wolf mating season, which occurs in February, has the potential to significantly disrupt the propagation of the species.

The Wisconsin NRB, which is the policy-setting body for the Wisconsin DNR and is comprised of political appointees (i.e., appointed by the Governor and confirmed by the State Senate to six-year terms), held a special meeting on January 22, 2021, to consider the Committees' request to hold an immediate winter wolf hunt. *Natural Resources Board Meeting,* Wisconsin NRB (Jan. 22, 2021), https://dnrmedia.wi.gov/main/Play/731c92f70bb84be69b8f69ef1ccbb99c1d. In a narrow 4-to-3 vote, the Wisconsin NRB confirmed its earlier decision and refused to authorize an immediate wolf hunt. The inability to adequately consult with Wisconsin Ojibwe tribes, as required by the *LCO/Voigt* cases, was cited as a primary reason by Wisconsin NRB members who opposed holding a February hunt.

---

[5] Wisconsin's Greenfire, *The February 2021 Wisconsin Wolf Hunt:  A Preliminary Assessment*, *May 2021*, 7 (Apr. 27, 2021), https://wigreenfire.org/2019/wp-content/uploads/2021/04/WGF-Cons-Bulletin-Feb-Wolf-Hunt-04-28-2021.pdf.

*Id.* On the other hand, those who voted in favor of an immediate hunt expressed their desire to immediately begin moving towards the wolf plan's target population of 350 wolves. *Id.*

The Wisconsin NRB did not have the last word. On February 2, 2021, a Kansas-based hunting advocacy group called Hunter Nation filed a lawsuit in Jefferson County Circuit Court requesting a writ of mandamus to force the Wisconsin DNR to hold an immediate wolf hunt. Complaint, *Hunter Nation et al. v. Wisconsin DNR* (Feb. 2, 2021) (No. 2021AP000256), https://will-law.org/wp-content/uploads/2021/02/hunter-nation-v.-dnr-complaint-2-2-21-redacted-1.pdf. The Complaint tracked the reasoning of the Committees' January 13, 2021 letter, arguing that Wisconsin law mandated a wolf hunt, and noting "there is a substantial possibility that Wisconsinites' time to hunt wolves is limited," because the new administration may choose to relist the wolf as a federally protected endangered species. *Id.* at ¶¶ 16, 21-11. On February 11, Circuit Court Judge Bennett Brantmeier ruled in favor of Hunter Nation, ordering the Wisconsin DNR to immediately implement a wolf hunting and trapping season. *Hunter Nation Inc. et al. v. Wisconsin Dep't of Nat, Resources et al.,* (No. 2021-CV-000031), *order issued* (Wis. Cir. Ct., Jefferson Cnty. Feb. 11, 2021). The Wisconsin DNR filed an appeal and a requested a stay of Judge Brantmeier's decision. However, on February 19, 2021, the Wisconsin Court of Appeals dismissed the appeal, claiming Judge Brantmeier's decision was not an appealable final order. *Hunter Nation Inc. et al. v. Wisconsin Dep't of Nat. Res.,* No. 2021AP256-LV, at *5 (Wis. Ct. App. Feb. 19, 2021).

In light of these court proceedings, the Wisconsin DNR met to determine the harvest quota that it would recommend to the Wisconsin NRB. Normally, such a quota would be developed after several meetings of the Wolf Advisory Committee, and government-to-government consultation with the Wisconsin Ojibwe tribes that possess treaty hunting rights in the ceded territory. But, for the February 2021 hunt, there was no input from the Wolf Advisory Committee, no legally required consultation

with tribal governments, and no input or comments from stakeholders.[6] Wisconsin's Greenfire, *The February 2021 Wisconsin Wolf Hunt: A Preliminary Assessment*, *May 2021*, 4 (Apr. 27, 2021). Instead, because Judge Brantemeier ordered the Wisconsin DNR to initiate a harvest with less than five days' notice, the process used to develop this quota was highly abbreviated. The Wisconsin DNR recommended a quota of 200 wolves, supposedly a conservative number which would result in no annual change to Wisconsin's wolf population. After being notified of this quota, the Ojibwe tribes exercised their right to declare 50% of the harvestable wolves within the ceded territory be reserved for their members. *Id.* The proposed quota was to be distributed among the State's six wolf management zones, and the Wisconsin DNR suggested that a maximum of ten licenses be issued for each quota animal. By law, wolf harvest licenses authorize the holder to take one wolf in any open zone using any legal method, including trapping, hunting with the use of electronic calls, bait and, as noted above, with the aid of dogs. Randy Johnson & Anna Schneider, *Wisconsin Wolf Season Report, February 2021* 1 (2021) ("2021 Wolf Season Report"), https://widnr.widen.net/s/k8vtcgjwkf/wolf-season-report-february-2021. Under State law, the Wisconsin DNR possesses the authority to close wolf zones as zone-specific harvest quotas are reached, but closures cannot become effective until 24 hours after they have been publicly announced. *Id.*

On February 15, 2021, the Wisconsin NRB held a second special meeting to authorize the wolf hunt. At the meeting, NRB members noted that the goal was to "[m]ove [the] population toward [the] population goal" of 350 wolves within the State. Adrian Treves, et al., *Quantifying the effects of delisting wolves after the first state began lethal management*, PeerJ, July 5, 2021, at 9 ("Treves,

---

[6] Wisconsin DNR staff had one meeting that included a GLIFWC staff member, but when it became apparent that the Wisconsin DNR was not going to engage in the legally required government-to-government consultation, that GLIFWC staff member was directed to cease participating in the meeting.

*Quantifying*"). When an NRB member asked about carcass collection for scientific purposes, the Wisconsin DNR responded they would not collect carcasses, because "[t]ypically the wolves that are harvested . . . are generally younger than breeding age wolves." *Id.* at 10. The NRB then voted to approve the Wisconsin DNR's recommended quota of 200 wolves, of which, 119 were to be allocated to the State and 81 were allocated to the Ojibwe tribes. 2021 Wolf Season Report at 1-2. But the NRB added an amendment to increase the number of licenses available to 20 per quota animal. Wisconsin's Greenfire at 4.

Using a lottery system, 2,380 people were given the opportunity to purchase a wolf license, and a total of 1,548 licenses were ultimately sold. Wolf Season Report at 2. The Wisconsin wolf hunting season began at 12:01 a.m. on Monday, February 22, 2021. On Tuesday, February 23 at 10 a.m., the Wisconsin DNR announced that based on the number of wolves reported as killed in the first 24 hours of the hunt, it was closing zones two, five and six. The Wisconsin DNR announced closures of zones one, three, and four at 3 p.m. on the same day. As noted above, under Wisconsin law, the Wisconsin DNR has to provide 24-hour notice of the closure of hunting in a particular zone. Therefore, hunting in all zones was legally required to cease by February 24 at 3 p.m., less than three days after the start of the wolf hunt.

Despite the short season, state-licensed hunters and trappers reported taking 218 wolves, 99 wolves (83%) more than the 119 wolf-quota set by the Wisconsin NRB. The reported harvest rates, compared with the actual quotas, are as follows:

|        | State-Licensed Quota | State-Licensed Harvest |
|--------|----------------------|------------------------|
| Zone 1 | 31                   | 53                     |
| Zone 2 | 18                   | 43                     |
| Zone 3 | 20                   | 42                     |
| Zone 4 | 6                    | 4                      |
| Zone 5 | 27                   | 31                     |
| Zone 6 | 17                   | 45                     |

Wolf Season Report at 6. As these numbers indicate, during the February 2021 hunt, wolves were removed primarily from zones 1-3. These zones are the core wolf habitats on public lands where conflicts with pets, livestock, or human safety rarely occur. *See Id.* at 5, 8-9 (providing maps of the wolf harvest zones and locations of wolf mortality). There was correspondingly little reduction of wolf populations in areas of marginal habitat where human-wolf conflicts are most likely to occur. Wisconsin's Greenfire at 8.

Of the reported 218 wolves killed during the February 2021 wolf hunt, 102 (47%) were female and 116 (53%) were male. Wolf Season Report at 3. While the Wisconsin DNR had claimed that most of the wolves harvested would not be adults, and therefore, collecting carcasses was not necessary, this was not true for the February 2021 wolf hunt. Thirty-nine percent of the wolves killed were adults, ages two and a half years or older (forty-seven male and thirty-eight female), and many other wolves were of breeding age (i.e., one year or older). Wolf Season Report at 7, T.4. Without carcass collection, however, it is impossible to determine exactly how many of these wolves were pregnant. Still, removal of this number of estimated pregnant females and adult males will more than likely result in 50 to 100 wolf packs failing to produce any pups this year. Wisconsin's Greenfire at 11-12; Treves, *Quantifying*, at 10.

Of course, the 218 wolves reported killed were not the only wolves that have died of human-caused mortality since the Delisting Rule became effective. In any hunting season, there are always unrecovered mortalities (e.g., a wolf that was shot and later succumbed to its wounds without being collected by the hunter), recovered mortalities caused by licensed hunters and trappers but are not reported, and illegal mortalities caused by non-licensed hunters and trappers. Danielle Kaeding, *Study Finds Hunters and Poachers Have Killed a Third of Wisconsin Wolves Since Delisting,* NPR (July 6, 2021), *available at* https://www.wpr.org/study-finds-hunters-and-poachers-have-killed-third-

15

wisconsin-wolves-delisting. Research published in a peer-reviewed journal recently concluded that approximately 100 wolves died as a result of human-caused mortality in addition to the 218 wolves that were harvested during the February wolf hunt. Treves, *Quantifying*, at 9 (estimating that 98 to 105 wolves have died since November 3, 2020, outside of the state-sanctioned wolf hunt, that would have been alive were it not for the delisting rule and noting that "cryptic poaching" has increased post-delisting). These losses, when combined with those reported by licensed hunters, represent around 313 to 323 wolves or up to 33% of the state's wolf population. The peer-reviewed study estimated the wolf population now comprises – *at most* -- 695 to 751 wolves across the state, a minimum 27-33% decline in less than one year. Treves, *Quantifying*, at 8.

Scientists believe it is unwise to hold another wolf hunt this fall. Yet the Wisconsin DNR has no discretion to prevent such a hunt, as it is mandated by Wisconsin law. Indeed, the Wisconsin NRB is just weeks away from proclaiming its new wolf hunting quota for the wolf season that will begin in November 2021.

## SUMMARY OF THE ARGUMENT

In 1973, Congress passed the Endangered Species Act ("ESA"), which is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153, 180 (1978). "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184. Section 4 of the ESA requires the USFWS to analyze five factors when determining whether to list a species as endangered or threatened: (a) The present or threatened destruction, modification, or curtailment of its habitat or range; (b) Overutilization for commercial, recreational, scientific, or educational purposes; (c) Disease or predation; (d) The inadequacy of existing regulatory mechanisms; or (e) Other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533(a)(1). A finding

that any one of these factors is met may support a listing decision. 50 C.F.R. § 424.11(c); *see also Seattle Audubon Soc'y v. Evans*, 852 F.2d 297, 302 (9th Cir. 1991) ("A species may . . . be listed simply because of 'the inadequacy of existing regulatory mechanisms' to protect it"). Delisting decisions (i.e., removing a species from protection as an endangered or threatened species) require consideration of the same five factors, and in this context, such a decision can only be upheld if none of these factors presents an ongoing threat to the species. 50 C.F.R. § 424.11(e).

The gray wolf's historic range once extended throughout most of the United States. Prior to listing under the ESA, the wolf was brought to the brink of extinction, with only small, remnant populations in northern Minnesota and on the isolated island of Isle Royale. Unlike many other species, the decline in the wolf population was not due to degradation of habitat; wolves are resilient and resourceful, and are able to survive in varied habitats, including in areas where there are significant human populations. Instead, wolves were nearly exterminated from the lower 48 states because they were hunted for recreation, commercial, and monetary purposes, often with the encouragement of state and federal laws.

The threat that existed at the time the wolf was listed remains today. While there were more than one thousand wolves in Wisconsin when the Delisting Rule became effective on January 4, 2021, after just a three-day wolf hunt, that number has now be reduced by at least one-third, and the State law mandates that another wolf hunt take place in November 2021. Officials on the Wisconsin NRB have repeatedly indicated that they plan to push the wolf population down to 350 animals, even though science no longer supports this figure. The Delisting Rule must be vacated to prevent

Ojibwe tribes in the State of Wisconsin, Minnesota, and the Upper Peninsula of Michigan[7] from suffering irreparable harm.

## ARGUMENT

### I.   WISCONSIN DOES NOT POSSESS ADEQUATE EXISTING REGULATORY PROTECTIONS AS REQUIRED FOR DELISTING UNDER THE ESA.

Section 4(a)(1)(D) of the ESA provides that federal safeguards for an endangered or threatened species cannot be removed if the state has "inadequa[te] existing regulatory mechanisms" to ensure the protection of the species. 16 U.S.C. § 1533(a)(1)(D). The plain language of this factor requires the state protective mechanism to be *existing*, not prospective, and to be *regulatory*, not voluntary or nonbinding. Sandra B. Zellmer et al., *Species Conservation & Recovery Through Adequate Regulatory Mechanisms*, 44 Harv. Envtl. L. Rev. 367, 367-68, 376 (2020) (noting that the USFWS "has a spotty . . . track record when it comes to assessing the adequacy of regulatory mechanisms and deploying them as a substitute for ESA protections"). The potential for relisting a species under either the ESA or a similar state statute is not an adequate regulatory mechanism. Indeed, reinitiating the listing process is expensive, political, and time-consuming, and not surprisingly, many species have gone extinct while waiting for federal or state protections. *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1029 (9th Cir. 2011) ("We reject out of hand any suggestion that future possibility of relisting a species can operate as a reasonable justification for delisting. Whatever comfort may be taken in relisting as a safety net, it is no answer to conclude that a species is not threatened simply because it can be relisted if it is threatened").

Additionally, the mere intention to manage a species in a certain way is not a regulatory mechanism under Section 4(a)(1)(D). *Center for Biological Diversity v. Morgenweck*, 351 F. Supp.

---

[7] Wolf populations in northern Minnesota, Wisconsin and the Upper Peninsula of Michigan are connected, and many of the *amici* possess treaty rights in more than one of these states.

2d 1137 (D. Colo. 2004) (holding that the USFWS improperly relied on actions described in conservation agreements with states to reject listing a fish species where the "Conservation Agreement does not legally bind the states to implement such actions"); *Oregon Natural Resources Council v. Daley*, 6 F. Supp. 2d 1139, 1155 (D. Or. 1998) (noting that to be considered a regulatory mechanism, there must be "some method of enforcing compliance"). For example, in *Save Our Springs v. Babbitt*, 27 F. Supp. 2d 739 (W.D. Tex. 1997), a federal district court found that a decision not to list the Barton Springs salamander was arbitrary and capricious, even though Texas had agreed to implement various conservation actions in the future. The court concluded that the USFWS "cannot use promises of proposed future actions as an excuse for not making a determination based on the existing record." *Id.* at 747. Similarly, this Court found that reliance on prospective measures set forth in a steelhead conservation agreement was "inconsistent with the aggressive preventive posture of the ESA," because "[t]here are no assurances that the measures will be carried out, when they will be carried out, nor whether they will be effective in eliminating the threats to the species." *Fed'n of Fly Fishers v. Daley*, 131 F. Supp. 2d 1158, 1165 (N.D. Cal. 2000).

Thus, for those species that were imperiled in the first instance by a lack of adequate legal protections to warrant delisting, there must be mandatory state regulatory structures, and those structures must be significant improvements over the structures that were in place at the time of listing. Additionally, the USFWS must also find that removing the ESA's protection will not place the species at risk again. Holly Doremus, *Delisting Under the ESA: An Aspirational Goal, Not a Realistic Expectation,* 30 Envt'l. L. Rep. 10,434, 10,446 (2000) (noting that the appropriate question is whether "the ESA [is] all that is preventing the species' downward spiral into extinction"); *see also* Federico Cheever, *The Rhetoric of Delisting Under the ESA:  How to Declare Victory Without Winning the War*, 31 Env't L. Rep. 11, 302, 11,306 (2001) (noting for the vast majority of species,

the belief that the ESA protections can be removed, and a species can still be kept from extinction is a fallacy).

Wisconsin does not have regulatory mechanisms that are adequate to protect the gray wolf. Wisconsin law – 2011 Wisconsin Act 169 – actually *mandates* a hunt be held each year unless the wolf is listed on the federal or state list of endangered species. Wis. Stat. § 29.185(1m). Following issuance of the Delisting Rule, the Wisconsin DNR and Wisconsin NRB both elected *not* to have a wolf hunt, and they were *forced* to open a hunting/trapping season by Wisconsin state courts under this very statutory scheme. *Hunter Nation Inc. et al. v. Wisconsin Dep't of Nat. Resources,* No. 2021AP256-LV, at *5 (Wis. Ct. App. Feb. 19, 2021). The only mandatory state structure that exists is a structure that could lead to the complete eradication of the wolf in Wisconsin.

The USFWS claims that Wisconsin law is adequate because the Wolf Management Plan requires the State maintain a population of 350 wolves. As an initial matter, there is nothing in Wisconsin law that precludes the wolf population from dipping below this population "goal." As noted above, Wisconsin law mandates wolf hunts every year unless the species is listed as endangered or threatened under federal or state law. There is no mechanism that allows wolves to be automatically listed as a state endangered species if its population drops below 350 wolves, *see* Wis. Stat. § 29.604, and federal courts have repeatedly held that the prospect of relisting a species is not a sufficient regulatory mechanism. *Servheen*, 665 F.3d at 1029.

And the prospect of the State's wolf population dipping below 350 wolves is not some remote, hypothetical threat. Wisconsin has a track record of being unable to develop a methodology that prevents it from exceeding its stated wolf harvest goals. *See, e.g.*, GLIFWC Comment Letter at 4-5 (noting that in 2014, Wisconsin authorized a wolf hunt with a quota of fifteen individuals in zone two but harvested nearly double that amount). Furthermore, Wisconsin law prevents its own wildlife

biologists from developing an effective system. For example, the statutory scheme *requires* the Wisconsin DNR to keep a hunting zone open to the public for at least 24 hours after it has publicly announced its closure, Wis. Stat. § 29.185(5)(c), encouraging licensed hunters to spend that time seeking to "bag a wolf" in what is already an over-harvested location. The statutory scheme *requires* the Wisconsin DNR to permit hunting wolves with the aid of dogs if the quota has not been reached by the end of the deer-gun season, and this is a highly efficient method not authorized by any other state. Wis. Stat. § 29.185(6)(a); Wisconsin's Greenfire at 7. Finally, the Wisconsin DNR does not have the final say in setting either the wolf quota itself, or the number of licenses to be offered to hunters to obtain that quota. Instead, the Wisconsin NRB, which is comprised of political appointees not required to have any scientific knowledge, makes these decisions. Wisconsin's Greenfire at 5.

The inadequacy of the State's regulatory mechanisms was highlighted by the February 2021 wolf hunt. The Wisconsin DNR claimed that it wanted to set a conservative quota that did not make an appreciable change to the current wolf population, while political appointees on the Wisconsin NRB explicitly stated the opposite – that they wanted to manage the wolf population to reduce it to only 350 wolves. In the end, the Wisconsin NRB made progress towards its goal by authorizing double the number of state licenses than had been proposed by the Wisconsin DNR; more than 1,500 wolf hunting and trapping licenses were issued, even though the entire wolf population was only estimated to contain 1,034 wolves. Although the Wisconsin DNR announced the closure of all wolf zones on the second day of the hunt, with this number of licensed hunters using the highly efficient method of hunting with the aid of dogs, the established quota was exceeded by 99 wolves, or 83%.

The Wisconsin DNR is now moving forward with the planning of the next wolf hunting and trapping season to begin in November 2021. It is doing so despite the lack of current, verifiable numbers for the wolf population in the state. The last wolf count occurred in the winter of 2020, prior

to the February 2021 hunt. Wisconsin's Greenfire at 3. In fact, a recent peer-reviewed study estimates that the wolf population has declined dramatically, and that between 50 and 100 wolf packs within the State were prevented from successfully producing wolf pups due to the ill-timed hunt in the middle of breeding season. Wisconsin's Greenfire at 11-12; Treves, *Quantifying*, at 10.

None of the features of 2011 Wisconsin Act 169 are discussed in the Delisting Rule, and the USFWS made no attempt to explain how Wisconsin's law mandating a wolf hunt to occur annually provides evidence of adequate regulatory mechanisms to secure the wolf population in the State. The Delisting Rule must be vacated.

## II.   THE TRIBES WILL SUFFER IRREPARABLE HARM IF THE DELISTING RULE IS NOT VACATED.

The traditional four-part test for injunctive relief does not apply in ESA cases. Courts do not have discretion to balance the parties' competing interests because Congress has established an "unparalleled public interest" in preserving endangered species. *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090 (2015); *Hill*, 437 U.S. at 194 ("Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities"). Additionally, the incalculability of the injury renders money damages inadequate, even if they were available. *Cottonwood*, 789 F.3d at 1090; *Lane v. Pena,* 518 U.S. 187, 192-93 (1996) (holding that absent an unequivocal waiver, the federal government has sovereign immunity against lawsuits or monetary claims). Thus, the language, history, and structure of the ESA removes three of the four factors in the court's traditional test for injunctive relief. *Cottonwood*, 789 F.3d at 1090.

Irreparable harm is the only element that remains. When seeking preliminary or permanent injunctive relief, the plaintiff must demonstrate they are likely to or have suffered irreparable harm. *Winter v. National Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008). But "[i]n light of the

stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them, establishing irreparable injury should not be an onerous task for plaintiffs." *Cottonwood*, 789 F.3d at 1090. Imminent future harm is grounds for injunctive relief in ESA cases. *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1064 (9th Cir. 1996) ("In this Circuit, we have repeatedly held that an imminent threat of future harm is sufficient for the issuance of an injunction under the ESA."); *see also*: *Palila v. Hawaii Dep't of Land and Nat. Res.,* 852 F.2d 1106, 1108 (9th Cir. 1988) (habitat destruction that can result in future extinction falls within definition of harm); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 787-88 (9th Cir. 2005) (affirming a preliminary injunction requiring the U.S. to ensure spill gates of dams were operating to minimize high mortality rates of migrating salmon).

Irreparable harm results from the deaths of individual animals – even if the species as a whole is not at risk – where, for example, the plaintiffs have established an affinity for, or an aesthetic interest in, the individual animals at issue. *Idaho Rivers United v. U.S. Army Corps of Engineers*, 156 F. Supp. 3d 1252 (W.D. Wash. 2015); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 220-21 (D. D.C. 2003); *Fund for Animals v. Espy,* 814 F. Supp. 142, 151 (1993); *Fund for Animals v. Clark,* 27 F. Supp. 2d 8, 14-15 (D. D.C. 1998). Likewise, in *Wishtoyo Foundation v. United Water Conservation District,* No. CV 16-3869-DOC (PLAx), 2018 WL 6265099 (C.D. Cal. Sept. 23, 2018)*,* the U.S. District Court for the Central District of California granted injunctive relief to the plaintiffs, who sought to protect a species of steelhead in the Santa Clara River. *Id.* at *77. The court concluded that plaintiff's interest in preserving the species for "cultural practices, ancestral connections, and aesthetic enjoyment" were sufficient to show irreparable harm. *Id.* at *66. The *amici* tribes have and will suffer a similar injury as the plaintiffs in *Wishtoyo.* Just as steelhead are integral to Chumash tradition, ma'iingan are integral to Ojibwe tradition. The tribes have a cultural, ancestral, and spiritual

23

relationship with wolves. Edward Benton-Banai, *The Mishomis Book: The Voice of the Ojibway* 8 (2d ed. 2010). The death of even a single additional ma'iingan will inflict irreparable harm to the Tribes, harm that cannot be remedied.

The *amici* Tribes are also irreparably harmed by the delisting of the wolf, which has paved the way for Wisconsin to reduce the State's wolf population to 350 or fewer wolves, because it is the very presence of the wolf enables the ceded territory's ecosystem to remain healthy. Ma'iingan help control the deer population, which in turn reduces overgrazing and protects rivers and streams. Curt Meine et al., *Early Wolf Research and Conservation in the Great Lakes Region, Recovery of Gray Wolves in the Great Lakes Region of the United States* 6-7 (Jan. 2009). When the deer population is less dense, there is less likelihood that CWD will spread into the ceded territory, and in fact, wolves are known to prey on weak and diseased deer. Significant reductions in the State wolf population in the ceded territory not only impacts the future of that species, but also the resources that the Ojibwe rely on to sustain their traditional way of life: resources that have been guaranteed by the United States through treaties with these same tribes. Ojibwe teachings promise that the fate of the wolf and the Ojibwe are intertwined. Both will be irreparably harmed if the Delisting Rule is not vacated.

**CONCLUSION**

For the foregoing reasons, the Court should vacate the Delisting Rule.

DATED this 23rd day of July, 2021.

Respectfully submitted,

/s/ *Colette Routel*
Colette Routel, (MN#0313336)
*Appearing Pro Hac Vice*
Mitchell Hamline School of Law
875 Summit Avenue
Saint Paul, MN 55105
(651) 290-6327
colette.routel@mitchellhamline.edu

Deborah A. Sivas, (CA#135446)
Stanford Law School
559 Nathan Abbott Way
Rm. N120, Neukom Building
Stanford, CA 94305
(650) 723-0325
dsivas@stanford.edu

*Counsel for Amici Tribes:*
*Red Cliff Band of Lake Superior Chippewa Indians,*
*Lac Courte Oreilles Band of Lake Superior Chippewa*
*Indians, Lac du Flambeau Band of Lake Superior*
*Chippewa Indians, Bay Mills Indian Community, Lac*
*Vieux Desert Band of Lake Superior Chippewa*
*Indians, Keweenaw Bay Indian Community, St. Croix*
*Chippewa Indians of Wisconsin, Sokaogon Chippewa*
*Community, Fond du Lac Band of Lake Superior*
*Chippewa, and the Mille Lacs Band of Ojibwe*