Stanford H. Atwood, Jr., CA Bar No. 37362
Atwood & Associates
750 University Avenue, Suite 130
Los Gatos, California 95032
Tel:    408-395-5503
Fax:    408-395-5519
stanford@atwoodlaw.net

Michael T. Jean, MI Bar No. P76010*
Hadan W Hatch, UT Bar No. 17671*
National Rifle Association of America
11250 Waples Mill Road
Fairfax, Virginia 22030
Tel:  703-267-1161
mjean@nrahq.org
hhatch@nrahq.org

Jeremy E. Clare, D.C. Bar No. 1015688*
Regina Lennox, D.C. Bar No. 1671299*
Safari Club International
501 2nd Street N.E.
Washington, D.C. 20002
Tel:  202-543-8733
jclare@safariclub.org
rlennox@safariclub.org

*Attorneys for Defendant-Intervenors*
*National Rifle Association of America and*
*Safari Club International*
*Appearing pro hac vice*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| DEFENDERS OF WILDLIFE, *et al.*, | Case No. 4:21-cv-344-JSW |
| | 4:21-cv-349-JSW |
| Plaintiffs, | 4:21-cv-561-JSW |
| vs. | **NATIONAL RIFLE ASSOCIATION OF** |
| | **AMERICA AND SAFARI CLUB** |
| U.S. FISH AND WILDLIFE SERVICE, *et al.*, | **INTERNATIONAL'S NOTICE OF** |
| | **MOTION AND CROSS-MOTION FOR** |
| Defendants, and | **SUMMARY JUDGMENT,** |

NRA and SCI Notice of Motion and Cross-Motion for Summary Judgment, Case No. 4:21-cv-
344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

1

1

NATIONAL RIFLE ASSOCIATION OF
AMERICA and SAFARI CLUB
INTERNATIONAL,

2

3

        Defendant-Intervenors.

4

_____

5

WILDEARTH GUARDIANS, *et al.*,

6

        Plaintiffs,

7

                vs.

8

DEBRA HAALAND, *et al.*,

9

        Defendants, and

10

NATIONAL RIFLE ASSOCIATION OF
AMERICA and SAFARI CLUB
INTERNATIONAL,

11

12

        Defendant-Intervenors.

13

_____

14

NATURAL RESOURCES DEFENSE
COUNCIL, INC.,

15

        Plaintiff,

16

                vs.

17

18

UNITED STATES DEPARTMENT OF THE
INTERIOR, *et al.*,

19

        Defendants, and

20

NATIONAL RIFLE ASSOCIATION OF
AMERICA and SAFARI CLUB
INTERNATIONAL,

21

22

        Defendant-Intervenors.

23

_____

24

25

26

27

28

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF CROSS-
MOTION FOR SUMMARY JUDGMENT,
and OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

**Hearing Date:** November 12, 2021
**Hearing Time:** 9:00 A.M.
**Courtroom**: 5
**Judge:** Hon. Jeffery S. White

NRA and SCI Notice of Motion and Cross-Motion for Summary Judgment, Case No. 4:21-cv-
344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

2

**NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 12, 2021, or as soon thereafter as counsel may be heard by the Honorable Jeffrey S. White, at Courtroom 5, 2d Floor, Oakland Federal Courthouse, 1301 Clay Street, Oakland, California 94612, the National Rifle Association of America and Safari Club International, through this Notice and the attached documents, will and hereby do respectfully move the Court for summary judgment in favor of Federal Defendants and Defendant-Intervenors.

As explained in the attached Memorandum of Points and Authorities, Federal Defendants and Defendant-Intervenors are entitled to summary judgment because Plaintiffs Defenders of Wildlife *et al.*, WildEarth Guardians *et al.*, and Natural Resources Defense Council's joint arguments fail as a matter of fact and law. Defendant-Intervenors respectfully request that the Court deny Plaintiffs' motion for summary judgment and find in favor of Federal Defendants and Defendant-Intervenors on all claims.

Dated this 27th day of August, 2021.

/s/ Jeremy Clare
Jeremy Clare

NRA and SCI Notice of Motion and Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

3

## MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... ii

STATEMENT OF THE ISSUES TO BE DECIDED ................................................... 1

STATEMENT OF FACTS ............................................................................................ 1

STANDARD OF REVIEW ........................................................................................... 4

ARGUMENT ................................................................................................................. 5

    I.    The FWS lawfully delisted the wolves in compliance with the ESA. ...................... 5

        A.   The FWS properly determined that the listed gray wolf entities are not species. ........................................................................................................... 7

        B.   The Delisting Rule is consistent with the 1978 Listing Rule and long-term recovery plans. ......................................................................................... 9

        C.   The FWS properly applied the ESA delisting factors in its analysis and correctly determined that gray wolves are no longer an endangered or threatened species. ....................................................................................... 13

        D.   The FWS properly concluded that existing regulatory mechanisms are more than adequate to ensure the persistence of healthy gray wolf populations.... 17

            1.   The FWS fully analyzed and correctly found that regulated hunting in the Great Lakes states does not pose a threat to gray wolves. ........ 18

            2.   The Delisting Rule's analysis of regulatory mechanisms for the West Coast and central Rocky Mountains wolves is legally and factually supported and complies with the APA. ............................ 24

    II.   Vacatur of the Delisting Rule is not the proper remedy. ........................................ 28

CONCLUSION ............................................................................................................ 32

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

i

# TABLE OF AUTHORITIES

**Cases**

All. for the Wild Rockies v. Salazar,
    672 F.3d 1170 (9th Cir. 2012)...................................................................... 4

Aluminum Co. v. Bonneville Power Admin.,
    175 F.3d 1156, 1162 (9th Cir. 1999)............................................................ 23

Bldg. Indus. Ass'n of Superior Cal. v. Norton,
    237 F.3d 1241 (9th Cir. 2001)............................................................ 7, 8, 15

Cascadia Wildlands v. Thraikill,
    49 F.Supp.3d 774 (D. Or. 2014)................................................................ 13

Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,
    467 U.S. 837 (1984) ........................................................................... 13, 17

Conservation Cong. v. Finley,
    774 F.3d 611 (9th Cir. 2014)...................................................................... 7

Conservation Cong. v. George,
    2015 WL 2157274 (N.D. Cal. 2015)......................................................... 12

Ctr. for Bio. Diversity v. FWS,
    402 F. Supp. 2d 1198 (D. Or. 2005), *aff'd in part, rev'd in part on other grounds,*
    274 F. App'x 542 (9th Cir. 2008)......................................................... 25, 28

Ctr. for Bio. Diversity v. FWS,
    807 F.3d 1031 (9th Cir. 2015)............................................................ 11, 15

Defs. of Wildlife v. Norton,
    258 F.3d 1136 (9th Cir. 2001).................................................................. 31

Defs. of Wildlife v. Salazar,
    729 F. Supp. 2d 1207 (D. Mont. 2010) ..................................................... 4

Defs. of Wildlife v. Sec'y, U.S. Dep't of the Interior,
    354 F. Supp. 2d 1156 (D. Or. 2005)........................................................... 3

Defs. of Wildlife v. Zinke,
    849 F.3d 1077 (D.C. Cir. 2017). .......................................................... 4, 24

Friends of Blackwater v. Salazar,
    691 F.3d 428 (D.C. Cir. 2012) ............................................................ 13, 28

Friends of Santa Clara River v. U.S. Army Corps of Eng'rs,
    887 F.3d 906, (9th Cir. 2018).......................................................... passim

Greater Yellowstone Coal., Inc. v. Servheen,
    665 F.3d 1015 (9th Cir. 2011)............................................................ 24, 28

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

ii

Humane Soc'y of the U.S. v. Jewell,
  76 F. Supp. 3d 69 (D.D.C. 2014) ................................................................... 3

Humane Soc'y of the U.S. v. Kempthorne,
  579 F. Supp. 2d 7 (D.D.C. 2008) .................................................................. 3

Humane Soc'y of the U.S. v. Salazar,
  1:09-cv-1092 (D.D.C.) ................................................................................. 3

Humane Soc'y of the U.S. v. Zinke,
  865 F.3d 585 (D.C. Cir. 2017) .......................................................... passim

Kandra v. United States,
  145 F. Supp. 2d 1192 (D. Or. 2001)...................................................... 14, 23

Kern Cnty. Farm Bureau v. Allen,
  450 F.3d 1072 (9th Cir. 2006)........................................................... passim

Marsh v. Or. Natural Res. Council,
  490 U.S. 360 (1989) ..................................................................................... 5

N.M. Cattle Growers Ass'n v. FWS,
  No. 98-CV-367, 1999 WL 34797509, *20 (D.N.M. Oct. 28, 1999)................................ 23

N.W. Motorcycle Ass'n v. U.S. Dept. of Agric.,
  18 F.3d 1468 (9th Cir. 1994)......................................................................... 4

Nat'l Ass'n of Home Builders v. Defs. of Wildlife,
  551 U.S. 644 (2007) ..................................................................................... 5

Nat'l Wildlife Fed'n v. Norton,
  386 F. Supp. 2d 553 (D. Vt. 2005)........................................................... 3, 13

Pollinator Stewardship Council v. U.S. EPA,
  806 F.3d 520 (9th Cir. 2015).......................................................................... 28

San Luis & Delta-Mendota Water Auth. v. Locke,
  776 F.3d 971 (9th Cir. 2014)...................................................... 7, 8, 15, 16

United States v. Carlo Bianchi & Co.,
  373 U.S. 709 (1963) ................................................................................... 22

Ventana Wilderness All. v. Bradford,
  313 F. App'x 944 (9th Cir. 2009)................................................................ 22

W. Watersheds Project v. Kraayenbrink,
  632 F.3d 472 (9th Cir. 2011)......................................................................... 5

WildEarth Guardians v. Jeffries,
  370 F. Supp. 3d 1208 (D. Or. 2019)............................................................ 27

**Statutes**

5 U.S.C. § 706 ................................................................................................ 4

16 U.S.C. § 1531(b)....................................................................................... 5

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

16 U.S.C. § 1532(3) .................................................................................. 6
16 U.S.C. § 1532(6) ........................................................................ 6, 16, 31
16 U.S.C. § 1532(16) ...................................................................... 3, 6, 32
16 U.S.C. § 1532(20) ........................................................................... 6, 31
16 U.S.C. § 1533(a)(1) ................................................................... passim
16 U.S.C.§ 1533(b)(1)(A) .................................................................. 7, 13
16 U.S.C. § 1533(c)(1) ............................................................................ 31
16 U.S.C. § 1533(c)(2)(B)(i) ..................................................................... 7
16 U.S.C. § 1533(f) ............................................................................ 9, 12
Mich. Comp. Laws § 324.40113a(2) ...................................................... 20
Minn. Stat. Ann. § 84.027 ....................................................................... 20
Minn. Stat. Ann. § 97A.045 ..................................................................... 20
Wisc. Stat. Ann. § 29.014 ........................................................................ 20
Wisc. Stat. Ann. § 29.185(1)(m) .............................................................. 20

**Rules**

39 Fed. Reg. 1171 (Jan. 4, 1974) ............................................................... 2
42 Fed. Reg. 29527 (June 9, 1977) .......................................................... 10
43 Fed. Reg. 9607 (Mar. 9, 1978) ..................................................... 2, 9, 12
74 Fed. Reg. 15070 (Apr. 2, 2009) ....................................................... 3, 4
74 Fed. Reg. 15123 (Apr. 2, 2009) ........................................................... 4
76 Fed. Reg. 81666 (Dec. 28, 2011) .......................................................... 3
84 Fed. Reg. 9648 (Mar. 15, 2019) ............................................................ 4
85 Fed. Reg. 69778 (Nov. 3, 2020) ................................................... passim

**Regulations**

50 C.F.R. § 424.11(a) ............................................................................... 6
50 C.F.R. § 424.11(c) ............................................................................... 6
50 C.F.R. § 424.11(e) ............................................................................... 7
50 C.F.R. § 424.11(e)(2) ........................................................................... 7

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

iv

Defendant-Intervenors National Rifle Association of America ("NRA") and Safari Club International ("SCI") submit this Memorandum of Points and Authorities in opposition to Plaintiffs Defenders of Wildlife *et al.*, WildEarth Guardians *et al.*, and Natural Resources Defense Council's joint motion for summary judgment ("Pls. Br."), Dkt. 74,[1] and in support of NRA and SCI's cross-motion for summary judgment.  Pursuant to this Court's May 3, 2021 Order, Dkt. 39, NRA and SCI endeavor to avoid duplicative briefing of matters already covered in Federal Defendants' briefing ("Feds. Br."), Dkt. 107.

## STATEMENT OF THE ISSUES TO BE DECIDED

1. Whether the U.S. Fish and Wildlife Service ("FWS") properly determined that the gray wolf entities at issue are not "species" under the Endangered Species Act ("ESA")?

2. Whether the FWS reasonably concluded that the gray wolf entities at issue are no longer endangered or threatened, as defined by the ESA; and specifically, whether the wolves have met recovery objectives, whether the FWS reasonably determined that adequate regulatory mechanisms exist for post-delisting wolf management, and whether the FWS relied on the best scientific and commercial data available in reaching its conclusions?

3. Whether remand without vacatur is proper if the Court finds a deficiency in the FWS's analysis of West Coast and central Rocky Mountains wolves, given that the Great Lakes area wolves are recovered?

## STATEMENT OF FACTS

The gray wolf (*Canis lupus*) in the United States is an Endangered Species Act ("ESA") success story.[2]  Gray wolves were nearly eradicated during the 19th and early- to mid-20th centuries as a result of human persecution and government-funded wolf-extermination efforts. AR_0000048.  Only about 1,040 gray wolves remained south of the Canadian border in

---

[1] Unless otherwise noted, all docket citations are to entries in Case No. 4:21-cv-344-JSW.

[2] U.S. Fish and Wildlife Service, Press Release (Oct. 29, 2020), https://www.fws.gov/news/ShowNews.cfm?ref=trump-administration-returns-management-and-protection-of-gray-wolves-to-&_ID=36801.

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

1

Minnesota and Isle Royale, Michigan, when the subspecies was first listed in 1974.  *Id.*; 39 Fed. Reg. 1171 (Jan. 4, 1974).  In 1978, the U.S. Fish and Wildlife Service ("Service") reclassified gray wolves in the lower 48 U.S. states as endangered, except in Minnesota, where gray wolves were listed as threatened because they had increased to over 1,200.  AR_0000048; 43 Fed. Reg. 9607 (Mar. 9, 1978) ("1978 Listing Rule").  The 1978 Listing Rule recognized three non-extinct subspecies and location combinations of gray wolves: "the Mexican wolf (*Canis lupus baileyi*), of Mexico and the southwestern United States; the northern Rocky Mountain wolf (*C.1. irremotus*), possibly still found in parts of Wyoming, Montana, and Idaho; [and] the eastern timber wolf (*C.1. lycaon*), now restricted to the northern Great Lakes region."  43 Fed. Reg. at 9607.  But the FWS chose to list the gray wolf species across the lower 48 states because the FWS "consider[ed] that this matter [could] be handled most conveniently by listing only the species name."  *See id.*  Despite the lower-48-wide listing, the 1978 Listing Rule gave assurances that the "biological subspecies would continue to be maintained and dealt with as separate entities."  *Id.* at 9609.

The FWS and its state, tribal, and local partners invested heavily in recovery of gray wolf populations in the Great Lakes states of Michigan, Minnesota, and Wisconsin.  *See, e.g.*, AR_0044456.  Similarly, the FWS and its state, tribal, and local partners implemented a recovery plan in the Northern Rocky Mountains ("NRM") states of Idaho, Montana, and Wyoming[3]— including the release and reintroduction of gray wolves into portions of the NRM.  *See, e.g.*, AR_0042855.  These efforts paid off.  By the late-1990s, the Great Lakes wolf populations had far exceeded recovery plan criteria.  AR_0000051.  The NRM wolf populations were not far behind and exceeded recovery goals by 2002.  AR_0000052.[4]

---

[3] The NRM also includes the eastern one-third of each of Washington and Oregon and a small part of north-central Utah.

[4] The third region, the Southwestern United States, is populated by the Mexican wolf subspecies, AR_0000047, and remains listed, AR_0000153.

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

Based on these successes, the FWS previously has sought to reduce or remove ESA protections for these wolves.  The FWS first reclassified populations of wolves from endangered to threatened in a 2003 rule, which was vacated by two district courts.  AR_0000041, Table 1.  In these cases, much of the courts' respective decisions turned on the FWS's attempt to create and downlist various "distinct population segments" ("DPS").[5]  *See Defs. of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156, 1170–72 (D. Or. 2005); *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 564–65 (D. Vt. 2005).

In 2007, 2009, and 2011, the FWS tried to delist the Great Lakes wolves.  AR_0000041, Table 1.  The 2007 rule was challenged by a number of groups.  The "central issue" before the court was FWS' use of the DPS policy to designate and delist a segment of gray wolves at the same time, which the court found impermissible.  *Humane Soc'y of the U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 11–12 (D.D.C. 2008).  The FWS sought to incorporate the court's reasoning into the 2009 rule delisting the Great Lakes wolves.  74 Fed. Reg. 15070 (Apr. 2, 2009).  But that rule was vacated by settlement, due to the FWS' failure to afford public notice and comment.  *Humane Soc'y of the U.S. v. Salazar*, 1:09-cv-1092 (D.D.C.).

In 2011, the FWS finalized another rule to remove the Great Lakes wolves from the ESA lists of endangered and threatened species.  76 Fed. Reg. 81666 (Dec. 28, 2011).  That rule was also vacated, largely based on the court's ruling that the ESA prevents the FWS from simultaneously designating and delisting a DPS.  *Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 113 (D.D.C. 2014).  On appeal, however, the D.C. Circuit reversed the district court and held that the ESA *allows* the FWS to designate and delist a DPS.  *Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585, 597 (D.C. Cir. 2017).  But the D.C. Circuit ultimately affirmed vacatur of

---

[5] Under the ESA, the term "species" "includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  16 U.S.C. § 1532(16).  The FWS considers three elements regarding the status of a possible DPS: (1) "discreteness of the population segment"; (2) the "significance of the population segment"; and (3) the "population segment's conservation status."  61 Fed. Reg. 4722, 4725 (Feb. 7, 1996).

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

the 2011 rule on the ground that the FWS failed to consider the implications of the delisting on wolves outside of the Great Lakes area.  *Id.* at 602.

In 2009, the FWS removed NRM wolf populations in Idaho, Montana, and portions of Oregon, Washington, and Utah from the ESA list.  74 Fed. Reg. 15123 (April 2, 2009); *see also* AR_0000041, Table 1.  Although a district court held that the FWS could not delist a subset of the gray wolf species, *see Defs. of Wildlife v. Salazar,* 729 F. Supp. 2d 1207 (D. Mont. 2010), Congress legislatively overturned that ruling and reinstated the delisting.  AR_0000041, Table 1.  That legislation was challenged and upheld by the Ninth Circuit.  *All. for the Wild Rockies v. Salazar*, 672 F.3d 1170 (9th Cir. 2012).  Accordingly, the Ninth Circuit vacated the district court's order in *Defenders of Wildlife v. Salazar*.  In 2011, the FWS also delisted the NRM wolf population in Wyoming.  The D.C. Circuit upheld that rule in 2017.  AR_0000041, Table 1; *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1093 (D.C. Cir. 2017).

On March 15, 2019, the FWS proposed to remove ESA protections for all remaining gray wolves (except Mexican wolves).  AR_0020097.  Unlike the prior rules, the proposal did not create any distinct population segments, but incorporated an across-the-board treatment of gray wolves in the lower 48 states.  On November 3, 2020, the FWS published the final rule removing the gray wolf, except Mexican wolves, from the ESA lists of threatened and endangered species ("Delisting Rule").  AR_0000038.  The Delisting Rule went into effect on January 4, 2021.  *Id.*

Plaintiffs sued the FWS and other Federal Defendants after the Delisting Rule went into effect.  Plaintiffs claim the delisting violates the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"), and the ESA.

## STANDARD OF REVIEW

Summary judgment motions are the appropriate mechanism for reviewing agency actions.  *E.g.*, *N.W. Motorcycle Ass'n v. U.S. Dept. of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994).

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

4

Courts review ESA claims under the APA's arbitrary and capricious standard. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011). This review is deferential to the agency determination. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007). The court's "proper role is simply to ensure that the agency made no clear error of judgment that would render its action arbitrary and capricious, [which] require[s] only a rational connection between facts found and conclusions made by the defendant agencies." *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 920–21 (9th Cir. 2018) (citations and quotations omitted). Accordingly, the court may not substitute its judgment for that of the agency. *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006). The agency's decision will not be vacated "unless the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Friends of Santa Clara River*, 887 F.3d at 921 (citations and quotations omitted).

The court must be "most deferential when the agency is making predictions within, its area of special expertise, at the frontiers of science" under the ESA, as is the case here. *Id.* (citations and quotations omitted). Moreover, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

## ARGUMENT

### I.   The FWS lawfully delisted the wolves in compliance with the ESA.

The Delisting Rule correctly interprets and applies the ESA and its five factors for listing or delisting. The purpose of the ESA is to "conserve" species. 16 U.S.C. § 1531(b). To "conserve" means "the use of all methods and procedures which are necessary to bring any

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

5

1    endangered species or threatened species *to the point at which the measures provided pursuant to*

2    *this chapter are no longer necessary*."  16 U.S.C. § 1532(3) (emphasis added).  Therefore, the

3    end goal of the ESA is to recover the species to where protections are no longer needed and the

4    species can be delisted.

5    The first step in implementing the ESA is identifying a species.  This is a technical

6    finding left to the discretion of the Secretary of the Interior (and by designation, the FWS).  16

7    U.S.C. § 1533(a)(1) ("The Secretary shall by regulation promulgated in accordance with

8    subsection (b) determine whether any species is an endangered species or a threatened species

9    …").  The ESA defines "species" as "any subspecies of fish or wildlife or plants, and any distinct

10   population segment of any species of vertebrate fish or wildlife which interbreeds when mature."

11   *Id.* § 1532(16).  When making a "species" determination, the FWS "shall rely on standard

12   taxonomic distinctions and the biological expertise of the [FWS] and the scientific community

13   concerning the relevant taxonomic group."  50 C.F.R. § 424.11(a).

14   The next step in a listing or delisting is to determine if the species is threatened or

15   endangered[6] based on five factors:

> (A) the present or threatened destruction, modification, or curtailment of its
>       habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational
>       purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

16

17

18

19

20

21   16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(c).  Again, this is a technical conclusion by the

22   Secretary/FWS.  The FWS makes the decision "solely on the basis of the best scientific and

23

24   _____

25   [6] An "endangered" species is "in danger of extinction throughout all or a significant portion of its
     range."  16 U.S.C. § 1532(6).  A "threatened" species "is likely to become an endangered species
26   within the foreseeable future throughout all or a significant portion of its range," 16 U.S.C.
     § 1532(20).

27   NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-
28   344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

commercial data available," and after "taking into account" efforts being made by state and foreign powers to protect the species.  16 U.S.C. § 1533(b)(1)(A).

The ESA also requires the FWS to review all endangered and threatened species listings periodically and determine whether any species should be removed from the lists.  16 U.S.C. § 1533(c)(2)(B)(i).  The FWS "shall delist a species if the Secretary finds that … [t]he species does not meet the definition of an endangered species or a threatened species."  50 C.F.R. § 424.11(e)(2).  "In making such a determination, the Secretary shall consider" the same five factors identified by the statute.  *Id*. § 424.11(c) & (e)(2); 16 U.S.C. § 1533(a)(1).

A delisting decision must also be "based on the best scientific and commercial data available."  50 C.F.R. § 424.11(e).  "The determination of what constitutes the best scientific data available belongs to the agency's special expertise and warrants substantial deference." *Friends of Santa Clara River*, 887 F.3d at 924 (citations and quotations omitted).  "The best available data requirement merely prohibits [FWS] from disregarding available scientific evidence that is in some way better than the evidence it relies on."  *Kern Cnty.*, 450 F.3d at 1080 (citation and quotations omitted).  The Court cannot "'substitute [its] judgment for the agency's in determining which scientific data to credit, so long as the conclusion is supported by adequate and reliable data.'"  *Friends of Santa Clara River*, 887 F.3d at 921 (quoting *Conservation Cong. v. Finley*, 774 F.3d 611, 620 (9th Cir. 2014)).  Where plaintiffs "have pointed to no data that was omitted from consideration," the court must defer to the agency's data as the best scientific data available.  *Bldg. Indus. Ass'n of Superior Cal. v. Norton*, 237 F.3d 1241, 1246–47 (9th Cir. 2001); *accord San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) ("what constitutes the best scientific and commercial data available is itself a scientific determination deserving of deference").

### A.  The FWS properly determined that the listed gray wolf entities are not species.

The FWS fulfilled its obligations under the ESA by delisting gray wolves.  The FWS determined first that the currently listed gray wolf entities do not meet the statutory definition of

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

7

a "species" which, as Federal Defendants highlight, is sufficient to end this analysis.  Feds Br. at 16–27; *see also* AR_0000043–44.  NRA and SCI agree and incorporate Federal Defendants' argument through reference.  That the FWS went even further in the Delisting Rule and analyzed the status of gray wolves throughout the lower 48 states, does not undermine the FWS' initial determination that the entities are not a "species" as defined by the ESA.  AR_0000043–44, AR_0000153.  The FWS is owed significant deference in this analysis because it is acting upon decades of its special expertise.  *Friends of Santa Clara River*, 887 F.3d at 921.

The FWS determined that these two listed entities do not meet the definition of a "species" on the basis of the best available scientific and commercial information regarding a species' status.  The FWS examined their own previous designations of the species, their previously published rules (both successful and unsuccessful), and numerous other studies.  *See, e.g.*, AR_0000041 (list of federal regulatory actions concerning gray wolves); AR_0000043–44 (various studies pertaining to the lack of barriers separating the entities, genetic similarities between the entities, etc.).  They also examined the taxonomy of the gray wolf and how current scholars view these classifications.  *See, e.g.*, AR_0000047 ("Taxonomy of Gray Wolves in North America").  Having relied upon the "best scientific and commercial data available," the FWS properly fulfilled its statutory duty to delist the listed gray wolf entities because they do not meet the definition of a "species" under the ESA.  This is a biological finding, not a legal one.  16 U.S.C. § 1533(a)(1).  Accordingly, even if the Court disagrees with the FWS' conclusion, the Court owes appropriate deference, because the FWS made this determination within its special expertise.  *Friends of Santa Clara River*, 887 F.3d at 921.

Notably, Plaintiffs do not challenge this aspect of the Delisting Rule.  *See* Feds Br. at 16. In light of Plaintiffs' failure to challenge the FWS' determination or to point to better data omitted from consideration, the FWS' scientific determination should be affirmed.  *Bldg. Indus. Ass'n*, 237 F.3d at 1246–47; *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 995.

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

8

### B. The Delisting Rule is consistent with the 1978 Listing Rule and long-term recovery plans.

The FWS' successful recovery and delisting of the gray wolves are consistent with the 1978 Listing Rule and recovery plans, which never sought to recover gray wolves throughout its historical range in the lower 48 states.  Rather, both the 1978 Listing Rule and the recovery plans focus on recovering separate populations of gray wolves in certain areas of the United States.  *See, e.g.*, 43 Fed. Reg. at 9609 (giving assurances that the "biological subspecies would continue to be maintained and dealt with as separate entities").

The ESA requires the FWS to develop recovery plans for listed species, unless such plans will not promote conservation of the species.  16 U.S.C. § 1533(f).  After adopting the 1978 Listing Rule, the FWS developed three recovery plans for gray wolves, each corresponding to recovery efforts for a particular subspecies/location of gray wolves.  *See* AR_0000041.  The Recovery Plan for the Eastern Timber Wolf ("Timber Wolf Recovery Plan") was developed in 1978 and revised in 1992.  AR_0044456.  The Northern Rocky Mountain Gray Wolf Recovery Plan ("NRM Recovery Plan") was developed in 1980 and revised in 1987.  AR_0044038.  The Mexican Wolf Recovery Plan was developed in 1982 and revised in 2017.  AR_0025842.

Relevant to this litigation, the Timber Wolf Recovery Plan's "basic approach … is, and has always been, to try to ensure that there be at least two viable populations of wolves within the historic range in the United States."  AR_0044480.  The plan focuses on recovering wolves in the Great Lakes area—unsurprisingly, since the Great Lakes area represented the wolves' remaining habitat in the lower 48 states at the time of the 1978 listing.  In Minnesota, the plan contemplates a recovery objective of 1251 to 1400 wolves, which would "assure" survival of Minnesota's wolf population.  AR_0044482, AR_0044484.  The second viable population, for which "Wisconsin/Michigan" was recognized as a possible area, would consist of at least 100 wolves over a period of five consecutive years, if within 100 miles of Minnesota.  AR_0044481–

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

9

82.[7]  The Timber Wolf Recovery Plan suggests 80 wolves in Wisconsin and 80 to 90 wolves in Michigan as sufficient for the second viable population.  AR_0044484.  In total, the "Planning Goals for Lake States" were set at 1411 to 1570 wolves.  *Id.*  These recovery objectives (and the entire plan) were developed by the Eastern Timber Wolf Recovery Team, which consisted of representatives from the FWS, U.S. Forest Service, National Park Service, Minnesota Department of Natural Resources, Michigan Department of Natural Resources, and Idaho Fish and Game.  *See* 42 Fed. Reg. 29527, 29528 (June 9, 1977).  The Timber Wolf Recovery Plan "was subjected to a lengthy review process and then was revised by the team."  *Id.*

Gray wolves in the Great Lakes area have greatly exceeded recovery objectives for decades.  By 1989, the *minimum* estimate for Minnesota's wolf population was 1,500 wolves.  By 1998, the population had grown to approximately 2,445 wolves in about 285 packs.  By 2004, 3,020 and 485 packs were estimated in Minnesota.  Annual surveys conducted since 2012 have indicated that there been "no statistically significant change in Minnesota's wolf population since 1998"—the state's wolf population is holding steady, roughly between 2,200 and 2,600 wolves.  AR_0000417.  This includes the three-year period when wolf hunts were held in Minnesota from 2012–2014.  *Id.*  Wolf range in Minnesota has likewise expanded by "nearly 300% (from approximately 38,850 sq km … to approximately 111,860 sq km) since the 1970s."  AR_0000418.  "Over the past 15 or more years, the population size and range [of Minnesota's wolves] have remained stable, as most of the suitable habitat has been occupied."  *Id.*  Simply, the Timber Wolf Recovery Plan objectives for Minnesota have long been met, and survival of the population has long been assured.

Wisconsin's wolf population has also significantly increased since the 1978 Listing Rule.  In 1979, Wisconsin had an estimated minimum population of 25 wolves.  By 1994, the estimated population of 83 exceeded the recovery objective of 80 wolves.  The population has continued to

---

[7] If the second viable wolf population formed more than 100 miles from Minnesota, the population objective would have been at least 200 wolves.  *Id.*

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

10

grow since.  *See* AR_0000427–28.  Like in Minnesota, wolves were hunted in Wisconsin for three seasons from 2012–2014, yet the 2019–2020 statewide survey produced a minimum count of 1,034–1,057 wolves.  AR_0000492.  The data also suggest that "most suitable habitat remains occupied" by wolves in the state.  AR_0000489.

In Michigan, the recovery objective of 80 to 90 wolves was achieved by 1995. AR_0000427.  Since 2011, the estimated number of wolves in the state has leveled off in the upper-600s, indicating a stable population.  AR_0000428.  Michigan held a wolf hunt in 2013, which resulted in minimal offtake.  AR_0000095.  Last year, the minimum estimate was 695 wolves.  AR_0002355.

In total, all three states have achieved the Timber Wolf Recovery Plan's specific population objectives for more than 20 years, and the "five consecutive years" objective for the second viable population was achieved by the late 1990s.  AR_0000427.  Plaintiffs do not and cannot dispute that the recovery plan's objectives are met.[8]

As for wolves in the western United States, the NRM Recovery Plan's "Primary Objective" for the NRM wolf population was to "secur[e] and maintain[] a minimum of 10 breeding pairs in each of the three recovery areas for a minimum of 3 successive years." AR_0044068; *see also* AR_0042860 (noting that ten breeding pairs of wolves is "about 100 wolves").  The three recovery areas identified were northwest Montana, central Idaho, and the Greater Yellowstone Area.  AR_0044050.  The recovery objectives were "established after

---

[8] Instead, Plaintiffs attempt to discredit the recovery plans as "outdated."  *E.g.*, Pls. Br. at 13 n.9. However, Plaintiffs fail to note any deficiencies besides the plans' age.  *See id.* ("And after roughly three decades, neither document reflects the best available science.").  Plaintiffs do not identify any data that the FWS should have incorporated in the recovery plan or point to any data that has been omitted or ignored.  The recovery plans are the best available scientific information.  *Ctr. for Bio. Diversity v. FWS*, 807 F.3d 1031, 1050 (9th Cir. 2015) (rejecting plaintiff's "best available science" claim where plaintiff did not point to better science than the FWS used, or any scientific information that the FWS disregarded "that was better than the evidence upon which it relied").  That Great Lakes wolf populations have long exceeded the recovery objectives reinforces the Delisting Rule's findings under the ESA's delisting criteria.

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

11

extensive literature review and consultation with a number of U.S. and Canadian biologists/wolf researchers."  AR_0044076.

As with the Great Lakes area wolves, the NRM wolves have long exceeded recovery objectives.  Due to successful reintroduction efforts, by the end of 2000 the three NRM states collectively contained a minimum of 30 breeding pairs and more than 300 wolves. AR_0000412.  "Temporal recovery" (i.e., three successive years of meeting recovered population levels) was achieved in 2002.  *Id.*  NRM wolves have achieved their recovery plan objectives for nearly 20 years.

Despite the FWS' and state's demonstrated achievements, Plaintiffs argue that the FWS has not done enough, and "the absence of recovered wolf populations in areas like the Pacific Coast and Central Rockies" spoils the wolves' conservation success.  *See* Pls. Br. at 13.  But none of the recovery plans discuss establishment of Pacific Coast or central Rocky Mountains wolf populations as recovery objectives.  And nothing in the 1978 Listing Rule or the recovery plans creates an obligation for the FWS to recover gray wolves throughout their historical range in the lower 48 states or even contemplates that as a possible objective.  That was simply never the plan.  Rather, the 1978 Listing Rule acknowledged the key wolf populations in the Great Lakes area, the NRM, and the Mexican wolf in the southwestern United States.  43 Fed. Reg. at 9607.  For this reason, the recovery objectives—and what the FWS and states have long achieved—was to recover populations of wolves in specific areas of the United States.  As recognized in the Delisting Rule, this focus included the NRM and the Great Lakes area.

The FWS' determination that gray wolves are recovered sufficient for delisting accords with the recovery plans and is reasonable.  A conclusion otherwise would have contradicted the recovery plans and could have been arbitrary and capricious.  *See* 16 U.S.C. § 1533(f) ("The Secretary shall develop and implement [recovery] plans ... [with] criteria which, when met, would result in a determination ... that the species be removed from the list"); *Conservation Cong. v. George*, No. 14–cv–01979, 2015 WL 2157274, *4 (N.D. Cal. May 7, 2015) ("Although

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

12

'recovery plans do not have the force of law,' and so federal agencies do not *necessarily* have to comply with them, consistency with such plans is a factor to consider in determining whether approval of an agency action was arbitrary or capricious.") (citing *Cascadia Wildlands v. Thraikill*, 49 F. Supp. 3d 774, 787 (D. Or. 2014); *Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 (D.C. Cir. 2012)).

And the FWS' choice to develop individual recovery plans for the three focal areas, as opposed to a nation-wide recovery plan, was explicitly upheld in a case regarding one of the FWS' previous wolf-related rules. *Nat'l Wildlife Fed'n*, 386 F. Supp. 2d at 567–68 ("Plaintiffs argue FWS's recovery plans are a 'piecemeal approach' to gray wolf recovery and, therefore, violate Sections 4(f)(1) and 7(a)(1) of the ESA. … Because '[c]ourts should be particularly reluctant to second-guess agency choices involving scientific disputes that are in the agency's province of expertise,' the Secretary's decision to proceed with the three recovery plans for the gray wolf rather than one comprehensive national plan must be afforded *Chevron* deference.") (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)) (other internal citation omitted).  Despite Plaintiffs' requests for the FWS to develop a nation-wide recovery plan, Pls. Br. at 13, n.9, the FWS' approach is reasonable and lawful.

### C.  The FWS properly applied the ESA delisting factors in its analysis and correctly determined that gray wolves are no longer an endangered or threatened species.

In addition to meeting the recovery objectives, the FWS followed the statutorily defined procedure when issuing the Delisting Rule.  The FWS was required to use "the best scientific and commercial data available" to determine whether "any one or a combination of" the five factors warranted wolves remaining listed.  16 U.S.C. § 1533(b)(1)(A); 16 U.S.C. § 1533(a)(1). The FWS did just that.

Plaintiffs claim the FWS incorrectly evaluated threats facing gray wolves across the lower 48 states (Pls. Br. at 28), failed to consider the impact of lost historical range in the threats

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

13

analysis (pp. 28–30); and erroneously analyzed existing state regulatory protections for gray wolves (pp. 30–37).

Each of these arguments is factually inaccurate. The Delisting Rule plainly *does* discuss the five factors as applied to the central Rocky Mountains and West Coast wolves. *See, e.g.*, AR_0000054, AR_0000077–79, AR_0000097–98, AR_0000102 It also evaluated whether the loss of historic range continues to threaten gray wolves. *See* Feds. Br. at 40–41; *see also* AR_0000052. And as discussed below, the Delisting Rule correctly and completely analyzed the adequacy of state regulatory mechanisms.

Moreover, each of these arguments fails to clear the highly deferential hurdle that is imposed by the APA standard of review. The FWS' methodology and judgment should not be overturned because no clear error of judgment exists and the FWS made a rational connection between facts found and conclusions made. *Friends of Santa Clara River*, 887 F.3d at 920–21. With respect to the fact the Delisting Rule spends more pages addressing the Great Lakes area— where most wolves live—compared to other parts of the country, the FWS has long held that its "approach to gray wolf recovery has been to establish healthy populations of gray wolves in three areas of ecological or genetic diversity," one of which is the Great Lakes. AR_0000153. Plaintiffs may disagree with this approach, but that does not make it a clear error of judgment. *See* pp. 9–13 above.

A common thread runs through many of Plaintiffs' objections: that the FWS failed to use the best available science in its decision making. *See, e.g.*, Pls. Br. at 27, 35–37. However, the FWS is owed significant deference to the science that it chooses to use due to its special expertise. *Friends of Santa Clara River*, 887 F.3d at 924. The Court presumes that the data on which the FWS relied was both "adequate and reliable." *See id.* at 921; *Kandra v. United States*, 145 F. Supp. 2d 1192, 1208 (D. Or. 2001) ("it is presumed that agencies have used the best data available unless those challenging agency actions can identify relevant data not considered by the agency"). Thus, to demonstrate that the FWS did not rely on the best available science,

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

14

Plaintiffs have an affirmative burden to identify better scientific information that the FWS ignored. *E.g.*, *Ctr. for Bio. Diversity*, 807 F.3d at 1050.[9]

Plaintiffs do not carry this burden. Just as with the federal recovery plans, Plaintiffs argue that Minnesota and Wisconsin's management plans are "outdated" because they were prepared in 2001 and 2006, respectively. Pls. Br. at 35. Plaintiffs again fail to note any deficiencies besides the plans' ages. They do not identify more current information on which the FWS should have relied, and thus do not identify better scientific information that the FWS disregarded. *Ctr. for Bio. Diversity*, 807 F.3d at 1050.

For the same reasons, Plaintiffs' criticism of the so-called state "population goals" should be rejected. Putting aside that these criteria are not "goals" in the sense that the states are seeking to achieve them (as discussed below), Plaintiffs "have pointed to no data that was omitted from consideration" by the FWS. *Bldg. Indus. Ass'n*, 237 F.3d at 1246–47. In fact, in assessing the adequacy of state regulatory mechanisms, the FWS analyzed the most recent hunt data available from western states, *see, e.g.*, AR_0000057–70 (analyses of both hunting and depredation control throughout the NRM area, including a chart), and the most recent hunt data available from the Great Lakes states, *see, e.g.*, AR_0000088 (Minnesota hunt data), AR_0000092 (Wisconsin hunt data), and AR_0000095 (Michigan hunt data), as well as the management plans and state laws governing post-delisting management. *See, e.g.*, AR_0000085–86 ("The Minnesota Wolf Management Plan"), AR_0000088–89 ("The Wisconsin Wolf Management Plan"), AR_0000092–94 ("The Michigan Wolf Management Plan"). The FWS did not ignore scientific data concerning gray wolves; it selected the *best* data for its analysis. Delisting a species is certainly an "area of special expertise, at the frontiers of science," and a great deal of deference is owed to the FWS' judgment. *Friends of Santa Clara River*, 887

---

[9] And the standard is the best *available* data; thus, the FWS has no obligation to conduct any studies not already available. *See San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 995 ("The standard does not, however, require an agency to conduct new tests or make decisions on data that does not yet exist.") (citation omitted).

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

15

F.3d at 921.  That deference was well-founded in the Delisting Rule, as the FWS relied on data that was both adequate and reliable.  *Id.*

Perhaps to deflect from the weakness of their argument, Plaintiffs claim that the *state management plans* omit consideration of "recent" studies regarding sustainable wolf mortality, trapping, and poaching mortality.  Pls. Br. at 36–37.[10]  As Federal Defendants point out, the best available scientific information standard does not apply to the content of state management plans evaluated as part of the delisting analysis, but only to the choice of data on which the FWS bases its delisting decision.  Feds. Br. at 42–43; 16 U.S.C. § 1533(a)(1).  Plaintiffs do not—because they cannot—argue that the *FWS* did not consider the studies they identify.  To the contrary, those studies are all contained in the Administrative Record (as Plaintiffs' brief demonstrates); almost all are also cited in the Delisting Rule.

Plaintiffs disparage the Great Lakes state management plans for "fail[ing] to address recent peer-reviewed studies that cast doubt on assumptions underlying the states' treatment of poaching mortality."  Pls. Br. at 36–37.  The studies on which Plaintiffs rely—not all of which were fully peer-reviewed—have been widely and loudly criticized by other researchers for their inherent bias and unsupported assumptions.  *E.g.*, AR_0002903–14; AR_0003877–86.  Thus, the Delisting Rule, for good reason, rejects this line of so-called scholarship.  *E.g.*, AR_0000072.  "An agency complies with the best available science standard so long as it does not ignore available studies, even if it disagrees with or discredits them."  *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 995.

Relatedly, Plaintiffs wrongly argue that the FWS misconstrued the "significant portion of its range" aspect of the "endangered species" definition.  Pls. Br. at 18 (citing 16 U.S.C. § 1532(6)).  Federal Defendants explain in detail why this analysis was appropriate, and NRA

---

[10] Some of these "recent" studies are over a decade old.  Although that made Wisconsin's management plan "outdated" in Plaintiffs' view one page earlier in their brief, it is apparently "recent" when convenient for their own argument.  *Compare* Pls. Br. at 35 *with id.* at 36–37.

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

1   and SCI incorporate this explanation through reference.  As "significant portion" has not been

2   defined by Congress, *Chevron* deference applies.  Because "Congress has not directly addressed

3   the precise question at issue," the court must determine "whether the agency's [interpretation] is

4   based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 842–43.  And

5   "considerable weight should be accorded to an executive department's construction of a statutory

6   scheme it is entrusted to administer, and the principle of deference to administrative

7   interpretations."  *Id.* at 844.  As the term "significant portion of its range" is not defined in the

8   ESA, it is therefore the FWS' responsibility to choose how to apply it.  The FWS developed the

9   approach in the Delisting Rule using multiple studies.  *See, e.g.,* AR_0000140 (referencing

10  Shaffer and Stein 2000 and Smith *et al.* 2018).  Further, this approach was developed in

11  coordination with other federal agencies who share significant expertise on this subject.  Feds.

12  Br. at 33 ("[T]he [FWS] collaborated with NMFS to issue a policy interpreting the phrase.").

13  Given these facts, the approach FWS chose was a "permissible construction" of this phrase.

14  *Chevron*, 467 U.S. at 843.  Therefore, this Court should grant considerable deference to the

15  FWS' interpretation.

16          In sum, the FWS fully analyzed the relevant threats potentially facing gray wolves, and

17  relied on the best scientific data available in so doing.  This Court should conclude that the FWS

18  met its statutory obligations in the Delisting Rule.

19      **D.  The FWS properly concluded that existing regulatory mechanisms are more
20          than adequate to ensure the persistence of healthy gray wolf populations.**

21          In particular, the Delisting Rule's analysis of existing regulatory mechanisms satisfies the

22  ESA and the deferential standard of review under the APA.  The FWS relied on the best

23  available scientific information in concluding that state management plans and laws will provide

24  for healthy wolf populations following delisting.  AR_0000085–103.  In challenging this aspect

25  of the Delisting Rule, Plaintiffs repeatedly ask this Court to substitute its judgment for the

26

27

28  NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-
    344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

                                                                                      17

FWS'—which this Court cannot do.  *E.g.*, *Kern Cnty.*, 450 F.3d at 1076.  Accordingly, the Court

should reject Plaintiffs' arguments and uphold the Delisting Rule.

       1.   <u>The FWS fully analyzed and correctly found that regulated hunting in the Great</u>
           <u>Lakes states does not pose a threat to gray wolves.</u>

      Plaintiffs repeatedly mischaracterize the management plans and regulated hunting

programs in the Great Lakes states.  For example, Plaintiffs assert that "these states' plans and

laws actually increase the harm to the species through sanctioned killing in ways that FWS either

failed to critically analyze or entirely ignored."  Pls. Br. at 30.  Plaintiffs are wrong.  The Great

Lakes states' management plans and hunting regulations do not require "massive" wolf

population reductions, as Plaintiffs allege.  While Plaintiffs are correct that some wolves will be

hunted, the Delisting Rule fully discusses and analyzes the potential risk and correctly

determines that state management activities do not pose a threat to the delisted wolves.

      The Court should disregard Plaintiffs' unsupported claim that wolf populations in the

Great Lakes area "will" decline under state management by 40-60%.  *See, e.g.*, Pls. Br. at 31–32.

First, none of the Great Lakes states' management plans *require* that wolf populations be

reduced.  Minnesota's plan allows the number of wolves to naturally expand throughout the

state, with no maximum population goal.  AR_0040422; *see also* AR_0000086.  "To assure the

continued survival of the wolf in Minnesota," the plan commits to a "*minimum* statewide winter

population goal [of] 1,600 wolves."  AR_0040422 (emphasis added).[11]  "If the population falls

under this minimum, [the Minnesota Department of Natural Resources] will take appropriate

management actions to address the cause of the reduction and assure recovery to the minimum

level in the shortest possible time."  *Id.*  Plaintiffs' brief provides zero support for its assertion

that, "[u]pon delisting, Minnesota will … cull the state's wolf population down 40%."  Pls. Br. at

33, 36.

---

[11] 1,600 wolves is well above the recovery plan objective of 1,251 to 1,400 wolves.

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-
344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

18

1   Similarly, Wisconsin's management plan commits to a "*minimum* population

2   management goal of 350 wolves (late winter counts) outside of Indian Reservations."

3   AR_0041104 (emphasis added), AR_0035576.  If the state wolf population dips below this level,

4   legal protections will be triggered, including reclassification of wolves under the Wisconsin

5   endangered species law.  AR_0041104.  Thus, Plaintiffs' repeated assertion that Wisconsin will

6   reduce its current wolf population (which exceeded 1,000 at the time of delisting), "by 60%," is

7   patently false and belied by the facts.  *E.g.*, Pls. Br. at 31–32.  As the Delisting Rule discusses,

8   when wolves were previously delisted, Wisconsin did not, immediately or otherwise, reduce its

9   wolf population by 60%.  The end result after three years of hunting and depredation control

10  reflected a less-than-9% population reduction.  *See, e.g.*, AR_0000092; *see also* AR_0003879

11  ("While the 1999 goal remains in place until a new plan is developed, there was no effort to

12  reduce the wolf population to the 350 level during previous delisting in 2012-2014.").[12]

13  Second, the Minnesota and Michigan wolf management plans and state laws do not

14  guarantee that regulated hunting, which could potentially control the wolf populations, will

15  occur—at least not any time soon.  Minnesota's wolf management plan imposes a five-year

16  pause on a public hunting season.  The season will be opened only after providing an opportunity

17  for public input, and "[d]ecisions on public taking will be based on sound biological data,

18  including comprehensive population surveys."  AR_0040423.  Michigan's wolf management

19  plan does not incorporate a hunting season, but only the development of recommendations for

20  such a season, "[i]f biologically sustainable, legally feasible, and socially acceptable."

21  AR_0028232–34; *see also* Pls. Br. at 33 (conceding that Michigan's plan does not incorporate a

22  hunting season).

23

_____

24  [12] Plaintiffs do not appear to press this argument in Michigan—likely because Michigan's wolf
    management plan specifically provides that "[t]he minimum criterion of 200 wolves does not

25  reflect the maximum number of wolves the available habitat in Michigan can support," and "is
    not necessarily sufficient to provide all of the ecological and social benefits valued by the public

26  (see 5.2).  Accordingly, 200 wolves is not a target population size."  AR_0028191.

27  NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-
    344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

28

19

1    Plaintiffs attempt to avoid the facts by asserting that in both states, when wolves were

2    delisted in 2012–2014, Minnesota held three wolf hunting seasons and Michigan held one.[13]  Pls.

3    Br. at 33–34.  Of course, the Great Lakes states retain authority to open hunts to sustainably

4    manage wolves, as they do with other game species.[14]  But they are not compelled to do so.

5    Plaintiffs' reliance on old legislation is misguided.  No such laws are presently in place in

6    Minnesota and Michigan.  AR_0000088, AR_0000095.

7        Wisconsin state law mandates a wolf hunting season.  AR_0000092; Wisc. Stat. Ann.

8    § 29.185(1)(m).  But having a hunting season does not, by itself, mean the wolf population will

9    decline; nor does a decline necessarily result in a threat sufficient to keep the wolves listed as

10   _____

11   [13] Plaintiffs argue that hunting and depredation actions taken when the wolves were delisted in
     2012-2014 demonstrate the inadequacy of the state plans.  Pls. Br. at 33.  They assert that in
12   Minnesota, hunting and depredation reduced the state's wolf population by approximately 700
     wolves and cite AR_0025305.  This is one of many examples where Plaintiffs mischaracterize
13   the record evidence on which they rely.  The full analysis in AR_0025305 explains, among other
     reasons, that the survey took place within one-and-a-half months of the lethal depredation control
14   and hunting, which did not allow the wolf population time to reflect that year's reproduction, the
     offset of compensatory mortality, and emigration of wolves.  AR_0025304-05.  The authors
15   further noted that, while the hunting offtakes (413 wolves) represented approximately 16% of
     Minnesota's current wolf population estimate, "2,600 wolf pups were likely born in spring
16   2013."  Although, of course, all those pups were not expected to survive, the high level of
     potential recruitment demonstrates that the net impact of the regulated hunting was considerably
17   lower than Plaintiffs assert.  AR_0025305-06.

18   Moreover, as discussed above (p. 10), Minnesota's wolf population has stabilized between
     approximately 2,200 and 2,600 wolves, including during each of the three previous years with
19   wolf hunts.  Some variability within that range is naturally expected.  Put simply, the document
     on which Plaintiffs rely does not support their conclusion.
20
     [14] Plaintiffs essentially argue that the Great Lakes area wolf management plans do not discuss
21   hunting enough.  Pls. Br. at 31.  But this disregards the state laws and regulations that manage
     hunting, and which do and will manage the hunting of gray wolves.  *E.g.*, in Minnesota, the
22   Department of Natural Resources, through its Commissioner, establishes hunting seasons,
     licenses, etc., and may prohibit or allow hunting to protect a species or for other reasons.  Minn.
23   Stat. Ann. §§ 84.027, 97A.045.  In Wisconsin, the Department of Natural Resources, overseen by
     the Natural Resources Board, establishes hunting seasons, bag and size limits, rest days and
24   conditions "that will conserve the fish and game supply and ensure the citizens … continued
     opportunities for good fishing, hunting and trapping."  Wisc. Stat. Ann. § 29.014.  In Michigan,
25   the Natural Resources Commission has exclusive authority to regulate the taking of game, based
     on "principles of sound scientific management."  Mich. Comp. Laws § 324.40113a(2).
26

27   NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-
28   344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

                                                                                                    20

endangered.  *E.g.*, AR_0000107–08, AR_0000119.  Data in the Delisting Rule and

Administrative Record make clear that wolf populations in the Great Lakes states reproduce at

high rates and can rapidly replace harvested wolves with births and recruitment.  *See, e.g.*,

AR_0000405 (acknowledging "[h]igh levels of reproduction and immigration in wolf

populations[, which] can compensate for anthropogenic mortality rates of 17% to 48%") (citing

Fuller *et al.* 2003 [22%], Adams *et al.* 2008 [29%], Creel and Rotella 2010 [22%], Gude *et al.*

2012 [48%], Vucetich and Carroll 2012, unpublished manuscript [17%]); AR_0025305;

AR_0030379; AR_0040431 ("Wolves have tremendous reproductive potential, and can

withstand human caused mortality rates of 28- 53 percent annually, and still maintain growing

populations.").[15]

The Delisting Rule used specific, real-world data from the NRM states and Wisconsin to

assess the limited impact that hunting will have on gray wolf populations, and to conclude that it

will not threaten recovered wolf populations in the lower 48 States.  As the Rule explained,

between 2009 and 2015, the NRM states used regulated hunting seasons "to manage wolves with

the objective of reversing or stabilizing population growth while continuing to maintain wolf

populations well above Federal recovery targets."  AR_0000057.  When harvests occurred "total

wolf mortality in the NRM increased to an average of 29 percent of the minimum known

population (USFWS *et al.* 2010-2016, entire), while population growth declined to an average of

approximately 1 percent annually (USFWS *et al.* 2010-2016, entire)."  *Id.*  In sum, despite high

levels of public harvest, the wolf population continued to increase (albeit at a lower rate), and the

NRM states maintained wolf populations "well above minimum recovery levels."  *Id.*

(explaining that, "[w]here high levels of wolf mortality occur, the species' reproductive capacity

---

[15] Plaintiffs concede that wolf offtakes up to 30% of the population are sustainable.  Pls. Br. at
36.  Plaintiffs ignore AR_0030375 (Gude *et al.* (2012))—published after the two studies cited by
Plaintiffs—which found that "[o]ur model depicting only the effects of human-caused mortality
on wolf [populations] predicted that sustainable mortality is 0.484 [i.e., 48.4%]… regardless of
recruitment."  AR_0030379.  The FWS relied on Gude *et al.* (2012) in the Delisting Rule.  *E.g.*,
AR_0000117.

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-
344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

21

and dispersal capability can compensate for mortality rates of 17 to 48 percent (USFWS 2020, pp. 8-9)[;] this appears to be the case in the NRM.").

The Delisting Rule also relies on data from Wisconsin during the prior period of delisting (2012–2014). It acknowledges that the wolf hunting quotas were adjusted each year from 2012–2014 to reflect management priorities. AR_0000092. A total of 528 wolves were hunted in the period 2012–2014, from a total population that was estimated at 815 before hunting began in 2012. *Id.* Despite this offtake, "[a]fter 3 years of public hunting and trapping seasons, [the wolf population] had been reduced to a minimum count of 746 in 2015, or a reduction of only 8.5 percent." *Id.* Notably, the FWS concluded that this evidence "indicates that active management with public harvests and targeted lethal depredation controls could reduce wolf-human conflicts without causing major declines in wolf numbers in the State," because verified wolf depredations "declined significantly" during the same period. *Id.* (citing Wiedenhoeft *et al.* 2015, pp. 4–5, 12; Wydeven 2019a, in litt.).[16]

After evaluating all these data, the FWS concluded that regulated harvest could potentially contribute to an initial population decline in the Great Lakes states' wolf

---

[16] Plaintiffs wrongly assert that the FWS did not fully consider that Wisconsin allows the hunting of wolves with dogs. The FWS fully considered the level of harvest that did or could occur in Wisconsin, regardless of the method of take. AR_0000092. Further, the administrative record addresses the potential for the wolf hunting season to continue into the early part of the wolf-breeding season. AR_0003877.

Plaintiffs and amici improperly call the Court's attention to details of the 2021 wolf hunt in Wisconsin, but that post-rule event is irrelevant to what the FWS considered in the Delisting Rule. "When reviewing an agency's action under the [APA], the reviewing court is ordinarily confined to 'consideration of the decision of the agency … and of the evidence on which it was based.'" *Ventana Wilderness All. v. Bradford*, 313 F. App'x 944, 947 (9th Cir. 2009) (quoting *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714–15 (1963)).

Further, Plaintiffs misleadingly assert that the 2021 wolf hunt quota was exceeded by nearly 100 wolves. Pls. Br. at 32, n.19. In fact, consistent with past practice, Wisconsin set a science-based total wolf quota of 200 wolves, with 81 (of the 200) allocated to tribal authorities, who chose to harvest zero wolves. In other words, although state-licensed hunters harvested more than their allotted quota, the total harvest was only 18 wolves more than the state-wide quota. *See* Dkt. 71-1 in Case No. 4:21-cv-561-JSW; *see also* AR_0000092.

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

populations;[17] however, that decline would stop and the populations would "fluctuat[e] around an equilibrium," reflecting the states' adaptive management "to maintain populations well above Federal recovery requirements." AR_0000072–73.[18] Far from "ignoring crucial data," as Plaintiffs assert, the Delisting Rule addresses the potential threat of a population reduction from regulated hunting head-on, and based on the real-world data and research cited in the Delisting Rule, concluded that the potential threat did not warrant a continued threatened or endangered listing. That Plaintiffs disagree with the Rule's conclusion does not mean that conclusion is arbitrary. *See, e.g.*, *Kern Cnty.*, 450 F.3d at 1081 (rejecting plaintiff's attempt to make the FWS answer its specific questions and points of analysis as not being required under the ESA or APA); *Kandra*, 145 F. Supp. 2d at 1210 ("plaintiffs simply disagree with the scientific conclusions reached by FWS and NMFS … The fact that such disagreement exists, however, does not render the BiOps arbitrary and capricious.") (citing *Aluminum Co. v. Bonneville Power Admin.*, 175 F.3d 1156, 1162 (9th Cir. 1999)); *see also Humane Soc'y*, 865 F.3d at 610 ("To be sure, killings are allowed at higher numbers than the Humane Society wants. That does not make the Service's decision unreasoned or arbitrary and capricious, however."); *N.M. Cattle Growers Ass'n v. FWS*, No. 98-CV-367, 1999 WL 34797509, *20 (D.N.M. Oct. 28, 1999) (holding that plaintiffs' disagreement with the FWS' conclusions on wolf management did not render FWS' decisions arbitrary). All the APA requires is that the FWS articulate a rational connection between the facts found and conclusions made. *Friends of Santa Clara River*, 887

---

[17] For the same reasons, Plaintiffs err in assuming that lethal depredation control "will" reduce wolf population. *See, e.g.*, Pls. Br. at 32. The FWS fully analyzed this issue. Feds. Br. at 39–42. NRA and SCI agree with Federal Defendants and incorporate their argument through reference.

[18] Although the FWS included this discussion under the second factor of ESA Section 4 (overutilization), NRA and SCI include it here, because Plaintiffs argue that existing regulatory mechanisms are not adequately protective because they permit too much offtake of wolves. As explained above, the Delisting Rule fully considered the impact of offtakes from hunting, depredation, and other sources, using real-world data and research, and concluded that neither factor threatens gray wolves so as to require continued listing under the ESA.

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

F.3d at 920; *Kern Cnty.*, 450 F.3d at 1076.  The FWS has carried its burden under the APA, and Plaintiffs' summary judgment motion should be denied.

> 2.   <u>The Delisting Rule's analysis of regulatory mechanisms for the West Coast and central Rocky Mountains wolves is legally and factually supported and complies with the APA.</u>

The Delisting Rule's assessment of regulatory mechanisms outside the Great Lakes should also be upheld under the APA.  Plaintiffs' criticisms should be rejected for a number of reasons.

First, Plaintiffs erroneously suggest that states must have binding wolf management plans to satisfy the ESA—despite the protections available from other laws, or recent case law holding to the contrary.  Plaintiffs assert that Washington's wolf management plan is not an adequate regulatory mechanism because it is not binding.  Pls. Br. at 37.  But as the FWS pointed out in the Delisting Rule, wolves in Washington State are listed as endangered under state law.  Take (including hunting without authorization by the fish and game commission, which has not approved a wolf season) is prohibited under this law.  *See* AR_0000095 (citing RCW 77.15.120). Accordingly, it does not matter if the state management plan is binding, because protective regulatory measures are otherwise in place.  *Defs. of Wildlife*, 849 F.3d at 1084–85; *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1019 (9th Cir. 2011) (upholding FWS' conclusion that regulatory mechanisms were adequate when incorporated into legally enforceable forest plans).

Second, Plaintiffs ignore empirical evidence considered in the Delisting Rule demonstrating that regulatory mechanisms outside the Great Lakes area are sufficient.  In disparaging Washington's management of its wolf population, Plaintiffs gloss over the fact that the state has seen a continued increase in wolves since 2008.  AR_0000069 ("Since 2010, wolf populations have increased an average of 26 percent annually … [A]s suitable habitat in eastern Washington has become increasingly saturated with wolves, statewide population growth has

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

24

declined in recent years … and has ranged between 3 and 15 percent since 2017.").  Plaintiffs

complain about lethal depredation control in Washington, but that control is empirically not

having a negative impact on the growing wolf population.[19]

Third, Plaintiffs attempt to impose a higher burden on the FWS than required by the ESA

or APA.  Plaintiffs challenge the FWS' analysis of regulatory mechanisms in Oregon on the

ground that the Oregon legislature "blocked judicial review" of the 2015 delisting of wolves.

Pls. Br. at 38.  Plaintiffs apparently believe that the FWS must police the legislative actions of

states as part of its delisting determination.  But the ESA does not impose such a high standard.

In assessing the adequacy of existing regulatory mechanisms, it is sufficient for the FWS "to

assess whether the existing regulatory mechanisms are so inadequate that they represent a threat

to the [species ] and, … lead FWS to a conclusion that the species is threatened or endangered."

*Ctr. for Bio. Diversity v. FWS*, 402 F. Supp. 2d 1198, 1209-10 (D. Or. 2005), *aff'd in part, rev'd*

*in part on other grounds*, 274 F. App'x 542 (9th Cir. 2008).  The question before the FWS under

§ 1533(a)(1) is whether state regulations, themselves, pose a threat to the continued survival of

the species.  *Id.* (noting "[t]here can be a large gap between the best regulatory mechanisms and

a situation in which the regulatory mechanisms contribute to the threat or endangerment of a

species").  Put differently, as long as the FWS acknowledges issues with regulatory mechanisms

but finds they do not pose a risk of endangerment, then the regulatory mechanisms are adequate.

In the Delisting Rule, the FWS acknowledged that Oregon had delisted the gray wolf from the

state endangered species list, but found other protections, including the state management plan,

---

[19] The Delisting Rule determined that "human-caused mortality has been responsible for the average removal of 9 percent of the known wolf population annually," a fairly low number given wolf population growth rates.  AR_0000068.  In the face of this hard data, Plaintiffs cite only to their own public comment in opposition to the Delisting Rule as "support" for their assertion that lethal depredation control is inadequately regulated.  Pls. Br. at 38.

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

25

1    would sufficiently guide management of wolves across the state.  AR_0000067, AR_0000094–

2    97.[20]

3         The Delisting Rule sufficiently analyzes regulatory mechanisms in Colorado and Utah,

4    for similar reasons.  Plaintiffs falsely claim the FWS "failed to even examine the existing

5    regulatory mechanisms in Colorado and Utah."  Pls. Br. at 39.  The criticism is easily reproved

6    by reference to the Delisting Rule.  The FWS discussed Colorado's state law, under which

7    "wolves are listed as an endangered species … and receive protection … , thereby making it

8    illegal for any person to hunt, take, or possess a gray wolf in the State."  AR_0000097.  The

9    FWS also noted that Colorado's wildlife authority convened a Wolf Management Working

10   Group in 2004 "to formulate management recommendations for wolves that naturally enter and

11   possibly begin to recolonize the State."  *Id.*  The working group's recommendations were

12   adopted by the Colorado Parks and Wildlife Commission, reaffirmed in 2016, "and will be used

13   to guide management of wolves that occur in or naturally enter Colorado post-delisting until a

14   wolf conservation and management plan is developed."  *Id.*  With respect to Utah, the Delisting

15   Rule discussed the wolf's current status as a "Tier 1 sensitive species" and a furbearer, and noted

16   that take of wolves (except for authorized depredation control) is currently prohibited.

17   AR_0000098.  The Rule fully acknowledged a Utah law directed the department of wildlife

18   resources to try and avoid the establishment of wolves in the state;[21] however, it also described

19   Utah's wolf management plan, which will be fully implemented for the first time after federal

20   delisting and has a different set of goals: "to manage, study, and conserve wolves moving into

21   ────────────────────────────

22   [20] Plaintiffs condemn the Washington, Oregon, and California wolf management plans for not
     having "population management goals."  Pls. Br. at 39.  This criticism is unfounded.  The FWS
23   concluded that these states currently manage their small (but increasing) wolf populations to
     achieve certain initial metrics.  AR_0000095-97.  And because these states currently have small
24   wolf populations, the management plans are doing just as much as they need to do.  *Humane
     Soc'y*, 865 F.3d at 264–65.

25   [21] Amici claim that the FWS did not consider this Utah law, which prevents the establishment of
     a viable pack.  *E.g.*, Dkt. 83-2 at 7.  However, the FWS discussed that state law directly.
26   AR_0000098.

27   NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-
28   344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

                                                                                          26

Utah while avoiding conflicts with the elk and deer management objectives of the Ute Indian Tribe; minimizing livestock depredation; and protecting wild ungulate populations in Utah from excessive wolf predation." *Id.*

These discussions of state regulatory mechanisms may be short compared to the Great Lakes states—but that brevity is wholly appropriate, given the small or non-established wolf populations in these states. *See Humane Soc'y*, 865 F.3d at 611–12 (holding "[t]he Service's decision to delist notwithstanding the lack of state plans … did not rise to the level of arbitrary-and-capricious decision-making, given the near non-existence of gray wolves within those jurisdictions," and the "absence of formal state wolf plans does not mean that the few wolves in those States lack legal protection," in light of other laws and regulations in place). The Court should reject Plaintiffs' selective reading of the Delisting Rule, and, like the court in *Humane Society*, hold that the Delisting Rule's discussion of existing regulatory mechanisms complies with the ESA.

Finally, Plaintiffs "curiously" assert that the FWS did not fulfill its "obligation to determine whether federal public lands management regimes provided adequate regulatory mechanisms to ensure a sustainable wolf population post-delisting." Pls. Br. at 40–41. But the Delisting Rule spends several pages doing exactly this. AR_0000100–102. Plaintiffs object to the Delisting Rule's analysis of post-delisting management on federal lands on two grounds: that federal lands policies are either not specific to wolves, or are not protective enough.[22] Plaintiffs posit that the U.S. Forest Service, for example, could develop "binding standards and guidelines" to better protect wolves. Pls. Br. at 40. But Plaintiffs again misconstrue the FWS' obligations under 16 U.S.C. § 1533(a)(1). The FWS need not conclude that regulatory mechanisms provide

---

[22] Plaintiffs rely on *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1231 (D. Or. 2019) for the proposition that "federal land management activities can have an adverse impact on gray wolves." But the court never made such a finding. Its analysis focused on the Forest Service's conclusion that there were no breeding wolf packs in the forest. The court found this conclusion to be in error, because the issue was not whether breeding packs existed, but whether any wolves (including specific individuals) inhabited the forest.

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

27

the same level of protection as under the ESA.  *E.g.*, *Greater Yellowstone Coal.*, 665 F.3d at 1032 ("we recognize that delisting cannot require the imposition of legal protections commensurate with those provided by the ESA itself.  After all, the ESA expressly aims for species recovery to the point where its own measures are 'no longer necessary,' … thus contemplating that something less can be enough to maintain a recovered species.").  Nor must the FWS find that regulatory mechanisms "guarantee the best of all possible worlds for the species at issue," *Ctr. for Bio. Diversity*, 402 F. Supp. 2d at 1209, or invent regulatory mechanisms that would allow a species "to reach still higher population levels if given more protection," *Humane Soc'y*, 865 F.3d at 612.  The FWS need only assess "existing" regulatory mechanisms in light of its assessment of other threats to the species.  *See Friends of Blackwater*, 691 F.3d at 436.  The FWS evaluated U.S. Forest Service and Bureau of Land Management protections, and found they would not increase human-caused mortality to a level that threatens the species.  Accordingly, the FWS fulfilled its obligations under the ESA, and Plaintiffs contrary arguments should be rejected.

## II. Vacatur of the Delisting Rule is not the proper remedy.

As explained above, the FWS reasonably and lawfully delisted the gray wolves at issue in this litigation.  However, if this Court finds otherwise, specifically as related to the FWS' analysis of wolves on the West Coast and in the central Rocky Mountains, the Court should remand the Delisting Rule without vacatur as to the Great Lakes wolves.  Remand without vacatur is proper "when equity demands" that the Court leave a rule in place.  *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015).  Here, equity demands remand without vacatur.

The disruptive consequences of vacatur will harm state management efforts in Wisconsin, Michigan, and Minnesota.[23]  Plaintiffs do not and cannot dispute that the Great Lakes wolves have recovered well above federal objectives.  Vacating the Delisting Rule as applied to those

---

[23] Plaintiffs incorrectly argue otherwise.  Pls. Br. at 47–48.

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

28

wolves would inequitably penalize those states, and their citizens.  These states have confronted a swinging pendulum of federal and state control over gray wolves for far too long, notwithstanding the fact that their wolf populations have continued to expand in both size and range.  Even Michigan, which filed an amicus brief in support of Plaintiffs, believes its wolves should be removed from the endangered species list.  *See* Dkt. 83-2 at 2 ("The gray wolf is recovered in Michigan, in no small part due to our state-level efforts.  And the [FWS] is correct that the Act authorizes us to take back wolf management from the federal government.").  Michigan's Department of Natural Resources agreed with the State's conclusion and "strongly" supported the delisting in its public comments to the proposed delisting rule.  AR_0010539; *see also* AR_0010333 ("Minnesota DNR acknowledges that the recovery of the gray wolf in Minnesota has been a resounding success.").[24]  Vacatur would unnecessarily pull the rug out from under the states who have long achieved the recovery objectives and long awaited the wolves' delisting so that they can implement their adaptive management plans.  *See* AR_00000102–03 ("Each of the three Great Lakes States has a longstanding history of leadership in wolf conservation.  All of the State management plans provide a high level of assurance of the persistence of healthy wolf populations and demonstrate the States' commitment to wolf conservation.").

Moreover, maintaining the delisting of the Great Lakes wolves "will further [the ESA's] conservation purposes by allowing [the FWS] to focus [their] recovery efforts on imperiled wolves in the Southwestern United States."  AR_0000153.  Not only will the Great Lakes states be permitted to benefit from their responsible management actions, but Mexican wolves (and perhaps even other species) will benefit from the FWS' ability to shift focus and divert resources where they are most appropriate.

---

[24] *See also* Opening Brief for the State of Wisconsin and Wisconsin Department of Natural Resources, Dkt. 1584984, Case No. 15-5060 (D.C. Cir. Nov. 23, 2015), at 18–26 (Defendant-Intervenor State of Wisconsin explaining the harms caused to Wisconsin by remanding with vacatur the previous Great Lakes delisting rule).

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

29

Remand without vacatur could also help preserve the public's tolerance of wolves as a predator species and willingness to continue to participate in wolf conservation. *See, e.g.*, AR_0000072 (discussing role of public attitudes in wolf conservation efforts; noting that overall public tolerance for wolves is low and that delisting may improve public tolerance over time); *see also* AR_0000109 (concluding that "public tolerance of wolves is likely to improve as wolves are delisted…"). Especially considering the Great Lakes wolves have long exceeded recovery objectives, prolonging the listing of the recovered wolves, and essentially rejecting the states' and public's good work on-the-ground in these states, can ultimately damage conservation efforts for those populations. AR_0000129 (concluding that "public support may decrease if the species has recovered, yet remains on the List"). In addition, public attitudes towards the ESA are negatively impacted when a species that is demonstrably recovered continues to remain on the lists. *See id.* Wolves that regularly attack livestock, pets, and hunting dogs, and that compete with hunters for wildlife in the field, present ongoing challenges to the daily lives of members of the hunting and farming communities of the Great Lakes states. *E.g.*, AR_0042320 ("Problems of Wolf Recovery" include increased conflicts with livestock, pets, etc.).[25] Because of these challenges, the social tolerance of impacted communities is an important factor in the future of the Great Lakes wolves, particularly with respect to reducing illegal killing, which is the most difficult type of human-caused mortality for states and the FWS to manage. *See* AR_0000072 (finding that the state management of wolves has been shown to reduce illegal wolf killings in Wisconsin).

Plaintiffs argue that remand without vacatur would harm wolves due to hunting and "other wolf-control activities." Pls. Br. at 48. As discussed above (pp. 17–28), Plaintiffs are

---

[25] *See also, e.g.*, Dkt. 21-2, Biebl Decl., ¶¶ 8–10 (describing reduction of deer hunting opportunities due to wolf predation on 650-acre property, further noting that wolves are becoming bolder and "pose a legitimate threat to livestock, pets, and natural prey populations"); Dkt. 21-4, Goergen Decl., ¶¶ 8–9 (expressing concern that deer on his property have declined due to wolf predation, and stating "wolves threaten the deer herd constantly and need to be managed just like any other large wild animals").

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

1  wrong, and the Great Lakes states' management plans and state laws will adequately conserve

2  the wolf populations.  The Court should not disregard the successful recovery of wolves in the

3  Great Lakes area; instead, the Court can remand without vacatur of the rule as applied to those

4  populations.

5       Last, the ESA allows the FWS—and thus the Court via a remand order—to remove

6  recovered populations from the endangered and threatened species lists, even if the entire

7  "species" is not recovered.  The FWS "shall … specify with respect to each such species [listed

8  under Section 4(a)] over what portion of its range it is endangered or threatened …."  16 U.S.C.

9  § 1533(c)(1).  The ESA requires the FWS to determine whether a species is an endangered

10  species or a threatened species "throughout all or a significant portion of its range."  16 U.S.C. §

11  1532(6) & (20).  Thus, assuming a species is not endangered or threatened throughout its entire

12  range, but is so threatened or endangered in a significant portion of its range, the FWS must

13  "specify … over what portion of its range it is endangered or threatened," and include that

14  portion on the ESA lists.  16 U.S.C. § 1533(c)(1).  Conversely, the FWS need not include the

15  recovered, or non-endangered and non-threatened, portions on the ESA list.  This reading of the

16  ESA's statutory provisions accords with the Ninth Circuit's decision in *Defenders of Wildlife v.*

17  *Norton*, 258 F.3d 1136 (9th Cir. 2001).

18       In *Defenders of Wildlife*, the Ninth Circuit examined the definitions of "endangered

19  species" and "threatened species," specifically related to the "extinction throughout all or a

20  significant portion of its range" clause.  *Id.* at 1141.  The Court rejected proposed interpretations

21  of these phrases from plaintiffs and federal defendants, reviewed relevant legislative history, and

22  concluded, "consistently with the Secretary's historical practice, that a *species* can be extinct

23  'throughout … a significant portion of its range' if there are major geographical areas in which it

24  is no longer viable but once was.  Those areas need not coincide with national or state political

25  boundaries, although they can."  *Id.* at 1145 (emphasis added).  In other words, the Court

26  empowered the FWS to designate portions of a species range as threatened or endangered while

27

28  NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-
344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

31

leaving other portions unlisted.  And, notably, this authority is not limited to the FWS' ability to designate distinct population segments, because such segments are considered "species" under the ESA, *see* 16 U.S.C. § 1532(16), and so are not "portions" of a species.

In sum, under Ninth Circuit precedent, this Court could order removal of the Great Lakes area wolves from the ESA lists, while maintaining ESA protections for West Coast and central Rocky Mountains wolves.  Thus, the Court need not and should not vacate the entire Delisting Rule if it finds the FWS' analysis of West Coast and central Rocky Mountains wolves illegal.

## CONCLUSION

For the reasons stated above, NRA and SCI respectfully request that the Court enter judgment in favor of Federal Defendants and Defendant-Intervenors on all claims and uphold the Delisting Rule.

Dated this 27th day of August, 2021.

Respectfully Submitted,

Stanford H. Atwood, Jr.
CA Bar No. 37362
Atwood & Associates
750 University Avenue, Suite 130
Los Gatos, California 95032
Tel:  408-395-5503
Fax:  408-395-5519
stanford@atwoodlaw.net

Michael T. Jean, MI Bar No. P76010*
Hadan W Hatch, UT Bar No. 17671*
National Rifle Association of America
11250 Waples Mill Road
Fairfax, Virginia 22030
Tel:  703-267-1161
Fax:  703-267-3976
mjean@nrahq.org
hhatch@nrahq.org

/s/ Jeremy E. Clare
Jeremy E. Clare, D.C. Bar No. 1015688*
Regina Lennox, D.C. Bar No. 1671299*

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

32

Safari Club International
501 2nd Street N.E.
Washington, D.C.  20002
Tel:  202-543-8733
Fax:  202-403-2244
jclare@safariclub.org
rlennox@safariclub.org

*Attorneys for Defendant-Intervenors*
*National Rifle Association of America and*
*Safari Club International*
*Appearing pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2021, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will serve all counsel of record.

/s/ Jeremy Clare
Jeremy Clare

NRA and SCI Memo in Support of Cross-Motion for Summary Judgment, Case No. 4:21-cv-344-JSW, 4:21-cv-349-JSW, 4:21-cv-561-JSW

33