LANE E. RUHLAND (WI Bar No. #1092930)
*Pro Hac Vice Application Pending*
**RUHLAND LAW AND STRATEGY, LLC**
215 South Century Avenue, #198
Waunakee, Wisconsin 53597
Phone: (608) 291-7504
Email: lane@ruhlandlaw.com

GEORGE M. LEE [Cal. State Bar No. 172982]
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, CA 94111
Phone: (415) 979-0500
Fax (415) 979-0511
Email: gml@seilerepstein.com

*Counsel for Amicus Curiae
Hunter Nation, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. FISH AND WILDLIFE SERVICE, et al.,<br><br>Defendants. | Case Nos. 4:21-cv-00344-JSW<br>4:21-cv-00349-JSW<br>4:21-cv-00561-JSW<br><br>**BRIEF OF *AMICUS CURIAE* HUNTER NATION, INC. IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| WILDEARTH GUARDIANS, et al.,<br><br>Plaintiffs,<br>v.<br><br>DEBRA HAALAND, U.S. SECRETARY OF THE INTERIOR, et al.,<br><br>Defendants. | **Date:** November 12, 2021<br>**Time:** 9:00 a.m.<br>**Courtroom:** 5<br>**Judge:** Hon. Jeffrey S. White |

| | |
|---|---|
| 1 | NATURAL RESOURCES DEFENSE COUNCIL, INC., |
| 2 | |
| 3 | Plaintiffs, |
| | v. |
| 4 | |
| 5 | UNITED STATES DEPARTMENT OF THE INTERIOR, et al., |
| 6 | |
| 7 | Defendants. |

## **TABLE OF CONTENTS**

STATEMENT OF INTEREST ........................................................................................................ 1

INTRODUCTION .......................................................................................................................... 2

BACKGROUND ............................................................................................................................ 3

ARGUMENT ................................................................................................................................. 6

    I.    Regulatory Mechanisms In The Great Lakes States Are Adequately Protective
        Of The Gray Wolf. ........................................................................................................... 6

    II.   Substituting The Science-Based And Necessarily Rigorous Rulemaking Process
        Prescribed By The ESA With Policy Preferences Will Have Disastrous Results
        On Delicately Balanced Ecosystems And Agriculture, As Well As Increase
        Human/Wolf Conflict. ..................................................................................................... 9

CONCLUSION ............................................................................................................................. 11

# TABLE OF AUTHORITIES

**Cases**

*Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011)................9

*Humane Society of the United States v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017).....................8


**Statutes**

16 U.S.C. § 1533(b).............................................................................................................6

16 U.S.C. § 1535(a).............................................................................................................1

5 U.S.C. § 706.....................................................................................................................5

Minn Stat. Ann. § 97B.647..................................................................................................8

Wis. Admin. Code NR § 10.20............................................................................................7

Wis. Stat. Ann. § 29.185..................................................................................................6, 7


**Rules**

85 Fed. Reg. 69778-01, 2020 WL 6393716 (Nov. 3, 2020).........................................3, 4, 5

Wis. Emergency Rule EmR1210 (2021) .............................................................................7

# **STATEMENT OF INTEREST**

"In a civilized and cultivated country, wild animals only continue to exist at all when preserved by sportsmen…[t]he excellent people who protest against all hunting, and consider sportsmen as enemies of wildlife are ignorant of the fact that in reality the genuine sportsman is by all odds the most important factor in keeping the larger and more valuable wild creatures from total extermination."

– President Theodore Roosevelt

Hunter Nation Inc.'s ("Hunter Nation") members are the sportsmen spoken of decades ago by President Theodore Roosevelt. Hunter Nation is the fastest-growing grassroots organization in America fighting to protect and expand our sporting heritage. We are dedicated to promoting the right to hunt, encouraging future generations to carry on the great American tradition of hunting, educating the public regarding hunting, and combatting threats to hunting. For Hunter Nation's members, hunting is not just a hobby, it is heritage. Our members are not only hunters, but farmers and landowners who care deeply about our natural resources. Key to protecting natural resources is implementing responsible predator management.

Hunter Nation represents over half a million hunters in all 50 states, including tens of thousands of hunters in Minnesota, Wisconsin and Michigan who have participated and will continue to participate in their states' wolf hunts. Hunter Nation members have hunted in past wolf hunts and intend to hunt in future wolf hunts, made possible through this delisting. However, their interest in this litigation goes beyond their ability to hunt wolves.

Hunter Nation is committed to supporting laws and policies that restore as much land and wildlife management authority from federal management back to State Fish and Game Agencies. This Federal-State cooperation is undoubtedly a primary goal of the Endangered Species Act ("ESA"). See 16 U.S.C. § 1535(a) (requiring the federal government to "cooperate to the maximum extent practicable with the States" in implementing the ESA).

Each time the United States Fish and Wildlife Service (the "Service") has attempted to delist wolves, a legal challenge has followed. At each turn, organizations representing hunters have stepped up to protect these rights, and consistently, courts have found the hunter's voice relevant in deciding these important issues. Hunter Nation has a significant interest in ensuring that the wolf remains delisted so that its members can continue to engage in responsible predator management.

- 1 -
AMICUS CURIAE HUNTER NATION, INC.'s BRIEF IN SUPPORT OF DEFENDANTS
CASE NOS. 4:21-cv-00344-JSW | 4:21-cv-00349-JSW | 4:21-cv-00561-JSW

Moreover, Hunter Nation has a strong interest in ensuring ESA's deference to state authority to regulate its hunting practices is protected.

A hunter's ability to manage wolves through hunting also helps reduce human/wolf, pet/wolf, and livestock/wolf conflict. Moreover, responsible management of wolves prevents excessive depredation of other wildlife hunted by our members, like deer. These interests are directly at stake in this litigation.

**INTRODUCTION**

Plaintiffs claim in part that the Service's decision to delist the gray wolf should be vacated because it did not reasonably conclude the state management plan had adequate regulatory schemes. In keeping with the appropriate role of *amicus curiae*, Hunter Nation will not duplicate the robust arguments of Defendants on all claims here. Rather, Hunter Nation seeks to offer this Court additional context for the regulatory framework that exists, more specifically in Wisconsin, as Plaintiffs use their characterization of Wisconsin's regulatory scheme as a keystone of their argument. Plaintiffs' portrayal of the regulatory framework in Wisconsin and the other Great Lakes states is misleading. Hunter Nation is no stranger to the prescriptive hunting programs in these states. Hunter Nation regularly assists its members in navigating these regulatory schemes. Plaintiffs' contention that the Service did not properly consider the adequacy of regulatory mechanisms ignores the lengths the Service went in analyzing these regulatory mechanisms during promulgation of the Delisting Rule.

Secondly, the outcome in this litigation has implications far beyond just the gray wolf hunt. Failing to respond to the scientific framework and delist recovered wolf populations as required by the ESA will have massive consequences on other wildlife populations (e.g., decimation of deer population) and leads to increased human/wolf, livestock/wolf conflicts. Most inappropriately, Plaintiffs ask this Court to second guess the work of the Service because its science-based decision-making yielded a result that does not align with Plaintiffs' policy preference.

Plaintiffs in this case ask this Court to direct the Service to ignore the ESA's requirements and reach an outcome that satisfies the policy outcome Plaintiffs would prefer – the eradication of

hunting of the gray wolf. The wisdom of the policy preference of Plaintiffs, amici or defendants is not before this Court to be settled. Rather, the question before this Court is whether the Service properly applied the Endangered Species Act. It is clear it has.

## BACKGROUND

*The Endangered Species Act Success Story*

The story of the gray wolf demonstrates the effectiveness of the ESA. In the 1960's very few wolves existed in the lower 48 states.[1] After facing near eradication, because of collaboration between the Service, state, tribes, and local partners, in just a few decades, populations of wolves across the United States exceeded recovery goals. See, e.g., 85 Fed. Reg. 69778-01, 2020 WL 6393716 (Nov. 3, 2020), at 69779-80. The purpose of the ESA is to get species to place where they no longer require protections. Thus, through the ESA, the Service is required to regularly review the list to determine if delisting is appropriate. Fortunately, Congress had the foresight to ensure that this determination is not based on whether the Service believes paving the way for wolf hunts is the best policy decision, but rather, whether science supports the delisting.

*The Gray Wolf Population is Recovered and Robust.*

Forty-five years after their listing under the Endangered Species Act (ESA), the gray wolf population has recovered and thrived.[2] In large part, this is because of responsible predator management and cooperation between the federal government, hunters, Tribes, and other conservationists. The sheer fortitude of the gray wolf has also played a large role in their recovery. The gray wolf has been recognized by experts at the Service as "one of the most adaptable and resilient land mammals on earth." Defs. Br at 4 (citing AR_403-405, 426). The gray wolf's pack

---

[1] U.S. Fish and Wildlife Service, *History of Decline, Protection and Recovery* (last visited August 28, 2021) available at https://www.fws.gov/midwest/wolf/history/index.html.

[2] U.S. Fish and Wildlife Service, *Trump Administration Returns Management and Protection of Gray Wolves to States and Tribes Following Successful Recovery Efforts* (October 29, 2020) available at https://www.fws.gov/news/ShowNews.cfm?ref=trump-administration-returns-management-and-protection-of-gray-wolves-to-&_ID=36801.

social structure is undoubtedly complex and adaptable and allows for population growth, even in the face of significant population decline events. In fact, population growth of the gray wolf consistently outpaces rates of human-caused mortality. AR_57.

The gray wolf population in the Great Lakes states has consistently exceeded recovery goals under the ESA for decades and has continued to increase. Since the mid-2000's the wolf population in Wisconsin has exceeded the state's wolf population goal of 350 individual wolves.[3] By 2017, the conservative over-winter minimum estimate wolf count report by the WI DNR increased to a minimum of 925-952. WI DNR, 2017 Wisconsin Gray Wolf Monitoring Report (Last visited August 28, 2021).[4] From 2012-2014, Wisconsin had three hunting seasons. AR_0000492. Even after three successful hunting seasons, the 2019-2020 Wisconsin wolf survey showed a minimum count of over 1,000 wolves, almost three times the population goal of the WI DNR. *Id*.

Minnesota has seen similar success in wolf management with the wolf population holding steady somewhere between 2,200 and 2,600 for decades. AR_0000417. The population stayed consistent even following multiple hunting seasons from 2012-14. *Id*. And in Michigan, the gray wolf population grew exponentially from a population of around 80 to 90 in 1995 to a current stable population of at minimum 695 wolves. AR_0002355.

*Previous Delisting of the Gray Wolf*

Science has supported the delisting on multiple occasions and as a result, the Service has seen fit to delist the gray wolf on multiple occasions. In 2007, 2009 and 2011, the Service attempted delisting certain gray wolf populations. 85 Fed. Reg. at 69781, Table 1. Each time, those rules were vacated by federal courts. *Id*. Then, in 2009, the Service removed the Northern Rocky Mountain ("NRM") wolves from the ESA list, and the rule was vacated by a federal court. *Id*. However,

---

[3] Wisconsin Department of Natural Resources, "Changes in Wisconsin Gray Wolf Population and Range: 1980-2020" (Last visited August 28, 2021) available at https://dnr.wisconsin.gov/sites/default/files/topic/images/2020WolfPopRange_0.png

[4] Available at https://p.widencdn.net/pa9xbm/WolfReport2017

Congress through legislation reinstated the delisting. *Id*. In 2011, the Service delisted the Wyoming NRM Wolf population. *Id*. That decision was upheld in 2017 by the D.C. Circuit. *Id*.

*Rulemaking in Question in this Case*

Gray wolf populations have exceeded recovery goals for decades. AR_412-21. However, because of a flurry of litigation and regulatory activity, there was a lack of consistency in the way the gray wolf was treated across the United States. Recognizing that this inconsistent approach was not intended by Congress, the Service began a rulemaking in 2019 to delist the "threatened" Minnesota wolves and the "endangered" 44-State entity. As recognized by the Service, once recovered, the ESA "does not allow the Service to withhold regulatory action on gray wolves…" Def. Br. at 2.

The Service undertook necessarily rigorous rulemaking to delist the gray wolf, including a robust public comment period with a public hearing conducted in Minnesota, a location directly and greatly impacted by the proposed rulemaking, and in response to criticisms during the peer review process, the Service amended the rule. Ultimately, in applying the ESA's requisite delisting inquiries, the Service determined that these wolf entities – the Minnesota wolf and the 44-state entity – did not meet the definition of "species" and thus, under the terms of the ESA, were to be managed by the States. AR_43-44. Even then, the Service went above and beyond and set forth a review of the "status of gray wolves in several configurations…to eliminate the possibility of removing protections for any gray wolves that might meet the Act's definition of a species and might be endangered or threatened." AR_44. After this review, the Service maintained that the "gray wolves in the United States exist in robust, well-distributed, and expanding metapopulations…" Def. Br. at 14.

The litigation before this Court is a result of this rule finalized in November of 2020, which delists all remaining gray wolf populations, except the Mexican wolves. 85 Fed. Reg. 69778. The rule went into effect January 4, 2021, *id*., and Plaintiffs sued claiming that this rule was promulgated in violation of 5 U.S.C. § 706, the Administrative Procedure Act. See Dkt. 1; Dkt. 25 (Amended Complaint).

# ARGUMENT

## I. REGULATORY MECHANISMS IN THE GREAT LAKES STATES ARE ADEQUATELY PROTECTIVE OF THE GRAY WOLF.

Regulatory mechanisms in the Great Lakes states are more than adequately protective of the gray wolf. Thus, the Service's analysis of regulatory mechanisms that exist in the Great Lakes states satisfies the requirements of the ESA. The requirement under the ESA is not for the Service to ensure that every aspect of a state's management plan is based on the "best available science." *See* Pls. Br. at 35-37, *see also* Defs. Br. at 42. Rather, the Service must determine whether a species is endangered or threatened "solely on the basis of the best scientific and commercial data available…after taking into account those efforts, if any, being made by any State…to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction." 16 U.S.C. § 1533(b)(1)(A).

In reaching its conclusion that the existing regulations and management plans were sufficient, the Service did consult the best available scientific information to ensure the gray wolf would be adequately protected upon delisting. AR_0000085-103. Even a cursory review of the state-specific management plans of the Great Lakes region demonstrates a commitment to responsible management, in some instances, perhaps erring on the side of being overly protective. *See* AR_0040423 (Minnesota has imposed a five-year pause on a public hunting season despite a consistent population of near double the recovery goal. AR_0044482, AR_0044484).

Plaintiffs seemingly ignore the full regulatory scheme of each of the Great Lakes states and characterizes the state management plans as "increas[ing] the harm to the species through sanctioned killing in ways that [the Service] either failed to critically analyze or entirely ignored." Pls. Br. at 30.

As it relates to Wisconsin, Plaintiffs point only to the statutory requirement to hold a hunt upon delisting, Wis. Stat. Ann. § 29.185, as if that is the only regulatory framework for the state's wolf hunting program. Plaintiffs fail to provide the Court critical statutory and regulatory tools the Wisconsin Department of Natural Resources (WI DNR) must utilize to manage its predators.

Wisconsin does indeed require the establishment of a hunting season each year if the wolf is delisted. Wis. Stat. Ann. § 29.185(1m); Wis. Stat. Ann. § 29.185(5). If the wolf is delisted, the

department "shall allow the hunting and trapping of wolves and shall regulate such hunting and trapping as provided in this section and shall implement a wolf management plan." Wis. Stat. Ann. § 29.185(1m) (emphasis added). Moreover, Wisconsin law requires the WI DNR to divide the state into zones for even more localized management to be responsive to specific population and habitat conditions and ensure that no one portion of the state sees an excessive harvest. Wis. Stat. Ann. § 29.185(5)(b). The WI DNR has the authority, and exercised that authority through state rulemaking, to not only set zone-specific wolf quotas, but also, the authority to close wolf zones as zone-specific harvest quotas are reached. Wis. Stat. Ann. § 29.185(5)(c); Wis. Admin. Code NR § 10.20; Wis. Emergency Rule EmR1210 (2021). Wisconsin requires state-licensed hunters and trappers to obtain a specific wolf license to harvest a wolf. Wis. Stat. Ann. § 29.185(2)(a). Each method of trapping or hunting is subject to separate, stringent, regulatory schemes.

Under this framework, and through multiple hunting seasons, the gray wolf population in Wisconsin continues to thrive. Beyond the statutory protections, Wisconsin's wolf management plan adheres to a "minimum population management goal of 350 wolves (late winter counts) outside of Indian Reservations." AR_0041104, AR_0035576. This management goal is not just a goal, however. If the gray wolf population falls below 350, gray wolves will be reclassified under the State's endangered species law. AR_004114. Plainly put, Plaintiffs are simply wrong that Wisconsin's regulatory framework only "increases harm," Pls. Br. at 30, and their assertions that the Delisting Rule necessarily leads to a 60% reduction in wolf population is without merit. Def.-Intervs. Br. at 19 citing AR_0000092 ("When wolves were previously delisted, Wisconsin did not, immediately or reduce its wolf population by 60%. The result after three years of hunting and depredation control reflected a less-than-9% population reduction.").

*Wisconsin's February 2021 Wolf Hunt*

Plaintiffs repeatedly contend that Wisconsin's February 2021 hunt is further evidence of lacking regulatory mechanisms, but this argument fails for two reasons: (1) the February 2021 hunt occurred after the Delisting Rule went into effect, thus making it irrelevant in determining whether the Service acted arbitrarily or capriciously, Defs. Br. at 46, and (2) the characterization of the hunt is inaccurate.

Due to the timing and unusual circumstances of this hunt, the DNR set a conservative quota based on various factors like wolf population estimates, population response to past hunts, and impacts of various quotas. See Wisconsin DNR, Wisconsin Wolf Season Report (Feb 2021). The February hunt was a success. Hunters filled the wolf quota in a period of 39 hours, ultimately harvesting 218 wolves – 9% above the total quota. *Id*. When the quote is set the WI DNR sets aside a portion of the full quota for the Tribes, thus creating both a state-license portion of the quota, and another Tribe specific quota. Thus, the harvest quota is inclusive of the state-wide quota (non-tribal) as well as the portion attributed to the tribes, 81 wolves in this instance. *Id*. There was not an 80% exceedance of the overall quota, as asserted by Plaintiffs. Pls. Br. at 14. Rather it was an 80% exceedance of the state-license portion, but overall, only a 9% exceedance of the total 200 quota as the Tribes did not harvest any wolves. See also Defs Br. at 46. Most importantly, regardless of how these particulars might be characterized, the outcome of the February wolf hunt is not outcome determinative in this case.

Plaintiffs' contention that wolf populations are certain to decline upon delisting is just as unfounded in Minnesota and Michigan as it is in Wisconsin. Minnesota's law allows the Minnesota DNR (MN DNR) to implement a wolf season upon delisting, but no such season is required.[5] Minn Stat. Ann. § 97B.647(2). And Michigan's wolf management plan does not set a hunting season, but only requires that the state develop recommendations for a season, "[i]f biologically sustainable, legally feasible, and socially acceptable" AR_0028232-34, see also Def.-Intervs. Br. at 19. These are the same state management plans relied upon by the Service in its 2011delisting rule affecting the western Great Lakes DPS of wolves. Defs. Br. at 47. In the litigation that followed, the D.C. Circuit upheld the rule finding that the state plans at issue in that case "provided adequate monitoring of and protection for the wolf segment." *Humane Society of the United States v. Zinke*, 865 F.3d 585, 594 (D.C. Cir. 2017).

---

[5] MN DNR decided not to hold a hunt this year despite the delisting. John Myers, *Minnesota DNR calls off wolf hunt this year despite support from farmers, hunters* (Jul 2021) available at https://www.pinejournal.com/northland-outdoors/7104250-Minnesota-DNR-calls-off-wolf-hunt-this-year-despite-support-from-farmers-hunters.

II. **SUBSTITUTING THE SCIENCE-BASED AND NECESSARILY RIGOROUS RULEMAKING PROCESS PRESCRIBED BY THE ESA WITH POLICY PREFERENCES WILL HAVE DISASTROUS RESULTS ON DELICATELY BALANCED ECOSYSTEMS AND AGRICULTURE, AS WELL AS INCREASE HUMAN/WOLF CONFLICT.**

In enacting the ESA Congress had the foresight to develop a decision-making framework based on the best available science, not policy preference. Notably, this rule was finalized under President Trump's administration and is now defended by President Biden's administration. Basing the decision to list or delist a particular species on science, not policy preference, is not only in the best interest of the species, but the entire ecosystem. The very goal of the ESA is to get species off the list and all parties should celebrate the success story that is the gray wolf given their population numbers and consistent fortitude. Therefore, it is unclear at what point Plaintiffs would be satisfied, if ever, to delist the gray wolf. This is exactly why the ESA's listing and delisting process is based on science, not policy preference. Continuing to provide ESA protections to such a prolific predator and preventing States and Tribes from managing their populations can have dire consequences. It directly impacts the ability of hunters to effectively manage predators and carry on their conservation efforts. A well-managed predator population leads to decreases in livestock kills, pet attacks and conflicts with humans. Defs. Br. at 46 quoting AR_56. Our members depend upon regulatory bodies strictly adhering to the authority delegated to them, and the corresponding limits on that authority. More specifically, hunters rely on the Service to abide by the scientific guiderails of the ESA.

The Service plainly understands its duty and authority under the ESA. As explained by the Service, the ESA "does not authorize the Service to preempt State and Tribal management of wildlife because of the policy considerations expressed by Plaintiffs, various amici, and some of the peer reviewers." Def. Br. at 2, n.2. This principle has been recognized by the courts. See Def. Br. at 15; *see also*, *Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011). In reviewing this rulemaking, the Court should not "grapple with" "scientific, political, and philosophical questions regarding the complex relations between" the delisted animal and people. *Greater Yellowstone Coal.*, 665 F.3d at 1019. This Court should not "purport to resolve scientific

uncertainties or ascertain policy preferences." *Id*. Rather it should address "only those issues [it is] expressly called upon to decide pertaining to the legality of the Service's delisting decision." *Id*. There is an important reason for this. The criteria that make a species eligible for removal from the list, have real implications beyond just a raw population number.

The underlying goal of the ESA is to bring a species to a point where it no long needs the protections of the ESA. Keeping a species on the list simply because of opposition to lethal management practices ignores the harm of an unmanaged, overpopulated predator group. Therefore state-specific wolf management plans have consistently balanced the needs to protect domestic animals and other wildlife from excessive predation.

Wolves do not exist in a vacuum. They live in locations with other species, including humans, and domestic animals, like pets and livestock. When lethal predator management practices are prohibited, there are consequences.[6] The significant increase in wolf numbers over the past few decades without an ability to manage the population via lethal means has led to additional wolf conflicts. For example, in Wisconsin wolf complaints have increased significantly since 2014, seeing increases perhaps as high as 70% (2014 was the last wolf hunting season prior to the February 2021 hunt).[7] These are not just statistics, each is a striking blow to a farmer's livelihood or the trauma of the violent death of a family pet. Conversely, during the three years that the wolves were delisted "verified wolf kills on cattle and the number of farms with verified depredations declined significantly…, indicating that active management with public harvests and targeted lethal depredation controls could reduce conflicts without causing significant declines in wolf numbers."

---

[6] *See* Opening Brief for the State of Wisconsin and Wisconsin Department of Natural Resources, Dkt. 1584984, Case No. 15-5060 (D.C. Cir. Nov. 23, 2015), at 18–26.

[7] *See* WI DNR, "Wolf Depredation Reports" 2014-2020 available at
https://dnrx.wisconsin.gov/wdacp/public/depredation/2014 (2014),
https://dnrx.wisconsin.gov/wdacp/public/depredation/2015 (2015),
https://dnrx.wisconsin.gov/wdacp/public/depredation/2016 (2016),
https://dnrx.wisconsin.gov/wdacp/public/depredation/2017 (2017),
https://dnrx.wisconsin.gov/wdacp/public/depredation/2018 (2018),
https://dnrx.wisconsin.gov/wdacp/public/depredation/2019 (2019),
https://dnrx.wisconsin.gov/wdacp/public/depredation/2020 (2020).

Defs. Br. at 46 quoting AR_56. For example, Minnesota saw a decrease in depredation reports during its most recent hunting seasons. Minnesota Department of Agriculture, *Wolf-Livestock Conflict Prevent Grants* (2020).[8] In 2011, Minnesota reported 128 claims for reimbursements for wolf depredations. *Id*. Upon commencement of the wolf hunting season in 2012, claims dropped markedly to 81. *Id*. Ultimately, bottoming out in 2015 at 65. *Id*. Claims then skyrocketed in 2016, totaling 137. *Id*.

An unmanaged population is directly related to wolf conflict. This is not to convince the Court that allowing wolf hunting is the correct policy decision, rather it is to demonstrate why the science-based decision-making framework of the ESA must be followed and policy preferences of the parties here must not be outcome determinative. Asking the Court to direct the Service to ignore science and instead promulgate the preferred policy of Plaintiffs and certain *amici* has dangerous consequences.

## CONCLUSION

For the above reasons, amicus Hunter Nation, Inc., respectfully requests that this Court enter judgment in favor of Federal Defendants and Defendant-Intervenors on all claims and uphold the Delisting Rule.

Respectfully submitted,

Dated: August 31, 2021

**RUHLAND LAW AND STRATEGY, LLC**

/s/ Lane E. Ruhland
Lane E. Ruhland (WI Bar No. #1092930)
  *Pro Hac Vice Application Pending*
215 S. Century Avenue, #198
Waunakee, WI 53597
Tel. (608) 291-7504
Email: lane@ruhlandlaw.com

---

[8] Available at https://www.leg.mn.gov/docs/2020/Mandated/200022/pdf

**SEILER EPSTEIN LLP**

/s/ George M. Lee
George M. Lee (Cal. State Bar No. 172982)
  *Local Counsel*
275 Battery Street, Suite 1600
San Francisco, CA 94111
Tel. (415) 979-0500
Email: gml@seilerepstein.com

*Counsel for Amicus Curiae
Hunter Nation, Inc.*